**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

JUSTIN BAERGA; STEVEN GREENE; GIOVANNA
SANCHEZ-ESQUIVEL;   and   SARAH   ARVIO,
individually and on behalf of all others similarly situated,
and  COMMUNITY  ACCESS,  INC.;  NATIONAL
ALLIANCE ON MENTAL ILLNESS OF NEW YORK
CITY, INC.; and CORRECT CRISIS INTERVENTION
TODAY - NYC,

                                        Plaintiffs,

                    -against-

CITY OF NEW YORK; BILL DE BLASIO; DERMOT
F. SHEA; NYPD POLICE OFFICER KRZYSZTOF
WNOROWSKI; NYPD POLICE OFFICER SHERON;
NYPD   POLICE   OFFICER   MCDOWELL;   NYPD
POLICE  SERGEANT  NATHAN  MOLE;  NYPD
POLICE OFFICER MARTIN HABER; NYPD POLICE
SERGEANT  GBAIN,  NYPD  POLICE  OFFICER
VIKRAM   PRASAD;   NYPD   POLICE   OFFICER
ANDRE   DAWKINS;   NYPD   POLICE   OFFICER
TYRONE   FISHER;   NYPD   POLICE   OFFICER
DEVIENDRA RAMAYYA; NYPD POLICE OFFICER
JULIAN TORRES; NYPD OFFICER SANCHEZ, and
NYPD OFFICERS JOHN and JANE DOES # 1-40,
                                        Defendants.
-------------------------------------------------------------------- X

No. 21-cv-05762 (AJN)

**FIRST AMENDED CLASS
ACTION COMPLAINT**

Plaintiffs JUSTIN BAERGA, STEVEN GREENE, GIOVANNA SANCHEZ-ESQUIVEL,

SARAH ARVIO, individually and on behalf of all others similarly situated, and COMMUNITY

ACCESS, INC., NATIONAL ALLIANCE ON MENTAL ILLNESS OF NEW YORK CITY,

INC., and CORRECT CRISIS INTERVENTION TODAY - NYC, as and for their complaint, by

their attorneys, Beldock Levine & Hoffman LLP, Marashi Legal, New York Lawyers for the

Public Interest, Inc., and Shearman & Sterling LLP, challenging the systemic failure of the City of

New York to provide safe and appropriate, immediate, and long-term responses to New Yorkers

experiencing mental health crises, allege as follows:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

JURISDICTION ................................................................................................. 5

VENUE ............................................................................................................ 5

PARTIES .......................................................................................................... 5

COMPLIANCE WITH NEW YORK'S GENERAL MUNICIPAL LAW ............................ 9

STATEMENT OF FACTS ................................................................................... 10

    I. The City's History of Criminalizing People with Mental Disabilities ................... 10

    II. The History of the NYPD's "EDP" Policy ............................................................. 12

    III. The NYPD's Outdated "EDP" Policy Sanctions Mistreatment of Individuals
    with Mental Disabilities and Produces Tragic Results .................................................. 14

    IV. The City Has Repeatedly and Knowingly Failed to Curb the Unlawful
    Treatment of Individuals with Mental Disabilities ........................................................ 18

    V. The City's Most Recent Pilot Program Is Inadequate.......................................... 23

    VI. Plaintiffs' Experiences ......................................................................................... 29

        1. Justin Baerga ............................................................................................ 29

        2. Steven Greene ........................................................................................... 31

        3. Giovanna Sanchez-Esquivel ...................................................................... 33

        4. Sarah Arvio................................................................................................ 35

        5. Community Access: Independent, Integrated Living for all New Yorkers 39

        6. NAMI-NYC: Advocacy for Improved Mental Health Services................. 43

        7. CCIT-NYC's Fight for Appropriate Mobile Crisis Response ................... 46

CLASS ACTION ALLEGATIONS .......................................................................... 48

CAUSES OF ACTION ......................................................................................... 52

    First Cause of Action: Discrimination Based on Disability or Perceived Disability,
    Title II of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq*.................. 52

**Second Cause of Action: Discrimination Based on Disability or Perceived Disability, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794** *et seq.*.....................................55

**Third Cause of Action: Unlawful Seizure and Warrantless Entry, 42 U.S.C. § 1983, Fourth and Fourteenth Amendments to the United States Constitution** .................57

**Fourth Cause of Action: Excessive Force, 42 U.S.C. § 1983, Fourth and Fourteenth Amendments to the United States Constitution** ...........................................58

**Fifth Cause of Action:** *Monell v. Dept. of Social Services of the City of New York***, 42 U.S.C. § 1983, Fourth and Fourteenth Amendment of U.S. Constitution,** ...............60

**Sixth Cause of Action: Assault, Battery, False Imprisonment, Unreasonable Detention, and Warrantless Entry, New York State Constitution and New York State Common Law**........................................................................................62

**Seventh Cause of Action: Discrimination Based on Disability or Perceived Disability, New York City Human Rights Law, N.Y.C. Admin. Code § 8-101** *et seq.*
........................................................................................................63

**RELIEF REQUESTED** ........................................................................66

## PRELIMINARY STATEMENT

1.     This civil rights class action challenges the systemic failure of the City of New York to provide safe, appropriate, and immediate responses to New Yorkers experiencing mental health crises.

2.     Despite the myriad civil rights violations suffered by those with mental disabilities at the hands of the police, and despite the desperate need for reform, New York City has discriminatorily and unconstitutionally continued to use armed police officers as first responders to mental health crises, while other communities across the country and around the world have adopted models that do not require police involvement.

3.     The individual Plaintiffs are people with actual or perceived mental disabilities who have been unlawfully seized and forced into unconstitutional confinement in violation of their constitutional rights.

4.     At the time they were seized, the individual Plaintiffs were unarmed. They were committing no crime. Yet each Plaintiff was subjected to an unconstitutional seizure and detention. Each was forcibly detained, and injured physically and emotionally, while being involuntarily committed to a hospital against their will.

5.     Justin Baerga was home experiencing a mental health crisis when his mother called 911 requesting an ambulance. Armed New York City Police Department ("NYPD") officers arrived instead, forcibly entered Mr. Baerga's home, strapped him to a gurney, and transported him to a hospital against his will.

6.     Steven Greene was home when armed police officers and New York City Emergency Medical Services personnel arrived, claiming he was suicidal. Even though Mr. Greene

clearly and calmly explained that he was not suicidal, the police officers forcibly detained him and transported him to a hospital against his will.

7.     Giovanna Sanchez-Esquivel was home when her boyfriend called 911, stating that she was having a "manic episode." Ms. Sanchez-Esquivel was not violent. She remained calm throughout the entire interaction. Yet, armed NYPD officers forcibly detained her and committed her to a hospital against her will.

8.     Sarah Arvio was on the phone with her doctor's office regarding a liver ailment when she said, "I'm so frustrated with you all that I feel like jumping off the bridge." Minutes later, armed NYPD officers and Emergency Medical Services personnel forcibly detained Ms. Arvio and involuntarily committed her to a hospital.

9.     The organizational Plaintiffs—Community Access, Inc. ("Community Access"), National Alliance on Mental Illness of New York City, Inc. ("NAMI-NYC"), and Correct Crisis Intervention Today - NYC ("CCIT-NYC")—are organizations committed to safeguarding New Yorkers with mental disabilities. Each organization has diverted a significant amount of its resources to promote a non-police first response to mental health crisis calls in New York City in order to end the City's dangerous, discriminatory, and unconstitutional practices.

10.    Plaintiffs seek to remedy the NYPD's longstanding policy and practice of criminalizing individuals with mental disabilities, which has resulted in numerous police killings, violence, injury, and other losses of liberty of people experiencing mental health crises. The policy is currently found in the NYPD's Patrol Guide § 221-13 (the "EDP Policy") and is attached hereto as Exhibit 1. In addition to using the antiquated and offensive term "Emotionally Disturbed Person" (abbreviated "EDP") to refer to people experiencing a mental health crisis, the policy

authorizes members of the NYPD to detain "EDPs," even if the individuals are "unarmed," "not violent," and are "willing to leave voluntarily."

11.     Under the "EDP" Policy, the NYPD detains individuals against their will—often through the use of excessive force—based on a police officer's knowledge or perception of the individual's mental diagnosis or based on mental health decisions made by police officers who lack the necessary perspective and mental health expertise required to make such significant discretionary decisions. This policy and practice has persisted for decades in the NYPD, notwithstanding numerous police killings and violence, injury, and other losses of liberty suffered by individuals experiencing mental health crises.

12.     The NYPD's actions pursuant to the "EDP" Policy dehumanize people with mental disabilities. They perpetuate stereotypes and criminalize those with mental disabilities.

13.     The "EDP" Policy discriminates against individuals with mental disabilities or perceived mental disabilities by treating them differently simply because of their mental disability or perceived mental disability.

14.     The Policy strips those individuals of their constitutional rights to be free from unwarranted seizures, detention, excessive force, restraints, involuntary hospitalizations, and warrantless entries to their homes.

15.     The NYPD's failure to develop appropriate policies or practices tailored to the needs of individuals with mental disabilities also makes the community at large less safe. For example, the policy of using the NYPD to respond to all 911 calls involving an individual subject to the "EDP" Policy, and providing that such individuals be detained against their will even if they pose no threat to themselves or others, discourages individuals with mental disabilities and their loved ones from seeking help. By disregarding the risk that aggressive confrontations by police

could trigger an individual with a mental disability who otherwise poses no threat, the NYPD's policy unnecessarily risks escalating such incidents.

16.     Defendants City of New York, New York City, Mayor Bill de Blasio, and New York City Police Department Commissioner Dermot F. Shea have acted with deliberate indifference to the constitutional rights of those individuals with mental disabilities or perceived mental disabilities who are criminalized for their disabilities and are forced into NYPD custody. These Defendants have knowingly permitted the NYPD to respond to mental health crises, which are not matters of law enforcement but rather are health issues that require the services of health professionals.

17.     This action is, therefore, brought by the individual Plaintiffs, on their own behalf and on behalf of those similarly situated, as well as by the organizational Plaintiffs—Community Access, NAMI-NYC, and CCIT-NYC—against Defendants City of New York, Mayor Bill de Blasio, Police Commissioner Dermot F. Shea, and numerous NYPD police officers pursuant to the Americans with Disabilities Act (42 U.S.C. § 12132 *et seq*.) ("ADA,"), Section 504 of the Rehabilitation Act (29 U.S.C. § 794) ("Section 504"), the Civil Rights Act of 1871 (42 U.S.C. § 1983), the Fourth and Fourteenth Amendments to the United States Constitution, the New York State Constitution, New York Common Law, and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 *et seq*.).

18.     Plaintiffs seek a declaration that the "EDP" Policy and associated policies, practices, and customs violate the ADA, Section 504, the Fourth and Fourteenth Amendments of the United States Constitution, and New York State and City laws. Plaintiffs also seek a permanent injunction enjoining Defendants from continuing these discriminatory policies, practices, and customs, and requiring defendants City of New York and Bill de Blasio to submit a remedial plan

for approval mandating implementation of a new, non-police mental health crisis response program operating independently of the NYPD. Plaintiffs also seek damages for all members of the class to compensate them for the injuries suffered as a result of the "EDP" Policy and Defendants' conduct.

## JURISDICTION

19.     Jurisdiction is conferred on this Court under 28 U.S.C. §§ 1331 and 1343(a)(3) and (4).

20.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

21.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to hear Plaintiffs' state law claims.

## VENUE

22.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2), as at least one of the defendants resides in this district, and the acts alleged herein were committed within this district.

## PARTIES

23.     At all times relevant hereto, Plaintiff Justin Baerga was a resident of the State of New York, County of Queens, and City of New York. He is a Latino man and has mental impairments including depression, anxiety, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD") and is a qualified individual with a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law. Mr. Baerga was unconstitutionally detained and forcibly hospitalized against his will on August 25, 2019.

24.     At all times relevant hereto, Plaintiff Steven Greene was a resident of the State of New York, County of Bronx, City of New York. He is a Black man and has mental impairments including post-traumatic stress disorder and attention deficit disorder ("ADD") and is a qualified individual with a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law. Mr. Greene was unconstitutionally detained and forcibly hospitalized against his will on May 6, 2020.

25.     At all times relevant hereto, Plaintiff Giovanna Sanchez-Esquivel was a resident of the State of New York, County of Kings, City of New York. She is a Latina woman and has mental impairments including ADHD, depression, and bipolar disorder, and is a qualified individual with a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law. Ms. Sanchez-Esquivel was unconstitutionally detained and forcibly hospitalized against her will on November 7, 2020.

26.     At all times relevant hereto, Plaintiff Sarah Arvio was a resident of the State of New York, County of Bronx, City of New York. She is a white woman whom Defendants perceived to have a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law. Ms. Arvio was unconstitutionally detained and forcibly hospitalized against her will on March 13, 2020.

27.     Community Access is a nonprofit organization incorporated in the State of New York. Community Access conducts its operations in the City, County, and State of New York.

28.     Community Access was founded in 1974 to provide supportive housing to New Yorkers with mental disabilities. Since then, Community Access has become a leading advocate and provider of affordable housing, education, job training, and crisis support for New Yorkers with disabilities. The organization's mission is to expand opportunities for people living with

6

mental health concerns to recover from trauma and discrimination through affordable housing, training, advocacy, and healing-focused services.

29.     NAMI-NYC is a nonprofit organization incorporated in New York. NAMI-NYC conducts its operations in the City, County, and State of New York.

30.     NAMI-NYC helps families and individuals affected by mental disabilities build better lives through education, support, and advocacy. The organization provides an information and referral helpline, offers evidence-based education classes, facilitates support groups for individuals and families affected by mental disabilities, conducts community education on state and local mental health policy, and provides mentorship and training to people affected by mental disabilities to advocate for improved mental health systems in their communities.

31.     CCIT-NYC is a membership organization based in New York City. CCIT-NYC conducts its operations in the City, State, and County of New York.

32.     CCIT-NYC is a coalition of more than 80 civil rights and human service organizations, peers (people with lived mental health experience), family members, and other advocates, all of whom work together with a mission to transform the City's response to mental health crises by providing peer-driven supports to individuals with mental disabilities.

