**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------- X

JUSTIN BAERGA; STEVEN GREENE; GIOVANNA
SANCHEZ-ESQUIVEL;     and     SARAH     ARVIO,
individually and on behalf of all others similarly situated,
and COMMUNITY ACCESS, INC.; NATIONAL
ALLIANCE ON MENTAL ILLNESS OF NEW YORK
CITY, INC.; and CORRECT CRISIS INTERVENTION
TODAY - NYC,

Plaintiffs,

-against-

CITY OF NEW YORK; BILL DE BLASIO; DERMOT
F. SHEA; NYPD POLICE OFFICER KRZYSZTOF
WNOROWSKI; NYPD POLICE OFFICER SHERON;
NYPD POLICE OFFICER MCDOWELL; NYPD
POLICE SERGEANT NATHAN MOLE; NYPD
POLICE OFFICER MARTIN HABER; NYPD POLICE
SERGEANT GBAIN, NYPD POLICE OFFICER
VIKRAM PRASAD; NYPD POLICE OFFICER
ANDRE DAWKINS; NYPD POLICE OFFICER
TYRONE FISHER; NYPD POLICE OFFICER
DEVIENDRA RAMAYYA; NYPD POLICE OFFICER
JULIAN TORRES; NYPD OFFICER SANCHEZ, and
NYPD OFFICERS JOHN and JANE DOES # 1-40,

Defendants.

No. 21-cv-05762 (PAC)

------------------------------------------------------------------------- X

<br>

# PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

STATEMENT OF FACTS ................................................................................. 2

STANDARD OF REVIEW ................................................................................ 4

ARGUMENT .................................................................................................. 5

    I. PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS FOR FALSE ARREST AND
    EXCESSIVE FORCE ................................................................................. 5

        A. The Defendant Officers Lacked Probable Cause to Seize Plaintiffs ................ 5

        B. There Were No Exigent Circumstances Supporting the Officers' Entry .......... 9

    II. INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED
    IMMUNITY .......................................................................................... 13

    III. PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS UNDER THE ADA, SECTION
    504, AND NYCHRL ............................................................................. 14

    IV. THE ORGANIZATIONAL PLAINTIFFS HAVE BOTH DIRECT AND
    ASSOCIATIONAL STANDING ................................................................. 18

        A. All Three Organizational Plaintiffs Sufficiently Plead Direct Standing .......... 18

        B. CCIT-NYC Sufficiently Pleads Associational Standing ................................ 20

    V. PLAINTIFFS ADEQUATELY PLEAD THEIR *MONELL* CLAIMS ...................... 21

    VI. PLAINTIFFS' CLAIMS UNDER THE STATE CONSTITUTION MUST SURVIVE
    .......................................................................................................... 25

CONCLUSION .............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Am. Council of the Blind of N.Y., Inc. v. City of N.Y.*, 579 F. Supp. 3d 539 (S.D.N.Y. 2021) ..... 15

*Aouatif v. City of N.Y.*, 2019 U.S. Dist. LEXIS 94303 (E.D.N.Y. May 31, 2019) ........................ 8

*Art & Antique Dealers League of Am. v. Seggos*, 2019 U.S. Dist. LEXIS 16620 (S.D.N.Y. Feb. 1, 2019) ................................................................................................................................. 21

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 5

*Batt v. Buccilli*, 725 F. App'x 23 (2d Cir. 2018) ...................................................................... 10

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ............................................................... 5

*Bison Capital Corp. v. ATP Oil & Gas Corp.*, 2010 U.S. Dist. LEXIS 62836 (S.D.N.Y. June 24, 2010) ................................................................................................................................. 24

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).. 14

*Brown v. State*, 89 N.Y.2d 172 (1996) ................................................................................... 25

*Butchino v. City of Plattsburg*, 2022 U.S. Dist. LEXIS 7995 (N.D.N.Y. Jan. 14, 2022) ............. 17

*Chamberlain v. City of White Plains*, 960 F.3d 100 (2d Cir. 2020) ................................. 10, 13, 14

*Colon v. New York*, 60 N.Y.2d 78 (1983) ................................................................................. 7

*Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439 (2d Cir. 2021) .................................... 19

*Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167 (2d Cir. 2021).......................................... 18

*Connick v. Thompson*, 563 U.S. 51 (2011) ............................................................................. 25

*Davis v. Rodriguez*, 364 F.3d 424 (2d Cir. 2004) ..................................................................... 5

*Durr v. Slator*, 558 F. Supp. 3d 1 (N.D.N.Y. 2021) ................................................................. 17

*Felix v. City of N.Y.*, 2020 U.S. Dist. LEXIS 189223 (S.D.N.Y. Oct. 13, 2020) ........................ 16

*Felix v. City of N.Y.*, 344 F. Supp. 3d 644 (S.D.N.Y. 2018)...................................................... 25

*Felix v. City of N.Y.*, 408 F. Supp. 3d 304 (S.D.N.Y. 2019)...................................................... 25

*Ferebee v. City of N.Y.*, 2017 U.S. Dist. LEXIS 104783 (S.D.N.Y. July 6, 2017)...................... 12

*Fishon v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 143930 (S.D.N.Y. Aug. 11, 2022) . 21

*Green v. City of N.Y.*, 465 F.3d 65 (2d Cir. 2006) ........................................................ 6

*Guan v. City of N.Y.*, 37 F.4th 797 (2d Cir. 2022) ....................................................... 6

*Heller v. Bedford Cent. Sch. Dist.*, 144 F. Supp. 3d 596 (S.D.N.Y. 2015)..................................... 9

*Jocks v. Tavernier*, 316 F.3d 128, 135 (2d Cir. 2003) ..................................................... 7

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020) ............................................................ 13

*Kennedy v. Arias*, 2017 U.S. Dist. LEXIS 103576 (S.D.N.Y. July 5, 2017)............................... 13

*Kerman v. City of N.Y.*, 261 F.3d 229 (2d Cir. 2001). ....................................... 7, 10, 14

*Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268 (2d Cir. 2009).............................. 14

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ............................................. 21

*Lurch v. City of N.Y.*, 2021 U.S. Dist. LEXIS 26815 (S.D.N.Y. Feb. 10, 2021)........................... 7

*Maxwell v. City of N.Y.*, 380 F.3d 106 (2d Cir. 2004) ............................................. 13

*Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693 (2d Cir. 2015) .................................. 21

*Mizrahi v. City of N.Y.*, 2018 U.S. Dist. LEXIS 136348 (E.D.N.Y. Aug. 13, 2018)..................... 7

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) .......... 18

*O'Connor v. Donaldson*, 422 U.S. 563 (1975) ................................................. 6

*Oliver v. City of N.Y.*, 2022 U.S. Dist. LEXIS 27053 (S.D.N.Y. Feb. 15, 2022) .................... 9, 25

*Reeves v. Anderson*, 2014 U.S. Dist. LEXIS 177179 (S.D.N.Y. Dec. 24, 2014) ........................ 10

