**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

JUSTIN BAERGA; STEVEN GREENE; GIOVANNA
SANCHEZ-ESQUIVEL;    and    SARAH    ARVIO,
individually and on behalf of all others similarly situated,
and  COMMUNITY  ACCESS,  INC.;  NATIONAL
ALLIANCE ON MENTAL ILLNESS OF NEW YORK
CITY, INC.; and CORRECT CRISIS INTERVENTION
TODAY - NYC,

Plaintiffs,

-against-

CITY OF NEW YORK; BILL DE BLASIO; DERMOT
F. SHEA; NYPD POLICE OFFICER KRZYSZTOF
WNOROWSKI; NYPD POLICE OFFICER SHERON;
NYPD  POLICE  OFFICER  MCDOWELL;  NYPD
POLICE  SERGEANT  NATHAN  MOLE;  NYPD
POLICE OFFICER MARTIN HABER; NYPD POLICE
SERGEANT  GBAIN;  NYPD  POLICE  OFFICER
VIKRAM  PRASAD;  NYPD  POLICE  OFFICER
ANDRE  DAWKINS;  NYPD  POLICE  OFFICER
TYRONE  FISHER;  NYPD  POLICE  OFFICER
DEVIENDRA RAMAYYA; NYPD POLICE OFFICER
JULIAN TORRES; NYPD OFFICER SANCHEZ, and
NYPD OFFICERS JOHN and JANE DOES # 1-40,

Defendants.

No. 21-cv-05762 (PAC)

-------------------------------------------------------------------- X

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

LEGAL STANDARD...................................................................................................... 6

ARGUMENT ................................................................................................................. 8

I. PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCITON..................................... 8

II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ............................... 9

    a. The Involuntary Removal Plan and "EDP" Policy Violate the ADA and Section 504
    ...................................................................................................................... 10

    b. The Involuntary Removal Plan and "EDP" Policy Violate the NYCHRL ............. 12

    c. The Involuntary Removal Plan and "EDP" Policy Violate the Unlawful Seizure and
    Warrantless Entry Provisions of the Fourth and Fourteenth Amendments............ 13

    d. The Involuntary Removal Plan and "EDP" Policy Violate the Excessive Force
    Provisions of the Fourth and Fourteenth Amendments......................................... 14

    e. Plaintiffs Demonstrate Fourth and Fourteenth Amendment Violations under *Monell*
    ...................................................................................................................... 15

    f. The EDP Policy and Involuntary Removal Plan Violate the NYS Constitution and
    New York State Common Law ............................................................................ 16

III. THE BALANCE OF HARDSHIPS TIP DECIDEDLY IN PLAINTIFFS' FAVOR  16

IV. THE PUBLIC INTEREST FAVORS AN INJUNCTION ........................................ 17

V. PLAINTIFFS SEEK EXPEDITED DISCOVERY .................................................... 17

CONCLUSION............................................................................................................. 19

# TABLE OF AUTHORITIES

**Cases**

*Arias v. Decker*, 2020 U.S. Dist. LEXIS 64551 (S.D.N.Y. Apr. 10, 2020)..................................... 8

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588 (S.D.N.Y. 2013).. 12

*Butchino v. City of Plattsburg*, 2022 U.S. Dist. LEXIS 7995 (N.D.N.Y. Jan. 14, 2022)............. 11

*Doe v. Congregation of the Sacred Hearts of Jesus & Mary*, No. 21-CV-6865 (VSB), 2022 U.S. Dist. LEXIS 130614 (S.D.N.Y. July 22, 2022) ........................................................................ 19

*Durr v. Slator*, 558 F. Supp. 3d 1 (N.D.N.Y. 2021) ....................................................................... 11

*Felix v. City of N.Y.*, 2020 U.S. Dist. LEXIS 189223 (S.D.N.Y. Oct. 13, 2020) ......................... 11

*Ferebee v. City of N.Y.*, No. 15-CV-1868 (PAC), 2017 U.S. Dist. LEXIS 104783 (S.D.N.Y. July 6, 2017) ........................................................................................................................................ 14

*Gov't Emples. Ins. Co. v. Relief Med., P.C.*, 554 F. Supp. 3d 482 (E.D.N.Y. 2021).................... 17

*Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007).................................. 7

*Guan v. City of N.Y.*, 37 F.4th 797 (2d Cir. 2022) ....................................................................... 14

*Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 898 F. Supp. 2d 610 (S.D.N.Y. 2012) ............................................................................................................................................ 10

*Hardy v. Fischer*, 701 F. Supp. 2d 614 (S.D.N.Y. 2010) ............................................................... 8

*Jolly v. Coughlin*, 76 F.3d 468 (2d Cir. 1996) ............................................................................... 8

*Jones v. Cummings*, 528 F. Supp. 1078 (W.D.N.Y. 1981) ............................................................. 8

