UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

JUSTIN BAERGA; STEVEN GREENE; GIOVANNA SANCHEZ-ESQUIVEL; and SARAH ARVIO, individually and on behalf of all others similarly situated, and COMMUNITY ACCESS, INC.; NATIONAL ALLIANCE ON MENTAL ILLNESS OF NEW YORK CITY, INC.; and CORRECT CRISIS INTERVENTION TODAY - NYC,

                              Plaintiffs,

-against-

CITY OF NEW YORK; BILL DE BLASIO; DERMOT F. SHEA; NYPD POLICE OFFICER KRZYSZTOF WNOROWSKI; NYPD POLICE OFFICER SHERON; NYPD POLICE OFFICER MCDOWELL; NYPD POLICE SERGEANT NATHAN MOLE; NYPD POLICE OFFICER MARTIN HABER; NYPD POLICE SERGEANT GBAIN; NYPD POLICE OFFICER VIKRAM PRASAD; NYPD POLICE OFFICER ANDRE DAWKINS; NYPD POLICE OFFICER TYRONE FISHER; NYPD POLICE OFFICER DEVIENDRA RAMAYYA; NYPD POLICE OFFICER JULIAN TORRES; NYPD OFFICER SANCHEZ, and NYPD OFFICERS JOHN and JANE DOES # 1-40,

                              Defendants.

------------------------------------------------------------------ X

No. 21-cv-05762 (PAC)

**DECLARATION OF JONATHAN C. MOORE IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

JONATHAN C. MOORE, an attorney duly admitted to practice law in the State of New York and in this court, declares under penalty of perjury:

1. I am a partner at Beldock Levine & Hoffman LLP, one of the attorneys for Plaintiffs, and am well-familiar with the facts of this case. I submit this declaration in support of Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction.

2. On or about November 28, 2022, New York City published a new policy entitled "Mental Health Involuntary Removals." This policy, the "Involuntary Removal Policy," is attached as **Exhibit 1**.

1

3. The City's new policy provides that NYPD officers detain and involuntarily commit any individual who merely "appears to be mentally ill and displays an inability to meet basic living needs, even when no recent dangerous act has been observed." *See* **Exhibit 1**.

4. There is no guidance on what "appears to be mentally ill" means or on what "display an inability to meet basic living needs" means.

5. Whereas the City's "EDP" Policy, found in Patrol Guide Section 221-13, requires an articulation that an "EDP" was defined as "a person who appears to be mentally ill or temporarily deranged *and is conducting himself in a manner which a police officer reasonably believes is likely to result in serious injury to himself or others*," the new policy drastically lowers the existing standard by authorizing NYPD officers to involuntarily detain and transport to a hospital individuals whom they perceive to have a mental disability—based on that perception alone. (emphasis added)

6. On November 29, 2022, New York City Mayor Adams held a press conference discussing the City's new policy to use involuntary detentions to remove individuals who appear to be facing mental health issues from the streets of New York (the "Involuntary Removal Policy"). A full transcript of that press conference is attached as **Exhibit 2**.

7. *The New York Times* published an article on November 29, 2022 entitled "New York City to Involuntarily Remove Mentally Ill People From Streets," covering Mayor Adams' announcement.[1]

8. During that press conference, the Mayor repeatedly stated that individuals who appear to have a mental disability could be deemed "a danger to themselves due to an inability to meet their basic needs."

---

[1] Newman, Andy and Fitzsimmons, Emma G., *New York City to Involuntarily Remove Mentally Ill People From Streets*, N.Y. Times, https://www.nytimes.com/2022/11/29/nyregion/nyc-mentally-ill-involuntary-custody.html.

a. "This directive lays out an expedited step by step process for involuntarily transporting a person experiencing a mental health crisis to a hospital for evaluation. It explicitly states that it is appropriate to use this process when a person refuses voluntary assistance and it appears that they are suffering from mental illness *and are a danger to themselves due to an inability to meet their basic needs*. We believe this is the first time that a mayoral administration has given this direction on the basic needs standard and official guidance." (emphasis added)

"Second, our Mobile Crisis Teams and police officers receive enhanced training on how to assist those in mental health crises. There will be a new focus on the need to intervene in situations where an individual appears to be suffering from *mental illness and in danger due to inability to meet their basic needs*. This would include an in depth discussion on what inability to meet basic needs means, and an array of options to consider before resorting to involuntary removal. The first training to this is going to be incorporated today. This new focus took place this morning and we will soon roll it out to all current members of the mobile crisis teams and the NYPD." (emphasis added)

9. During this press conference, the Mayor also indicated that trainings on this new policy would be taking place immediately, and, in fact, that the "new focus" had already been incorporated into a training taking place that morning.

