1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   JUSTIN E. BAERGA, et al.,

4                   Plaintiffs,

5           v.                                21 CV 5762 (PAC)

6   CITY OF NEW YORK, et al.,

7                   Defendants.               Conference
    ------------------------------x
8                                             New York, N.Y.
                                              December 12, 2022
9                                             3:30 p.m.

10  Before:

11                       HON. PAUL A. CROTTY,

12                                            District Judge

13                          APPEARANCES

14  BEDLOCK LEVINE & HOFFMAN LLP
         Attorneys for Plaintiffs
15  BY:  LUNA DROUBI
         JONATHAN C. MOORE
16       -and-
    NEW YORK LAWYERS FOR THE PUBLIC INTEREST, INC.
17  BY:  RUTH LOWENKRON
         MARINDA van DALEN
18       -and-
    P. JENNY MARASHI
19
    SYLVIA HINDS-RADIX
20       Corporation Counsel for the City of New York
         Attorney for Defendants
21  BY:  ALAN SCHEINER

22

23

24

25

```
 1                (Case called)

 2           MS. DROUBI:  Luna Droubi, Bedlock Levine & Hoffman,

 3    for the plaintiffs.

 4           MR. MOORE:  Jonathan Moore, Bedlock Levine & Hoffman,

 5    for the plaintiffs.

 6           MS. van DALEN:  Marinda van Dalen, New York Lawyers

 7    for the Public Interest, for the plaintiffs.

 8           MS. LOWENKRON:  Ruth Lowenkron, New York Lawyers for

 9    the Public Interest, for plaintiff.

10           MS. MARASHI:  Jenny Marashi from Marashi Legal for

11    plaintiffs.

12           THE COURT:  Who is going to be speaking for the

13    plaintiffs?

14           MS. DROUBI:  I will, your Honor.

15           THE COURT:  For the city.

16           MR. SCHEINER:  Alan Scheiner, your Honor, from the

17    Corporation Counsel's office.

18           THE COURT:  Ms. Droubi, you want --

19           MS. DROUBI:  I'm sorry.  I missed what you stated.

20           THE COURT:  Do you want to address the issue?

21           MS. DROUBI:  Yes, your Honor.

22           First and foremost, we would ask the city to consent

23    to stay of the pending new policy until the Court has decided

24    the preliminary injunction motion.  We do so so that we could

25    gather some necessary information, which is what's currently
```

1    before the Court on a motion -- a premotion letter seeking

2    expedited discovery for the sole and limited purpose of

3    gathering information about this new policy.

4         We do so as a matter of urgency because the policy is,

5    as we understand it, being implemented as we speak, which will

6    affect thousands of New York City residents who have or are

7    perceived to have mental disabilities, and they live in

8    constant clear as a result of the lowering of the standard for

9    involuntary hospitalizations and detentions.  We believe that

10   we would like certain information in order to support our

11   motion --

12        THE COURT:  Has anybody been taken to the hospital as

13   a result of this new policy?

14        MS. DROUBI:  This is one of the items of information

15   we are seeking in our request for expedited discovery to

16   understand --

17        THE COURT:  Do you know of any?

18        MS. DROUBI:  We do not currently know of any, but we

19   do know that trainings were set to take place -- we understand

20   from the mayor's statement that trainings are taking place with

21   NYPD officers as we speak, and what these officers are being

22   told and when they are told to implement them means that this

23   could take effect as we speak.

24        So we believe that expedited discovery for information

25   about exactly how many individuals this will be affecting, when

1   the rollout took place, what the rollout will look like is

2   necessary for us to be able to put forward to the Court our

3   request.  We would ask for a supplement to our existing

4   preliminary injunction motion to provide the Court with

5   additional information as to why this is a matter of urgency.

6          THE COURT:  Mr. Scheiner sent me a letter today.

7          MR. SCHEINER:  Yes, your Honor.

8          THE COURT:  December 12.

9          I am not finished with Ms. Droubi.

10         That says that the initiative of November 29 is an

11  application of existing law rather than a departure from it.

12         MR. SCHEINER:  Yes, your Honor, exactly.  That's

13  stated --

14         THE COURT:  I'm not finished yet.

15         MS. DROUBI:  I'm sorry, your Honor.  I could not

16  understand.

17         THE COURT:  Let me repeat.

18         Mr. Scheiner takes the position that the application,

19  what was done by the mayor was an application of existing law

20  rather than a departure from it.

21         MS. DROUBI:  Our position is, your Honor, that's not

22  the case.  This is a lowering of the standard in which a police

23  officer, who is not a mental health professional, is now tasked

24  with simply looking at an individual, and that perception of an

25  individual being mentally disabled is now sufficient to

 1   involuntarily commit them against their will, even if there was

 2   no indication at all if there is an imminent violent act, which

 3   was the prior standard.  Now you simply have to look mentally

 4   disabled to an NYPD officer without training in order to be

 5   involuntarily detained.

 6          THE COURT:  What, in your view, in the merits

 7   statement changes what was the existing policy?

 8          MS. DROUBI:  His statement indicates that a person

 9   specifically needs to look unkempt, look a certain way, act a

10   certain way and that should be sufficient for them to not be

11   able to take care of themselves and that in and of itself is

12   grounds for an involuntary commitment to a hospital.

13          THE COURT:  I'll hear from you now, Mr. Scheiner.

14          MR. SCHEINER:  Yes.

15          First, I want to note that I believe the plaintiffs,

16   once again, are procedurally a little out of line because this

17   conference was scheduled as a discovery conference on their

18   application regarding expedited discovery.  Your Honor directed

19   that it should be treated as such, as a premotion conference,

20   and that, in addition, that the parties should confer about a

21   briefing schedule on the plaintiffs' motion for preliminary

22   injunction.

23          It sounds to me like the plaintiffs are now asking

24   your Honor to enter a TRO today, which is contrary to your

25   Honor's instructions and not something that I discussed -- that

1   the plaintiffs raised when I last spoke to them on Friday and

2   exchanged emails with them over the weekend.

3           Once again, it's kind of, you know, trial by surprise

4   and ambush, but I'm happy to speak to the merits of what

5   plaintiffs' counsel has said.

6           THE COURT:  I wish you would.

7           MR. SCHEINER:  The mayor's statement on its face

8   quotes 9.41, which is the applicable law, which mandates that

9   police officers and peace officers specifically are authorized

10  to take people into custody when they appear to be mentally ill

11  and are conducting themselves in a manner that presents a risk

12  of serious physical harm.