33.     Defendant City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is authorized by law to maintain a police department, and does maintain the NYPD, which acts as its agent in the area of law enforcement and other matters and for which it is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

34.     Defendant Bill de Blasio was at all times relevant to this Complaint, and still is, the Mayor of New York City.[1] As Mayor, Defendant de Blasio, at all relevant times, was and is an elected officer and the chief executive officer of the City, and has final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

35.     Defendant Dermot F. Shea was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times, had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties. Defendant Shea constitutes a city policymaker for whom the City is liable. He is sued individually and in his official capacity.

36.     Defendant NYPD Officer Krzysztof Wnorowski; NYPD Officer Sheron, whose first name is currently unknown; NYPD Officer McDowell, whose first name is currently unknown; and NYPD Sergeant Nathan Mole are NYPD members who unlawfully detained and/or used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff Baerga on the basis of his disability in violation of law. They are sued individually and in their official capacities.

37.     Defendants NYPD Police Officer Martin Haber, whose first name is unknown; NYPD Police Sergeant Gbain, whose first name is unknown; NYPD Police Officer Vikram Prasad; NYPD Police Officer Andre Dawkins; NYPD Police Officer Tyrone Fisher; NYPD Police Officer

---

[1] Per Section 8 of the City Charter, "[t]he mayor shall be responsible for the effectiveness and integrity of city government operations and shall establish and maintain such policies and procedures as are necessary and appropriate to accomplish this responsibility. . . ." N.Y.C. Admin. Code & Charter, Ch. 8.

Deviendra Ramayya; and NYPD Police Officer Julian Torres are members of the NYPD who unlawfully detained and/or used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff Sanchez-Esquivel on the basis of her disability in violation of law. They are sued individually and in their official capacities.

38.     Defendant NYPD Officers John and Jane Does # 1-40 are members of the NYPD who unlawfully detained and/or used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff Greene on the basis of his disability in violation of law. They are sued individually and in their official capacities.

39.     Defendant NYPD Police Officer Sanchez, whose first name is unknown, and NYPD Officers John and Jane Does # 1-40 are members of the NYPD who unlawfully detained and/or used excessive force against, and/or otherwise discriminated against Plaintiff Arvio on the basis of her perceived disability in violation of law. They are sued individually and in their official capacities.

40.     At all times relevant herein, Defendants de Blasio, Shea, Wnorowski, Sheron, McDowell, Mole, Haber, Gbain, Prasad, Dawkins, Fisher, Ramayya, Torres, and Sanchez have acted under color of law, and within their authority as employees, officers, and/or agents of the NYPD and/or the City of New York.

## **COMPLIANCE WITH NEW YORK'S GENERAL MUNICIPAL LAW**

41.     Plaintiff Justin Baerga timely served a Notice of Claim upon the City of New York.

42.     Plaintiff Baerga attended a hearing pursuant to Section 50-h of New York's General Municipal Law on June 24, 2020.

43.     More than thirty days have elapsed since Plaintiff Baerga served a Notice of Claim and the City has not offered adjustment or payment thereof.

44.     Plaintiff Steven Greene timely served a Notice of Claim upon the City of New York.

45.     Plaintiff Greene attended a hearing pursuant to Section 50-h of New York's General Municipal Law on August 18, 2020.

46.     More than thirty days have elapsed since Plaintiff Greene served a Notice of Claim and the City has not offered adjustment or payment thereof.

47.     Plaintiff Giovanna Sanchez-Esquivel served a Notice of Claim upon the City of New York.

48.     Plaintiff Sanchez-Esquivel attended a hearing pursuant to Section 50-h of New York's General Municipal Law on June 9, 2021.

49.     More than thirty days have elapsed since Plaintiff Sanchez-Esquivel served a Notice of Claim and the City has not offered adjustment or payment thereof.

50.     Plaintiff Sarah Arvio timely served a Notice of Claim upon the City of New York.

51.     Plaintiff Arvio attended a hearing pursuant to Section 50-h of New York's General Municipal Law on December 4, 2020.

52.     More than thirty days have elapsed since Plaintiff Arvio served a Notice of Claim and the City has not offered adjustment or payment thereof.

## STATEMENT OF FACTS

### I.      The City's History of Criminalizing People with Mental Disabilities

53.     New York City's history of criminalizing people with mental disabilities or perceived disabilities is extensive, and representative of the City's repeated violations of the rights of persons with mental disabilities.

54.     People diagnosed with mental disabilities have, for centuries, been unfairly labeled as criminals and have been removed from the community with no regard for their humanity or their rights.

55.     During the mid-nineteenth century, the general attitude in the United States toward those with mental disabilities was that they were untreatable, "mad," and required isolation. To allay the public's fears, states, including New York State, frequently placed people with mental disabilities in state asylums.[2]

56.     People with mental disabilities were sorely neglected and abused in these state facilities.

57.      A wave of deinstitutionalization, begun in the 1950s, which was brought on by media exposes and litigation, sought to overcome the neglect and abuse in the state facilities. One famously de-institutionalized facility was the Willowbrook State School on Staten Island, a facility for children and adults with developmental disabilities, including individuals dually diagnosed with mental disabilities. Senator Robert F. Kennedy had referred to Willowbrook being like a "snake pit,"[3] and the United States District Court for the Eastern District of New York found that Willowbrook's conditions were so egregious that they violated the residents' constitutional rights to protection from harm in a state institution. *New York State Association for Retarded Children, Inc., v. Carey*, 551 F. Supp. 1165 (E.D.N.Y. 1982).

58.     The deinstitutionalization of psychiatric centers, however, was not accompanied by the provision of necessary community-based mental health services by most states and localities,

---

[2] *See* Catherine Ryan Gawron, *Funding Mental Healthcare in the Wake of Deinstitutionalization: How the United States and the United Kingdom Diverged in Mental Health Policy After Deinstitutionalization, and What We Can Learn From Their Differing Approaches to Funding Mental Healthcare*, 9 Notre Dame J. of Int'l & Compar. Law 85, 89 (2019).
[3] Benjamin Weiser, *Beatings, Burns and Betrayal: The Willowbrook Scandal's Legacy*, N.Y. Times, Feb. 21, 2020, https://www.nytimes.com/2020/02/21/nyregion/willowbrook-state-school-staten-island.html.

including the City. Individuals with mental illness, therefore, continue to languish, albeit in different settings such as on the streets, in sub-par adult homes, and in prisons and jails. This trend is also reflected in the increase in calls to police involving people with mental disabilities.[4]

## II.     The History of the NYPD's "EDP" Policy

59.     In 1984, the NYPD killing of Eleanor Bumpurs shook the City of New York. Ms. Bumpurs, a 66-year-old Black woman facing eviction from public housing for withholding rent over repair requests ignored by her landlord, was confronted by police when she was in the midst of a mental health crisis. She allegedly swung a kitchen knife at the police officers when they broke into her apartment in the Bronx. The NYPD officers then shot and killed her.

60.     As the *City* noted, "[h]er killing by the police exposed the NYPD's inability to deal with the mentally ill—a challenge that still plagues the department."[5]

61.     As a result of Ms. Bumpurs' death, in or around November 1984, the City made policy changes that included requiring street-level officers to wait until a supervisor arrived before confronting someone experiencing a mental health crisis. It also required officers to isolate and contain suspects experiencing mental health crises.[6]

62.     But calling a supervisor to the scene, isolating and containing individuals, and following other directions in the NYPD's "EDP" Policy, Section 221-13 of the NYPD Patrol Guide, has not ended police excessive force in response to "EDP" calls and has, instead, led to many deaths at the hands of police.[7]

---

[4] James Panero, *A New Moral Treatment*, City Journal (Spring 2013), https://www.city-journal.org/html/new-moral-treatment-13549.html?wallit_nosession=1.
[5] Greg B. Smith, *Eleanor Bumpurs' Namesake Kin Inherits Legacy of NYCHA Neglect and Disrepair*, The City (Jan. 24, 2021), https://www.thecity.nyc/2021/1/24/22247526/eleanor-bumpurs-nycha-disrepair-bronx-nypd.
[6] Alan Feuer, *Fatal Police Shooting in Bronx Echoes One from 32 Years Ago*, N.Y. Times (Oct. 19, 2016), https://www.nytimes.com/2016/10/20/nyregion/fatal-police-shooting-in-bronx-echoes-one-from-32-years-ago.html.
[7] *See infra* Section III.

63.     The "EDP" Policy states that it is applicable "[w]hen a uniformed member of the service reasonably believes that a person. . . is apparently mentally ill or emotionally disturbed." Although it states that the Policy is to be used "because the person is conducting himself in a manner likely to result in a serious injury to himself or others," it in fact requires members of the NYPD to take an individual into custody even where "the EDP is unarmed, not violent, and willing to leave voluntarily."

64.     The "EDP" Policy therefore vests even the lowest rank of NYPD patrol officer—rather than health professionals—with the unbridled discretion to determine whether an individual "appears to be mentally ill or temporarily deranged" and also whether "the person is conducting himself in a manner likely to result in a serious injury to himself or others."

65.     The number of "EDP" calls has increased three-fold in the last two decades. In 1999, police records indicated that the NYPD responded to 64,000 emergency calls classified by dispatchers as "EDP" calls.[8] The number of calls increased to 97,000 in 2009 and to almost 180,000 in 2019.[9] They have nearly doubled over the last decade, rising every year and in every precinct.[10]

66.     At the same time, the number of people with mental disabilities incarcerated in city jails has also increased.[11]

67.     Poorer, predominantly Black and Latino neighborhoods consistently experience a higher volume of "EDP" calls.[12]

---

[8] Urban Justice Center, Kramer Levin Naftalis & Frankel LLP, *Police Interactions with Individuals in Psychiatric Crisis* (Apr. 22, 2002), https://www.kramerlevin.com/images/content/2/1/v4/2161/Police-Interact-Fischman.pdf.
[9] Greg B. Smith, *The NYPD's Mental Illness Response Breakdown*, The City (Mar. 21, 2019) https://www.thecity.nyc/special-report/2019/3/21/21211184/the-nypd-s-mental-illness-response-breakdown.
[10] *Id.*
[11] Stephen Eide, *Systems Under Strain: Deinstitutionalization in New York State and City*, Manhattan Institute (Nov. 2018), https://media4.manhattan-institute.org/sites/default/files/R-SE-1118.pdf; Smith, *supra* note 5.
[12] Eide, *supra* note 11.

68.     The increased numbers of "EDP" calls and the unconstitutional "EDP" Policy have led to an increased number of unlawful detentions that have escalated encounters with individuals with mental disabilities or perceived mental disabilities causing numerous unnecessary injuries and tragic deaths that should have been avoided.

### III.     The NYPD's Outdated "EDP" Policy Sanctions Mistreatment of Individuals with Mental Disabilities and Produces Tragic Results

69.     Defendants City of New York, Mayor de Blasio, and Commissioner Shea have repeatedly had notice that the NYPD was inadequate at responding to mental health crises and that the "EDP" Policy was failing based on multiple incidents of excessive force, false arrest, and other misconduct against individuals with mental disabilities or perceived mental disabilities, dating back to at least 1984. Examples of the most egregious of these abuses which resulted in death include:

     a.  **1984 - Eleanor Bumpurs**: When New York City Housing Authority officials asked for NYPD assistance with the eviction of a 66-year-old Black woman they knew to have mental disabilities, officers broke in, ultimately shooting and killing Ms. Bumpurs. *Bumpurs v. N.Y.C. Hous. Auth.*, 139 A.D.2d 438, 527 N.Y.S.2d 217 (App. Div. 1st Dept. 1988).

     b.  **2004 - Gideon Busch**: Six NYPD officers responded to a call regarding a 29-year-old white man with mental disabilities who was holding a small hammer, and shot Mr. Busch twelve times, killing him instantly. *Busch v. City of N.Y.*, 224 F.R.D. 81 (E.D.N.Y. 2004).

     c.  **2007 - Khiel Coppin**: The mother of Khiel Coppin, an 18-year-old Black man with mental disabilities, called 911 seeking assistance to help transport her son to a psychiatric hospital. Mr. Coppin, who was holding a hairbrush under his shirt, was shot and killed by NYPD officers after he attempted to escape by climbing out of his window. *Owens v. City of N.Y.*, 2020 NY Slip Op 03019, 183 A.D.3d 903, 124 N.Y.S.3d 695 (App. Div. 2nd Dept.).

     d.  **2008 - Iman Morales**: When officers responded to a request for help by the mother of Iman Morales, a Latino man who had schizoaffective disorder and had barricaded himself in his apartment, the officers used a taser when Mr. Morales was standing on a ledge, causing him to fall to his death. *Negron v. City of N.Y.*, 976 F. Supp. 2d 360 (E.D.N.Y. 2013).

e. **2012 - <u>Shereese Francis</u>**: Shereese Francis, a 29-year-old Black woman, was killed in her home by NYPD officers summoned by her family to transport her to the hospital for psychiatric evaluation and care. The officers antagonized Ms. Francis, chased her, tackled her onto a bed, pressed their weight on her until she suffered cardiac arrest, and then prevented her from receiving appropriate, timely medical care. *Francis v. City of New York*, 13-cv-505 (E.D.N.Y. 2013)

f. **2012 - <u>Mohamed Bah</u>**: Mohamed Bah, a 28-year-old Black man, was killed by the NYPD after his mother called for an ambulance because he was experiencing mental health issues. Police officers arrived instead of an ambulance, and they insisted on confronting Mr. Bah, despite Mr. Bah's refusal to interact with them and his mother's request to try to calm her son down herself. NYPD officers surrounded the apartment and forced open Mr. Bah's front door. The officers used a taser against Mr. Bah, fired bean bags at him, and ultimately shot and killed him. *Bah v. City of New York*, No. 13CV06690 (S.D.N.Y. 2013).

g. **2015 - <u>David Felix</u>**: With knowledge of the mental disability of David Felix, a 24-year-old Black man with paranoid schizophrenia, two NYPD detectives entered his apartment without a warrant, causing Mr. Felix to jump out of bed in fear and flee. The detectives pursued Mr. Felix, who was unarmed, and shot and killed him in the lobby of his apartment building. *Felix v. City of N.Y.*, 344 F. Supp. 3d 644 (S.D.N.Y. 2018); *Felix v. City of N.Y.*, 408 F. Supp. 3d 304 (S.D.N.Y. 2019); *Felix v. City of N.Y.*, No. 16-cv-5845 (AJN), 2020 U.S. Dist. LEXIS 189223 (S.D.N.Y. Oct. 13, 2020).

h. **2015 - <u>Mario Ocasio</u>**: Mario Ocasio, a 51-year-old Latino man, was killed by the NYPD's excessive taser use after his girlfriend had called 911 stating that he was behaving erratically. Approximately a dozen officers responded to the call. After Mr. Ocasio was in handcuffs, an officer tased him in the back, killing him.[13]

i. **2015 - <u>Anthony Paul</u>**: Anthony Paul, a 29-year-old Black man, was killed after officers responded to a 911 call about an alleged "EDP." When Mr. Paul purportedly refused to let officers into his apartment, NYPD officers used an electric saw to break down the door. Upon confronting an unarmed Mr. Paul, NYPD officers tased him, causing him to suffer cardiac arrest and die.[14]

j. **2016 - <u>Deborah Danner</u>**: Deborah Danner, a 66-year-old Black woman with a history of schizophrenia, was killed by the NYPD after officers responded to a call that a woman had been acting erratically in an apartment building. When they arrived, Ms. Danner was holding kitchen scissors. The officers then allege that she picked up a wooden bat. An officer shot Ms. Danner twice, killing her. In response, NYPD Police Commissioner James P. O'Neill stated, "we've established

---

[13] J. David Goodman, *Family Disputes Police Account of Bronx Man's Stun Gun Death*, N.Y. Times (June 10, 2015), https://www.nytimes.com/2015/06/11/nyregion/family-disputes-police-account-of-bronx-mans-stun-gun-death.html.