*Reg'l Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002)............. 15

*Rose v. City of Utica*, 2015 U.S. Dist. LEXIS 196005 (N.D.N.Y. Dec. 2, 2015)........................ 11

*Selvon v. City of N.Y.*, 2015 U.S. Dist. LEXIS 104421 (E.D.N.Y. Aug. 10, 2015)..................... 22

*Silver v. Kuehbeck*, 217 F. App'x 18 (2d Cir. 2007) ................................................. 8

*Singer v. Fulton Cty. Sheriff*, 63 F.3d 110 (2d Cir. 1995) ............................................. 6

*Smith v. Yonkers Police Dep't*, 1995 U.S. Dist. LEXIS 11737 (S.D.N.Y. Aug. 9, 1995)............ 12

iii

*Tardiff v. City of N.Y.*, 991 F.3d 394 (2d Cir. 2021) ..................................................... 17

*Todd v. N.Y.C. Health & Hosps. Corp.*, 2018 U.S. Dist. LEXIS 230962 (E.D.N.Y. Sep. 26, 2018) .................................................................................................................................... 8

*Tsesarskaya v. City of N.Y.*, 843 F. Supp. 2d 446 (S.D.N.Y. 2012) ............................... 8

*U.S. v. Freeman*, 735 F.3d 92 (2d Cir. 2013) ................................................................ 8

*United States v. Sanchez*, 635 F.2d 47 (2d Cir. 1980) .................................................. 11

*Williams v. City of N.Y.*, 121 F. Supp. 3d 354 (S.D.N.Y. 2015) ................................... 17

*Wright v. City of Buffalo*, 137 A.D.3d 1739 (4th Dept. 2016) ....................................... 11

*Wyant v. Okst*, 101 F.3d 845 (2d Cir. 1996) ................................................................. 8

*Young v. Cty. of Fulton*, 160 F.3d 899 (2d Cir. 1998) ................................................... 24

**Statutes**

29 U.S.C. § 794(a) ........................................................................................................ 17

42 U.S.C. § 12132 ........................................................................................................ 17

42 U.S.C. § 12182(3) .................................................................................................... 17

N.Y. Mental Hygiene L. § 9.41 ............................................................................... passim

N.Y.C. Admin. Code § 8-107(4)(a) .............................................................................. 17

N.Y.C. Local Law No. 85 (2005) .................................................................................. 17

## PRELIMINARY STATEMENT

Defendants' Memorandum of Law in support of their partial Motion to Dismiss suffers from three key interrelated flaws that pervade the brief. First, Defendants disregard the well-established motion to dismiss standard and refuse to accept the facts alleged by Plaintiffs as true, let alone draw reasonable inferences in Plaintiffs' favor. For example, in arguing that police officers had probable cause to seize the individual Plaintiffs, Defendants do not base their argument on the factual allegations in the First Amended Complaint (hereinafter "FAC" or "Complaint"), but instead improperly speculate that each individual Plaintiff presented a serious threat to themselves or others merely because they had or were perceived to have a mental disability. Defendants make similar baseless leaps of logic in arguing for the dismissal of Plaintiffs' unlawful entry and excessive force claims, as well as in the individual Officer Defendants' purported entitlement to qualified immunity.

Second, Defendants fail to properly comprehend Mental Hygiene Law ("MHL") § 9.41, which exclusively applies where (1) individuals appear to have a mental illness *and* (2) are conducting themselves in a manner likely to result in serious harm to themselves or others. Defendants ignore that essential second element, and consistently infer that the individual Plaintiffs were a danger to themselves or others merely because they were identified as experiencing a mental health crisis or "appearing mentally ill." In this way, Defendants' filing makes palpable Plaintiffs' *Monell* claim and class action allegations: under the policy implemented by Defendants, the mere mention that an individual may have a mental illness causes police officers to enact a warrantless search, seize the individual, and force the individual to a facility, regardless of whether the individual presents a substantial risk of serious harm to themselves or others. In violation of the State and Federal constitutions, the Americans with Disabilities Act

1

("ADA"), Section 504 of the Rehabilitation Act ("Section 504"), and the New York City Human Rights Law ("NYCHRL"), Defendants repeatedly conflate having a mental disability with presenting a risk of serious harm.

Third, Defendants fundamentally misconstrue and misrepresent the Plaintiffs' and putative class's allegations. For example, in arguing for the dismissal of Plaintiffs' claims under the ADA, Section 504, and the NYCHRL, Defendants misleadingly argue that Plaintiffs are challenging the adequacy of the medical treatment that was provided to them by the NYPD and thereby improperly cabin the sphere in which reasonable accommodations can be made. In fact, it is the City's policy of having the NYPD respond to mental health calls that is at the core of Plaintiffs' failure to accommodate claims. Defendants' policy for individuals experiencing mental health issues—on its face and as applied—discriminates against individuals with actual or perceived mental disabilities by treating them differently than others without mental disabilities, a claim that Defendants chose not to move to dismiss.

As a result, Plaintiffs respectfully request that the Court deny Defendants' partial motion to dismiss in its entirety.

## **STATEMENT OF FACTS**

Individual Plaintiffs Justin Baerga, Steven Greene, Giovanna Sanchez-Esquivel, and Sarah Arvio, individually and on behalf of all others similarly situated, and Organizational Plaintiffs Community Access, Inc., National Alliance on Mental Illness of New York City, Inc. (NAMI-NYC), and Correct Crisis Intervention Today-NYC (CCIT-NYC) filed the First Amended Class Action Complaint on December 29, 2021, challenging the systematic failures of Defendant City of New York to provide safe and appropriate, immediate, and long-term responses to New Yorkers experiencing, or alleged to be experiencing, mental health crises. (FAC ¶ 1.) In particular, the

litigation challenges the City's use of police officers as first responders to potential mental health crises. (*Id*. ¶¶ 2; 10.) Defendants have a longstanding policy and practice of criminalizing individuals with mental disabilities, resulting in numerous police killings, violence, injury, and other losses of liberty. (*Id*. ¶ 10.) Defendants' policy is found in the NYPD's Patrol Guide § 221-13 (the "'EDP' Policy"), which uses the antiquated and offensive term "Emotionally Disturbed Person" and requires members of the NYPD—who do not have appropriate training and are not health professionals—to detain "EDPs," even if the individuals are "unarmed," "not violent," and "willing to leave voluntarily." (*Id*. ¶¶ 10, 64.) In addition to dehumanizing people with mental disabilities by perpetuating stereotypes, the "EDP" Policy, on its face, discriminates against such individuals by treating them differently simply because of their actual or perceived mental disability. (*Id*. ¶¶ 12–14.) Defendants' policy has remained consistent since 1984 and has led to abuses that have caused numerous deaths and grave injuries. (*Id*. ¶¶ 59, 69–72.) Defendants have had knowledge of their unlawful treatment of individuals with mental disabilities but have failed to alter their unconstitutional conduct. (*Id*. ¶¶ 73–93.) And, despite being warned by the Urban Justice Center in as early as 2002 that the City had "no systematic method for referring individuals in crisis to mental health providers," the City has continuously refused to adequately address the problem. (*Id*. ¶¶ 75–93.) Two separate City taskforces, one in 2014 and another in 2018, did little to remedy the systematic violations. (*Id*.) Defendants' most recent mental health crisis response program—the Behavioral Health Emergency Assistance Response Division ("B-HEARD")—also fails to appropriately serve those experiencing a mental health crisis, in its lack of oversight, accountability, or implementation by community groups, failure to use training instructors with knowledge of mental disabilities, and limitations with respect to hours as well as geographic coverage. (*Id*. ¶¶ 94–117.) Rather than providing a reasonable accommodation, in practice, this

3

program further entrenches a police presence in responses to mental health crises, as only 0.75% of all "EDP" calls City-wide were responded to by B-HEARD teams. (*Id.* ¶¶ 98–100.)