*Leisner v. N.Y. Tel. Co.*, 358 F. Supp. 359 (S.D.N.Y. 1973) ......................................................... 7

*Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224 (2d Cir. 1992) ............................................................................................................................................. 7

*Mitchell v. Cuomo*, 748 F.2d 804 (2d Cir. 1984)........................................................................... 8

*Mullins v. City of New York*, 626 F.3d 47 (2d Cir. 2010) ............................................................. 7

*N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32 (2d Cir. 2018)...... 6

*N.Y. State Natl. Organization for Women v. Terry*, 697 F. Supp. 1324 (S.D.N.Y. 1988), *aff'd as modified by*, 886 F.2d 1339 (2d Cir. 1989)................................................................................. 7

ii

*Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Friedman*, 350 F.3d 65 (2d Cir. 2003) .................................................................................................................. 18

*P.C.R. v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778 (KMK), 2022 U.S. Dist. LEXIS 20562 (S.D.N.Y. Feb. 4, 2022) ...................................................................................................... 10

*R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194 (W.D.N.Y. 2020) .......................... 18

*Reyes v. Town of Thomaston*, 2020 U.S. Dist. LEXIS 181331, 2020 WL 5849529 (D. Conn. Sept. 30, 2020) ............................................................................................................................ 11

*Roberts v. Atlantic Recording Corp.*, 892 F. Supp. 83 (S.D.N.Y. 1995) ....................................... 7

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ......................................................................... 17

*Singer v. Fulton Cty. Sheriff*, 63 F.3d 110 (2d Cir. 1995) ........................................................... 13

*Strouchler v. Shah*, 891 F. Supp. 2d 504 (S.D.N.Y. 2012) ........................................................... 8

*Univ. of Tex. v. Camenisch*, 451 U.S. 390 (1981) ........................................................................ 7

*Williams v. City of New York*, 121 F. Supp. 3d 354 (S.D.N.Y. 2015) ......................................... 11

*Wray v. City of New York*, 490 F.3d 189 (2d Cir. 2009) .............................................................. 15

**Statutes**

42 U.S.C. § 12182(3) .................................................................................................................. 12

N.Y.C. Local Law No. 85 (2005) ............................................................................................... 12

## PRELIMINARY STATEMENT

Plaintiffs seek immediate relief from this Court to enjoin Defendant New York City's newly announced Mental Health Involuntary Removals Policy ("Involuntary Removal Policy"), which grossly and dangerously broadens an already unlawful City policy allowing involuntary detentions of individuals who have or appear to have a mental disability.

The new policy, which the Mayor announced on November 29, 2022 and became effective immediately, lowers the standard for involuntary detentions and hospitalizations to such a point that individuals can be forcefully committed to a psychiatric hospital solely because an NYPD officer perceives them to have a mental disability and nothing more. An officer need only decide, based upon the scantest of information, that an individual is unable to meet their "basic needs," is "unaware" of their surroundings, or is exhibiting signs of "delusion"—without any indication that they had committed or will commit a dangerous act—before NYPD officers can forcefully detain and hospitalize them against their will.

The class action complaint filed by Plaintiffs on December 29, 2021 challenged the systemic failures of Defendants, including the City of New York, to provide safe and appropriate, immediate, and long-term responses to New Yorkers experiencing, or alleged to be experiencing, mental health crises. The City's recent announcement is the latest in a long history of failed attempts at reform that only serve to exacerbate these systematic failures. Defendants' policy which was in effect when this lawsuit was commenced, is found in the NYPD's Patrol Guide § 221-13 (the "'EDP' Policy") (Dkt. No. 21-1). Not only does it use the antiquated and offensive term "Emotionally Disturbed Person," or "EDP," it requires members of the NYPD—who are not health professionals—to detain "EDPs," even if the individuals are "unarmed," "not violent," and "willing to leave voluntarily." As explained at length in Plaintiffs' Opposition to Defendants'

1

pending Partial Motion to Dismiss, Dkt. No. 103, the Patrol Guide defies the law, including New York Mental Hygiene Law, which requires a determination that the individual is "conducting himself or herself in a manner which is *likely to result in serious harm* to the person or others." Mental Hygiene L. § 9.41 (emphasis added). By even further weakening the unlawful standards of the Patrol Guide, the City's new Involuntary Removal Policy also violates the Mental Hygiene Law, as well as myriad other federal and state constitutional and statutory provisions.

Details on the Involuntary Removal Policy and how it will be implemented are still scarce,[1] but Mayor Adams' statements (*see* Declaration of Jonathan C. Moore dated December 8,2022 ["Moore Decl."], at ¶¶ 7–9),  combined with the City's November 28, 2022 press release, titled "Mental Health Involuntary Removals" (Moore Decl. at ¶¶ 2–5), make clear that city agencies plan to increasingly and aggressively focus on instituting involuntary removals against New Yorkers deemed by police officers to be unable to meet their basic needs, even when no dangerous act has been observed and even if there is no indication of a likelihood of harm to the individual or others.