10. At the same time that the City is embarking on its involuntary removal program, which relies heavily on the NYPD to carry out the tasks of removal and detention, the NYPD underwent a "massive shakeup," including the replacement of such key positions as Chief of Department, Chief of Patrol, Head of Transit, Chief of Housing, and Head of Special Ops.[2]

11. The NYPD also declared in a November 30, 2022 statement that it was "currently in the process of aligning its policy, guidance and training in conformance with the mayor's directive *which the department received on Tuesday*."[3]

---

[2] Craig McCarthy, *NYPD Undergoes Massive Shakeup 2 Days after New Chief of Department Named*, N.Y. Post (December 2, 2022), https://nypost.com/2022/12/02/nypd-undergoes-massive-shake-up-days-after-chief-of-department-named/.

[3] Craig McCarthy, *NYPD was blindsided by Eric Adams' plan to involuntarily commit more mentally ill homeless people*, N.Y. Post (November 30, 2022), https://nypost.com/2022/11/30/nypd-blindsided-by-eric-adams-plan-to-commit-mentally-ill-homeless/.

12. Although the City stated that a "hotline" would be available to police officers who are dispatched to remove and detain persons believed to have mental illness, which would enable the officers to obtain advice from mental health professionals about whether to remove and detain, and which would purportedly facilitate the decision-making, the hotline is not yet up and running. *See* **Exhibit 2**.

13. Oren Barzilay, head of the union for Emergency Medical Services, which is another agency expected to remove and detain persons with mental illness pursuant to the Involuntary Removal Policy, *see* **Exhibit 2**, expressed concern about how his members would be able to carry out the policy, stating "[o]ur worry is that this policy will only exacerbate the danger our members are faced with on a daily basis."[4]

14. While Mayor Adams touts his new policy of removal and detention of persons with mental disabilities who are homeless, nearly 2,600 apartments designated for persons with mental disabilities sit vacant.[5]

15. As the new NYPD trainings regarding the Involuntary Removal Policy are taking place now, Plaintiffs, as putative class representatives, are requesting urgent action by the Court. Moreover, there are no assurances that other aspects of the Involuntary Removal Policy have not already been implemented.

16. According to a *New York Times* article on December 5, 2022, even the president of the Police Benevolent Association, Patrick J. Lynch, has represented that the implementation of the Mental Health Involuntary Removals plan will create "a strain on [the NYPD's] severely

---

[4] Thomas Tracy, *NYC Mayor Adams' mental health hospitalization plan greeted with skepticism from cops, EMS on the front lines*, N.Y. Daily News (December 3, 2022), https://www.nydailynews.com/new-york/ny-adams-mental-health-forced-hospitalization-20221203-g4fbk4aa6fcezh26qy4qohpmoy-story.html.

[5] Andy Newman, "Nearly 2600 apartments for mentally ill and homeless people sit vacant," N.Y. Times (November 4, 2022), https://www.nytimes.com/2022/11/04/nyregion/nearly-2600-apartments-for-mentally-ill-and-homeless-people-sit-vacant.html.

understaffed, overworked and underpaid ranks" and jeopardize their ability to carry out their jobs.[6]

17. And, although the State had provided funding to bring back psychiatric hospital beds, to date, they are still not available to City residents.[7] At most, there may be 50 available beds as the Mayor stated at the November 29 press conference. *See* **Exhibit 2**. This will cause a worsening effect on putative class members because they will involuntarily be committed to hospitals that have limited capacity.

18. None of the statements by the City or the documents related to the Involuntary Removal Policy discuss any mechanism for tracking the City employees' work under the Involuntary Removal Policy, nor is there any reference to publicly reporting about the involuntary removals, nor is there mention of any oversight mechanism for the removals.

19. Plaintiffs are also seeking expedited discovery from the City related to the Involuntary Removal Plan. Plaintiffs' Expedited Interrogatories and Demands for the Production of Documents Related to the City's 2022 Mental Health Policy is attached as **Exhibit 3**.

Dated: December 8, 2022
      New York, New York

_____
Jonathan C. Moore

---

[6] Corey Kilgannon, *Plan Tests Tense Relationship Between N.Y.P.D. and Mentally Ill People*, N.Y. Times, (December 5, 2022), https://www.nytimes.com/2022/12/05/nyregion/mental-health-plan-nypd.html.
[7] *See, e.g.*, Ethan Geringer-Sameth, Despite State Budget Funding, Little Progress Bringing Psychiatric Beds Back Into Service, Gotham Gazette, November 28, 2022, https://www.gothamgazette.com/state/11696-ny-state-budget-little-progress-psychiatric-beds-hochul-adams.