13          THE COURT:  Is that Commissioner O'Sullivan's

14  memorandum of February 18, 2022?

15          MR. SCHEINER:  That's actually the state's memorandum

16  that preceded the mayor's statement by several months.

17          THE COURT:  Did anybody file any litigation over that

18  particular document?

19          MR. SCHEINER:  I'm not with the state, but not that

20  I'm aware of, your Honor.  It was not subject to any challenge

21  that I'm aware of.

22          THE COURT:  Is there a difference between what this

23  letter seems to authorize, interpretive guidance for the

24  involuntary and custodial transportation.  Does that differ

25  from the mayor's statement of November --

1          MR. SCHEINER:  No, your Honor.  Sorry, were you done

2    with your question?

3          THE COURT:  Yes.

4          MR. SCHEINER:  No, there is no difference, your Honor.

5          In terms of the substance of the standard that the

6    mayor is articulating, it's exactly the same.  It's the legal

7    standard that has existed in New York State for decades and

8    which is embodied not only in the statute, but in case law.

9          What the mayor added in his statement was that he was

10   going to have additional training not just for the NYPD, but

11   for other city officials and mental health professionals to

12   advise them about this aspect of law, that this aspect of law

13   is not new.  It has always been there.  It's basically just a

14   supplement to existing training.  That is what the mayor was

15   trying to focus on.

16         There were other related programs that are part of

17   this initiative, but the core of it is simply to highlight this

18   aspect of the existing law that 9.41 has never required that

19   the person being taken into custody solely to be transported to

20   a hospital for evaluation, not involuntarily committed, but

21   just to be transported, never required that they be violent at

22   the time that they are taken into custody or threatening

23   violence.  It required that they be conducting themselves in a

24   manner that created a danger of serious injury.  That's been

25   upheld by numerous courts.

1          Plaintiffs have even disclaimed that they are

2    challenging that standard.  They say they acknowledge that

3    standard in their briefs.  But then they make -- your Honor, I

4    can't put it any other way, but a false allegation that the

5    city is authorizing its officers now -- and they claimed this

6    before, that this was so before, even though it wasn't true

7    then either -- it was authorizing its officers to take people

8    into custody just because they appear to be mentally ill.  It's

9    clearly not the case.  No matter how many times they want to

10   repeat the false statement, it doesn't make it true.  It's

11   right there in the exhibit that they filed with your Honor.

12          They do cite, I'll anticipate, something they are

13   likely to bring up, a comment by Mayor Adams at a press

14   conference referring to a man who was shadowboxing on the

15   street.  That's not part of the policy.  That's a comment at a

16   press conference.  In fact, there was a question about it and

17   it was explained.  That was not meant to be a basis for taking

18   anyone into custody, that the standard remains always the same,

19   there has to be probable cause to believe that the person is

20   conducting themselves in a way that creates a danger of serious

21   physical harm.

22          The plaintiffs want a different rule.  The plaintiffs

23   say, it should be violence, should be that there is an imminent

24   danger of violence by themselves against themselves or against

25   others.  That's just not the law, and they don't cite any case

1     to support that standard which, frankly, they have just made

2     up.

3           Your Honor, this is not only the centerpiece of this

4     recent action for which, as we alluded to in our letter, the

5     plaintiffs don't have standing because your Honor's question I

6     think spoke somewhat to that, that, first of all, there is no

7     evidence that anyone has been taken into custody unlawfully as

8     a result of this initiative.  As far as anyone in this room

9     knows, the initiative hasn't changed anything.

10          THE COURT:  What about Mr. Greene's statement that he

11    is afraid to go out on the street?

12          MR. SCHEINER:  Your Honor, Mr. Greene's fear does not

13    create standing.  If that were the case, then the inevitable

14    flood gates --

15          THE COURT:  His most recent interaction with the

16    police department was in 2020, as I understand it.

17          MR. SCHEINER:  That was before this initiative, your

18    Honor.  He is saying that his experience in the past creates

19    standing to challenge this initiative, which is not part of his

20    claim in this case.  It's not part of the amended complaint

21    because, obviously, it's new.  He is saying that because he was

22    taken into custody under different circumstances in the past,

23    that he has standing to challenge a new initiative because he

24    might be taken into custody in the future.

25          And there is substantial case law, like *Lyons* from the

1    Supreme Court, which we cited which says, you need a lot more

2    than the fact that something bad happened to you before, and

3    that it might happen to you again, to have standing to have a

4    prospective injunction, especially, your Honor, against a

5    facially valid policy, facially constitutional initiative.  I

6    want to point out, this is not an order.  This is a statement

7    and a directive to city agencies to implement what's stated

8    there in terms of training.

9        But to go back to the standing issue, when you have a

10   facially valid statement by the government and no instance of a

11   violation of the Constitution caused by that statement, then I

12   don't think these plaintiffs or frankly any other have

13   standing.

14       The fact that one of the plaintiffs who made this

15   petition and others who are on the complaint are organizations

16   does not give them standing.  These are organizations that are

17   principally directed towards advocacy for the mentally ill,

18   which is fine and laudable.  But the fact that they engaged in

19   that advocacy does not give them standing.  And the fact that

20   they have had to spend time and resources on this matter

21   because they are advocates for the mentally ill does not give

22   them standing.  There is clear case law in that as well.

23       What we have is essentially a new action for which the

24   plaintiffs have no standing and, therefore, this motion is

25   without jurisdiction, which is part of what we want to

1    litigate, one of the issues we think should be litigated

2    carefully, not here today, but -- because there is no

3    emergency, and there is no need to rush that determination.

4    There are serious issues raised by this.

5              THE COURT:  Let me here from Ms. Droubi, please.

6              MS. DROUBI:  Your Honor, the city is now representing

7    that this isn't a new policy, and yet the mayor issued a press

8    conference announcing a new initiative, a new policy that was

9    going to be rolled out, as we speak, which lowers the standard

10   of how a police officer can look at an individual and determine

11   that they have a disability and are unable to take care of

12   themselves.

13             THE COURT:  Where was that in the papers?

14             MS. DROUBI:  We provided your Honor with a transcript

15   of the mayor's press conference, as well as a document

16   attached --

17             THE COURT:  Where is it in the transcript of the press

18   conference?

19             MS. DROUBI:  One moment, your Honor.

20             Your Honor, I think the best place we can highlight

21   this is found in Moore declaration, Exhibit 1, which is the

22   directive where the city has taken the position that a person

23   who appears mentally ill and displays an inability to meet

24   basic living needs, even when no recent dangerous act has been

25   observed, can be now taken into custody or involuntarily

1   committed by NYPD officers.  That's Moore declaration, Exhibit

2   1 at 1.