[14] Emma Whitford, *Family Of Man Who Died After Being Tasered By NYPD Sues For $25 Million*, Gothamist (Mar. 16, 2016), https://gothamist.com/news/family-of-man-who-died-after-being-tasered-by-nypd-sues-for-25-million.

procedures and protocols for handling emotionally disturbed people. That's to keep everybody safe, that's to keep the cops safe, the community safe and the person that we're dealing with safe." He added, "it looks like some of those procedures weren't followed."[15]

k. **2016 - <u>Garry Conrad</u>**: NYPD officers were summoned to a supermarket after a customer, Garry Conrad, a 46-year-old white man, had been reported to be acting erratically. After the police escorted Mr. Conrad out of the store, the officers shot Mr. Conrad seven times after he allegedly brandished a small knife, which he used in his position as a stagehand. *Conrad v. City of N.Y.*, 2020 NY Slip Op 30610(U) (Sup. Ct. 2020).

l. **2016 - <u>Ariel Galarza</u>**: Ariel Galarza, a 49-year-old Latino man, was killed by the NYPD after a neighbor called 911, mistakenly believing Mr. Galarza was holding a knife and acting erratically. He died after he was tased twice by NYPD officers.[16]

m. **2017 - <u>James Owens</u>**: James Owens, a 63-year-old Black man, was killed after his sister called 911, stating that Mr. Owens was acting erratically. Officers arrived and, claiming Mr. Owens was holding a knife, tased and shot Mr. Owens, ultimately killing him.[17]

n. **2017 - <u>Dwayne Jeune</u>**: Dwayne Jeune, a 32-year-old Black man, was killed by the NYPD after his mother called 911, saying that he was acting erratically, although not violently. Officers, who had knowledge of Mr. Jeune from prior mental health crises, alleged that, when they arrived, Mr. Jeune charged them with a knife.[18]

o. **2017 - <u>Miguel Richards</u>**: Miguel Richards, a 31-year-old Black man, was killed in his home by the NYPD after they responded to a request for a "wellness check" from his landlord. The officers found Mr. Richards in his room, purportedly holding a knife and a toy gun. For approximately 15 minutes, officers screamed at him, ordering him to put his knife down. Mr. Richards remained motionless and silent. One officer suggested that the officers close the door and allow the Emergency Service Unit officers, who were downstairs, to handle the situation. Instead, the officers fired 16 shots at Mr. Richards. While he lay on the ground bleeding, the officers stepped over his body, moved his body, and delayed calling for medical help.[19]

---

[15] Ashley Southall, *Officer Faces Discipline 5 Years After Killing Mentally Ill Woman*, N.Y. Times (Oct. 4, 2021), https://www.nytimes.com/2021/10/04/nyregion/nypd-killing-mental-illness.html.
[16] Scott Heins, *Death Of Unarmed Bronx Man Tasered By NYPD Ruled A Homicide*, Gothamist (April 7, 2017), https://gothamist.com/news/death-of-unarmed-bronx-man-tasered-by-nypd-ruled-a-homicide
[17] Byron Smith & Graham Rayman, *James Owens' family demands charges for cops who shot him as they lay the 63-year-old Brooklyn man to rest*, N.Y. Daily News (Jan. 11, 2017), https://www.nydailynews.com/new-york/brooklyn/family-demands-charges-lay-james-owens-rest-article-1.2944202.
[18] Sean Piccoli & Ashley Southall, *Police Fatally Shoot 'Emotionally Disturbed' Man Holding Knife in Brooklyn*, N.Y. Times (July 31, 2017), https://www.nytimes.com/2017/07/31/nyregion/police-fatally-shoot-man-in-brooklyn.html.
[19] Ashley Southall & Joseph Goldstein, *Police Release Body Camera Footage of Shooting Death in Bronx*, N.Y. Times (Sept. 14, 2017), https://www.nytimes.com/2017/09/14/nyregion/police-body-camera-footage-new-york.html.

p. **2017 - <u>Cornell Lockhart</u>**: Cornell Lockhart, a 67-year-old Black man with known mental disabilities who was living in a supportive housing unit for at-risk and formerly homeless people, was shot and killed by the police two minutes after they arrived. Officers were called to an "assault in progress" after Mr. Lockhart had allegedly attacked two security guards.[20]

q. **2018 - <u>Dwayne Pritchett</u>**: Dwayne Pritchett, a 48-year-old Black man, was killed by the NYPD after he was handcuffed by officers responding to his father's 911 call that Mr. Pritchett had barricaded himself in his room.[21]

r. **2018 - <u>Michael Hansford</u>**: Michael Hansford, a 52-year-old Black man, was shot and killed by police after a call regarding a dispute with his landlord in which his landlord informed him that he would be evicted in two weeks. NYPD officers were called to the scene, upon information and belief, for an "EDP Call." Officers claim that Mr. Hansford then lunged at them with a knife, leading them to shoot and kill him.[22]

s. **2018 - <u>Saheed Vassell</u>**: Saheed Vassell, a 34-year-old Black man, was walking down a street in Brooklyn, holding a metal pipe. His neighbors knew that he had a mental disability, but that he never acted violently. Nonetheless, when police officers responded to a call of a Black man holding a gun, they did no investigation to determine that Mr. Vassell had a mental disability. Instead, they shot Mr. Vassell ten times, killing him.[23]

t. **2018 - <u>Susan Muller</u>**: Susan Muller, a 54-year-old white woman, was known by the NYPD to have a mental disability, as police had visited her Queens home nine times since 2000. Ms. Muller called 911 to report an armed burglar in her home. Officers responded, noting she was an "EDP" and shot and killed her in her home.[24]

u. **2019 - <u>Kawaski Trawick</u>**: Kawaski Trawick, a 32-year-old Black man with mental disabilities, was alone in his apartment when an officer pushed open the door. He was holding a bread knife and later a stick. Police shot and killed him in his apartment, within less than two minutes of their arrival.[25]

---

[20] Nikita Stewart & Benjamin Mueller, *Searching for Answers in Stabbing That Led to Fatal Police Shooting*, N.Y. Tomes (Nov. 14, 2017), https://www.nytimes.com/2017/11/14/nyregion/nypd-shooting-cornell-lockhart.html.
[21] N.Y.S. Off. of the A.G., Report on the Investigation into The Death of Dwayne Pritchett, https://ag.ny.gov/sites/default/files/oag_report_-_pritchett.pdf.
[22] Bronx landlord calls police shooting of tenant justified, ABC News (Jan. 30, 2018), https://abc7ny.com/shooting-bronx-police-involved-belmont/3006027/.
[23] Benjamin Mueller & Nate Schweber, *Police Fatally Shoot a Brooklyn Man, Saying They Thought He Had a Gun*, N.Y. Times (April 4, 2018), https://www.nytimes.com/2018/04/04/nyregion/police-shooting-brooklyn-crown-heights.html.
[24] Ashley Southall & Nate Schweber, *The Local Precinct Knew Her Troubles. The Officers Who Shot Her Came From Another*, N.Y. Times (Sept. 18, 2018), https://www.nytimes.com/2018/09/18/nyregion/nyc-police-queens-shooting-911-call.html.
[25] Eric Umansky, *It Wasn't the First Time the NYPD Killed Someone in Crisis. For Kawaski Trawick, It Only Took 112 Seconds*, ProPublica (Dec. 4, 2020), https://www.propublica.org/article/it-wasnt-the-first-time-the-nypd-killed-someone-in-crisis-for-kawaski-trawick-it-only-took-112-seconds.

v.  **2019 - <u>Kwesi Ashun</u>**: The sister of Kwesi Ashun, a 33-year-old Black man with schizophrenia and bipolar disorder, called 911 indicating that her brother was exhibiting signs of distress, but was told nothing could be done by the City. Days later, Mr. Ashun was a bystander to another individual's arrest when there was a confrontation between him and the police. Officers then shot and killed him after he allegedly struck one officer with a chair.[26]

w.  **2020 - <u>George Zapantis</u>**: George Zapantis, a 29-year-old white man with mental disabilities, was killed after being tased seven times by police in the doorway of his Queens home. Body camera footage capture Mr. Zapantis telling officers that he was not able to breathe throughout the encounter.[27]

x.  **2021 - <u>Eudes Pierre</u>**: Days before the filing of this complaint, on December 20, 2021, Eudes Pierre, a 26-year-old Black man with bipolar disorder, was shot 10 times and killed by the police. The NYPD claimed to receive a call about a man allegedly "armed with a gun and knife." Mr. Pierre was known to the police to have had two prior encounters with the NYPD related to mental health crises. When NYPD officers tried to confront Mr. Pierre, he fled into the subway station. NYPD officers reportedly attempted to deploy their stun guns and ultimately shot and killed him. Officers did not find a gun.[28]

70.    Since 2015 alone, at least nineteen people—sixteen of them Black or other people of color—have been killed by police in New York City when experiencing a mental health crisis.

71.    Upon information and belief, none of the NYPD members involved in the above-referenced nineteen incidents were ever disciplined for their conduct.

72.    There are countless other incidents of the mistreatment of individuals experiencing mental health crises, including traumatization, serious injuries, deaths, arrests, imprisonments, and forced hospitalizations.

IV.    **<u>The City Has Repeatedly and Knowingly Failed to Curb the Unlawful Treatment of Individuals with Mental Disabilities</u>**

---

[26] Greg B. Smith, *City Mental Health Services Checked In on Man Killed by Cop — After He Died*, The City (Nov. 1, 2019), https://www.thecity.nyc/health/2019/11/1/21210730/city-mental-health-services-checked-in-on-man-killed-by-cop-after-he-died.
[27] Yoav Gonan, *Cops Tased Unarmed Queens Man Seven Times Before He Died, Video Shows*, The City (Aug. 11, 2020), https://www.thecity.nyc/2020/8/11/21364522/nypd-cops-tased-unarmed-queens-man-died-video-shows.
[28] Ali Watkins, *Brooklyn Man Shot by the Police Was Mentally Ill, Family Says*, N.Y. Times (Dec. 23, 2021), https://www.nytimes.com/2021/12/23/nyregion/eudes-pierre-police-shooting-brooklyn.html.

73.     Though it has known about serious and protracted problems with how it handles interactions with individuals with mental disabilities or perceived disabilities, the NYPD has historically been resistant to "develop[ing] a more accurate picture of its interactions with individuals undergoing a mental health crisis or to disseminate publicly what little information it might have in this area."[29]

74.     The failure to capture accurate data concerning police interactions with individuals experiencing mental health crises, coupled with the NYPD's resistance to releasing what data it does collect, exacerbates tensions between the police and the mental health community.[30]

75.     As early as 2002, the Urban Justice Center prepared a briefing for Michael A. Cardozo, then Corporation Counsel for the City of New York, and Raymond W. Kelly, then Commissioner of the NYPD.

76.     The briefing paper identified a number of inadequacies, including but not limited to the fact that there was "no systematic method for referring individuals in crisis to mental health providers."[31] The paper also correctly warned that, "[i]n most cases, even when the person in crisis clearly needs or wants assistance, the only assistance the police can offer is 'non-assistance.' . . . . Predictably, this pattern of non-assistance can lead to repeat incidents, often after the initial crisis has escalated."[32] Other findings included that "the NYPD has not complied with . . . ADA requirements" putting the City "at risk" of violating 42 U.S.C. § 1983.[33]

---

[29] Urban Justice Center, Kramer Levin Naftalis & Frankel LLP, *Police Interactions with Individuals in Psychiatric Crisis* (Apr. 22, 2002), https://www.kramerlevin.com/images/content/2/1/v4/2161/Police-Interact-Fischman.pdf.
[30] *Id.*
[31] *Id.* at 10.
[32] *Id.* at 12.
[33] *Id.* at 15.

77.     The paper concluded that "[t]he NYPD's training programs and protocols for dealing with individuals in emotional or psychiatric crisis are not only bad policy, they may also violate federal and state law."

78.     From 2002 to 2013, despite the 2002 recommendations to Corporation Counsel Cardozo and Commissioner Kelly, the City failed to take effective action to remedy the glaring inadequacies of the "EDP" Policy. It fell to community organizations to advocate and raise awareness about the failures of the NYPD response to mental health crises.[34]

79.     Anticipating the election of a new mayor for New York City, in October 2012, Community Access launched and led an advocacy campaign called "Communities for Crisis Intervention Teams"—the beginnings of CCIT-NYC. The campaign's goal was to educate the candidates and the public in general about alternatives to the City's approach in responding to mental health crises, starting with enhanced training for police officers.