Such failures have real-world consequences. Justin Baerga was home experiencing a mental health crisis when his mother called 911 requesting an ambulance. Armed NYPD officers arrived instead, forcibly entered Baerga's home, strapped him to a gurney, and transported him to a hospital against his will. (*Id*. ¶¶ 5, 118–137.) Steven Greene was also home when armed NYPD officers and City Emergency Medical Services ("EMS") personnel arrived, claiming he was suicidal. Even though Greene clearly and calmy explained that he was not suicidal, NYPD officers forcibly detained him and transported him to a hospital against his will. (*Id*. ¶¶ 6, 138–160.) Giovanna Sanchez-Esquivel was home when her boyfriend called 911 claiming that she was having a "manic episode." Sanchez-Esquivel was not violent and remained calm throughout the entire interaction, yet armed NYPD officers forcibly detained her and committed her to a hospital against her will. (*Id*. ¶¶ 7, 161–173.) Sarah Arvio was on the phone with her doctor's office regarding a liver ailment when she said, "I'm so frustrated with you all that I feel like jumping off the bridge." Minutes later, armed NYPD officers and EMS personnel forcibly detained her and committed her to a hospital against her will. (*Id*. ¶¶ 8, 174–204.)

These failures also harm organizations that focus on a continuum of issues related to mental health. Plaintiffs Community Access, NAMI-NYC, and CCIT-NYC are organizations committed to safeguarding New Yorkers with mental disabilities. Each organization has diverted a significant amount of resources to promote a non-police first response to mental health crisis calls in the City. (*Id*. ¶¶ 9, 205–252.)

## **STANDARD OF REVIEW**

To survive a motion to dismiss, a complaint "must contain sufficient factual matter,

4

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*.

## ARGUMENT

### I.   PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS FOR FALSE ARREST AND EXCESSIVE FORCE

Defendants' arguments against Plaintiffs' § 1983 claims fail for a simple reason: none of the individual Plaintiffs conducted themselves in a manner likely to result in serious harm to themselves or others. MHL § 9.41 only applies where an individual "appears to be mentally ill *and* is conducting himself or herself in a manner which is likely to result in serious harm to the person or others" (emphasis added). Distilled, Defendants argue that, as long as Plaintiffs reportedly had or appeared to have a mental disability, they were conducting themselves in a manner likely to result in serious harm implicating MHL § 9.41. Defendants' argument exposes the City's misunderstanding of § 9.41 as they obstinately defend the unlawful "EDP" Policy, under which officers are required to take any individual identified as an "EDP" into custody, regardless of their behavior based on their disability or perceived disability alone. (FAC ¶ 10.)

### a.    The Defendant Officers Lacked Probable Cause to Seize Plaintiffs

For § 1983 false arrest claims, a plaintiff must allege that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Singer v.*

*Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995).

Defendants argue only that the seizures were privileged because the officers had probable cause pursuant to MHL § 9.41. However, MHL § 9.41 provides that a police officer "may take into custody any person who appears to be mentally ill *and* is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." Mental Hygiene L. § 9.41 (emphasis added). The phrase "likely to result in serious harm" is defined as "(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is a danger to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." *Id.* § 9.01. "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will, as 'there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom.'" *O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975). "A mental health false arrest claim arises from both the Fourth Amendment's protection against unreasonable mental health seizures and the Fourteenth Amendment's due process protections." *Guan v. City of N.Y.*, 37 F.4th 797, 807 (2d Cir. 2022).

As the Second Circuit has clarified, "to make a mental health arrest, police officers must consider whether probable cause exists to believe the individual is a danger to herself or others, that is, whether there is a *substantial* risk of *serious* physical harm to herself or others." *Id.* (emphasis added). The reasonableness of an officer's belief must be assessed in light of the particular circumstances confronting the officer at the time. *Kerman v. City of N.Y.*, 261 F.3d 229, 235 (2d Cir. 2001). Regardless of what information is initially provided to an officer, "the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack

6

of probable cause." *Colon v. New York*, 60 N.Y.2d 78, 82 (1983). In other words, probable cause

can dissipate if the officer learns new facts in responding to a call or situation. *Jocks v. Tavernier*,

316 F.3d 128, 135, 137–38 (2d Cir. 2003). Moreover, "[f]or a competent adult, dangerousness to

oneself justifying such a seizure does not include a refusal to accept medical treatment." *Green v.

City of N.Y.*, 465 F.3d 65, 83 (2d Cir. 2006).

Defendants improperly infer probable cause for the seizure of all four individual Plaintiffs

because, "in each incident, a 911 operator was informed that the respective plaintiff was having a

mental health crisis." (Defs' Partial Mot. to Dismiss, Dkt No. 102 ("MTD") at 5.) In addition,

Defendants point to the following allegations from the Complaint in support of the seizures:

- Baerga's mother told the 911 operator that her son, who had "mental issues," was breaking things in their apartment, and that when officers arrived, Baerga was locked in the apartment. (FAC ¶¶ 120, 123, 126.)
- The caller reporting Greene's crisis stated he was suicidal, and he became anxious when police arrived and walked away from them. (FAC ¶¶ 144, 147, 149.)
- Sanchez-Esquivel's boyfriend told the 911 operator that she had been having a manic episode for multiple days, and when officers arrived at the scene, she begged them to leave. (FAC ¶¶ 162, 164–65, 168.)
- Arvio told her doctor's secretary in "nothing more than an expression of frustration" that she felt "like jumping off a bridge." (FAC ¶¶ 175, 178.)

None of this establishes an objectively reasonable basis for any Plaintiff's seizure as a

matter of law. Several cases in this Circuit have found that a 911 call in itself is often insufficient

to establish probable clause. *Lurch v. City of N.Y.*, 2021 U.S. Dist. LEXIS 26815, at *10 (S.D.N.Y.