The newly announced Involuntary Removal Policy not only violates New York's Mental Hygiene Law, but it discriminates against individuals by treating them differently simply because of their actual or perceived mental disability. The City's new policy—like the "EDP" Policy—is thus both unconstitutional and violative of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL"). The very existence of the Involuntary Removal Policy—as well as the "EDP" Policy—also provide a strong

---

[1] On December 2, 2022, Plaintiffs requested that the City immediately provide Plaintiffs with documents that describe exactly what changes are being made, how officers or other city Officials are being trained to implement those changes, and what the City is doing to oversee how those changes take place. The City has yet to provide any of the requested information.

2

basis for Plaintiffs' *Monell* claims, as they demonstrate a formal City policy. Plaintiffs easily demonstrate a likelihood of success on the merits supporting their request for immediate Court intervention to halt the implementation of the City's new, unlawful policy.

At the heart of Plaintiffs' Application is the City's use of police officers with little to no expertise in dealing with individuals with mental disabilities who will be required to determine whether an individual should be forcefully—often violently—detained against their will. The examples cited by Mayor Adams at his press conference illustrate how difficult it will be for police officers to make these sorts of determinations and how likely it is that the rights of New Yorkers will be violated by the Involuntary Removal Policy. Mayor Adams' example of "the shadow boxer on the street corner in Midtown, mumbling to himself as he jabs at an invisible adversary" does not describe someone who is unable to care for their basic needs, let alone describe someone who meets the standard of serious danger to themselves or others.[2] Moreover, the City's new policy is bereft of details as to how an officer may in fact determine whether Mayor Adams' shadow boxer is unable to take care of his basic needs or is merely exercising.

If the Involuntary Removal Policy is permitted to continue to be implemented, Plaintiffs and countless other New Yorkers will suffer irreparable harm, including a substantially increased likelihood that they will be subjected to unlawful detention and involuntary hospitalization just for exhibiting behavior perceived by a police officer to be unusual—whether the individual has a mental disability or not.

---

[2] Andy Newman and Emma G. Fitzsimmons, *New York City to Involuntarily Remove Mentally Ill People From Streets*, N.Y. Times, Nov. 29. 2022, https://www.nytimes.com/2022/11/29/nyregion/nyc-mentally-ill-involuntary-custody.html.

Plaintiffs respectfully request that the Court issue a temporary restraining order and a preliminary injunction restraining, enjoining, and staying Defendants, pending the final determination of this action, from implementing the Involuntary Removal Policy, including training police officers and other City employees regarding the policy. Plaintiffs also seek expedited discovery to learn the details of the Involuntary Removal Policy, how it will be implemented, and what trainings are being or will be undertaken.

## STATEMENT OF FACTS

Plaintiffs respectfully refer the Court to the First Amended Complaint and the Statement of Facts section in Plaintiffs' Opposition to Defendants' Partial Motion to Dismiss for the facts and allegations that form the basis of this action. (Dkt. Nos. 21 & 103 at 2-4). Below are additional facts relating to the Involuntary Removal Policy that plaintiffs seek to enjoin.

In addition, on November 29, 2022 Mayor Adams announced the Involuntary Removal Policy. (Moore Decl. ¶ 6). On or about the same day, the City published a directive entitled "Mental Health Involuntary Removals," dated November 28, 2022, which provides additional information (Moore Decl., Ex. 1). The directive starts by stating that six City agencies "have worked together to clarify roles and responsibilities in involuntary removals under [Mental Hygiene Law] sections 9.41 and 9.58." (Moore Decl., Ex. 1 at 1).[3]

The directive notes that both sections 9.41 and 9.58 of the Mental Hygiene Law ("MHL") provide the standard for involuntary psychiatric admissions. (Moore Decl., Ex. 1 at 1). It states that "Section 9.41 authorizes a peace officer or police officer to take into custody, for the purpose

---

[3] The six City agencies are the New York Police Department, the New York City Department of Social Services, the New York City Fire Department Bureau of Emergency Medical Services, the Metropolitan Transit Authority ("MTA"), the MTA Police Department, and the New York City Department of Health and Mental hygiene.

4

of a psychiatric evaluation, an individual who appears to be mentally ill and is conducting themselves in a manner likely to result in serious harm to self or others." (Moore Decl., Ex. 1 at 1). According to the directive, the City takes the position that "both sections 9.41 and 9.58 authorize the removal of a person who appears to be mentally ill and displays an inability to meet basic living needs, even when no recent dangerous act has been observed." (Moore Decl., Ex. 1 at 1).