3         THE COURT:  Section 9.41 authorizes a peace officer or

4   police officer to take into custody for the purpose of

5   psychiatric evaluation an individual who appears to be mentally

6   ill and conduct themselves in a manner likely to result in

7   serious harm to himself or others.

8         Is that the portion?

9         MS. DROUBI:  It goes on to say:  The display of an

10  inability to meet basic living needs, even when no recent

11  dangerous act has been observed, can meet that standard.

12        THE COURT:  Is that the city policy or is that the

13  policy of the department of mental health?

14        MS. DROUBI:  That's the city's new interpretation of

15  the policy.  That was launched -- that caused a press

16  conference to take place, the directive to be issued, and now

17  trainings to be rolled out to NYPD officers who are now going

18  to be on the front lines of policing mental health in the

19  streets of New York by simply looking at an individual and

20  determining that they look unable to meet their basic living

21  needs just by the way they look.

22        THE COURT:  The question that I have is, is that a

23  change from the existing policy of the commissioner of mental

24  health, the state commissioner of mental health and the state

25  and the city?

1           MS. DROUBI:  Yes.  We believe that they are not

2   interpreting the guidance which was guidance that was provided

3   by the office of mental health.  That was guidance.  They are

4   misinterpreting that guidance by lowering the standard.

5           THE COURT:  What is the existing policy?

6           MS. DROUBI:  The existing policy that's in the patrol

7   guide requires imminent harm to oneself or others.  That's

8   what's being taken away.  Now, instead of imminent harm, they

9   are saying, if you look unable to take care of yourself, that

10  is imminent harm.  That's a lowering of the standard.

11          THE COURT:  Mr. Scheiner.

12          MR. SCHEINER:  Yes, your Honor.

13          That assertion is also false.  The patrol guide

14  defines -- and I know plaintiffs take offense to this

15  definition, but it is what's in the documents for many years.

16  But it defines the persons subject to removal under 9.41 as

17  emotionally disturbed persons and it defines them thus:  A

18  person who appears to be mentally ill or temporarily deranged

19  and is conducting himself in a manner which a police officer

20  reasonably believes is likely to result in serious injury to

21  himself or others.  There is nothing in this document requiring

22  that somebody be presenting an imminent danger of serious harm

23  in order to be taken in pursuant to 9.41.

24          The reason why the mayor issued this initiative and

25  these guidelines is because, as a matter of discretion and

1    practice, the feeling is that the police department and others,

2    other mental health professionals who have this authority under

3    section 9.58, were not applying the law in the most complete

4    extent.  In other words, they were exercising their discretion

5    to not take action when they could.  That was considered by the

6    person elected to make the difficult policy decisions necessary

7    to keep all New Yorkers safe.  There is nobody in this room

8    like that.

9         But that person and the people who are appointed by

10   him to do that made the decision that people should not be

11   exercising their discretion in this way when 9.41 authorizes

12   people to be cared for who are in serious danger.  And the

13   guidance, the initiative gives specific examples.  It says:

14   The following circumstances could be reasonable indicia of an

15   inability to support basic needs.

16        THE COURT:  Where are you reading from?

17        MR. SCHEINER:  I'm reading from the plaintiff's

18   Exhibit 1, 112-1, mental health involuntary removals.  That is

19   the written summary of the mayor's initiative, of the guidance

20   issued by the mayor.  That is an exhibit to Jonathan Moore's --

21   Exhibit 1 to Jonathan Moore's declaration.

22        THE COURT:  Let me see if I can find Mr. Moore's

23   statement.

24        Has the state mental health law changed in any regard,

25   aspect?

1          MR. SCHEINER:  No, your Honor.

2          THE COURT:  Is that right, Ms. Droubi?  Has the state

3    law changed?

4          MS. DROUBI:  I'm sorry, your Honor.  The state law has

5    not changed, no.

6          THE COURT:  The city is in compliance with the state

7    law?

8          MS. DROUBI:  No.  This new policy certainly is not in

9    compliance with the state law, your Honor.  Our position is

10   they are misinterpreting state law and that this loosening or

11   lowering of the standard that somebody, simply because they

12   can't meet their basic needs and that's it, is not what the

13   state guidance provides.

14         THE COURT:  Mr. Scheiner.

15         MR. SCHEINER:  Yes, your Honor.

16         Our initiative does not say that they can be taken

17   into custody just because they can't meet their basic needs.

18   What it says is that that's one example if that causes them to

19   be in danger of serious harm, which is the state standard

20   according to the New York State Office of Mental Hygiene in

21   their guidance which was adopted by the city and reading from

22   the official statement of this initiative.

23         THE COURT:  Is it fair to say it was adopted by the

24   city?  The city doesn't have much choice other than to comply

25   with the state mental health requirements, doesn't it?

1          MR. SCHEINER:  Your Honor, it wasn't a regulation.  It

2    was interpretive guidance of what the law means.  So the city

3    decided to follow the guidance to publicize it, to incorporate

4    it into its training.  That's what the initiative is all about.

5          And the state didn't invent this guidance.  It's in

6    the case law which we cited to your Honor in our first letter,

7    on December 8, 2022, on page 2.  We cited *Boggs v. Health and*

8    *Hospitals Corporation*, 132 A.D.2d 340.  That's New York

9    Appellate Division.  I think 1st.  I'm sorry if I omitted that

10   from the citation.  1987.

11         It says:  It is well established in this state that a

12   person may be involuntarily confined for care and treatment

13   where his or her mental illness manifests itself in neglect or

14   refusal to care for themselves to such an extent that there is

15   presented "serious harm" to their own well-being.  That's a

16   statement of law in their courts.  The plaintiffs have not

17   cited any case law to the contrary, your Honor.  They have

18   simply invented the idea that this standard either doesn't

19   exist or is contrary to the Constitution or contrary to the

20   Americans with Disabilities Act.  There is no authority for

21   that whatsoever.  To come in and ask for a TRO, of all things,

22   or emergency discovery to interfere with the operation --

23         THE COURT:  We have a pending lawsuit.  What's wrong

24   with their making a motion in the pending lawsuit?

25         MR. SCHEINER:  Your Honor, they have made this motion

essentially as part of the pending lawsuit, but the pending

lawsuit does not concern this initiative.  None of the

plaintiffs were injured.  They couldn't possibly have been

injured as a result of this initiative.