80.     Community Access and CCIT-NYC met with high-level City officials and continued to advocate for a more appropriate City response to individuals in mental health crises. These efforts included a push for less NYPD involvement in crisis response.

81.     Unfortunately, the Communities for Crisis Intervention Teams campaign and the change in administrations did not bring about change. Though the urgency is clear, and the City has had notice and knowledge of such violations, the City and Defendant de Blasio have repeatedly and chronically failed in their attempts to transform mental health services for New Yorkers.

82.     For example, in June 2014, Mayor de Blasio formed the first-ever Task Force on Behavioral Health and Criminal Justice (the "Task Force"). By December 2014, the Task Force issued an Action Plan to purportedly address "how the criminal justice and health systems can

---

[34] *See generally* Jeffrey Fagan & Alexis D. Campbell, *Race and Reasonableness in Police Killings*, 100 Boston Univ. L. Rev. 951 (2020).

work together better to ensure that we are reserving criminal justice resources for the appropriate cases and deploying treatment and other proven effective remedies to interrupt those needlessly cycling through the system."[35] The Action Plan noted that while the overall jail population had decreased by 15% over the previous five years, the percentage of people in jail with "mental health issues" rose from 29% to 38%, meaning the number of people in jail with mental disabilities actually increased over this period from around 3,500 to over 4,000.[36] The City recognized that its jails were becoming de facto psychiatric facilities.

83.    One part of the Task Force's Action Plan called for training all NYPD police officers in crisis intervention training ("CIT Training") techniques, in order to respond less violently to the approximately 200,000 yearly calls that New York City's 911 emergency call center receives for people in an apparent mental health crisis.[37]

84.    Yet four years after the City promised to teach every member of the NYPD how to interact with people experiencing mental health crises through CIT Training, less than one-third of the force had been trained.[38]

85.    The CIT Training that does exist has also been woefully inadequate.

86.    In a January 2017 Report by the New York City Department of Investigation, Office of the Inspector General for the NYPD ("OIG-NYPD"), the OIG-NYPD identified long-standing deficiencies in the NYPD's handling of responses to individuals with mental disabilities or perceived mental disabilities, and specifically highlighted deficiencies in the CIT Training. These deficiencies include:

  a.    The NYPD's failure to "systematically assign[] CIT-trained officers to mental

---

[35] Mayor's Task Force on Behavioral Health and the Criminal Justice System, *Action Plan*, at 6 (2014), http://criminaljustice.cityofnewyork.us/wp-content/uploads/2018/04/annual-report-complete.pdf.
[36] *Id*. at 5.
[37] *Id*.
[38] Greg B. Smith, The NYPD's Mental Illness Response Breakdown, THE CITY (Mar. 21, 2019), https://www.thecity.nyc/special-report/2019/3/21/21211184/the-nypd-s-mental-illness-response-breakdown

health crisis incidents."

    b.   The NYPD's failure to "coordinat[e] and integrat[e] its CIT efforts department-wide."

    c.   The NYPD's failure to allow for "adequate data analysis of its CIT initiative."

    d.   The failure of NYPD officers who undergo CIT Training to have proper exposure to individuals with mental disabilities.[39]

87.    Another part of the Action Plan included a program that would allow police officers to bring individuals experiencing a mental health crisis to "diversion centers" instead of hospital emergency rooms or jails.[40] However, the City opened only one diversion center in 2020—six years after the Action Plan—and its availability to New Yorkers in crisis is greatly limited. The effectiveness of that diversion center remains unknown, due to lack of data.[41]

88.    By December 2018, after training only about one-quarter of approximately 40,000 uniformed officers with 40 hours of CIT, it was apparent that the City's Action Plan was not working. Not only was there a lack of transparency, but it was clear that CIT training was not effective and that members of the NYPD continued to use excessive force tactics in interactions with individuals with actual or perceived mental disabilities. Between June 2015 and January 2018, officers responding to 911 mental health crisis calls fatally shot at least nine people—substantially more killings compared to the three years preceding the CIT training program.[42]

---

[39] OIG-NYPD, *Putting Training into Practice: A Review of NYPD's Approach to Handling Interactions with People in Mental Crisis* (Jan. 2017), http://www1.nyc.gov/assets/oignypd/downloads/pdf/Reports/CIT_Report_01192017.pdf

[40] Mayor's Task Force on Behavioral Health and the Criminal Justice System, *Action Plan*, at 9 (2014), http://criminaljustice.cityofnewyork.us/wp-content/uploads/2018/04/annual-report-complete.pdf.

[41] Greg B. Smith & Reuven Blau, *Failure to Thrive: NYC's $100 Million 'Diversion Centers' for Mentally Ill Sit Empty or Barely Used*, THE CITY (May 9, 2021), https://www.thecity.nyc/2021/5/9/22426250/thrive-nyc-nypd-diversion-centers-for-mentally-ill-sit-empty [https://perma.cc/6UWN-HL5D]

[42] Eric Umansky, *It Wasn't the First Time the NYPD Killed Someone in Crisis. For Kawaski Trawick, It Only Took 112 Seconds*, ProPublica, Dec. 4, 2020, https://www.propublica.org/article/it-wasnt-the-first-time-the-nypd-killed-someone-in-crisis-for-kawaski-trawick-it-only-took-112-seconds.

89.     In fact, officials who helped craft the NYPD's de-escalation CIT training told the press that the department has "never really committed to making it work."[43]

90.     The failure of the City to adhere to the recommendations of its own Task Force is but one example of a long line of City failures, including the unconstitutional seizures and detentions of individuals with actual or perceived mental disabilities.

91.     On June 22, 2018, Mayor de Blasio convened a second Task Force—the NYC Crisis Prevention and Response Task Force ("Second Task Force")—to address specific mental health issues connected to 911 calls and their aftermath.

92.     The Second Task Force included over 80 individuals, the majority of them employees from City agencies, including the NYPD — with virtually no civil rights advocates or people living with mental disabilities who would be recipients of the program's services.

93.     The Second Task Force, like the First Task Force, had little if any effect. The City only issued a press release related to the Second Task Force; no recommendations were ever publicly announced.[44]

**V.      The City's Most Recent Pilot Program Is Inadequate**

94.     Most recently, Mayor de Blasio launched a pilot program, known as B-HEARD—Behavioral Health Emergency Assistance Response Division (the "Pilot")—that promised to substitute undefined "mental health professionals" and emergency medical technicians ("EMTs")

---

[43] *Id.*

[44] Press Release, Mayor de Blasio, First Lady McCray and City Council Members Announce $37 Million Annual Investment in New Strategies to Address Serious Mental Illness, Oct. 21, 2019, *available at* https://www1.nyc.gov/office-of-the-mayor/news/496-19/mayor-de-blasio-first-lady-mccray-city-council-members-37-million-annual-investment.

employed by New York City's Emergency Medical Services ("EMS") in place of police officers in response to "low acuity mental health 911 calls" in a small part of Northern Manhattan.[45]

95.     Although the City touts the Pilot as a "health-centered response" rather than a police response, the Pilot is co-run by the NYPD and utilizes the NYPD's 911 call system for all mental health crisis calls, with the City's 911 operators responsible for determining which calls will be forwarded to the Pilot.[46] The City's website regarding the Pilot also pointedly notes that "[c]allers cannot specifically request" that a Pilot team be dispatched.[47] The City has also stated that the Pilot will not be used "where violence and/or imminent suicide or harm is identified by the 911 operator," and that "[s]uch calls will continue to be handled by NYPD and EMS."[48]

96.     The Pilot only covers three police precincts,[49] and the City has provided little information about any expansions of the Pilot.

97.     The pilot operates only 16 hours per day.

98.     By the City's own admissions, the Pilot was first projected to continue to have police respond to approximately 30% of all Pilot calls, but NYPD officers and New York City Fire Department EMTs continue to respond to nearly all mental health 911 calls.[50] The City also admits that the extensive police response "often is not the most appropriate form of help for those in a mental health emergency . . . [as it] lacks a mental health professional in the response."[51]

---

[45] Mayor's Office of Community Mental Health, *B-HEARD: 911 Mental Health Emergency Health-Centered Response Pilot Project* (May 27, 2021), https://mentalhealth.cityofnewyork.us/wp-content/uploads/2021/05/B-HEARD-One-Pager-FINAL-5.27.2021.pdf.
[46] B-HEARD: 911 Mental Health Emergency Alternative Response Pilot Project, Frequently Asked Questions, https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/b-heard-public-faqs-5-27-2021.pdf.
[47] *Id*.
[48] *Id*.
[49] The pilot program is in Harlem in the areas patrolled by the 25th, 28th and 32nd precincts. In all other communities and precincts, NYPD officers and FDNY Emergency Medical Services EMTs will continue to respond to mental health emergencies. *Id.*.
[50] B-HEARD: 911 Mental Health Emergency Alternative Response Pilot Project, Frequently Asked Questions, https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/b-heard-public-faqs-5-27-2021.pdf.
[51] *Id*.

99.    The City subsequently *increased* its projected number of "EDP" calls to be handled by the NYPD to 40% of calls, and, most recently, to 50%. Notably, the current percentage of calls responded to by the NYPD is actually closer to 80%.

100.    In the first three months of the Pilot, during the limited hours that the Pilot functioned, the NYPD 911 operators routed a mere 23% of mental health 911 calls in the pilot area (only 342 of approximately 1,487 total calls) to B-HEARD teams. The remaining 77% of calls were routed to the police. In addition, B-HEARD teams responded to only 283 of the 342 calls specifically routed to them, with the NYPD responding to the remaining calls.[52] Overall, fewer than 20% of mental health calls placed in the pilot area—or about .75% of all "EDP" calls City-wide—were actually routed to and responded to by B-HEARD teams.

101.    Critically, all calls during the eight hours per day that the Pilot is not active continue to be responded to by the NYPD.

102.    Aside from noting that B-HEARD will not be used "where violence and/or imminent suicide or harm is identified by the 911 operator," and that "[s]uch calls will continue to be handled by NYPD and EMS,"[53] the City has provided extremely limited information about the program.

103.    The terms "violence" and "harm" are not defined.

104.    The average response time for mental health crisis calls under the Pilot is nearly 14 minutes, as opposed to average response times of 8 to 10 minutes for all other emergencies.[54]

---

[52] B-HEARD, Transforming NYC's Response to Mental Health Crises, https://mentalhealth.cityofnewyork.us/wp-content/uploads/2021/10/FIRST-QUARTER-OF-OPERATIONS-FINAL.pdf.

[53] B-HEARD: 911 Mental Health Emergency Alternative Response Pilot Project, Frequently Asked Questions, https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/b-heard-public-faqs-5-27-2021.pdf.

[54] B-HEARD: Transforming NYC's Response to Mental Health Emergencies, First Sixth Months of Operations, https://mentalhealth.cityofnewyork.us/wp-content/uploads/2021/12/FINAL-DATA-BRIEF-B-HEARD-FIRST-SIX-MONTHS-OF-OPERATIONS-12.15.21-1.pdf (Response times in the first 6 months averaged 13 minutes 41 seconds.); 911 End to End Detail from 11/18/13 - 3/22/21, City of New York,

105.    Pilot teams are not able to transport an individual experiencing a mental health crisis to any health care provider or appropriate place for diversion or de-escalation.[55] Rather, in the event of an emergency requiring transport, the Pilot team must first "call EMS for an ambulance transport."[56] No options are available for non-emergency transports, escalating all such encounters and requiring involuntary commitment to a hospital.

106.    The City's Pilot is a wholly insufficient, given the imminency and gravity of the harm experienced by individuals with mental disabilities.

107.    The Pilot has a number of other significant flaws:

a.    The Pilot is not run by community-based entities that can provide culturally competent care, can intervene prior to a crisis, and are more likely to have a history with the individual in need.

b.    The Pilot is not implemented or overseen by community groups specializing in mental disabilities and consisting of people with mental disabilities, who have experienced mental health crises and know best how to engage people in need of support.

c.    The Pilot teams do not receive training that is experiential, trauma-informed, or uses instructors with relevant knowledge of mental disabilities.

d.    Though hiring has commenced for the Pilot program, it is unlikely that the hiring is anywhere near sufficient for the size of the project, should it be implemented City-wide. A Health Department spokesperson stated that the number of individuals being trained was "the right number needed for the pilot" only, and thus it is unclear when or whether expansion of the pilot program to other precincts will occur.[57]

108.    The Pilot is therefore inadequate.

---

https://www1.nyc.gov/site/911reporting/reports/end-to-end-detail.page. (Average Response times for other emergency response between 2013 and 2021 are: EMS (Life-threatening) 8:20; EMS (Non-life-threatening): 11:52; FDNY (Medical Emergencies): 07:19; FDNY (non-medical-emergency): 07:47).

[55] B-HEARD: 911 Mental Health Emergency Alternative Response Pilot Project, Frequently Asked Questions, https://www1.nyc.gov/assets/nypd/downloads/pdf/public_information/b-heard-public-faqs-5-27-2021.pdf.

[56] *Id.*

[57] Greg B. Smith & Reuven Blau, *Failure to Thrive: NYC's $100 Million 'Diversion Centers' for Mentally Ill Sit Empty or Barely Used*, THE CITY (May 9, 2021), https://www.thecity.nyc/2021/5/9/22426250/thrive-nyc-nypd-diversion-centers-for-mentally-ill-sit-empty.

109.    Police officers will continue to be dispatched in far too many unnecessary situations, thereby defeating the purpose of a program aimed to reduce police presence.

110.    These officers will continue to mistreat, mishandle and discriminate against people with mental disabilities or perceived mental disabilities across the City, including under the Pilot, through the continued use of its discriminatory "EDP" Policy.

111.    Those interactions would prompt the use of the NYPD's discriminatory "EDP" Policy leading officers to detain and remove individuals experiencing mental health crises, and call in the Emergency Services Unit, often increasing the police presence and exacerbating feelings of distress, especially for individuals experiencing a mental health crisis. This is especially true in communities of color where relations with the police are strained.

112.    Furthermore, Mayor de Blasio's term will end shortly, and it is unclear whether the next New York City mayor will implement the Pilot program, which has no statutory or regulatory underpinnings.