Feb. 10, 2021) (impossible to establish probable cause from 911 call made by social worker);

*Mizrahi v. City of N.Y.*, 2018 U.S. Dist. LEXIS 136348, at *60 (E.D.N.Y. Aug. 13, 2018) ("the

911 call on which the defendant police officers rely cannot provide the basis for a reasonable belief

that plaintiff was a danger to herself"). The Second Circuit has found that a pair of anonymous

calls did not even create reasonable suspicion for a stop, let alone a seizure. *United States v.*

*Freeman*, 735 F.3d 92, 98 (2d Cir. 2013). Outside the context of 911 calls, courts have also found that even the combination of a city employee identifying someone as an "EDP," coupled with the person subsequently refusing to open the door to the police is "insufficient to establish probable cause on the face of the pleadings." *Todd v. N.Y.C. Health & Hosps. Corp.*, No. 16-CV-02124, 2018 U.S. Dist. LEXIS 230962, at *15 (E.D.N.Y. Sep. 26, 2018); *see also Tsesarskaya v. City of N.Y.*, 843 F. Supp. 2d 446, 456 (S.D.N.Y. 2012) (whether plaintiff's behavior in refusing to open door was sufficiently erratic to satisfy MHL§ 9.41 was a jury question).

Moreover, Defendants' reliance on probable cause to attempt to dismiss the false arrest claim is inappropriate because of the parties' myriad factual disputes. For a false arrest claim, probable cause is an affirmative defense "normally asserted in an answer." *Silver v. Kuehbeck*, 217 F. App'x 18, 22 (2d Cir. 2007). This is because it is rare that the elements of the defense can be established from the face of the complaint when all inferences are read in a plaintiff's favor, as "[d]etermining probable cause to justify a mental health seizure requires courts to 'look to the specific observations and information available' at the time of the seizure." *Aouatif v. City of N.Y.*, 2019 U.S. Dist. LEXIS 94303, at *9 (E.D.N.Y. May 31, 2019). While there are instances in which the defense can be established based on the pleadings, the existence of probable cause may only be determined as a matter of law "if there is no dispute as to the pertinent events and the knowledge of the officers." *Wyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).

Here, there is a fundamental dispute as to both the pertinent events and the knowledge of the officers. For example, Defendants focus on the allegation that Baerga's mother reported he was breaking things in their apartment. However, the Complaint states that she asked the 911 operator not to send police, and then when the police arrived, she informed officers that he was not violent towards himself or anyone else and did not have any weapons. (FAC ¶¶ 120–24.)

8

Defendants argue that an unidentified social worker—who the Complaint states was actually Greene's ex-girlfriend—reported Greene was suicidal, but Greene told the officers that he was not suicidal, did not tell anyone else he was suicidal, and did not have medical problems. (*Id.* ¶¶ 143–44.) Defendants do not explain how the seizures of Sanchez-Esquivel or Arvio were supported by probable cause; merely citing to the allegations that a 911 caller reported that Sanchez-Esquivel stated she was having a manic episode and asked the police to leave, and that Arvio told her doctor's secretary in "nothing more than an expression of frustration" that she felt "like jumping off a bridge." (*Id.* ¶¶ 162, 164–65, 168; 175, 178.)

These disputes on pertinent issues make it premature and infeasible to find Defendants had probable cause at this stage. *Oliver v. City of N.Y.*, 2022 U.S. Dist. LEXIS 27053, at *33 (S.D.N.Y. Feb. 15, 2022) ("Probable cause cannot be found as a matter of law on the basis of information known by the police at the time of the arrest when it is unclear what was said to the police, and by whom.").[1] The seizures of Plaintiffs were unreasonable.

### b.    There Were No Exigent Circumstances Supporting the Officers' Entry

Defendants misstate both the law and the allegations in the FAC when they argue that the emergency aid exception was triggered because "an identified individual who knew each plaintiff called 911, reporting that the person was in danger and needed mental health care." (MTD at 8.)

At the core of the Fourth Amendment is the right of a person to retreat into his or her "own home and there be free from unreasonable government intrusion." *Silverman v. United States*, 365

---

[1] While it is possible for probable cause to be established on the face of a complaint, the *Heller v. Bedford Cent. Sch. Dist.* case Defendants cite shows the specificity required for such a finding: the plaintiff alleged that, after receiving a notification of concern for his well-being, police officers monitored his online communications, in which he mentioned, among other things, his desire to commit mass murder, which concerned the police, who knew the plaintiff had recently purchased firearms and intended to purchase more. 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015).

U.S. 505, 511 (1961). "Under the Fourth Amendment, warrantless searches are presumptively unreasonable." *Reeves v. Anderson*, 2014 U.S. Dist. LEXIS 177179, at *14 (S.D.N.Y. Dec. 24, 2014). However, police officers "may enter a dwelling without a warrant to render assistance to a person whom they reasonably believe to be in distress." *Kerman*, 261 F.3d at 235 . This is known as the "emergency aid exception," which in exigent circumstances allows an officer to enter a home to assist persons who are seriously injured or threatened with serious injury. *Batt v. Buccilli*, 725 F. App'x 23, 25 (2d Cir. 2018). Nonetheless, the law is clear that an uncorroborated and anonymous 911 call is insufficient to trigger this exception and excuse warrantless entry into a dwelling. *Kerman*, 261 F.3d at 236. In particular, "an uncorroborated 911 call . . . reporting that a mentally ill person was in distress is insufficient support for probable cause to believe there is a medical exigency." *Chamberlain v. City of White Plains*, 960 F.3d 100, 111 (2d Cir. 2020) (unlawful entry where "EDP" himself firmly and repeatedly informed the officers that he had not called for help and was not in need of assistance).

Plaintiffs were not threatening serious injury to themselves or others. Baerga's mother expressly told the 911 operator that her son was not violent, had no weapons, and that police were not necessary. (FAC ¶ 120.) Greene's ex-girlfriend called 911 on him, but there is no allegation in the Complaint that the caller stated Greene presented an immediate danger to himself or anyone else, and when officers arrived he repeatedly stressed he was not in need of assistance. (FAC ¶¶ 143-44.) Sanchez-Esquivel's boyfriend called 911 but stated that she was not violent and did not have any weapons, and she explained to officers when they arrived that she did not want their assistance. (FAC ¶ 162.) It is unclear from the face of the Complaint who called 911 regarding

Arvio or the contents of that call.[2] At the motion to dismiss stage, without any evidence of what the callers told 911, there is no support for the applicability of the emergency aid exception.[3] Even if there were any indicia of exigent circumstances based on the 911 calls, once officers arrived at the scene and it was clear that Plaintiffs were not a danger to themselves or others, as alleged in the FAC, there were no longer exigent circumstances permitting the officers' entry.