The directive states that "[c]ase law does not provide extensive guidance regarding removals for mental health evaluations based on short interactions in the field." (Moore Decl., Ex. 1 at 1). Still, it asserts that "[i]f the circumstances support an objectively reasonable basis to conclude that the person appears to have a mental illness and cannot support their basic human needs to an extent that causes them harm, they may be removed for an evaluation." (Moore Decl., Ex. 1 at 1). The directive lists three circumstances as "reasonable indicia of an inability to support basic needs due to mental illness": "serious untreated physical injury, unawareness or delusional misapprehension of surroundings, or unawareness or delusional misapprehension of physical condition or health." (Moore Decl., Ex. 1 at 1). The Mayor stated at the November 29 press conference that the City would immediately start training police officers, Emergency Medical Services staff, and other medical personnel regarding the Involuntary Removal Policy. (Moore Decl. 8, Ex. 2). However, it has also been reported that the NYPD had no knowledge of this plan, that the Police Benevolent Association does not understand how police will be able to effectively carry out these new duties, and that New York City hospitals will not be able to meet the dramatic rise in hospitalizations. (Moore Decl. 16).

Plaintiff Steven Greene has already been severely affected by the Involuntary Removal Policy. Greene has been forced to suffer involuntary hospitalizations on three or more occasions,

which have exacerbated his mental health.  (Declaration of Steven Greene Dated December 8, 2022 ("Greene Decl.") at ¶ 27). Since the Mayor announced the Policy, Greene has lived in a constant state of fear that he will be forcibly hospitalized once again merely, for being an individual with a mental disability. (Greene Decl. at ¶ 29). Greene has been afraid to leave his apartment, as he fears the Policy's standard for involuntary detention is so low that he could be detained and hospitalized just by going about his business in his neighborhood. (Greene Decl. at ¶ 30).

The organizational Plaintiffs have felt the effect of the Involuntary Removal Policy as well. CCIT-NYC, for example, has already begun to divert resources in response, as they have been researching what the Policy will mean for the communities they serve based upon the information available, checking in with and being contacted by their members about how they are being affected by the Policy, speaking with elected officials, organizing a rally, and more. (Declaration of Felix Guzman dated December 8, 2022 ("Guzman Decl.") at ¶¶ 18-19). Many of CCIT-NYC's members with mental disabilities have been detained under the City's "EDP" Policy, and since the Involuntary Removal Policy lowers the bar for involuntary detentions of individuals perceived to have mental disabilities, the members will face a heightened risk of being discriminated against, being subjected to baseless involuntary detentions, and suffering from related constitutional violations as a result of the City's Policy. (Guzman Decl. at ¶¶ 19-26).

## LEGAL STANDARD

"The purpose of a preliminary injunction is . . . to preserve the relative positions of the parties." *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not

required to prove his case in full at a preliminary-injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). In fact, "hearsay evidence may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 51-52 (2d Cir. 2010).

The standards for issuing a temporary restraining order and a preliminary injunction are the same. *See Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228–29 (2d Cir. 1992); *Roberts v. Atlantic Recording Corp.*, 892 F. Supp. 83, 86 (S.D.N.Y. 1995). A court may issue a preliminary injunction under Federal Rule of Civil Procedure 65(a) when the moving party demonstrates "that he is likely to succeed on the merits; that he is likely to suffer irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor; and that an injunction is in the public interest; or he may show irreparable harm and either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *ACLU v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (internal citations omitted). District courts have "wide discretion in determining whether to grant a preliminary injunction." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60 (2d Cir. 2007) (quoting *Moore v. Consol. Edison Co.*, 409 F.3d 506, 510 (2d Cir. 2005)).

The Court also has inherent equitable authority to grant class-wide injunctive relief, even though a class has not yet been certified. *See N.Y. State Natl. Organization for Women v. Terry*, 697 F. Supp. 1324, 1336 & n.16 (S.D.N.Y. 1988), *aff'd as modified by*, 886 F.2d 1339 (2d Cir. 1989); *Leisner v. N.Y. Tel. Co.*, 358 F. Supp. 359, 371 (S.D.N.Y. 1973) ("[R]elief as to the class is appropriate at this time even though when the preliminary injunction motion was heard, the class action had not yet been certified."); *see also Strouchler v. Shah*, 891 F. Supp. 2d 504, 518-19

(S.D.N.Y. 2012) (finding that class certification was likely and considering facts relating to putative class members when adjudicating preliminary injunction motion).