The plaintiffs' papers make some reference to this

being relevant to a *Monell* claim, but it's not because, of

course*, Monell* is a specious and vicarious liability for acts

that have occurred in the past.  There is no time travel.

That's one problem with that theory.

The other is that although plaintiffs refer to

something called *Monell* violations, there is actually no such

thing, because *Monell* is not a standard of liability in and of

itself.  It's a standard of vicarious liability.  It doesn't

define constitutional violations.  It's inappropriate to say

it's part of their *Monell* case.

If you look at their request for relief, which we

think on its face is invalid for reasons we said in our motion

to dismiss and others that we can address in briefing this

preliminary injunction motion, they ask for basically a

complete redesign of the city's policy with regard to the

mentally ill.  They ask your Honor to order the city to hire

people to work in what are essentially new governmental

agencies.

They ask your Honor to order that the police may not

carry out their state-mandated function of protecting the

1    mentally ill by taking them into custody for psychiatric

2    evaluation under 9.41.  That's not relief that we believe they

3    are entitled to.

4           With respect to this prospective relief about a

5    brand-new initiative, we think they don't even -- for reasons

6    that are even greater than the standing arguments we have made

7    in our motion papers already on the complaint, we think --

8           THE COURT:  My question is a little bit different.  My

9    question is, what is wrong -- there is a pending lawsuit in

10   this case, right, Justin Baerga v. the City of New York, 21 CV

11   5762, started about a year ago.  What's wrong with making a

12   motion in that case?

13          MR. SCHEINER:  Your Honor, they can make the motion.

14   We argue they don't have enough standing for it, but they can

15   make it, and we will respond to it.

16          What I'm saying is, it's not an emergency.  It doesn't

17   call for extraordinary relief of your Honor enjoining anything

18   that the city is doing now.

19          And to return to the initial issue this conference was

20   scheduled for, it doesn't call for emergency discovery.

21   Because if their argument has any validity at all, it has to be

22   a facial challenge to the initiative.  It can't be as

23   an-applied challenge --

24          THE COURT:  Should the plaintiffs amend their

25   complaint so that it incorporates the current allegations?

1              MR. SCHEINER:  I think your Honor, as a matter of good

2     housekeeping, yes, they should.  Because, otherwise, they are

3     making a motion that's not within the corners of their

4     complaint.  Couldn't possibly be.  Their complaint is a year

5     old at this point.

6              Yes, your Honor.  It is not within the scope of the

7     amended complaint.  It's essentially a motion about a new

8     thing, which is the initiative.

9              If I could respond --

10             MS. DROUBI:  Your Honor, can I respond to that point?

11             THE COURT:  Yes.

12             MS. DROUBI:  Your Honor, there is a pending putative

13    class action with an injunctive class on a policy, the patrol

14    guide, with respect to the way the city treats individuals they

15    deem emotionally disturbed.  This is directly relevant to our

16    case.  The city did not provide us with this change in policy

17    in advance.

18             We believe it necessary to halt this illegal policy of

19    lowering of the standard, which is why we came into the court

20    on an urgent basis.  We believe we have standing.  We have

21    individuals who have been harmed by this exact policy and will

22    be harmed.

23             THE COURT:  Who are the individuals?  Not Mr. Greene.

24             MS. DROUBI:  Mr. Greene is one of our plaintiffs.

25             THE COURT:  I know he is one of your plaintiffs, but

1    does he really have a grievance?  He complains about conduct

2    that took place in 2020.  He says he's afraid to go in the

3    street today.

4            MS. DROUBI:  He has been harmed by the existing patrol

5    guide EDP policy, which is now imminently about to change, and

6    it is a loosening of the standard.  So simply him walking on

7    the streets --

8            THE COURT:  How can you say it's about the change?

9            MS. DROUBI:  His fear of imminent harm as he walks

10   down the street with his mental disability and that that might

11   prompt another police act is his standing.  He is now walking

12   the streets of New York with a mental disability, and that is

13   all it takes for a police officer, with the guidance provided

14   by the mayor and what will be --

15           THE COURT:  We can agree that that hasn't happened

16   yet.

17           MS. DROUBI:  We know that the city has announced the

18   change effective immediately and that trainings are happening

19   as we speak.  So police officers are getting this guidance that

20   they can look at an individual who has a mental disability who

21   seems as though they might not be able to take care of

22   themselves and, on that basis alone, that officer can sweep

23   them off the street.  That's why he has standing.  He has been

24   affected by this policy in the past, and he will be affected by

25   this policy and these changes in the future.

1           THE COURT:  Mr. Scheiner.

2           MR. SCHEINER:  Yes, your Honor.

3           Just to respond to the repeated false allegation that
4  the city is authorizing or encouraging police officers to take
5  people into custody just because they appear to be mentally
6  ill, it's completely false for the reasons I pointed out.  I
7  want to point out some more reasons.

8           The written guidance which the plaintiff submitted to
9  your Honor, the mayor's statement, says that the following
10 circumstances could be reasonable indicia of an inability to
11 support basic needs due to mental illness that pose harm to the
12 individual:  Serious untreated physical injury, unawareness or
13 delusional misapprehension of surroundings or unawareness or
14 delusional misapprehension of physical condition or health.

15          THE COURT:  Where are you reading from?

16          MR. SCHEINER:  I'm reading from the Exhibit 1 to
17 Jonathan Moore's declaration, document 112-1, titled mental
18 health involuntary removals.  It's near the bottom of the page.

19          There are specific examples in a document which I
20 provided to plaintiffs' counsel voluntarily, even though we
21 haven't consented to expedited discovery, which is the FINEST
22 message that was issued to all members of the service in the
23 NYPD about the initiative.  That too gives specific examples.

24          It says:  Police may also remove a person for an
25 evaluation when the person appears mentally ill and incapable

1    of meeting basic human needs to such an extent that the person

2    is likely to suffer physical injury or serious harm without

3    immediate attention.

4            Plaintiffs want to ignore that whole clause, to such

5    an extent that the person -- I'm sorry.  May I complete my

6    statement, your Honor?

7            THE COURT:  Yes.

8            MS. DROUBI:  I'm sorry.

9            MR. SCHEINER:  To such an extent that the person is

10   likely to suffer physical injury or serious harm without

11   immediate attention.  In this circumstance, a person's actions

12   or inactions may be evidence of mental illness and inability to

13   care for oneself, for example, an incoherent person may be

14   unable to assess and safely navigate their surroundings, e.g.,

15   avoiding oncoming traffic or subway tracks, may suffer from a

16   serious untreated injury or unable to seek out food, shelter,

17   or other things needed for survival.  These circumstances are

18   likely to lead a person to suffer serious harm.