113.    The inadequacy of the Pilot stands in stark contrast to the success of programs like Eugene, Oregon's Crisis Assistance Helping Out on the Streets ("CAHOOTS"). CAHOOTS provides non-coercive support services to community members with mental disabilities, including those experiencing mental health crises. Unlike B-HEARD, CAHOOTS provides a non-police response to the vast majority of the city's mental health emergency calls, providing non-police response to nearly one-fifth of the city's total 911 calls.[58] In CAHOOTS' 32 years of service, handling as many as 24,000 calls a year, not a single person—neither community member nor staff—has ever been seriously injured.[59]

---

[58] *What is CAHOOTS?*, WHITE BIRD CLINIC (Oct. 29, 2020), https://whitebirdclinic.org/what-is-cahoots/.
[59] Ari Shapiro, *'CAHOOTS': How Social Workers and Police Share Responsibilities in Eugene, Oregon*, NPR (June 10, 2020), https://www.npr.org/2020/06/10/874339977/cahoots-how-social-workers-and-police-share-responsibilities-in-eugene-oregon.

114.    Across the country, cities have passed legislation to develop their own CAHOOTS-like programs to provide non-police response to people with mental disabilities. These cities include Denver, Colorado;[60] Oakland, California;[61] Olympia, Washington;[62] New Haven, Connecticut;[63] Austin, Texas;[64] and San Francisco, California.[65]

115.    The Pilot is only the latest in a series of failed efforts to craft an appropriate response to individuals in the City who are undergoing a mental health crisis.

116.    More importantly, given its track record of failing to implement a policy that effectively and constitutionally regulates how the City interacts with individuals experiencing a mental health crisis, and the serious deficiencies in the B-HEARD pilot, there is no reason to believe that this latest effort will be any more successful than the previous multiple failed efforts.

117.    The City's consistent failures over multiple decades to implement a non-discriminatory policy has led to the criminalization of individuals deemed by the NYPD to be "EDPs," the traumatization of these individuals, extensive injuries to these individuals, and far, far too many deaths.

---

[60] *See* David Sachs, *In the First Six Months of Health Care Professionals Replacing Police Officers, No One They Encountered Was Arrested*, Denverite (Feb. 2, 2021), https://denverite.com/2021/02/02/in-the-first-six-months-of-health-care-professionals-replacing-police-officers-no-one-they-encountered-was-arrested/ (discussing the Denver Support Team Assisted Response (STAR) program's six-month progress report).
[61] *See* Julian Glover, *Oakland Launches Civilian Crisis Response Team to Handle Nonviolent Mental Health Calls*, ABC7 (Mar. 18, 2021), https://abc7news.com/macro-oakland-civilian-crisis-response-team-mental-health-police-dept/10430680.
[62] *See* Abby Spegman, *Olympia's Crisis Response Team Had Nearly 700 Calls in its First Two Months*, The Olympian (Jun. 4, 2019), https://www.theolympian.com/news/local/article230718039.html.
[63] *See* Mary E. O'Leary, *Officials: New Haven Crisis Response Team Could Take 10% of 911 Calls for Police*, New Haven Register (May 11, 2021), https://www.nhregister.com/news/article/Officials-New-Haven-Crisis-Response-Team-could-16168634.php.
[64] *See* Jennifer Kendall, *Crisis Counselors Responding to More Mental Health Calls in Austin*, FOX7 Austin (Nov. 2, 2020), https://www.fox7austin.com/news/crisis-counselors-responding-to-more-mental-health-calls-in-austin.
[65] Eric Westervelt, *Removing Cops from Behavioral Crisis Calls: "We Need to Change The Model,"* NPR, WNYC, (Oct. 19, 2020), https://www.npr.org/2020/10/19/924146486/removing-cops-from-behavioral-crisis-calls-we-need-to-change-themodel.

VI.   **Plaintiffs' Experiences**

**Justin Baerga**

118.   Plaintiff Justin Baerga is a 22-year-old Latino man diagnosed with depression, anxiety, bipolar disorder, and ADHD.

119.   On August 25, 2019, Mr. Baerga was at home with his mother, Peggy Herrera, in the apartment they share.

120.   At approximately 6:40 p.m., Ms. Herrera called 911 and advised that her son had "mental issues," was not violent towards her, was not trying to harm himself, but had started breaking things in the apartment. Ms. Herrera specifically told the 911 operator that she needed an ambulance to show up, and "not the police." She also confirmed that Mr. Baerga was not violent, had no weapons, and was not under the influence of drugs or alcohol.

121.   Ms. Herrera also advised the 911 operator multiple times that she would not let anyone in her apartment "unless EMT is there because it is an EDP situation."

122.   At approximately 7:30 p.m., armed NYPD officers, including Defendant NYPD Officer Wnorowski, NYPD Officer Sheron, NYPD Officer McDowell, and NYPD Sergeant Mole, arrived at the Baerga/Herrera home. EMS arrived shortly thereafter.

123.   When the police officer arrived, Mr. Baerga became nervous and locked himself in the apartment. He refused to open the door to the police, and Ms. Herrera, who was outside at the time, was locked out and did not have her keys to the apartment.

124.   Mr. Baerga spoke with NYPD officers through the open window of the apartment as the officers stood on the street. Mr. Baerga was calm, and NYPD officers were able to determine that he was alone, not injured, and had no weapons.

125.     Mr. Baerga informed the NYPD officers through the window that he had just started a new job and did not want to be taken to the hospital and possibly miss a day of work.

126.     Ms. Herrera stood on the street outside with the NYPD and EMS personnel. Just as she had informed the 911 operator, she informed the NYPD and EMS personnel that her son had mental issues.

127.     After approximately 45 minutes, and despite the fact that Mr. Baerga was not violent and was not presenting a risk to himself or others, NYPD officers insisted on breaking down the door to the apartment. Neither the NYPD nor the EMS personnel took any steps to de-escalate the interactions.

128.     Ms. Herrera repeatedly asked that they not break down the door. She explained that doing so would trigger her son and greatly exacerbate the situation.

129.     When Ms. Herrera stood in front of the door to prevent NYPD officers from breaking it down, officers pushed her to the ground.

130.     Mr. Baerga saw the Defendant NYPD officers pushing Ms. Herrera aside and left the apartment to see what was happening to his mother.

131.     The officers then handcuffed and arrested Ms. Herrera in front of Mr. Baerga, charging her with obstruction of governmental administration.

132.     Meanwhile, the Defendant NYPD officers pushed Mr. Baerga against a wall and then pushed him to the ground. They held him down and punched him on his upper back and placed him in handcuffs.

133.     The NYPD and EMT personnel then strapped Mr. Baerga to a gurney and placed him in an ambulance.

134.    The EMT personnel transported Mr. Baerga to Queens General Hospital, where he was released shortly after arrival, without receiving any treatment.

135.    Although Mr. Baerga was not charged with any crime, he was detained and taken to the hospital against his will because he was designated an "EDP."

136.    All charges against Ms. Herrera were ultimately dismissed.

137.    The NYPD officers' behavior caused Mr. Baerga to suffer bruising on his back, swelling in his hands, and abrasions on his legs, as well as emotional distress due to both his detention and observing the arrest of his mother.

**Steven Greene**

138.    Steven Greene is a 26-year-old Black male diagnosed with post-traumatic stress disorder ("PTSD"), ADD, and an injured hip. He lives in Community Access housing and receives Social Security Disability benefits.

139.    On May 6, 2020, at approximately 12:30 a.m., armed NYPD officers and EMS personnel arrived at Mr. Greene's apartment in response to an "EDP with gun" call to 911.

140.    One of the Defendant officers whose name is not yet known stated that Mr. Greene's social worker had called them, and that they were there to "check on him." The Defendant Officer informed Mr. Greene that Mr. Greene would need to talk to the NYPD's Emergency Services Unit.

141.    Mr. Greene responded that he understood.

142.    The ESU personnel then asked him if he was suicidal.

143.    Mr. Greene stated he was not suicidal, did not tell anyone he was suicidal, and did not have medical problems. At no time was Mr. Greene in possession of a gun nor was there ever a gun present in his apartment.

144.     Nonetheless, the EMS employee said that, because an unidentified social worker had reported Mr. Greene was suicidal, they had to take him to the hospital. Upon information and belief, the 911 call was not made by a social worker, but rather was made by Mr. Greene's ex-girlfriend as a means to harass him.

145.     Mr. Greene had been on the phone with his fiancé when NYPD and EMS arrived, and he resumed talking with her.

146.     An NYPD officer took Mr. Greene's phone and began speaking with Mr. Greene's fiancé, who told the officer that Mr. Greene was not suicidal.

147.     Mr. Greene stated he did not want to go to the hospital and walked back inside his apartment.

148.     The officers then followed Mr. Greene into his apartment and began grabbing him. Mr. Greene asked them to stop touching him.

149.     Mr. Greene became increasingly anxious and told the officers he had PTSD, ADD, and an injured hip, and repeatedly asked the officers to stop touching him.

150.     The officers handcuffed Mr. Greene and dragged him against his will down the steps, forcing him out of his apartment.

151.     Rather than de-escalate the interactions, the officers and the EMTs then forced Mr. Greene onto a gurney and strapped him down.

152.     EMTs and Defendant officers placed Mr. Greene inside an ambulance.

153.     Inside the ambulance, Mr. Greene repeatedly said that the stretcher straps and handcuffs were too tight and that his arms felt numb, but the EMS personnel refused to loosen the straps or cuffs.

154.    Mr. Greene explained to the EMS personnel that it was impossible that his social worker had called 911 because the social worker did not work after 5 p.m. and could not have learned he was suicidal in the middle of the night.

155.    He also told them that they should not barge into the apartment of someone who has PTSD because it is triggering.

156.    Mr. Greene was taken to North Central Bronx Hospital, where he remained for a few hours until he was released.

157.    Although Mr. Greene was not charged with any crime, he was detained and taken to the hospital against his will because he was designated an "EDP" and he was subjected to excessive and unnecessary force, as well as extensive emotional trauma.

158.    Mr. Greene suffered bruising and abrasions to his chest, arms, and head.

159.    This is not the first time the City and NYPD officers have unlawfully forced Mr. Greene to be hospitalized against his will.

160.    Mr. Greene has been forced to suffer involuntary hospitalizations on at least three occasions. These frequent occurrences have caused him to suffer and exacerbate his existing PTSD.

**Giovanna Sanchez-Esquivel**

161.    Plaintiff Giovanna Sanchez-Esquivel is a 27-year old Columbia University student who is diagnosed with PTSD, autism, anxiety, depression, and bipolar disorder.

162.    On November 7, 2020, at approximately 9:00 p.m., Ms. Sanchez-Esquivel's boyfriend was trying to find mental health care for her due to a manic episode. He first called 311 and was told that there were no New York City services available for at least 24 to 48 hours and was instructed to call 911. He called 911 and stated that Ms. Sanchez-Esquivel had been having a

"manic episode" for multiple days. He stated on the call that Ms. Sanchez-Esquivel was not violent and did not have any weapons. He also informed the 911 operator that she had a mental disability, including depression and likely bi-polar disorder.

163.    Days earlier, on November 2, 2020, Ms. Sanchez-Esquivel had been voluntarily admitted to Woodhull Hospital for psychiatric care and released the same day.

164.    Armed NYPD officers who included, upon information and belief, Defendants NYPD Police Officer Haber, NYPD Police Sergeant Gbain, NYPD Police Officer Prasad, NYPD Police Officer Fisher, NYPD Police Officer Ramayya, and NYPD Police Officer Torres arrived at Ms. Sanchez-Esquivel's apartment shortly after her boyfriend's call and spoke with her for approximately 25 minutes. She did not threaten to harm herself or others and remained, for the majority of that time, seated on a couch.

165.    She repeatedly and clearly pleaded with the Defendant officers to leave her apartment, explaining that she knew her rights, that she recognized she had mental disabilities, but that she did not consent to them being present in her apartment.

166.    At approximately 9:10 p.m., the NYPD's Emergency Services Unit arrived.

167.    Ms. Sanchez-Esquivel explained that she had suffered trauma due to multiple rapes, that she was a neuroscientist with an understanding of her mental disabilities, and added, "I have zero cognitive empathy, I'm autistic, I have PTSD, I'm not crazy, I'm rooted in reality."

168.    After approximately 30 to 40 minutes, an officer stated that the police had to take Ms. Sanchez-Esquivel to the hospital because she was not willing to go on her own.

169.    The Defendant NYPD officers, including but not limited to Defendants Haber, Gbain, Prasad, Fisher, Ramayya, and Torres handcuffed Ms. Sanchez-Esquivel as she cried and

pleaded with them not to touch her, repeating that she had a history of trauma in that she had been repeatedly raped.

170.    The Defendant Officers forced Ms. Sanchez-Esquivel into the elevator against her will and picked her up and carried her when she refused to leave the building lobby.

171.    The NYPD's Emergency Services Unit used excessive force to detain Ms. Sanchez-Esquivel and to take her to Woodhull Hospital against her will because she was designated an "EDP."

172.    The NYPD did not charge Ms. Sanchez-Esquivel with a crime.

173.    The Defendant Officers physically injured Ms. Sanchez-Esquivel, resulting in physical injuries including severe bruises on her arms and hands, and back and shoulder pain caused by being handcuffed and dragged by NYPD officers. She also experienced PTSD and emotional distress.

### Sarah Arvio

174.    Plaintiff Sarah Arvio is a slim 67-year-old white woman who has two rare, chronic illnesses, polycythemia vera (a form of leukemia) and Budd-Chiari syndrome (a related liver condition).

175.    On March 13, 2020, at approximately 11 a.m., Ms. Arvio was sitting at her desk, sipping tea, and talking on the phone with a staff member at the Mount Sinai Institute for Liver Medicine ("Mount Sinai").

176.    For about ten days prior to this phone call, Ms. Arvio had been repeatedly trying, without success, to have her hepatologist at Mount Sinai complete a disability form for her.

177.    During the call, the secretary told Ms. Arvio that the hepatologist would not complete the form.

35

178.    In nothing more than an expression of frustration, Ms. Arvio said to the secretary, "I'm so frustrated with you all that I feel like jumping off the bridge." The secretary simply hung up.

179.    Minutes later, in a total shock to Ms. Arvio, three armed NYPD officers and an EMT arrived at Ms. Arvio's home in the Bronx and knocked loudly on her door. Ms. Arvio opened the door for them. She was dressed only in a short coral-pink spa robe, and was barefoot.