### c.    The Officers Used Excessive Force

Defendants also assert that Plaintiffs' excessive force claims fail because the facts alleged in the Complaint establish that Defendants could reasonably believe that Baerga, Greene, and Sanchez-Esquivel each posed an immediate threat to their own safety or that of others around them, and therefore the force used to accomplish their seizures under § 9.41 in the face of resistance was reasonable.[4] Defendants are wrong. First, courts are reluctant to dismiss excessive force claims at the motion to dismiss phase, because, as Defendants concede, "whether an officer's use of force was reasonable is a fact-intensive inquiry," MTD at 8, and undertaking such a fact-intensive inquiry at this juncture is impossible. *Wright v. City of Buffalo*, 137 A.D.3d 1739, 1742 (4th Dept. 2016); *Rose v. City of Utica*, 2015 U.S. Dist. LEXIS 196005, *11 (N.D.N.Y. Dec. 2, 2015) (collecting cases); *Smith v. Yonkers Police Dep't*, 1995 U.S. Dist. LEXIS 11737, at *10 (S.D.N.Y. Aug. 9, 1995). Defendants fail to cite any cases where an excessive force claim was defeated on a

---

[2] Defendants argue that Arvio's warrantless entry claim fails as she "opened the door for" the officers and therefore provided them with implicit consent to enter her apartment. MTD at n.7. This relies on an unfounded inference from the FAC, which only states that Arvio opened the door when the officers loudly knocked and that the officers entered; not that she invited them in. The case Defendants cite in support of their claim is plainly distinguishable. In *United States v. Sanchez*—on appeal following defendants' conviction and while considering a robust factual record and applying a different standard—the Second Circuit concluded that the officers' entry into the apartment was not clearly erroneous where the door was not just opened for the officers, but after the officers stated their desire to enter, the person who opened the door opened it wider and stood back to let them in, all without offering any objections. 635 F.2d 47, 60 (2d Cir. 1980).

[3] Defendants fail to cite a case where the court held the emergency aid exception applied on the pleadings.

[4] Defendants are not moving to dismiss Plaintiff Arvio's excessive force claim. (MTD at 8.)

motion to dismiss.

Second, considering the paucity of justifications for the police officers' use of excessive force against each individual Plaintiff, Defendants draw implausible and unreasonable inferences from the Complaint to attempt to save their argument that Plaintiffs were an "immediate threat." Defendants suggest that Baerga posed an "immediate threat" because he became nervous and locked himself in his room when the police arrived for approximately 45 minutes during which he was "not violent and was not presenting a risk to himself or others." (FAC ¶¶ 123, 127, 130, 132–33.) Defendants baselessly claim that a reasonable officer would believe Greene presented a danger to himself or others simply because he stated that he did not want to go to the hospital and walked back into his apartment. (FAC ¶¶ 147.) Defendants similarly argue Sanchez-Esquivel somehow provided officers with reasonable grounds to believe she was a danger to herself or others simply because she was not willing to go to the hospital. (FAC ¶ 168.) Defendants' attempted justifications fail because no reasonable officer could possibly draw such conclusions.

Defendants also argue that Plaintiffs' excessive force claims fail because the force alleged was reasonable incident to an arrest or was *de minimis*, but, as set forth in a case they cite, only "[p]ushes or shoves that cause *no injury* cannot support an excessive force claim." *Ferebee v. City of N.Y.*, 2017 U.S. Dist. LEXIS 104783, at *20 (S.D.N.Y. July 6, 2017) (emphasis added). (MTD at 9.) However, the Complaint expressly pleads that the individual Plaintiffs suffered physical and emotional injuries. Baerga suffered bruising on his back, swelling in his hands, abrasions on his legs, and emotional distress. (FAC ¶ 137.) Greene suffered bruising and abrasions to his chest, arms, and head, as well as extensive emotional trauma. (FAC ¶¶ 157–58.) Sanchez-Esquivel suffered physical injuries including severe bruises to her arms and hands, back and shoulder pain from being handcuffed and dragged by officers, as well as emotional distress. (FAC ¶ 173.) These

are all injuries adequate to save an excessive force claim from summary judgment, let alone a motion to dismiss. *See, e.g.*, *Kennedy v. Arias*, 2017 U.S. Dist. LEXIS 103576, at \*24 (S.D.N.Y. July 5, 2017) (existence of various bruises and abrasions indicate injuries sufficiently serious to survive summary judgment); *Maxwell v. City of N.Y.*, 380 F.3d 106, 108 (2d Cir. 2004) (involving an arrest in which an officer twisted plaintiff's arm, "yanked" her, and threw her up against a car, causing only bruising.).

## II. THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY

Qualified immunity protects government officials from civil damages only where their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020). Defendants argue that the Individual Officers are entitled to qualified immunity in relation to Plaintiffs' false arrest and excessive force claims for two reasons: first, because they had probable cause to support each individual Plaintiff's seizure; and second, because the level of force they used when arresting Plaintiffs Baerga, Greene, and Sanchez-Esquivel (but not Arvio) was objectively reasonable. As discussed in Section I, both arguments fail because the officers did not have probable cause and the level of force used was not objectively reasonable. Further, "as a general rule, the defense of qualified immunity cannot support the grant of a Rule 12(b)(6) motion," because it cannot be resolved "prior to ascertainment of the truth of the plausible factual allegations on which a finding of qualified immunity is premised." *Chamberlain*, 960 F.3d at 110. On a motion to dismiss, "the plaintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.*.

Moreover, Defendants' reliance on MHL § 9.41 again rings hollow. The individual

Plaintiffs did not present a serious risk to themselves or anyone else, and thus there were no grounds for officers to effectuate a seizure under § 9.41, let alone one with the level of force employed. The Second Circuit held that it would be constitutionally impermissible for police officers to seize and transport an individual to the hospital based solely on the concerns of a 911 caller, *Kerman*, 261 F.3d at 234–36, and that doing so with the force used by Defendants here violated the Fourth Amendment. *Id*. at 237–40. Moreover, "law was clearly established at the time of entry that a warrantless entry into a private dwelling, absent exigent circumstances, is unlawful." *Chamberlain*, 960 F.3d at 111. No exigent circumstances existed.

## III.   PLAINTIFFS SUFFICIENTLY PLEAD CLAIMS UNDER THE ADA, SECTION 504, AND NYCHRL

Plaintiffs allege multiple theories of liability under the ADA, Section 504, and the NYCHRL,[5] including that the individual Plaintiffs were treated differently because of their disability or perceived disability (FAC ¶¶ 279–80), and that the City's "EDP" Policy, on its face, discriminates against individuals because of their mental disabilities or perceived mental

---

[5] Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* Section 504 at 29 U.S.C. § 794(a). The NYCHRL, N.Y.C. Admin. Code § 8-107(4)(a), makes it an "unlawful discriminatory practice" for any "place or provider of public accommodation, because of the actual or perceived . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." *Brooklyn Ctr. for Indep*., 980 F. Supp. 2d at 642. It further requires that "any person prohibited by the [law] from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." *Id*. NYCHRL is to be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those with provisions comparably-worded to provisions of this title, have been so construed." N.Y.C. Local Law No. 85 (2005) § 7. Federal laws provide "a floor below which the City's Human Rights Law cannot fall." *Loeffler v. Staten Island Univ. Hosp*., 582 F.3d 268, 271 (2d Cir. 2009); *see also Brooklyn Ctr. for Indep*., 980 F. Supp. 2d at 643 (because City's actions "violate the ADA and the Rehabilitation Act, it follows that Defendants are liable under the NYCHRL as well.").