## **ARGUMENT**

### I.   **PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs and putative class members will suffer irreparable harm if the Court does not enjoin the City from moving forward with its unconstitutional and illegal Involuntary Removal Policy. Irreparable harm requires a showing that, in the absence of the requested relief, plaintiffs will suffer a harm that cannot be remedied by damages. *See Arias v. Decker*, 2020 U.S. Dist. LEXIS 64551 (S.D.N.Y. Apr. 10, 2020). It is well settled that involuntary removal and detention constitutes irreparable harm that justifies a temporary restraining order. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) (deprivation of a constitutional right is per se irreparable injury); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (violation of constitutional rights need not be proven to support a finding of irreparable harm, as "it is the *alleged* violation of a constitutional right that triggers a finding of irreparable harm") (emphasis in original); *Arias v. Decker*, 2020 U.S. Dist. LEXIS 64551, at *16-17 (S.D.N.Y. Apr. 10, 2020) (civil detention of immigrants during pendency of immigration proceedings constituted irreparable harm); *Jones v. Cummings*, 528 F. Supp. 1078, 1079 (W.D.N.Y. 1981) ( "[A] temporary restraining order may issue to prevent immediate and irreparable injury (and such may be assumed where one is confined in contravention of federally secured rights).") . In fact, even a "*threat* of unlawful detention . . . would violate plaintiffs' constitutional rights and therefore constitute quintessential irreparable harm." *Hardy v. Fischer*, 701 F. Supp. 2d 614, 619 (S.D.N.Y. 2010) (emphasis added) (finding

that state policy of "Post-Release Supervision" caused ongoing violation of rights, constituting irreparable harm).

Plaintiffs here face a direct and imminent threat of unlawful detention due to the City's Involuntary Removal Policy. This policy explicitly authorizes police to seize a person who "appears to be mentally ill and displays an inability to meet basic living needs, even when no recent dangerous act has been observed" and requires that the officer ensure the individual is "transported to the hospital" (Moore Decl., Ex. 1 at 1). This illegal standard creates a concrete risk to Plaintiffs and putative class members of being detained for merely living with their illness while in a public place. This harm is imminent, as the Mayor has announced that the training has already commenced, Moore Decl., Ex. 2 at 2, and the NYPD has announced that it is currently working to align its training policies with the Involuntary Removal Policy.[4] Once officers are fully trained, it will be inevitable that class members will be illegally and unconstitutionally detained pursuant to the Involuntary Removal Policy. Once trained, it is exceedingly difficult to become untrained. The only way to protect Plaintiffs and class members from irreparable harm is thus to grant Plaintiffs' request for a temporary restraining order enjoining the City from moving forward with any aspect of the Involuntary Removal Policy, including training.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

In determining whether a plaintiff has demonstrated a likelihood of success on the merits of the ultimate case, "a court is not called upon finally to decide the merits of the controversy; it is necessary only that the court find that the plaintiff has presented a strong *prima facie* case to

---

[4] "Plan Tests Tense Relationship Between N.Y.P.D. and Mentally Ill People," *New York Times*, December 5, 2022, https://www.nytimes.com/2022/12/05/nyregion/mental-health-plan-nypd.html

justify the discretionary issuance of preliminary relief." *Gwathmey Siegel Kaufman & Assocs. Architects, LLC v. Rales*, 898 F. Supp. 2d 610, 615 (S.D.N.Y. 2012) (internal quotation marks omitted). Moreover, the plaintiff must only show a likelihood of success on at least one claim that would support the issuance of a temporary restraining order. *See Butler v. Alabama Jud. Inquiry Comm'n*, 111 F. Supp. 2d 1224, 1230 (M.D. Ala. 2000) ("[T]he court does not have to find that Plaintiffs have a substantial likelihood of success on every claim set forth in their Complaint. It is sufficient if the law or facts support a substantial likelihood of success on at least one claim that would sustain the issuance of a temporary restraining order."); *Basank v. Decker*, 449 F. Supp. 3d 205, 215 (S.D.N.Y. 2020) (granting temporary restraining order by finding likelihood of success of one claim without considering likelihood of success of second claim).  Plaintiffs easily make such a showing here, as they have put forth a strong *prima facie* case that the City's "EDP" Policy violates the ADA, Section 504, the NYCHRL, and in practice results in unconstitutional seizures. Since the Involuntary Removal Policy lowers the already illegal standard of the "EDP" Policy, it is an even clearer violation of the law and more likely to lead to constitutional violations.

> a.     **The Involuntary Removal Policy and "EDP" Policy Violate the ADA and Section 504**

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* Section 504 at 29 U.S.C. § 794(a).[5]

The ADA requires police departments to make reasonable accommodations for people with

---

[5] As the standards for actions under Title II of the ADA and Section 504 are "generally equivalent," courts in the Second Circuit "frequently analyze such claims together." *P.C.R. v. Fla. Union Free Sch. Dist.*, 2022 U.S. Dist. LEXIS 20562, at *86 (S.D.N.Y. Feb. 4, 2022).