19           Your Honor, frankly, what the plaintiffs want,

20   although they claim to be advocates for the mentally ill, I

21   find that a little perverse because what they want is for the

22   city to allow people to starve to death, bleed to death on the

23   street, wander on subway tracks, wander into traffic.  It makes

24   no sense.

25           THE COURT:  Please.

1          MS. DROUBI:  Your Honor, may I respond to that?

2          THE COURT:  Yes.

3          MS. DROUBI:  Your Honor, first of all, that's not at

4    all what we are saying.  We are not asking -- what we are

5    simply saying is, the police should not be the ones to look at

6    an individual and, as this document that Mr. Scheiner just

7    read, indicate that they are unable to assess and safely

8    navigate their surroundings.

9          Who is to say what that means?  Is mumbling to oneself

10   sufficient to be unable to take care of oneself?  An incoherent

11   person, it's so broad and it's such a loosening of the term.

12   To expect NYPD officers to be able to understand that without

13   believing that somebody who is mumbling to themselves can just

14   meet the standard now and be involuntarily committed, it's a

15   dangerous lowering of the standard --

16         THE COURT:  The police officer doesn't make a decision

17   about involuntary commitment, does he?  He makes a decision

18   about transportation to a hospital.

19         MS. DROUBI:  Right.  Involuntarily taking them to a

20   hospital against their will.  That's the problem, is that they

21   make that determination that they have to be forcibly taken to

22   a hospital against their will.  That itself is a restriction on

23   their liberty because it causes detention and involuntarily

24   hospitalizing them against their will.

25         MR. SCHEINER:  Your Honor, the police have been called

1  upon by state law, and this has been constitutionally upheld,

2  to make that determination for decades.  They have to make

3  determinations about probable cause all the time, including

4  under 9.41, but of course also under the criminal law which

5  has, in some cases, its own difficult-to-apply standards.

6          Nevertheless, somebody has to do it, and they are the

7  people who are mandated to do it, with the assistance of EMS,

8  by the way.  When they do this, when they do a removal under

9  the initiative and existing practice, it's done through EMS.

10  EMS is called.  EMS takes the person to the hospital with the

11  officer for safety to make sure they get there.

12          This is something that we have to --

13          THE COURT:  Your point of view is that nothing has

14  changed as a result of Mayor Adams' press conference.

15          MR. SCHEINER:  What's changed is that there is now

16  further guidance for the police department and other agencies

17  about circumstances --

18          THE COURT:  What the police can do hasn't changed.

19          MR. SCHEINER:  Correct.  Yes, your Honor.

20          THE COURT:  So the purpose of the press conference was

21  to do what?

22          MR. SCHEINER:  To announce the fact that the mayor is

23  taking the initiative of providing further guidance to the

24  agencies about what is permitted under current law so that they

25  can take action to protect New Yorkers under circumstances that

1    the law permits.

2            To make an example, and I don't mean to trivialize

3    what we are talking about, nonprosecution of fare jumping or

4    when marijuana was illegal.  Often, people were not prosecuted

5    for violating laws which the police considered minor or which

6    the prosecutor considered minor, for matters of resources or

7    other reasons.  That doesn't mean that it's unconstitutional to

8    enforce those laws.

9            The mayor issued this guidance because it was

10   perceived that officers were, perhaps out of ignorance, perhaps

11   out of discretion, not utilizing -- officers and others were

12   not utilizing 9.41 and 9.58 to the greatest extent that's

13   permitted.  That doesn't mean anyone is asking for maximum

14   enforcement of the statute.  It's simply making clear that

15   there are circumstances that had been overlooked.

16           Part of the problem here is, we are talking about

17   hypotheticals.  That is why we think the plaintiffs don't have

18   standing.  Since we are here to talk about it, I'll give a

19   hypothetical.  I noticed a man on the subway the other day who

20   was walking around on the tracks.  I didn't talk to him.  I

21   don't know what he would have said if I had approached him as

22   to, why are you on the tracks?  Do you know that you're on the

23   tracks?  Do you know what the tracks are?  I don't know.

24           But the police could ask those questions of that

25   person, maybe before they got on the tracks, if they appeared

1   to be mentally ill and appeared unaware of their surroundings,

2   behaving in a way that seemed to show that they were unaware of

3   the danger.

4           THE COURT:  Anybody can ask that question.

5           MR. SCHEINER:  Yes, your Honor.  But the police would

6   ask that question in order to determine if there is probable

7   cause to believe that the person is mentally ill and,

8   therefore, unable to determine, unable to know that the tracks

9   are dangerous and that they shouldn't climb onto the tracks to

10  get a cigarette.  They can make that determination based on

11  common sense and their training.  They have already had

12  training in applying 9.41, of course.  This is a supplement to

13  that training to make clear that there are circumstances like

14  this.  What if the person --

15          THE COURT:  How many police officers have received

16  this training?

17          MR. SCHEINER:  Under the initiative?

18          THE COURT:  Yes.

19          MR. SCHEINER:  Your Honor, it's just being rolled out

20  this week.  So probably --

21          THE COURT:  Prior to the initiative.

22          MR. SCHEINER:  Well, there was no training on the

23  initiative prior to the initiative.  All officers have received

24  training --

25          THE COURT:  Prior to the initiative being issued, what

1    was the training with regard to 9.41 and 9.58 and 9.37?

2          MR. SCHEINER:  Your Honor, only 9.41 applies to the

3    police, so that's what they would have received training on.

4    And 9.41 training consists of an explanation of the mental

5    health law and examples of when it can be applied.

6          There are materials I haven't brought with me, because

7    that wasn't the subject of today's conference, but there is

8    training materials that exist on how to apply 9.41 that the

9    police have been doing for decades and using that training.

10   That may not be the full extent.  It may just not be written

11   training.  The NYPD's police department training is always

12   updated.  There is always in-service training.  There is roll

13   call training.  There is a lot of different elements to it.

14         But they are not -- they get a lot of training in how

15   to implement 9.41 as part of their normal job, and there is a

16   procedure which was alluded to, the patrol guide procedure,

17   which has a lot of safeguards, like circumstances under which

18   they should call for help or they should call for supervisors

19   where they should call for emergency services.  It specifies

20   they should call for EMS.  There is a lot of rules surrounding

21   how to implement 9.41.  But the basic standard is always the

22   same.