180.    The officers entered and told Ms. Arvio that they needed to take her to the hospital for psychiatric evaluation.

181.    Ms. Arvio spoke with the officers in a calm, rational, and cordial manner. She told them that she was fine, and that she had a busy day ahead, including a critical visit to her hepatologist at Mount Sinai Hospital.

182.    The officers responded that once they receive a call about suicide, they were mandated to take the person who was the subject of the call to a hospital. Ms. Arvio asked them if they would take her to Mount Sinai. They said no.

183.    Ms. Arvio asked for options, but the officers responded that she had no recourse but to go with them.

184.    A fourth armed officer then arrived at the door and entered.

185.    Seeing no alternative, Ms. Arvio agreed to go with the officers and began walking toward her bedroom to get dressed.

186.    However, Defendant NYPD Police Officer Sanchez blocked Ms. Arvio's way.

187.    Defendant Sanchez stated that she would get Ms. Arvio's clothes and began walking toward Ms. Arvio's bedroom. Ms. Arvio pleaded with the officer not to touch her things.

188.    Having been prevented from going to her own bedroom to get dressed, Ms. Arvio walked back toward her desk to sit down. She heard one of the officers say, "That's it!" At that moment, upon information and belief, two officers, John Doe 1 and Defendant P.O. Sanchez, and one EMT, swarmed Ms. Arvio and crushed their bodies around hers, pressing her torso from all sides.

189.    The officers twisted Ms. Arvio's arms behind her back and handcuffed her. The metal cuffs were too tight and squeezed her wrists.

190.    Two of the officers kicked the back of Ms. Arvio's legs with their knees while the third officer held Ms. Arvio's head and pressed his thumb into her neck, causing her to pass out.

191.    Ms. Arvio can only partially recollect being carried through her foyer and out the door, with her face downward and close to the floor. She regained full consciousness in the hallway, where the officers wrapped her tightly onto a gurney with a sheet, her handcuffed wrists squeezed underneath her.

192.    Ms. Arvio noticed that the lower part of the sheet was spattered with blood and that her leg was bleeding profusely.

193.    Even though Ms. Arvio cried out to the officers that she was bleeding, none of them asked the EMT on scene to even examine, let alone treat, the wound.  The EMT also did not offer to examine or treat Ms. Arvio and did nothing to de-escalate the matter.

194.    Ms. Arvio was then transported to Lincoln Medical Center accompanied by two officers and the EMT where she arrived around noon.

195.    In the waiting area, one of the officers observed that Ms. Arvio had been very calm and peaceful when she was in her apartment.

37

196.    At one point, Ms. Arvio heard medical staff yell, "COVID!," and three staff in protective gear slowly rolled a gurney right past her and took the gurney into a separate room. Neither the patient on the gurney, nor Ms. Arvio, nor anyone else in the waiting room wore a mask or other protective gear.

197.    Ms. Arvio was then moved to the "psych ward." At approximately 12:30 p.m., she had two visits from psychiatrists who spoke with her briefly, and the second psychiatrist said, "Let's get you out of here."

198.    But she was not released until approximately 6 p.m. that day. In the meantime, the wound had swollen up, and the gash, two to three inches long, has turned black. Despite her entreaties, hospital personnel barely glanced at it during the hours that followed. She cleaned it herself with hand sanitizer, and an aide brought her plain distilled water to pour over it. At around 4 p.m., her shin was x-rayed. Ms. Arvio also reports that she cried for most of the day.

199.    The NYPD used excessive force against and detained Ms. Arvio, taking her to Lincoln Hospital against her will because she was perceived to have a mental disability and was therefore designated an "EDP."

200.    Dressed in hospital pants and someone else's unwashed sweater (provided by an aide), the then 66-year-old Ms. Arvio had to find her way home on public transportation, limping.

201.    When Ms. Arvio woke the next morning, she could not lift her head from the pillow. Her head pounded, her neck and upper arms were stiff and painful, there were sore spots all over her body, and her feet and ankles were bruised.

202.    Ms. Arvio's leg wound also became infected. She began to be feverish on March 16, and on March 19, at the advice of her hematologist, she visited the Weill-Cornell ER, where

she was given extensive tests and prescribed a course of antibiotics for an infected "traumatic leg injury."

203.    Ms. Arvio, who lives alone, largely stayed in bed for over two months, suffering from recurrent fevers, chills, exhaustion, and shortness of breath. She was also in extreme emotional distress, which she describes as pain, despair, and a sense of having been violated. She relived the events over and over, trying to recall and understand every moment of what had happened to her.

204.    Even now, nearly two years later, Ms. Arvio feels severe emotional distress. She feels weakened and traumatized due to the Defendant officers' actions.

**Community Access: Integrated Community Living for All New Yorkers**

205.    Community Access is a nonprofit organization that provides assistance to New Yorkers living with mental disabilities. Its work includes developing and operating supportive housing units in New York City, providing supported education and job training, operating a peer-driven crisis respite program, operating mobile treatment teams for people who have been disconnected from traditional treatment, and leading advocacy efforts for people with mental disabilities.

206.    Community Access' mission is to expand opportunities for people living with mental disabilities to recover from trauma and discrimination through affordable housing, training, advocacy, and healing-focused services.

207.    Core to this mission is promoting "self-determination" for those with mental disabilities by enabling them to "create lives of their own choosing" free from involuntary treatment and institutionalization. Community Access prioritizes services and advocacy that

support the ability of people with mental disabilities to live in integrated settings in their own communities.

208.    Defendants' wrongful and discriminatory conduct frustrates Community Access' ability to support integrated community living and forces it to divert organizational resources away from providing housing, counseling, and other services, and into directly responding to and managing the after-effects of mental health crises of those they serve as a result of NYPD responses to crisis situations.

209.    Community Access' supportive housing program is a key part of its organizational mission to enable community living for people with mental disabilities. Community Access has developed 1,315 supportive housing units, where individuals with mental disabilities live side-by-side with individuals who do not have disabilities. Community Access is currently developing additional supportive housing units, and these programs account for a substantial portion of Community Access' organizational budget.

210.    To make its housing model possible, Community Access hires and manages staff, including service coordinators and program directors, to provide day-to-day assistance to residents with mental disabilities. These staff are essential to Community Access' supportive housing model that promotes community integration and creates environments where residents can move forward with their lives.

211.    Some of the building's residents with mental disabilities experience mental health crises that require acute support.

212.    Community Access staff are hesitant to call 911 in these situations, for fear that members of the NYPD will escalate encounters or forcibly hospitalize, injure, and otherwise traumatize residents.

213.    As a direct result of the City's inadequate mental health response, Community Access must provide additional training to program managers, service coordinators, and other staff to enable them to respond to a significant portion of these crises themselves.

214.    This training includes instruction on how to identify and evaluate risky situations, when to call 911 and when to refrain from calling 911, and how to de-escalate crises. This training also involves instruction on how to interact with police and observe police encounters when they occur.

215.    Because Community Access cannot rely on the City to safely respond to any mental health crises its residents experience, Community Access must expend additional resources directly responding to and managing such crises and transporting residents to care facilities.

216.    When police respond to mental health crises at Community Access buildings, service coordinators and program directors frequently observe encounters and provide de-escalation support to minimize police harm. These tasks divert resources from the other necessary day-to-day tasks these staff need to perform for residents, and the tasks reduce Community Access' ability to provide services to residents not involved in these police encounters.

217.    Repeated instances of NYPD misconduct have occurred during these encounters, and Community Access has expended considerable resources and staff time to investigate these incidents, reach out to NYPD Community Liaisons to report issues, and act as an intermediary between officers and residents during such incidents in an effort to decrease harm.

218.    Residents with mental disabilities are often traumatized by these police encounters, and Community Access must expend even more resources to provide counseling services and crisis prevention plans to help residents recover from these encounters and to prevent future incidents. This too reduces Community Access' ability to provide its core services and supports to residents.

41

219.    Moreover, residents' trust in Community Access is undermined when traumatic police encounters result from staff having called the NYPD. These traumatic responses directly undermine Community Access' mission and have caused the organization to expend considerable time and resources to rebuild this trust.

220.    The police encounters are also traumatic for Community Access' staff and undermine the organization's ability to retain staff in a sector characterized by high turnover. They also require Community Access to provide extensive support to its traumatized staff.

221.    Supportive housing already encounters considerable stigma and opposition, and the City's inappropriate handling of people experiencing mental health crises only adds to this opposition. NYPD appearances at Community Access buildings have specifically been cited by opponents at public hearings as a justification for restricting further construction of new housing units. Construction of additional units is essential to Community Access' mission of providing supportive housing in communities across New York, many of which still lack these housing options.

222.    In an effort to counteract the effects of Defendants' discriminatory conduct, Community Access devotes significant resources to community organizing and policy advocacy aimed at ending police response to mental health crises and creating adequate alternatives.

223.    For example, in response to Defendants' conduct, Community Access has organized numerous community events with public lawmakers and citizens, addressing the NYPD's inadequate response to mental health crises, including a mayoral candidate forum and multiple panel discussions on appropriate, non-police community crisis responses. Additionally, Community Access has diverted significant time to organizing and mobilizing community

members to advocate for change through organizations of which it is a member, such as CCIT-NYC.

224.    All of these activities have burdened Community Access' limited resources and caused it to forego other activities in order to focus on improving the City's response to mental health crises.

225.    As a direct and proximate result of Defendants' discriminatory practices described above, Community Access has suffered and will continue to suffer a diversion of its resources and frustration of its mission to support community integration for people living with mental disabilities.

226.    Community Access seeks injunctive relief in this action in order to remedy the harms it has experienced by trying to avoid Defendants' discriminatory practices and to enable it to devote its resources to providing services to individuals with mental disabilities so that they can live independently in their communities.

### NAMI-NYC: Advocacy for Improved Mental-Health Services

227.    National Alliance on Mental Illness of New York City is a nonprofit organization that helps families and individuals affected by mental disabilities build better lives in their communities.

228.    NAMI-NYC helps families and individuals affected by mental disabilities build better lives through education, support, and advocacy. The organization provides an information and referral helpline, offers evidence-based education classes, facilitates support groups for individuals and families affected by mental disabilities, conducts community education on state and local mental health policy, and provides mentorship and training to people affected by mental disabilities to advocate for improved mental health systems in their communities.

229.    In an effort to counteract the effects of Defendants' discriminatory conduct, NAMI-NYC has been forced to devote significant resources to community organizing and policy advocacy aimed at ending unlawful police response to mental health crises and creating adequate alternatives.

230.    For example, in response to Defendants' conduct, NAMI-NYC has organized numerous community events addressing the NYPD's inadequate response to mental health crises, including a mayoral candidate forum and multiple panel discussions on decriminalizing mental illness by implementing appropriate, non-police responses to mental health crisis calls.

231.    NAMI-NYC has met with elected officials, testified at public hearings, submitted memoranda and letters of support to elected officials, conducted phone banking and email writing campaigns, drafted public policy platforms to support policy reforms that would end unlawful police response to mental health crises and provide adequate alternative response, and conducted phone banking and email writing campaigns in support of a true non-police crisis response system.[66]

232.    NAMI-NYC has also diverted significant time and resources to organizing and mobilizing community members to advocate for change. This includes organizing community rallies, participating in the work of CCIT-NYC, of which NAMI-NYC is a long-time member, and developing an advocacy ambassador program that empowers people affected by mental disabilities to advocate for the transformation of New York's mental health system, including mental health crisis response.

233.    Through its helpline, NAMI-NYC spends considerable time and resources providing individual consultation and assistance to people with mental disabilities who have been

---

[66] *See, e.g.*, Advocacy Policy Priorities, NAMI-NYC, https://www.naminycmetro.org/advocacy/nami-nyc-advocacy-policy-priorities/; Education Events, NAMI-NYC, https://www.naminycmetro.org/events/public-education/.

harmed by police encounters. Helpline staff provide direct support to help people work through the trauma of these encounters and help coordinate referrals to additional services.

234.    NAMI-NYC's helpline staff similarly provide support and referral services to people with mental disabilities and families working to avoid future police interaction during mental health crises. NAMI-NYC helps these clients connect with alternative crisis resources and proactively plan to mitigate potential police harm.

235.    These activities cause NAMI-NYC to forego other advocacy activities and devote fewer resources toward its other policy priorities. NAMI-NYC has and will continue to divert its attention away from its mentorship programs and support groups to focus on addressing the need to transform the City's mental health crisis response. It also diverts resources from its other community education efforts, such as its workplace mental health initiative, which aims to support employers in creating more accommodating, integrated workplaces for individuals with disabilities. In addition, it is forced to devote fewer resources toward its other policy priorities such as improving psychiatric emergency room services, increasing access to mental health care, and expanding the proper use of mental health courts.

236.    As a direct and proximate result of Defendants' discriminatory practices described above, NAMI-NYC has suffered and will continue to suffer a diversion of its resources and frustration of its mission to support community members with mental disabilities and their families.

237.    NAMI-NYC seeks injunctive relief in this action in order to remedy the harms it has experienced by trying to eliminate Defendants' discriminatory practices and enable it to devote its resources to providing services to individuals with mental disabilities.

**CCIT-NYC: Fighting for Appropriate Mobile Crisis Response**

238.    Correct Crisis Intervention Today – NYC is a membership organization whose members include nearly 80 New York nonprofit organizations, as well as individual members. CCIT-NYC's mission is to transform the City's response to mental health crises. It seeks to organize and enable its members to improve the mental health resources available to New Yorkers who experience mental health crises and to create change that will prevent or reduce mental health crises in the first place.

239.    CCIT-NYC is governed by a steering committee composed of representatives of these member organizations. The Steering Committee makes strategic decisions for CCIT-NYC and determines how and when CCIT-NYC will expend its resources.

240.    As a plaintiff in this action, CCIT-NYC represents its members, who have been harmed by Defendants' discriminatory conduct. Many of CCIT-NYC's member organizations, including Community Access, NAMI-NYC, the Police Reform Organizing Project, and Concern for Independent Living have standing to bring this lawsuit.