14

disabilities. (*Id.* ¶¶ 11–13.)[6] Plaintiffs also allege, under the NYCHRL, that the "EDP" Policy

disparately impacts individuals with mental disabilities. (*Id.* ¶ 352.)

Defendants' sole argument for dismissal of Plaintiffs' ADA, Section 504, and NYCHRL

claims focuses on Plaintiffs' failure to accommodate theory of liability, but Plaintiffs alleging

violations under the ADA and Section 504 "may proceed under any or all of three theories:

disparate treatment, disparate impact, and failure to make reasonable accommodation." *Reg'l*

*Econ. Cmty. Action Program v. City of Middletown*, 294 F.3d 35, 48 (2d Cir. 2002); *Am. Council*

*of the Blind of N.Y., Inc. v. City of N.Y.*, 579 F. Supp. 3d 539, 571 (S.D.N.Y. 2021) (NYCHRL has

a "broader notion of which accommodations are reasonable" than the ADA and Section 504).

Notably, Defendants do not challenge Plaintiffs' disparate treatment or disparate impact claims

under the ADA, Section 504, or the NYCHRL. Those claims must, therefore, proceed.

On failure to accommodate, Defendants mistakenly cast Plaintiffs' allegations as

concerning the adequacy of the medical treatment purportedly provided by the NYPD, and then

argue that these allegations are not cognizable under the ADA. This is gross mischaracterization

of the allegations set forth in the Complaint. Plaintiffs never allege that the medical treatment the

NYPD provided for their disabilities was inadequate. Rather, Plaintiffs challenge the City's failure

to provide "safe, appropriate, and immediate responses to New Yorkers experiencing mental health

crises" as evidenced, in part, by the City's policy of requiring police responses to individuals with

mental disabilities or perceived disabilities experiencing crises. *See, e.g.*, FAC ¶¶ 1, 2, 53, 63–64,

69, 274. In other words, the City improperly attempts to cabin the sphere in which a reasonable

---

[6] For example, Defendants fail to acknowledge that the ADA guidance is directly at odds with the existing "EDP" policy. The ADA provides that a "direct threat" means "a *significant* risk to the health and safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(3) (emphasis added).

accommodation can be made by focusing on the contingencies of the police response. However, Plaintiffs do not argue that the NYPD needs to adjust its response when dealing with individuals with mental health disabilities or perceived disabilities, but that the NYPD is the improper responder in the first place.[7] Plaintiffs, individually and on behalf of those they seek to represent, seek accommodations in the form of "[i]mplementation of a new *non-police* mental health crisis response program operating independently of the NYPD," and the creation of "[m]ental health crisis first response teams consisting of one independent emergency medical technician and one trained crisis counselor who identifies as a person with lived mental health experience." (FAC at 66–68 [emphasis added].) The City apparently recognized the need to remove police as first responders by establishing the B-HEARD pilot, but the program is deeply flawed and insufficient. (FAC ¶¶ 94–117.)

Even if it were appropriate for Defendants to provide a police response to an individual experiencing a mental health crisis (for example, in situations in which an individual presents a substantial and immediate risk of inflicting serious physical harm on themselves or others), the ADA requires police departments to make reasonable accommodations for people with disabilities, as has been recognized by myriad cases. *See, e.g.*, *Felix v. City of N.Y.*, 2020 U.S. Dist. LEXIS 189223, at *15 (S.D.N.Y. Oct. 13, 2020) (collecting cases). District courts in this Circuit, along with five Circuit Courts,[8] have held that interactions between law enforcement and individuals with disabilities are subject to the protections of the ADA. *See, e.g.*, *Williams v. City of N.Y.*, 121

---

[7] The New York City Charter makes it clear that the police are not the proper agency for responding to mental health emergencies. Section 556 of the City Charter establishes the Department of Health and Mental Health as the sole city agency responsible for the health, including mental health, of New Yorkers.

[8] *See Reyes v. Town of Thomaston*, 2020 U.S. Dist. LEXIS 181331, *9 n.1, 2020 WL 5849529 (D. Conn. Sept. 30, 2020) (collecting cases).

F. Supp. 3d 354, 364-65 (S.D.N.Y. 2015) (the ADA governs "on-the-street encounters" between police and covered individuals, concluding that "the City's crabbed interpretation of Title II's coverage of police activity simply does not comport with the language of Title II and its implementing regulations, particularly in light of the remedial purpose of the statute and the weight of authority that has considered the issue."); *Durr v. Slator*, 558 F. Supp. 3d 1, 32 (N.D.N.Y. 2021) ("Title II of the ADA requires police officers to provide reasonable accommodations to arrestees"); *Butchino v. City of Plattsburg*, 2022 U.S. Dist. LEXIS 7995, *33 (N.D.N.Y. Jan. 14, 2022) (noting that "[w]hereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit … is a quintessential failure to accommodate disability claim.").

Defendants do not engage with any of the settled reasonable accommodation jurisprudence, instead asserting that *Tardiff v. City of N.Y.*, 991 F.3d 394 (2d Cir. 2021) defeats Plaintiffs' claims under the ADA. *Tardiff* is inapposite. There, the plaintiff had epilepsy, and alleged that her epilepsy was not adequately treated while she was being detained. *Id.* The court found no evidence that the plaintiff's disability "made it difficult in any way for her to access benefits—namely, medical services—that were available to all pretrial detainees," concluding that "her claim relates solely to whether she received adequate medical treatment in police custody for her disability," which "is not cognizable under the ADA." [9] *Id.* at 405.

By contrast, here Plaintiffs do not allege that Defendants' actions or policies prevented individuals from receiving adequate medical treatment for their disabilities, while they were being

---

[9] *Tardiff* only considered a reasonable accommodation challenge under the ADA, and not disparate treatment or disparate impact claims, both of which are alleged by Plaintiffs here, (FAC ¶¶ 279–283, and neither of which is the subject of Defendants' limited motion to dismiss.

detained or otherwise. Instead, the Plaintiffs allege that they were denied reasonable accommodations and equal access to, and the benefits of, health and public safety services because of their disabilities or perceived disabilities, including the right to be free of discriminatory or disparate treatment. The City has a duty to make reasonable accommodations, and Defendants failed to do so at any point in their interactions with the individual Plaintiffs.

## IV. THE ORGANIZATIONAL PLAINTIFFS HAVE BOTH DIRECT AND ASSOCIATIONAL STANDING

All three organizational Plaintiffs have direct standing to bring this lawsuit as they were harmed as organizations by Defendants' actions and policies. Additionally, CCIT-NYC, the only membership organization, also has associational standing to sue on behalf of its members.[10]

### a. All Three Organizational Plaintiffs Sufficiently Plead Direct Standing

An organization can establish standing by demonstrating that it was directly injured by showing: "(i) an imminent injury in fact to itself as an organization . . . that is distinct and palpable; (ii) that its injury is fairly traceable to the challenged act; and (iii) that a favorable decision would redress its injuries." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172–73 (2d Cir. 2021). A party can satisfy the injury prong when it "diverts its resources away from its other current activities, or otherwise incurs some perceptible opportunity cost." *Id.* Defendants argue that the Organizational Plaintiffs have not adequately alleged direct standing because the Complaint does not (1) include specific instances in which each organization had to divert resources and (2) allege what such resources have been diverted from. This is untrue.