disabilities. *See, e.g.*, *Felix v. City of N.Y.*, 2020 U.S. Dist. LEXIS 189223, at *15 (S.D.N.Y. Oct. 13, 2020) (collecting cases). District courts in this Circuit, along with five Circuit Courts,[6] have held that interactions between law enforcement and individuals with disabilities are subject to the protections of the ADA. *See, e.g.*, *Williams v. City of N.Y.*, 121 F. Supp. 3d 354, 364-65 (S.D.N.Y. 2015) (the ADA governs "on-the-street encounters" between police and covered individuals, concluding that "the City's crabbed interpretation of Title II's coverage of police activity simply does not comport with the language of Title II and its implementing regulations, particularly in light of the remedial purpose of the statute and the weight of authority that has considered the issue."); *Durr v. Slator*, 558 F. Supp. 3d 1, 32 (N.D.N.Y. 2021) ("Title II of the ADA requires police officers to provide reasonable accommodations to arrestees"); *Butchino v. City of Plattsburg*, 2022 U.S. Dist. LEXIS 7995, *33 (N.D.N.Y. Jan. 14, 2022) (noting that "[w]hereas the failure to provide medical care is a generalized issue that applies beyond the ambit of disability law, the failure to provide reasonable accommodation to a service or benefit … is a quintessential failure to accommodate disability claim.").

Plaintiffs have shown that the individual Plaintiffs were treated differently because of their disability or perceived disability (i.e., they were unlawfully detained and subjected to excessive force) and that the City's "EDP" Policy, on its face, discriminates against individuals because of their mental disabilities or perceived mental disabilities. At the heart of Plaintiffs' challenge in this litigation is the City's authorization of police officers to detain individuals simply for having or appearing to have a mental disability. Nothing more is required. The Involuntary Removal Policy,

---

[6] *See Reyes v. Town of Thomaston*, 2020 U.S. Dist. LEXIS 181331, *9 n.1 (D. Conn. Sept. 30, 2020) (collecting cases).

which lowers the standard of the "EDP" Policy, also treats individuals with mental disabilities or perceived mental disabilities differently simply because NYPD officials deem them to be different. The ADA specifically proscribes this rationale, requiring a "direct threat" or "a significant risk to the health and safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." 42 U.S.C. § 12182(3) (emphasis added). Plaintiffs also show that the City has failed to provided New Yorkers with mental disabilities reasonable accommodations by refusing to provide voluntary mental health services in lieu of having police officers detain individuals against their will and transport them to highly restrictive psychiatric hospitals.

The plain text of the City's "EDP" Policy and the Involuntary Removal Policy, as well as the experiences of the individual Plaintiffs, demonstrates that the City has violated the ADA, and Section 504.

### b.    The Involuntary Removal Policy and "EDP" Policy Violate the NYCHRL

The NYCHRL, which is to be construed liberally for the accomplishment of its broad and remedial purposes, makes it an "unlawful discriminatory practice" for any "place or provider of public accommodation, because of the actual or perceived . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 642 (S.D.N.Y. 2013); N.Y.C. Admin. Code § 8-107(4)(a); N.Y.C. Local Law No. 85 (2005) § 7. It further requires that "any person prohibited by the [law] from discriminating on the basis of disability shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." *Id*.

12

As with their ADA and Section 504 claims, Plaintiffs prove their NYCHRL claim by showing that the City has denied individuals with mental disabilities the full and equal enjoyment of their lives on equal terms and conditions as those without mental disabilities, including the freedom to live without unlawful seizures and excessive force by law enforcement. It has done so in policy and practice by implementing and enforcing a law that requires police officers to detain individuals who merely appear to be unable to care for their "basic human needs," regardless of whether they present a serious risk of substantial harm to themselves or others.

### c.   The Involuntary Removal Policy and "EDP" Policy Violate the Unlawful Seizure and Warrantless Entry Provisions of the Fourth and Fourteenth Amendments

For Section 1983 false arrest claims, a plaintiff must allege that "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995). There is no dispute regarding the first three elements, and Plaintiffs also show that confinement of each individual Plaintiff is not privileged.

MHL § 9.41, the same section of the MHL cited by the City in support of the Involuntary Removal Policy, provides that a police officer "may take into custody any person who appears to be mentally ill *and* is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." Mental Hygiene L. § 9.41 (emphasis added). The phrase "likely to result in serious harm" is defined as "(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is a danger to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." *Id.* § 9.01. As the Second Circuit has clarified,

13

"to make a mental health arrest, police officers must consider whether probable cause exists to believe the individual is a danger to herself or others, that is, whether there is a *substantial* risk of *serious* physical harm to herself or others." *Guan v. City of N.Y.*, 37 F.4th 797, 807 (2d Cir. 2022) (emphasis added).

Here, Plaintiffs show that the individual Plaintiffs, who may have met, and may meet, the watered-down standard set forth in the Involuntary Removal Policy, did not present a substantial risk of serious physical harm to anyone and there is thus no probable cause for their detention. For example, Plaintiff Greene did not do anything to even remotely suggest that he represented a danger to himself or anyone else, as he was involved in a quiet call with his fiancé when the police arrived unannounced, and his fiancé advised the police that he was not a danger to himself or others. (Greene Decl. ¶¶ 11–12). Plaintiff Sanchez-Esquivel and Arvio likewise were both calm when the police arrived at their homes and did nothing to give officers probable cause to support their detention. (FAC ¶¶ 162, 164–65, 168; 175, 178).   Should the named Plaintiffs act similarly calmly when spotted by the police under the new Removal policy, their rights may well be violated again, should an officer merely believe that they have a mental illness or that they are unable to take care of their basic needs.