23         They have the guidance of the FINEST message, which I

24   just read that they just received.  The FINEST message is the

25   most that, as far as I know, most police officers would have

 1    seen about this particular initiative.

 2         The NYPD is in the process of finalizing and rolling

 3    out additional training this week in conformance with the

 4    initiative.

 5         THE COURT:  How long will it take to train all these

 6    people on the initiative?

 7         MR. SCHEINER:  Your Honor, I'm not sure.  We have a

 8    large number of people in the department.  I don't know the

 9    exact number.  But last I heard, it was about 30,000.  So I do

10    not know for sure.  I do believe that the training sergeants,

11    who are the people primarily responsible for new training to

12    in-service members for service outside the academy should

13    receive their training on the initiative this week.  In other

14    words, it's in progress.  The NYPD is moving quickly.  But even

15    under the current training, they are only being asked to do

16    what they have always been doing.  The current training

17    explains to them specific circumstances where they can do

18    that --

19         THE COURT:  You say they have always been doing it.

20    The fact of the matter, they have not been doing it.  That's

21    the whole purpose of the initiative, isn't it?

22         MR. SCHEINER:  They might have.  It's just that the

23    city government determined that there were occasions when

24    people could be taken into custody when it was not being done,

25    not that it was never done, because the content of the

1    initiative is not prohibited by any existing policy.  It's not

2    prohibited by any law.  It's within the scope of their current

3    training.  It's just circumstances that we are having

4    supplemental training on to make sure that all the officers are

5    aware of it.

6           In other words, it's not that there is -- was a

7    hard-and-fast rule or any rule against this before.  It's

8    simply an explanation of, by the way, don't forget, you can do

9    this too.  You don't have to wait until somebody threatens

10   suicide or jumps on the tracks.  You don't have to wait until

11   they jump in front of a car.  You don't have to wait until they

12   are passed out on the sidewalk, if they are bleeding or

13   obviously injured or obviously starving or out in the cold,

14   which will soon be the case in below-zero temperatures.

15          THE COURT:  Ms. Droubi.

16          MS. DROUBI:  Or, your Honor, they can simply be an

17   incoherent person with an inability to take care of themselves

18   and that's enough now.  This is a new initiative.  It's newly

19   announced by the mayor, as the city attorney is stating.  There

20   is a training.  They are moving quickly.  There is a training

21   timeline.  Why would they be providing new trainings for a

22   policy --

23          THE COURT:  The mayor's statement, as I understand it,

24   he believes he is doing a good thing for the people who have

25   mental disease.

1          MS. DROUBI:  That might be the case that he believes

2    that, your Honor, but he has to do it -- in this role it has to

3    be done in a manner that is consistent with the law.

4          What we are saying is that this standard, and counsel

5    referenced a FINEST message, which has really problematic

6    guidance for police officers who are now going to be policing

7    mental health, just simply looking at an individual, saying

8    they are incoherent is enough, and that's incredibly

9    problematic.  And new training on this initiative, we believe,

10   would -- on an initiative that violates the law should be

11   stopped.

12         THE COURT:  Let me see if I have this right.  From

13   your standpoint or from Mr. Scheiner's standpoint, what the

14   police are being summoned to do now, under the new guidance

15   from Mayor Adams, is enforce the law that they could always

16   enforce it in a way they have chosen not to enforce it the last

17   six months.  And the city's position is, we are just asking the

18   police to do what they always could do, which is enforce the

19   law.  Is that correct?

20         MR. SCHEINER:  Yes, your Honor, that's our position

21   that's the case.

22         I would like to offer to your Honor a copy of the

23   FINEST message, because it does not say what plaintiffs'

24   counsel just alleged.

25         THE COURT:  Didn't you submit that today?

1              MR. SCHEINER:  No, your Honor.  I did not submit it

2    with either of my letters, but I have a copy here for the

3    Court, if you wish.

4              THE COURT:  Do you have any objection, Ms. Droubi?

5              MS. DROUBI:  No objection, your Honor.

6              THE COURT:  Hand it up.

7              What's the part that you object to, Ms. Droubi?

8              MS. DROUBI:  That an individual -- police may remove a

9    person for evaluation when the person appears mentally ill and

10   incapable of meeting basic human needs.  It goes on:  To such

11   an extent when the person is likely to suffer physical injury

12   or serious harm without immediate attention.

13             But it gives examples.  Examples include:  Inability

14   to care for oneself.  For example, an incoherent person may be

15   unable to assess and safely navigate their surroundings.  It

16   goes on:  May suffer from a serious untreated injury.

17             But the key is, mental illness and an inability to

18   care for oneself; for example, an incoherent person.  So a

19   person who is mumbling on the street appears to have a mentally

20   disability.  This is now somebody who is at risk of getting

21   involuntarily committed to a hospital by a police officer

22   against their will.

23             THE COURT:  But if the city can establish that this

24   has always been the policy or has been the policy for an

25   extended length of time, it's not a change.  It's merely just

1    calling to mind to the police department what the limits of

2    their discretion are.  Your case would evaporate, wouldn't it?

3          MS. DROUBI:  The mayor has announced a change in the

4    patrol guide.  This is a change in the policy.  These aren't

5    the same standards that existed in the police department as of

6    two weeks ago.  There is a change in the policy that is

7    imminent.  It was announced that they will be changing the

8    patrol guide, that they are loosening the standard.  That

9    interpretation is --

10         THE COURT:  Loosening the standards, but not changing

11   the standards insofar as they exist under the law.

12         MS. DROUBI:  We believe they are inconsistent with the

13   law, and there is Second Circuit case law that supports our

14   position, *Guan v. City of New York*, which says:  To make a

15   mental health arrest, police officers must consider whether

16   probable cause exists to believe the individual is a danger to

17   herself or others, that is, whether there is a substantial risk

18   of serious physical harm to herself or others.  That is

19   inconsistent with a directive that says, appears mentally ill

20   and incapable of meeting basic human needs, including being

21   incoherent.

22         This is policing somebody for being homeless.  This is

23   policing somebody for having a mental disability and looking

24   like they have a mental disability with nothing further, and

25   that is inconsistent with the law, your Honor.

1          MR. SCHEINER:  Your Honor, may I?

2          THE COURT:  Yes.

3          MR. SCHEINER:  It's easy to mischaracterize a document

4    if you only pick and choose the words that you want to quote

5    from the document.