241.    As set forth above, Community Access and NAMI-NYC are members of CCIT-NYC and have diverted significant resources to counteract Defendants' unlawful conduct by documenting and publicizing the unlawful conduct, training their staff to respond to the unlawful conduct, and engaging in extensive policy advocacy to eliminate future unlawful conduct.

242.    Many of CCIT-NYC's member organizations experience similar harms and have similarly diverted resources from their core services and advocacy to counteract Defendants' unlawful conduct by documenting and publicizing the unlawful conduct, training their staff to respond to the unlawful conduct, and engaging in extensive policy advocacy to eliminate future unlawful conduct, including delivering testimony at public hearings and meeting with elected

46

officials and their staff to brief them on viable alternatives. Member organizations have also conducted focus groups, as well as an extensive community survey regarding community attitudes toward the City's current police response to mental health crises, which was the basis of a report entitled *Saving Lives, Reducing Trauma: Removing Police from New York City's Mental Health Crisis Response*. Members have also been involved in extensive advocacy to obtain body-worn camera footage of police shootings of individuals experiencing mental health crises.

243.    CCIT-NYC seeks to improve the mental health resources available to New Yorkers, both to avoid mental health crises and to help deal with the effects of crises after the crises have been de-escalated. CCIT-NYC also seeks to relieve its organizational members of the resource drain caused by expending resources on crisis de-escalation.

244.    CCIT-NYC also has suffered in its own right.

245.    In an effort to counteract the effects of Defendants' discriminatory conduct, CCIT-NYC, through the decisions of its steering committee, diverts significant resources to community organizing and policy advocacy aimed at transforming the City's response to mental health crises and reducing the incidence of violence and trauma caused by police serving as first responders.

246.    In response to Defendants' conduct, CCIT-NYC developed a public proposal to remove the NYPD from mental health crisis response, and CCIT-NYC has organized public rallies, panel discussions, and other events to promote reform.

247.    CCIT-NYC has also met with elected officials and testified at public hearings to draw attention to police misconduct and advocate for reforms addressing these inappropriate responses to mental health crises.

248.    All of these activities have burdened CCIT-NYC's limited resources and caused it to forego other activities in order to focus on police response to mental health crises.

249.    For example, CCIT-NYC has had to divert its attention away from its other core policy goals—namely, expanding access to both acute and long-term services for those experiencing mental health crises and to avoid mental health crises in the first place, and advocating for peer involvement in all aspects of mental health service delivery.

250.    Defendants' conduct has also caused CCIT-NYC to divert a larger portion of its resources to reforming City policy, at the expense of the coalition's broader efforts on the state level, including advocacy for a suicide and mental health crisis hotline, such as 988, expansion of crisis stabilization centers, and funding of regional mobile crisis teams.

251.    As a direct and proximate result of Defendants' discriminatory practices described above, CCIT-NYC has suffered and will continue to suffer a diversion of its resources and its member organization resources, as well as a frustration of its mission to support community members with mental disabilities.

252.    CCIT-NYC seeks injunctive relief in this action in order to remedy the harms that both CCIT-NYC and its member organizations have experienced in trying to eliminate Defendants' discriminatory practices, thus permitting it to engage in broader mental health advocacy.

## VII.    CLASS ACTION ALLEGATIONS

253.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the individual Plaintiffs seek to represent a certified Plaintiff class consisting of individuals who, because of their mental disability or perceived mental disability, have been, could have been, or will be seized, detained, and/or subjected to force in interactions with NYPD officers pursuant to NYPD Patrol Guide Procedure No. 221-13 or its equivalent and/or denied the appropriate response to mental health crises.

254.    The members of the class are so numerous as to render joinder impracticable.

The NYPD responds to approximately 200,000 "EDP" calls a year. In fact, this number is likely

much larger as some calls are not appropriately identified as mental health calls.

255.    The class members share a number of questions of law and fact in common:

a.      Whether the NYPD's "EDP" Policy violates the rights of individuals with mental disabilities, or perceived mental disabilities, on its face, by authorizing the NYPD to unlawfully enter the homes of, and unlawfully seize, individuals they perceive to be "EDP"s.

b.      Whether the NYPD engages in a policy, practice, and/or custom of forceable entries and seizures of individuals the NYPD believes are "EDPs," without lawful justification.

c.      Whether the NYPD engages in a policy, practice, and/or custom of excessive force against individuals the NYPD believes are "EDPs," without lawful justification.

d.      Whether the NYPD's "EDP" Policy, which grants NYPD officers the ability to make discretionary determinations about an individual's mental health or perceived mental health, violates federal, state, or city law.

e.      Whether the NYPD's "EDP" Policy violates the ADA, Section 504, Section 1983, the New York State Constitution, New York Common Law, and the New York City Human Rights Law by discriminating against qualified individuals who have or are perceived to have mental disabilities.

f.      Whether the NYPD's "EDP" Policy violates the Fourth and Fourteenth Amendments to the United States Constitution by authorizing members of the NYPD to make unlawful seizures of, and warrantless entries into the homes of, individuals who are non-violent, and are not a risk of harm to themselves or others.

g.      Whether the City has failed to provide safe and appropriate, immediate and long-term responses to New Yorkers experiencing mental health crises in violation of federal, state, and city law; and

h.      Whether the City has failed to provide safe and appropriate services to New Yorkers with mental disabilities in order to avoid mental health crises in violation of federal, state, and city law.

256.    Plaintiffs' claims are typical of those of the class. Like the other members of the

class, Plaintiffs have been victims of the NYPD's discriminatory practices of unlawful seizures of

individuals who have mental disabilities or are perceived to have mental disabilities. They have

been subjected to excessive force by being physically restrained, forced to be committed to a psychiatric hospital without their consent, and inappropriately thrust into the criminal legal system.

257.    The NYPD and other officials, including EMS workers, entered their homes unlawfully without a warrant, consent, or exigent circumstances. They have also been deprived safe and appropriate, immediate and long-term responses to mental health crises, and deprived of safe and appropriate services to avoid mental health crises.

258.    The legal theories under which Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiffs are typical of the harms suffered by the class members.

259.    Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the class, and will fairly and adequately protect the interests of the class. Plaintiffs have each had interactions with the NYPD in which they were subjected to unlawful and discriminatory seizures, confinements, and excessive force; forced to be committed to a psychiatric hospital without their consent; inappropriately thrust into the criminal legal system; gravely injured; deprived of safe and appropriate, immediate and long-term responses to mental health crises; or deprived of safe and appropriate services to avoid mental health crises.

260.    Plaintiffs are represented by Jonathan C. Moore, Luna Droubi, Rebecca Pattiz, and Deema Azizi of the law firm Beldock, Levine & Hoffman LLP ("BLH"); P. Jenny Marashi of Marashi Legal Group; Marinda van Dalen and Ruth Lowenkron of New York Lawyers for the Public Interest ("NYLPI"); and Richard Schwed, Dennis Kitt, and Samuel P. Vitello of Shearman & Sterling LLP.

261.    BLH attorneys have litigated a number of class action lawsuits including, but not limited to: *El Sayed v. City of New York*, No. 18-cv-10566 (S.D.N.Y.) (injunctive claims, including

a revised Patrol Guide policy, resolved on June 11, 2021); *Syed v. City of New York*, No. 16-cv-04789 (S.D.N.Y. 2016) (class certified on February 15, 2019); *McLennon v. City of New York*, No. 14-cv-6320 (E.D.N.Y. 2014) (injunctive claims resolved on March 3, 2020); *Floyd v. City of New York*, No. 08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore . . ., class counsel is undoubtedly qualified and experienced to conduct this litigation."); *see also MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

262.    P. Jenny Marashi has litigated dozens of cases in federal court, including cases with multiple plaintiffs seeking policy change including, but not limited to, *Meister and Greater Los Angeles Agency on Deafness*, CV14-1096 MWF (C.D.C.A. 2014); *The Estate of Reyes v. City of New York*, 16-cv-4880 (S.D.N.Y. 2016); *Urbina v. City of New York*, 16-349-CV (2d Cir.); *Li v. City of New York*, 15-cv-1599 (E.D.N.Y. 2015), and *Flores v. City of New York*, 15-cv-5845 (S.D.N.Y. 2015) (involving "EDPs").

263.    New York Lawyers for the Public Interest attorneys have litigated a number of class action lawsuits, the majority of which were litigated on behalf of people with disabilities and under the same laws at issue in this case, including *Jimenez v. N.Y.C. Dep't of Educ.*, No. 155825/2018 (N.Y. App. Div.); *N.Y. Ass'n for Retarded Children v. Paterson*, Index No. 72 Civ. 356 (E.D.N.Y) (currently in the monitoring and enforcement stage); *O'Toole v. Cuomo*, 1:12CV04166 (E.D.N.Y.) (currently in the monitoring stage); *Brad. H. v. City of New York*, No. 117882/99 (N.Y. App. Div.) (currently in the monitoring stage); *Ligon v. City of New York*, 12-cv-02274 (S.D.N.Y.) (currently in the remedial stages); *Casale v. Kelly*, 257 F.R.D. 396 (S.D.N.Y. 2009).

264.    Shearman & Sterling LLP has represented individuals and organizations in matters including *HIAS, Inc. v. Trump*, No. 19-cv-03346 (D. Md.) (obtained preliminary injunction,

executive order later revoked); *The Humane Society of the United States v. USDA*, No. 20-cv-03258 (C.D. Cal. Nov. 29, 2021) (currently in discovery); and *Kim v. Kum Gang, Inc.*, No. 12-cv-06344 (S.D.N.Y.) (obtained $2.67 million in back wages and damages for restaurant workers).

265.    Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

266.    The Plaintiff class should be certified pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

## FIRST CAUSE OF ACTION
### Discrimination Based on Disability or Perceived Disability
### Title II of the Americans with Disabilities Act,
### 42 U.S.C. § 12111, *et seq.*
### (On Behalf of All Plaintiffs and Class Members against the City of New York)

267.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

268.    Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, states that, "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

269.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

270.    Defendants are public entities, or employees of public entities, within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

271.    The term "disability" includes a "mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1)(A), as well as "being regarded as having such

an impairment," 42 U.S.C. § 12102(1)(C).

272.    Plaintiffs and Class Members have mental impairments that substantially limit one or more of their major life activities such as thinking, communicating, working, and interacting, or are perceived as having such mental impairments.

273.    A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

274.    The provision of health and public safety is a service of the City of New York.

275.    The involvement of NYPD officers in interactions involving individuals with mental disabilities or perceived mental disabilities, the provision of mental health services, and responding to mental health crises, are programs and activities of the City of New York.

276.    The individual Plaintiffs and Class Members are qualified individuals with disabilities because they meet the essential eligibility requirements for the receipt of services by having resided in and/or been present in the City of New York, and they are therefore eligible for mental health, crisis response, health, and public safety services, programs, and activities within the scope of Title II of the ADA.

277.    The NYPD's "EDP" Policy provides for police interactions with individuals who have a mental disability or who they deem to be "apparently mentally ill or emotionally disturbed," who "must be taken into protective custody." This is the case even if the individual is "not violent and willing to leave voluntarily." *Id*.

278.    The ADA prohibits the City from discriminating against individuals by depriving

them of equal access to, and the benefits of, health and public safety services because of their disabilities or perceived disabilities.

279.    The individual Plaintiffs and Class Members were discriminated against and deprived of equal access to, and the benefits of, health and public safety services because of their disability or perceived disability.

280.    Defendants have been deliberately indifferent to the individual Plaintiffs and Class Members by reason of their disabilities or perceived disabilities, denying them the benefits of the services, programs, and activities to which they are entitled as persons with mental disabilities, including, but not limited to, the right to be free of discriminatory or disparate treatment by virtue of their mental disability or perceived mental disability. As a result, Plaintiffs suffered harm in violation of their rights under the ADA, 42 U.S.C. § 12132.

281.    Defendants also discriminated against Plaintiffs Baerga, Greene, Sanchez-Esquivel, and certain Class Members under the ADA by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. 42 U.S.C. § 12112(b)(5)(A).

282.    Defendants have failed to accommodate Plaintiffs Baerga, Greene, Sanchez-Esquivel, and certain Class Members by failing to provide non-police services to them knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interactions; (b) seizing Plaintiffs without probable cause or basis; (c) using excessive and extreme force; (d) wrongly determining that Plaintiffs required hospitalization; and (e) inappropriately deploying the heavily-armed Emergency Services Units that lead to further escalation.

283.    The City and NYPD have also failed to take appropriate steps to (a) ensure that

communications with members of the public with disabilities are as effective as communications with others; (b) furnish appropriate aids and services where necessary to afford an individual with a disability an equal opportunity to enjoy the benefits of a service, program, or activity conducted by the public entity; (c) and give primary consideration to the requests of the individual with a disability in determining what type of aid and service is necessary. *See* 28 C.F.R. § 35.160. The City must ensure that persons with mental disabilities can obtain information as to the existence and location of accessible services, activities, and facilities. *See* 28 C.F.R. § 35.163(b).

284.   As a result of Defendants' discriminatory acts, Plaintiffs and Class Members have been harmed and are entitled to damages, including but not limited to damages to compensate for emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

285.   Plaintiffs and Class Members are also entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C. § 794(a).

**SECOND CAUSE OF ACTION**
**Discrimination Based on Disability or Perceived Disability**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.***
**(On Behalf of All Plaintiffs and Class Members against the City of New York)**

286.   Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

287.   Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

288.   An "individual with a disability" is defined under the statute, in pertinent part, as an "individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual," or is "perceived" as having such an impairment. 29 U.S.C. §

705(2)(B) (referencing 42 U.S.C. § 12102).

289.    A "qualified" individual with a disability means a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, that program or activity. 28 C.F.R. § 39.103.

290.    For the reasons set forth above, Plaintiffs and Class Members are qualified persons with disabilities or persons with perceived disabilities.

291.    Defendants' acts and omissions described herein violate the equal access and non-discrimination provisions of Section 504 and the regulations promulgated thereunder, and have resulted in injury to Plaintiffs and Class Members.

292.    This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs and Class Members have no adequate remedy at law.

293.    Defendants also discriminated against Plaintiffs Baerga, Greene, Sanchez-Esquivel, and certain Class Members under Section 504 by not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual. 28 C.F.R. § 39.130.