Unlike the conclusory allegation in the case cited by Defendants—*Conn. Citizens Def.*

---

[10] Where a case has multiple plaintiffs, only one plaintiff need possess the requisite standing for a suit to go forward. *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 470 (S.D.N.Y. 2020).

*League, Inc. v. Lamont*, 6 F.4th 439, 448 (2d Cir. 2021)—all organizational Plaintiffs here allege numerous instances of diverting their specific resources due to Defendants' actions and the "EDP" Policy*, see, e.g.*, FAC ¶¶ 212–26; 229–36; 241–51, including actual examples of the work being impaired and the diversion of resources. For example, the staff at Community Access are hesitant to call 911 in situations in which its buildings' residents with mental disabilities experience mental health crises requiring acute support because of the policies challenged in this lawsuit. (*Id.* ¶ 212.) Its staff must also divert resources so that its staff can handle these issues without risking dangerous responses by the NYPD. (*Id.* ¶ 213.) It has also had to divert resources and staff time from day-to-day resident services to investigate police encounters and act as intermediaries between the police and residents of its buildings. (*Id.* ¶¶ 216–17.) Likewise, NAMI-NYC has devoted resources away from its programs and advocacy to, among other things, provide consultation and assistance to people with mental disabilities who have been harmed in police encounters. (*Id.* ¶¶ 232–33.) But for the urgent work they do challenging police responses to mental health crises, NAMI-NYC would have more resources for their mentorship program, support groups, and other program and policy priorities. (*Id.* ¶ 235.) Finally, CCIT-NYC also details how it has had to divert resources because of Defendants' actions and polices, for example organizing panel discussions and rallies, meeting with elected officials, and providing testimony at public hearings to transform the City's mental health crisis response. (*Id.* ¶¶ 244–51.) As a result, it has had to divert resources away from other priorities like expanding access to acute and long-term mental health services. (*Id.* ¶¶ 249–50.)

Defendants also incorrectly argue that the organizational Plaintiffs do not have standing because "the very purpose of the plaintiff organizations is to expend resources on the matters alleged." (MTD at 18.) On the contrary, as alleged in the Complaint, challenging the "EDP" Policy

and preventing Defendants' unlawful actions are not the organizational Plaintiffs' main function or purpose, and Defendants fail to prove otherwise in their motion papers. Community Access's mission is "to expand opportunities for people living with mental disabilities to recover from trauma and discrimination through affordable housing, training, advocacy, and healing-focused services," and includes expanding housing services (FAC ¶¶ 206, 221.) Because of the City's unlawful response to mental health crises, Community Access has had to expend resources to train its staff on de-escalation during police encounters, (*Id*. ¶¶ 213-14), to provide trauma recovery services after police encounters, (*Id.* ¶ 218), to investigate police related incidents and act as an intermediary between police officers and residents, (*Id*. ¶¶ 216-17). These resources would be far better spent supporting Community Access's actual mission and priorities. (*Id.* ¶ 207.)

NAMI-NYC's helps families and individuals affected by mental disabilities build better lives through education, support, and advocacy. (*Id.* ¶ 228.) NAMI-NYC also has several policy priorities in support of its mission such as community education efforts, workplace mental health initiatives, improving psychiatric emergency room services, increasing access to mental health care, and expanding the proper use of mental health courts. (*Id.* ¶ 235.) NAMI-NYC has had to divert resources from these programs and policy priorities toward advocacy to transform the City's mental health response. (*Id.*) And CCIT-NYC has had to divert its resources away from core policy goals at the state level like the expansion of crisis stabilization centers, better hotline services, and funding of regional mobile crisis teams. (*Id.* ¶ 250.) These extensive allegations are adequate at the pleading stage to establish direct organizational standing for all three organizational Plaintiffs.

   **b.   CCIT-NYC Sufficiently Pleads Associational Standing**

CCIT-NYC also has associational standing. A membership organization has standing to sue on behalf of its members when: "(a) its members would otherwise have standing to sue in their

own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Mental Hygiene Legal Serv. v. Cuomo*, 609 F. App'x 693, 695 (2d Cir. 2015). To assert associational standing at the pleading stage, a plaintiff "must make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Art & Antique Dealers League of Am. v. Seggos*, 2019 U.S. Dist. LEXIS 16620, at *6 (S.D.N.Y. Feb. 1, 2019).

Defendants contend that CCIT-NYC lacks associational standing as Plaintiffs have not alleged that they have members who would have standing to sue in their own right. First, Community Access and NAMI-NYC are both members of CCIT-NYC, and each have independent standing to sue, as discussed above, and Plaintiffs have alleged that other organizations including Police Reform Organizing Project and Concern for Independent Living are in similar situations.[11] (FAC ¶¶ 240–42.) Plaintiffs have also alleged that CCIT-NYC has individual members that have been harmed by Defendants' conduct. (FAC ¶¶ 238-40.) These specific allegations are adequate to establish associational standing at the pleading stage.

## V.   PLAINTIFFS ADEQUATELY PLEAD THEIR *MONELL* CLAIMS

Defendants' depiction of Plaintiffs' *Monell* claims is both specious and disingenuous. At the motion to dismiss stage, a plaintiff need not "allege all elements of a prima facie case of municipal liability. Instead, [a plaintiff] must simply allege facts that allow the Court to draw the inference that the constitutional violation was the result of a municipal policy of inaction, as opposed to 'isolated misconduct by a single actor.'" *Selvon v. City of N.Y.*, 2015 U.S. Dist. LEXIS

---

[11] The harms alleged on behalf of CCIT-NYC's members in the FAC (¶¶ 240-42) exceed standing requirements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992); *Fishon v. Peloton Interactive, Inc.*, 2022 U.S. Dist. LEXIS 143930, at *24 (S.D.N.Y. Aug. 11, 2022).

104421, at *6 (E.D.N.Y. Aug. 10, 2015). As detailed below, Plaintiffs have adequately alleged various *Monell* requirements: existence of a formal policy, existence of a *de facto* policy or custom, as well as deliberate indifference by Defendants.

The formal policy at issue is the "EDP" Policy, which is a one-size-fits-all, non-discretionary prescription to transport anyone with a disability or perceived disability to the hospital. (FAC Ex. 1.). It defines an "EDP" as "[a] person who appears to be mentally ill or temporarily deranged and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others." (*Id.*) However, the "EDP" Policy fails to explain how an officer can determine whether an individual is in fact an "EDP" or contemplate a situation in which a person reported or perceived to be mentally ill *is not* behaving in such a manner as to create a reasonable belief of serious injury, even when the "EDP" is unarmed and not violent. (FAC ¶ 63.)