### d.    The Involuntary Removal Policy and "EDP" Policy Violate the Excessive Force Provisions of the Fourth and Fourteenth Amendments

The individual Plaintiffs were subjected to, and will again be subjected to, excessive force when detained. A police officer's use of force is excessive in violation of the Fourth Amendment "if it is objectively unreasonable in light of the facts and circumstances confronting the officer, without regard to his or her underlying intent or motivation." *Ferebee v. City of N.Y.*, 2017 U.S. Dist. LEXIS 104783, at *20 (S.D.N.Y. July 6, 2017) (internal quotation marks omitted).

The facts show that the force used to effectuate the detention of each individual Plaintiff was excessive. Despite the fact that Plaintiff Greene displayed no signs of being a risk to himself or anyone else, he was tightly handcuffed, dragged down steps, and tightly strapped to a stretcher while handcuffed, suffering bruising and abrasions to his chest, arms, and head in the process. (Greene Decl. ¶¶ 17–25). Plaintiff Sanchez-Esquivel suffered severe bruises on her arms and hands, back and shoulder pain, as well as PTSD and emotional distress, by being handcuffed and dragged out of her apartment by NYPD officers despite having spoken calmly with officers for nearly a half-hour while seated on her couch and without exhibiting any signs that she was a threat to herself or anyone else. (FAC ¶¶ 164-73). Plaintiff Arvio was home drinking tea in a robe when officers arrived at her door and took her against her will to the hospital for a psychiatric evaluation. (FAC ¶¶ 174-92). Despite explaining the misunderstanding to officers in a calm, rational, and cordial manner, she was brutally handcuffed, had her legs kicked out, which caused one leg to bleed profusely, lost consciousness, and strapped to a gurney with her handcuffed wrists squeezed painfully underneath her. (FAC ¶¶ 183-92). There is nothing in the record to suggest that the detention of any of the individual Plaintiffs was reasonable under the circumstances.[7]

### e.   Plaintiffs Demonstrate Fourth and Fourteenth Amendment Violations under *Monell*

To allege a *Monell* claim and hold a city liable under Section 1983 for the unconstitutional actions of its employees, "a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2009). Plaintiffs demonstrate the

---

[7] Any argument by Defendants that these calls provided the officers with probable cause to detain the individual Plaintiffs is unavailing, as the officers still had the duty to assess the individual Plaintiffs' behavior at the scene, and none provided any grounds for their detention.

existence of a formal policy—the "EDP" Policy and the Involuntary Removal Policy—authored, enforced, promoted, authorized, and sanctioned by the City, which permits the unlawful seizure and detention of individuals with mental disabilities or perceived mental disabilities, even though they are not actually a harm to themselves or others.

As Defendants have acknowledged in their Motion to Dismiss briefing, NYPD officers treat individuals as "EDPs" merely because someone tells a 911 operator that the person has or had a mental disability, not because they are conducting themselves "in a manner which is likely to result in serious harm to [themselves] or others." Under the "EDP" policy, officers do not have any discretion and must seize any individuals that they deem or have been told are "EDPs." ("EDP" Policy ¶ 17). Under the newly announced Involuntary Removal Policy, even less is required. This is unconstitutional on its face, as it requires officers to seize individuals who appear to have mental disabilities simply for existing.

  **f.**  **The "EDP" Policy and Involuntary Removal Policy Violate the New York State Constitution and Common Law**

Plaintiffs also show that, since the officers' misconduct occurred and occurs while on duty or in the scope of their duties as police officers, they were acting and will continue to act as agents or employees of the City, invoking its power and authority. The City is thus liable to Plaintiffs pursuant to the doctrine of *respondeat superior* for violations of the New York State Constitution, as well as violations of the New York State common law for assault and battery, false imprisonment, and unreasonable detention.

## III.  THE BALANCE OF HARDSHIPS TIP DECIDEDLY IN PLAINTIFFS' FAVOR

The balance of equities tilts decidedly in Plaintiffs' favor because, absent immediate injunctive relief, the lowered standard of the Involuntary Removal Policy will lead to a huge

increase in illegal detentions and involuntary hospitalizations, sending hundreds (if not thousands) of involuntary hospitalizations, sending putative class members to hospitals that do not have the capacity to house them. (Moore Decl. ¶ 17). Even the NYPD's union is reporting that the new policy will put a strain on the "understaffed, overworked and underpaid" NYPD officers. (Moore Decl. ¶ 16). There are no current mechanisms for tracking the City employees' work under the Involuntary Removal Policy, no reference to publicly reporting about the involuntary removals, and no mention of any oversight mechanism for the removals. (Moore Decl. ¶ 18). Given that the existing "EDP" Policy has long been in effect, the City will not suffer any harm in maintaining the status quo. *See, e.g.*, *Gov't Emples. Ins. Co. v. Relief Med., P.C*., 554 F. Supp. 3d 482, 504 (E.D.N.Y. 2021).