6          But repeatedly what plaintiff's counsel has done is

7    focused on particular words, like incoherent person, and left

8    out the rest of it, which is the important limitation on what

9    the police can do.  What it says is:  A person's actions or

10   inactions may be evidence of mental illness and inability to

11   care for oneself.  For example, an incoherent person may be

12   unable to assess and safely navigate their surroundings, e.g.,

13   avoiding on coming traffic or subway tracks.  You can't erase

14   those words from the message in order to make it improper, your

15   Honor.  In the city's view, it's entirely consistent with the

16   standard articulated by the Second Circuit, as well as New York

17   State law.

18         And what the plaintiffs are asking you to do is to say

19   that this FINEST message and the mayor's initial statement, the

20   mental health involuntary removal statements, are contrary to

21   the Constitution or contrary to the ADA.  There is no legal

22   authority at all that says that.  The legal authority that

23   exists says that the standards articulated in these documents

24   are the correct standards under 9.41 and are perfectly lawful.

25         So they are asking to make new law.  They can make

1   that request if they have standing to do it, which we think

2   they don't.  And they can make the motion.  If your Honor

3   determines they have standing, your Honor can consider it.

4           But that's not something that should be rushed, to

5   change decades of law to up end an initiative by the elected

6   officials of the City of New York to save lives in an emergency

7   proceeding.

8           As we indicated in our letter, if your Honor wants to

9   hear the motion, we will litigate it, but it should be done in

10  an orderly fashion, and we don't think it requires discovery

11  about ongoing activities of the city to interfere with and

12  burden city officials who are trying to implement this guidance

13  in addition to all their other duties.  The initiative stands

14  or falls if on its face, your Honor.

15          THE COURT:  Let me shift gears for a minute and ask

16  the lawyers sitting at the first table whether they want to be

17  heard on the issue of standing, New York Lawyers for the Public

18  Interest or anybody else who wants to be heard.

19          MS. van DALEN:  Thank you, your Honor, for the

20  opportunity.

21          Your Honor, I appreciate my cocounsel has represented

22  our interests in the arguments this morning.  I would urge the

23  Court, though, to consider that the organizations who have

24  brought this claim do have standing.  They have diverted

25  substantial resources in addressing the illegal policies of the

1   city, as well we believe that Mr. Steven Greene, whose

2   affidavit you have before us, is experiencing already

3   irreparable harm due to the change in the policy.  He is no

4   longer leaving his home out of fear of being arrested.  Thank

5   you, your Honor.

6          THE COURT:  That's the standing.  He has standing

7   because he is afraid to go outside.  Is that it?

8          MS. van DALEN:  Mr. Greene has standing because he has

9   already been injured by the policy, by the city's policy, by

10  being arrested and detained and taken to a hospital and by

11  living in fear of this new policy as a person who has been

12  diagnosed with a mental illness.  And the organizations have

13  standing based upon the diversion of resources that they have

14  had to incur as a result of the defendant's policies.

15         THE COURT:  Anybody else want to be heard on this?

16         MS. van DALEN:  Thank you, your Honor.

17         THE COURT:  Thank you.

18         Mr. Moore.

19         MR. MOORE:  No, Judge.

20         THE COURT:  Mr. Scheiner.

21         MR. SCHEINER:  Yes, your Honor.  If I may respond

22  briefly on the standing issue.

23         THE COURT:  Yes.

24         MR. SCHEINER:  We haven't had the opportunity to fully

25  brief standing for the current motion.  We did brief standing

1   in our prior motion to dismiss, although not for the

2   individual's request for injunctive relief but only for the

3   organizations who, as we understand it, are seeking only

4   injunctive relief in the underlying case, as well as the

5   present motion.

6          But the case law, and we cited I think one case in our

7   recent letter, but there is a lot more we can cite if we have

8   the opportunity to brief it, says that when organizations are

9   engaged in advocacy, as a principal part of their function,

10  that efforts that they make to advocate on the issue that they

11  are concerned about do not establish standing because that's

12  bootstrapping.

13         That's like saying that a person who writes to their

14  congressman has standing to challenge a law they don't like.

15  It's not the case.  They have to be injured in some concrete

16  way that is unrelated to their advocacy function, which they

17  have chosen to engage in.

18         I want to point out that on the websites, which we

19  haven't cited before, because we were on a motion-to-dismiss

20  posture before, but the websites of all these organizations

21  state as one of their goals is to severely curtail or eliminate

22  the role of law enforcement in the provision of care to the

23  mentally ill under 9.41 and 9.58 and other statutes.  That's

24  been their longstanding goal as a political matter, and they

25  are free to advocate for that, to pursue that in elections and

1   legislatively and with free speech.  But it doesn't give them a

2   light to come into court and try to essentially micromanage or

3   conduct an inquisition against the city because the city is

4   engaged in a policy that they don't like.

5          THE COURT:  What about their position as an *amicus*

6   *curiae*?

7          MR. SCHEINER:  Your Honor, *amicus curiae* would require

8   that there be somebody with standing to bring that claim.  As

9   we have said before, Mr. Greene, none of the plaintiffs have

10  been subjected to this initiative and their subjective fear of

11  it does not create standing.  Standing is not a subjective

12  standard.  It's an objective standard of actual harm or

13  imminent danger of harm which they haven't established, which

14  is entirely speculative.  Without even a single example of

15  somebody who was taken into custody because of the initiative

16  without probable cause.  Not a single example, your Honor,

17  which plaintiffs concede.

18         In other words, nobody has standing.  We also don't

19  think that the -- these organizations are appropriate or

20  necessary as *amicus curiae* for a case of this nature.  It's not

21  something that has been raised before.  I am not taking like a

22  final position on that, I guess we would want to consider our

23  position on that.  But nobody has standing to challenge the

24  initiative, your Honor.

25         MS. van DALEN:  Your Honor, may I speak on standing

1   further?

2           THE COURT:  Yes.

3           MS. van DALEN:  Thank you.

4           We respectfully dispute the characterization of

5   standing on the circuit, as stated by opposing counsel.  This

6   issue has been briefed in the motion-to-dismiss papers.  The

7   organizations, including Community Access, Correct Crisis

8   Intervention Today NYC, and NAMI NYC each have standing to

9   bring this action.

10          As is pointed out in our complaint and in our briefing

11  on the partial motion to dismiss, each of these organizations

12  has diverted resources from other policies and other priorities

13  that they have to support people with mental disabilities and

14  advocate for services and housing.  Mr. Greene lives in

15  supportive housing and he believes that when he comes and goes

16  from his housing that is provided to people like him who have

17  mental disabilities that he is vulnerable to the police under

18  this new policy.