294.    Defendants have failed to accommodate Plaintiffs Baerga, Greene, Sanchez-Esquivel, and certain Class Members by failing to provide non-police services to them knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interactions; (b) seizing Plaintiffs without probable cause or basis; (c) using excessive and extreme force; (d) wrongly determining that Plaintiffs required hospitalization; and (e) inappropriately deploying the heavily-armed Emergency Services Units that lead to further escalation.

295.    The City and NYPD have also failed to take appropriate steps to (a) ensure that

communications with members of the public with disabilities are as effective as communications with others; (b) furnish appropriate aids and services where necessary to afford an individual with a disability an equal opportunity to enjoy the benefits of a service, program, or activity conducted by the public entity; (c) and give primary consideration to the requests of the individual with a disability in determining what type of aid and service is necessary. *See* 28 C.F.R. § 35.160. The City must ensure that persons with mental disabilities can obtain information as to the existence and location of accessible services, activities, and facilities. *See* 28 C.F.R. § 35.163(b).

296.    As a result of Defendants' discriminatory acts, Plaintiffs and Class Members have been harmed and are entitled to damages, including but not limited to damages to compensate for emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

297.    Plaintiffs and Class Members are also entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C. § 794(a).

**THIRD CAUSE OF ACTION**
**Unlawful Seizure and Warrantless Entry**
**Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution**
**(On Behalf of Individual Plaintiffs and Class Members against All Defendants)**

298.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

299.    Defendants' seizure of Plaintiffs herein was done without any judicial warrant, was unreasonable, and was done without lawful justification.

300.    Plaintiffs did not consent to, and were conscious of, their confinements by Defendants.

301.    Defendants did not have probable cause to seize, detain, or involuntarily hospitalize Plaintiffs, as Plaintiffs did not pose a risk of harm to themselves or others.

302.    Defendants' seizure of Plaintiffs was unjustified and objectively unreasonable, taking into consideration the information available to Defendants at the time they seized Plaintiffs.

303.    Defendants entered the homes of the Plaintiffs without probable cause or exigent circumstances.

304.    In addition, Defendant City designed and/or implemented policies and practices, including the "EDP" Policy, pursuant to which the individual officer Defendants and other members of the NYPD ordered, effected, and otherwise participated in unlawfully seizing and unlawfully entering the homes of Plaintiffs and other individuals with actual and perceived mental disabilities.

305.    Moreover, this was done when the Defendant City knew that non-police response teams could safely and effectively support people experiencing mental health crises without violating their rights.

306.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, city, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

307.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**FOURTH CAUSE OF ACTION**
**Excessive Force**
**Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution**
**(On Behalf of Individual Plaintiffs and Class Members against Individual Defendants)**

308.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

58

309.    Defendants used force against Plaintiffs that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

310.    The types and levels of force Defendants used against Plaintiffs were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

311.    Defendants Wnorowski, McDowell, Mole, Haber, Gbain, Prasad, Dawkins, Fisher, Ramayya, Torres, and Sanchez used excessive force against Plaintiffs, without making appropriate determinations about whether those uses of force were necessary, justified, or reasonable.

312.    In many cases, Defendants used excessive force, even though Plaintiffs and/or class members agreed to voluntarily leave with Defendants to go to a nearby hospital.

313.    In many cases, Defendants used excessive force even though Plaintiffs and/or class members were observably frail, did not resist, or did not otherwise pose a threat to the safety of the officers or others.

314.    In many cases, where Defendants and other NYPD members caused injury to Plaintiffs and/or class members through the use of excessive force, Defendants did nothing to address those injuries.

315.    The types and levels of force Defendants used against Plaintiffs were harmful and resulted in seriously physical and emotional injury to Plaintiffs.

316.    In addition, pursuant to Defendant City's policies and practices, including the "EDP" Policy, individual officer Defendants and other members of the NYPD ordered, effected, and otherwise participated in using excessive force against the Individual Plaintiffs, as well as against the class.

317.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, city, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

318.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CAUSE OF ACTION
**Violations of Fourth and Fourteenth Amendment of U.S. Constitution, *Monell v. Dept. of Social Services of the City of New York*, 42 U.S.C. § 1983**
**(On Behalf of All Plaintiffs and Class Members against the City of New York)**

319.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

320.    Plaintiffs have been injured proximately and directly by Defendants, including by being subjected to unlawful seizure, excessive force, and warrantless entry without due process of law.

321.    Defendants City of New York, Mayor de Blasio, and Commissioner Shea have directly enforced, promoted, authorized, and sanctioned the unlawful seizure and detention of people with actual or perceived mental disabilities through the maintenance of the "EDP" Policy, which permits the unlawful seizure and detention of individuals with mental disabilities or perceived mental disabilities for long periods of time, even though they are not actually a harm to themselves or others.

322.    Defendants City of New York, Mayor de Blasio, and Commissioner Shea have directly enforced, promoted, authorized, and sanctioned a *de facto* policy or custom of excessive force against those they identify as "EDP's," including by the use of standard police tactics which have the predictable result of escalating the risk of harm to persons undergoing mental health

crises.

323.    Defendants City of New York, Mayor de Blasio, and Commissioner Shea have been deliberately indifferent to the rights of individuals with mental or perceived mental disabilities.

324.    Defendants City of New York, Mayor de Blasio, and Commissioner Shea have repeatedly had notice that the NYPD was inadequate at responding to mental health crises and likely to cause constitutional violations, based on multiple incidents of excessive force, false arrest, and other misconduct against individuals with mental disabilities or perceived mental disabilities, dating back to at least 1984. *See* supra section III.

325.    The NYPD continues to employ, promote, and even give additional responsibility to NYPD officers with a known history of abusive behavior towards individuals with mental disabilities or perceived mental disabilities.

326.    Defendant City of New York, through Mayor de Blasio and Commissioner Shea, ratified the unsafe, unconstitutional, and otherwise unlawful treatment of individuals with mental disabilities or perceived mental disabilities by their knowledge of, participation in, and/or deliberate indifference to such actions, as well as their failure to discipline or hold misbehaving officers accountable.

327.    By these failures, Defendant City of New York, through Mayor de Blasio and Commissioner Shea, has been deliberately indifferent to the rights of individuals with mental disabilities or perceived mental disabilities, and these failures and policies are the moving force behind, and direct and proximate cause of, the constitutional violations suffered by Plaintiffs as alleged herein.

328.    As a direct result of Defendant City of New York's failures and policies, the individual Plaintiffs suffered severe harm, including physical injury, emotional distress, fear,

apprehension, and concern for Plaintiffs' own safety.

329.    Plaintiffs and Class Members have no adequate remedy at law and will suffer serious and irreparable harm to their constitutional rights unless Defendants are enjoined from continuing NYPD's policy, practice, and/or custom of unconstitutional and discriminatory treatment of people with mental disabilities or perceived mental disabilities, and unless Defendants are enjoined from continuing the policies and/or customs that have directly and proximately caused such constitutional and discriminatory abuses.

### SIXTH CAUSE OF ACTION
**Violations of the New York State Constitution and New York State Common Law**
**(On Behalf of Individual Plaintiffs and Class Members against Individual Defendants)**

330.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

331.    The conduct of the Defendant police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, invoking state power and/or authority, and as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

**Violations of the New York State Constitution**

332.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 11, and 12 of the New York State Constitution. These provisions prohibit discrimination in a person's civil rights, as well as warrantless entries, searches, and unreasonable searches and seizures.

333.    A damages remedy here is necessary to effectuate the purposes of Article I, §§ 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiffs' rights under those sections.

334.    As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury and emotional distress, and were otherwise damaged and injured.

335.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Assault and Battery**

336.    Defendants committed assault against Plaintiffs within the meaning of New York's common law by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

337.    Defendants committed battery against Plaintiffs within the meaning of New York's common law by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

**False Imprisonment and Unreasonable Detention**

338.    By the actions described above, the named police officials falsely arrested and/or imprisoned Plaintiffs within the meaning of New York's common law, without reasonable suspicion or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement, and it was without their consent.

**SEVENTH CAUSE OF ACTION**
**Discrimination Based on Disability or Perceived Disability**
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*.**
**(On Behalf of All Plaintiffs and Class Members against All Defendants)**

339.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

340.    The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a) provides, "[i]t shall be an unlawful discriminatory practice for any person, being the

owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation . . . ."

341.    The term "person" in the NYCHRL includes "governmental bodies or agencies." N.Y.C. Admin. Code § 8-102(a).

342.    NYCHRL defines the term "place or provider of public accommodation" to include "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kinds are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

343.    The City, including through its agency the NYPD, is a person, place, or provider of public accommodation because it provides services, facilities, accommodations, advantages and privileges by acting in response to calls regarding individuals experiencing mental health crises.

344.    The involvement of NYPD officers in interactions with individuals with mental disabilities or perceived disabilities is a program, service, and activity of the NYPD and the City.

345.    Through the actions described above, the City has denied to individuals with mental disabilities the full and equal enjoyment of their lives, on equal terms and conditions as those without mental disabilities. This includes the freedom to live without unlawful seizures and excessive force by law enforcement.

346.    The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a

person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Administrative Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of Section 8-107, which includes Defendants under the N.Y.C. Admin. Code § 8-102(1).

347.    Creation and provision of an appropriate and non-discriminatory health and public safety service constitutes a reasonable accommodation under the NYCHRL.

348.    Defendants have been aware of the need for an appropriate mental health crisis response in New York City for years, but have failed to remedy the policies and practices, causing continuing and repeated harm to class members.

349.    Defendants have made inadequate or no reasonable accommodations to allow people with mental disabilities the opportunity to live without unlawful law enforcement interference.

350.    Defendants have failed to accommodate Plaintiffs Baerga, Greene, Sanchez-Esquivel, and certain Class Members by failing to provide non-police services to them knowing that such services are more appropriate for individuals with mental disabilities, and instead (a) escalating the interactions; (b) seizing Plaintiffs without probable cause or basis; (c) using excessive and extreme force; (d) wrongly determining that Plaintiffs required hospitalization; and (e) inappropriately deploying the heavily armed Emergency Services units that lead to further escalation.

351.    Defendants' conduct also violates N.Y.C. Administrative Code § 8-107(17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity

results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

352.     Defendants' policy or practice of allowing police officers to make discretionary decisions about an individual's mental disability or perceived mental disability has a disparate negative impact on individuals with mental disabilities who are unable to be free from unlawful and unconstitutional seizures, to receive appropriate responses to mental health crises, and to receive appropriate mental health services to avoid mental health crises.

353.     As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

354.     As a result of Defendants' discriminatory acts, Individual Plaintiffs have been harmed and are entitled to damages, including but not limited to damages to compensate for emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

355.     This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

356.     Consequently, Plaintiffs are also entitled to injunctive relief.

## RELIEF REQUESTED

**WHEREFORE**, the Individual Plaintiffs, on behalf of themselves and other members of the class they seek to represent, as well as Community Access, NAMI-NYC, and CCIT-NYC respectfully request that this Court:

a.     Enter an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, for the class described herein, with the named plaintiffs as class representatives;

b.     Issue a class-wide declaratory judgment that the NYPD's "EDP" Policy violates the Fourth and Fourteenth Amendments of the United States Constitution, the ADA, Section 504, Section 1983, the New York State Constitution, New York State's Common Law principles of Assault, Battery, False Imprisonment, Warrantless Entry, and

66

Unreasonable Detention, the New York City Human Rights Law, and N.Y.C. Local Law No. 48;

  c.  Issue a permanent injunction enjoining New York City from continuing to apply the current "EDP" Policy and from violating federal, state, and city law with respect to class members including, but not limited to, an injunction that requires Defendants to issue and implement the following, subject to Plaintiffs' and the Court's approval:

    i. A comprehensive remedial plan to protect members of the class from abuse by NYPD employees and to provide the class with needed services related to their mental health. The plan shall mandate:

      1. Implementation of a new non-police mental health crisis response program operating independently of the NYPD;

      2. Mental health crisis first response teams consisting of one independent emergency medical technician and one trained crisis counselor who identifies as a person with lived mental health experience;

      3. Mental health crisis first responder teams to be deployed by a non-governmental agency or agencies which shall receive funding from the City;

      4. Response times of mental health crisis first responder teams to be no case slower than the City's response times for other crises;

      5. Mental health crisis first responder teams to be available 24 hours a day, 7 days a week, 52 weeks per year;

      6. A new phone number for mental health crisis calls, as an alternative to 911—such as 988;

      7. An oversight board to monitor the new mental health crisis response program, which shall (a) include a majority of peers and represent the diversity of New York City; (b) have access to data from the new mental health crisis response program; (c) be empowered to request and obtain data from the NYPD and other city agencies involved in providing mental health services; and (d) creation of an independent entity to evaluate data from the new mental health crisis response program and to issue annual reports, which shall be provided to this Court, counsel in this matter, and the oversight board, and made available to the public.

       ii.   A new NYPD policy that ensures the safety of members of the class and compliance with federal, state, and city law during interactions between police officers and people with actual or perceived mental disabilities.

      d.     Appoint a monitor to oversee the development and implementation of the remedial plan and to determine that the plan is sufficient and appropriately implemented.

      e.     Award Plaintiffs, and the members of the class they seek to represent, compensatory damages in an amount that is fair and reasonable, to be determined at trial;

      f.     Award Plaintiffs punitive damages in an amount to be determined at trial;

      g.     Award Plaintiffs, and the members of the class they seek to represent, reasonable attorneys' fees, costs, and interest;

      h.     Retain jurisdiction of this case until the unlawful practices, policies, acts and omissions complained of herein no longer exist and this Court is satisfied that they will not recur; and

      i.     Grant such other and further relief as this Court may deem appropriate and equitable as may be required in the interests of justice.

Dated: New York, New York
December 29, 2021

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400

By:_____
Jonathan C. Moore
Luna Droubi
Rebecca Pattiz
Deema Azizi

MARASHI LEGAL
930 Grand Concourse #1E
Bronx, NY 10451
(917) 703-1742

By: /s/_____
P. Jenny Marashi

NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.
151 West 30th Street, 11th Floor
New York, New York 10001-4017
(212) 244-4664

By:_____
Marinda van Dalen (pro hac pending)
Ruth Lowenkron

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

By: /s/_____
Richard Schwed
Dennis Kitt
Samuel P. Vitello