As Defendants' brief admits, NYPD officers treat individuals as "EDPs" merely because someone tells a 911 operator that the person has or had a mental disability, not because they are conducting themselves "in a manner which is likely to result in serious harm to [themselves] or others." Under the "EDP" policy, officers do not have any discretion and must seize any individuals that they have been told are "EDPs." (FAC ¶¶ 135, 144, 157, 168, 182.) This is unconstitutional on its face, as it requires officers to seize individuals with mental disabilities simply for existing.

Defendants argue that the "EDP" Policy cannot serve as a basis for Plaintiffs' *Monell* claims as it merely tracks the MHL, which has been deemed constitutional. (MTD at 20–22.) However, as explained *supra*, the "EDP" Policy is different from MHL § 9.41, which includes the important conjunction, "and": an officer "may take into custody any person who appears to be

22

mentally ill *and* is conducting himself in a manner which is likely to result in serious harm to himself or others" (emphasis added). Plaintiffs do not challenge the MHL; they challenge the City's unlawful policy that on its face requires officers to seize and detain any individual an officer believes has a mental disability without reason or articulation, even if that individual is not violent, unarmed, and willing to leave voluntarily.[12] This is stated explicitly in the "EDP" Policy. (FAC ¶¶ 118–204.)

Plaintiffs have also adequately alleged a *de facto* municipal policy or custom carried out by Defendants set out over nearly sixty paragraphs of their Complaint, FAC ¶¶ 59–117, including that the City, Mayor, and NYPD Commissioner "have directly enforced, promoted, authorized, and sanctioned the unlawful seizure and detention of people with actual or perceived mental disabilities [not only] through the maintenance of the "EDP" Policy" but also through "a *de facto* policy or custom of excessive force against those they identify as 'EDP's". (*Id*. ¶¶ 321–22.) The Complaint details these *de facto* policies or customs. (*See, e.g.*, *id*. ¶¶ 59–72.)

Defendants do not appear to challenge that Plaintiffs have adequately pled the existence of a formal or *de facto* municipal policy. (MTD at 21; FAC ¶ 10.) Defendants instead focus on a single paragraph of Plaintiffs' Complaint detailing 23 of the most egregious incidents in which the NYPD inadequately responded to the mental health crises of various New Yorkers, and claim it is insufficient to show a *de facto* policy because, first, Plaintiffs did not allege that any of the findings resulted in admissions or findings of liability, and second, most of the incidents recounted ended in death while Plaintiffs were just taken to the hospital. (MTD at 22.) Plaintiffs are not contending that Defendants have a policy of killing those experiencing mental health crises, but rather that

---

[12] The question of what is meant by "willing to leave voluntarily" is a question of fact best left for discovery.

Defendants were on notice through these 23 egregious incidents that their policy, which is detailed over several dozen paragraphs of the FAC, resulted in avoidable and tragic outcomes. *See* FAC ¶ 69 ("Examples of the most egregious of these abuses which resulted in death include . . . "). It should have been clear to Defendants that "the 'EDP' Policy was failing based on multiple incidents of excessive force, false arrest, and other misconduct against individuals with mental disabilities or perceived mental disabilities." (FAC ¶ 69.)[13]

Finally, Defendants argue that Plaintiffs' "failure to train" allegations are inadequate. (MTD at 23–24.) But Plaintiffs do not make a failure to train allegation as the policy as a whole is deeply flawed and cannot be remedied by training. What Plaintiffs do allege is that Defendants have proven to be deliberately indifferent to constitutional violations of the rights of people with actual or perceived mental disabilities. For deliberate indifference, a plaintiff must plead: "(1) that a policymaker of the municipality knows to a moral certainty that its employees will confront a given situation; (2) that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation; and (3) that the wrong choice by the employee will frequently cause the deprivation of a citizen's constitutional rights." *Young v. Cty. of Fulton*, 160 F.3d 899, 904 (2d Cir. 1998). The "continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees establishes the conscious disregard for the consequences of their action – the 'deliberate indifference'" *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

All of these elements are adequately pled in the Complaint. Plaintiffs have alleged that

---

[13] Defendants also note that these examples only amount to a tiny fraction of annual "EDP" calls, an argument that goes beyond the four corners of the FAC, and must be addressed through discovery and further proceedings. *Bison Capital Corp. v. ATP Oil & Gas Corp.*, 2010 U.S. Dist. LEXIS 62836, at *15 (S.D.N.Y. June 24, 2010).

there are numerous "EDP" calls every year in New York City, and that NYPD officers respond to these calls. (FAC ¶¶ 64-65.) Plaintiffs have alleged that responding to these calls puts officers in difficult situations, which they are not equipped to handle. (FAC ¶ 11, 83.) Plaintiffs have also alleged that the wrong choice will frequently cause the deprivation of persons' constitutional rights, and that Defendants' failure to change course represents a deliberate indifference to the rights of the putative class. (FAC ¶¶ 11, 68, 72.) This is adequate at the pleading stage. *See Felix v. City of N.Y.*, 344 F. Supp. 3d 644, 660 (S.D.N.Y. 2018).

## VI.    PLAINTIFFS' CLAIMS UNDER THE STATE CONSTITUTION MUST SURVIVE

It may be "well-settled that no private right of action exists for violations of the New York State Constitution when a plaintiff has an alternative remedy under § 1983 for violations of parallel provisions of the U.S. Constitution." *Oliver*, 2022 U.S. Dist. LEXIS 27053, at *40. However, Defendants neglect to mention that "[w]hile the standard for liability under the Fourth Amendment and the New York Constitution are the same, there is a *respondeat superior* remedy under the New York State Constitution that is significantly broader than that under Section 1983." *Felix v. City of N.Y.*, 408 F. Supp. 3d 304, 312 (S.D.N.Y. 2019). Thus, "[a] plaintiff seeking to recover on the basis of *respondeat superior* simply does not come within the terms of section 1983." *Brown v. State*, 89 N.Y.2d 172, 194 (1996). Plaintiffs' state-law claims were brought under a theory of *respondeat-superior* liability, (FAC ¶ 331), and they must survive.

## <u>CONCLUSION</u>

For the reasons articulated above, this Court should deny Defendants' partial Motion to Dismiss in its entirety.

Dated: New York, New York
October 19, 2022

BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400


By: _____
    Jonathan C. Moore
    Luna Droubi
    Deema Azizi
    Jeffrey F. Kinkle


MARASHI LEGAL
930 Grand Concourse #1E
Bronx, NY 10451
(917) 703-1742


By: /s/ _____
    P. Jenny Marashi


NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.
151 West 30th Street, 11th Floor
New York, New York 10001-4017
(212) 244-4664


By:_____
    Marinda van Dalen
    Ruth Lowenkron


SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000


By: /s/ _____
    Richard Schwed
    Dennis Kitt