## IV.    THE PUBLIC INTEREST FAVORS AN INJUNCTION

Finally, "the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). Far from the public interest being disserved, the issuance of an injunction here is in the public interest. Plaintiffs have already detailed how the Involuntary Removal Plan is violative of the ADA, Section 504, the NYCHRL, and will lead to violations of the constitutional rights of putative class members. Moreover, all indications are that the Policy has suffered from a sudden and ineffectual rollout that is likely to compound its fundamental infirmities. For example, it has been reported that the NYPD was blindsided by the Mayor's announcement and that hospitals have limited capacity to deal with the influx of mental health detainees. (Moore Decl. ¶¶ 16-17). An injunction here will serve the public interest by halting the implementation of an illegal policy that will exacerbate the systemic failures of the City's existing mental health policies.

## V.    PLAINTIFFS SEEK EXPEDITED DISCOVERY

Plaintiffs also seek expedited discovery regarding the Involuntary Removal Policy. The federal rules "give district courts broad discretion to manage the manner in which discovery proceeds." *Official Comm. of Unsecured Creditors of Hechinger Inv. Co. of Del., Inc. v. Friedman*, 350 F.3d 65, 69 (2d Cir. 2003). A party may seek discovery prior to conferring as required by Rule 26(f) when authorized by court order. FRCP 26(d)(1). An early start to discovery can be appropriate in cases involving requests for a preliminary injunction. FRCP 26, 1993 Advisory Committee Notes. "The majority of courts in the Second Circuit apply the more flexible 'good cause' standard when evaluating motions for expedited discovery." *R.R. Donnelley & Sons Co. v. Marino*, 505 F. Supp. 3d 194, 209 (W.D.N.Y. 2020).

Here, at the very least, Plaintiffs are entitled to the underlying documents and information related to the Involuntary Removal Policy and how the City is implementing, and how it intends to further implement, and oversee it. It is directly relevant to Plaintiffs' claims and this expedited discovery can be narrowly tailored to this purpose. (*See* Moore Decl., Ex. 3, for Plaintiffs' expedited discovery demands). Plaintiffs are also entitled to inquire into the City's planned changes and implementation of the same through questioning of a relevant City representative.[8]

"When determining a request for expedited discovery, courts in this Circuit examine the discovery request on the entirety of the record to date and the *reasonableness* of the request in light of all the surrounding circumstances. In doing so, courts utilize a flexible standard of reasonableness and good cause. Courts will also compare the potential prejudice which will be suffered by the defendant if discovery is permitted, and that which will be experienced by the

---

[8] Plaintiffs also seek an expedited Fed. R. Civ. P. 30(b)(6) deposition on the Involuntary Removal Policy as well information sought through the expedited interrogatories and document requests, Moore Decl., Ex. 3.

plaintiff if denied the opportunity for discovery at this stage." *Doe v. Congregation of the Sacred Hearts of Jesus & Mary*, 2022 U.S. Dist. LEXIS 130614, at *4 (S.D.N.Y. July 22, 2022) (internal citations omitted, emphasis in original). Here, any potential prejudice to the City is far outweighed by the prospect of widespread violations of the ADA, Section 504, the NYCHRL, and the constitutional rights of the putative class members. Plaintiffs' limited requests will allow them to understand more about changes to a policy that are directly relevant to their present litigation.

## VI.    CONCLUSION

For the reasons articulated above, and based on the pleadings and papers filed in this action, Plaintiffs respectfully request that the Court issue a temporary restraining order and a preliminary injunction restraining, enjoining, and staying Defendants, pending the final determination of this action, from implementing the Involuntary Removal Policy, including training police officers and other City employees regarding the policy. Plaintiffs also seek expedited discovery to learn the details of the Involuntary Detention Plain, and how it is being and will be implemented, including what trainings are being or will be undertaken.

Dated:  New York, New York
        December 8, 2022

BELDOCK LEVINE & HOFFMAN LLP          MARASHI LEGAL
99 Park Avenue, PH/26th Floor          930 Grand Concourse #1E
New York, New York 10016               Bronx, NY 10451
(212) 490-0400                         (917) 703-1742


By: _____     By: /s/ _____
    Jonathan C. Moore                       P. Jenny Marashi
    Luna Droubi
    Deema Azizi
    Jeffrey F. Kinkle

19

NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.
151 West 30th Street, 11th Floor
New York, New York 10001-4017
(212) 244-4664

By:_____
     Marinda van Dalen
     Ruth Lowenkron

SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000

By: /s/_____
     Richard Schwed
     Dennis Kitt