19          Thank you, your Honor.

20          THE COURT:  Thank you.

21          Anybody else want to be heard?

22          I'll have a decision four shortly.  Thank you very

23  much.

24          MR. MOORE:  May I?

25          THE COURT:  Yes.

1          MR. MOORE:  One additional thing.  This lawsuit began

2     as a challenge to the policy of the police department and how

3     they were enforcing the laws against people who have a mental

4     health crisis.  We have alleged in our complaint, in our

5     original complaint and our amended complaint, that the police

6     department has inadequately trained and inadequately supervised

7     officers throughout the years, going back at least to the

8     *Eleanor Bumpers* case in 1984, that that has a pattern and

9     practice over the years.  We give you 22 examples in our

10    amended complaint of individuals who have been harmed by this

11    policy.

12          So what we were faced with a week ago was in the

13    context of a policy that could not be implemented solely by

14    police, but now a change in the policy that we believe lowered

15    the standard.  That's why we moved this Court for the relief.

16          It would seem to me, given the fact that Mr. Scheiner

17    has admitted that they have not even started implementing the

18    policy yet, they don't even have an idea of what the training

19    is yet, that holding that action in abeyance for us to do some

20    initial discovery, to do a 30(b)(6) deposition of a witness and

21    the police department to find out what the heck is going on

22    here was appropriate and that's what we stand on today, Judge.

23          THE COURT:  Do you think you ought to amend your

24    pleadings?

25          MR. MOORE:  We can do that if the Court thinks.  I

1    don't think we do because I think the basic premise of the

2    lawsuit is that the police department is not the vehicle alone

3    to deal with people in mental health crisis on the street.

4          Clearly they play a part, but you have to involve, as

5    these organizations have fought for for many years, mental

6    health professionals in that assessment.  You can't ask a

7    rookie cop to determine whether somebody sitting on a bench at

8    a subway station -- not on the track.  That's an extreme

9    example, and Mr. Scheiner knows it.  Nobody is saying they

10   shouldn't get help.  But if you're sitting on a bench and you

11   look homeless, you can't ask a rookie cop to go up and say,

12   well, he seems incoherent.  Maybe the person doesn't speak

13   English.  Therefore, they are incoherent.  Maybe they can't

14   care for themselves.  Maybe they don't have money to get

15   housing or to get food.

16         THE COURT:  We can all agree that this has not

17   happened yet.

18         MR. MOORE:  I think that's part of what the problem

19   has been historically, that the police department overpolices

20   those situations, not just in the subway context, but --

21         THE COURT:  Mr. Scheiner's view is of the view that it

22   underpolices.

23         MR. MOORE:  I know Eric Adams said for 20 years he

24   walked by those people and did nothing and now they are going

25   to start doing something.  I don't think that's what

1    Mr. Scheiner said.  I think what he's saying is, everybody

2    should get out of our way because this is a police matter, and

3    you can't interfere with what the police are doing because of

4    the state mental health code.

5              We don't think that's constitutional, given how it has

6    been applied over the years, and we think this new policy even

7    makes it easier for the police to abuse that power to take

8    people involuntarily against their liberty into a hospital

9    setting where they may or may not get any kind of service.  if

10   they come in the front door, they will be shown out the back

11   door.  That's our concern, Judge.

12             THE COURT:  Thank you, Mr. Moore.

13             MR. SCHEINER:  Your Honor, may I respond to the recent

14   comments?

15             THE COURT:  Yes.  Briefly.

16             MR. SCHEINER:  Thank you, your Honor.

17             I think is this is very much a moving target.

18   Mr. Moore started talking about excessive-force cases.  There

19   is nothing in the initiative about excessive force.  That is

20   something that is one of the prongs of the plaintiffs' initial

21   complaint, but the initiative has nothing to do with standards

22   for use of force.

23             And it sounds to me like Mr. Moore is saying that this

24   is really a preliminary injunction based on the initial

25   complaint, which it's not and it's very surprising, considering

1    the initial complaint is quite long.  Not the initial.  The

2    amended complaint is 62 pages and over 350 paragraphs, your

3    Honor, and it doesn't ask for a preliminary injunction.  and

4    plaintiffs have not sought one until now.  The current motion

5    is about initiative, your Honor, and the amended complaint is

6    the subject of a motion to dismiss, which we think are valid

7    and we would appreciate -- we think is valid and we would

8    appreciate oral argument on.

9            I also want to point out that Mr. Moore has used

10   hypotheticals that are not drawn from any event that we have

11   heard any evidence about.  They are contrary to the

12   hypotheticals given in the written guidance that's been issued

13   by the city as part of the initiative, which I think is clear

14   and I won't rehash all that.

15           I also want to point out that only two plaintiffs have

16   put in evidence with respect to standing, CCIT New York and the

17   individual plaintiff, Mr. Greene.  We think that evidence is

18   insufficient to establish standing, which is jurisdictional.

19   If the other plaintiffs think they have the better case for

20   standing, they should be required to put in some evidence, but

21   they haven't.

22           Unless your Honor has questions, I think that

23   concludes my response.

24           THE COURT:  Thank you very much.

25           MS. LOWENKRON:  Your Honor, may I be heard for one

1   second, since you invited others to speak briefly?

2           THE COURT:  Yes.

3           MS. LOWENKRON:  Thank you, your Honor.

4           I think that we are being put, as plaintiffs, in a

5   very unfair situation here by the attorney for the city in that

6   he says, in the one hand, there is nothing new about this

7   initiative, yet, the other hand, he speaks of this in fact as a

8   new initiative where they are going to be interpreting things

9   differently.  Plus, it's irrelevant if it is an interpretation

10  difference or a written difference.  The reality is, it is an

11  absolutely new initiative where the mayor went on a press

12  conference --

13          THE COURT:  So you say.  You say it's absolutely

14  different.  He says it's precisely the same thing.

15          MS. LOWENKRON:  But he doesn't say it's precisely the

16  same thing.  Every other sentence is suggesting that in fact

17  this is new because it is in fact going to be telling police

18  officers a different way of doing things, and we think that

19  that different way is even worse than the first way, but it's

20  definitely different, and I think that there is a speaking out

21  of both sides of the mouth on that, your Honor.

22          THE COURT:  Thank you, Ms. Lowenkron.

23          MS. LOWENKRON:  Thank you, your Honor.

24          (Adjourned)

25