Docket No.  21 Civ. 5762 (PAC)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUSTIN BAERGA; STEVEN GREENE; GIOVANNA SANCHEZ-
ESQUIVEL; and SARAH ARVIO, individually and on behalf of all others
similarly situated, and COMMUNITY ACCESS, INC.; NATIONAL
ALLIANCE ON MENTAL ILLNESS OF NEW YORK CITY, INC.; and
CORRECT CRISIS INTERVENTION TODAY - NYC,

Plaintiffs,

- against -

CITY OF NEW YORK, BILL DE BLASIO; DERMOT F. SHEA; NYPD
POLICE OFFICER KRZYSZTOF WNOROWSKI; NYPD POLICE
OFFICER SHERON; NYPD POLICE OFFICER MCDOWELL; NYPD
POLICE SERGEANT NATHAN MOLE; NYPD POLICE OFFICER
MARTIN HABER; NYPD POLICE SERGEANT CARRKU GBAIN,
NYPD POLICE OFFICER VIKRAM PRASAD; NYPD POLICE
OFFICER ANDRE DAWKINS; NYPD POLICE OFFICER TYRONE
FISHER; NYPD POLICE OFFICER DEVINDRA RAMAYYA; NYPD
POLICE OFFICER JULIAN TORRES; NYPD OFFICER APRIL
SANCHEZ, and NYPD OFFICERS JOHN and JANE DOES # 1-40,

Defendants.

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR EXPEDITED DISCOVERY

*HON. SYLVIA. O. HINDS-RADIX*
*Corporation Counsel of the City of New York*
   *Attorney for Defendants City, de Blasio, Shea, Wnorowski,*
   *Sheron, Mole, Haber, Gbain, Dawkins, Fisher, Ramayya,*
   *Torres, Prasad, McDowell, and Sanchez*
   100 Church Street
   New York, N.Y. 10007
   *Of Counsel: Alan H. Scheiner*
               *Jeffrey F. Frank*
   Tel: (212) 356-2344/3541

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................................II

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF FACTS ........................................................................................ 1

ARGUMENT

      POINT I

           THE DISCOVERY SOUGHT IS NOT RELEVANT
           TO PLAINTIFFS' PENDING CLAIMS SET
           FORTH IN THE AMENDED COMPLAINT ........................................... 4

           A.   The Expedited Discovery is Not Relevant to
               Pending Claim Under Section 1983. ................................................... 5

           B.   The Discovery is Not Relevant to a Claim Under
               the Disability Laws ........................................................................... 10

           C.   Plaintiffs' pretension to a class action does not
               support expedited discovery. ............................................................ 12

      POINT II

           PLAINTIFFS LACK STANDING TO SEEK
           EXPEDITED DISCOVERY ON THE CITY'S
           INITIATIVE BECAUSE IT HAS NOT CAUSED
           THEM HARM OR IMMINENT HARM ................................................. 12

           A.   The Individual Plaintiffs Cannot Demonstrate
                Injury in Fact.................................................................................... 13

            B.   The Institutional Plaintiffs Also Lack Standing ................................ 19

      POINT III

           THE DISCOVERY REQUESTS WOULD IMPOSE
           BURDENS THAT ARE DISPROPORTIONATE
           TO THE NEEDS OF THE CASE AND THERE IS
           NO NEED TO EXPEDITE THE DISCOVERY, IF
           IT IS TO BE HAD AT ALL .................................................................. 21

CONCLUSION......................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                   **Pages**

*Addington v. Texas*,
 441 U.S. 418 (1979)................................................................................................6

*Am. Library Ass'n v. Barr*,
 294 U.S. App. D.C. 57, 956 F.2d 1178 (1992) ....................................................18

*Amato v. City of Saratoga Springs*,
 170 F.3d 311 (2d Cir. 1999).................................................................................8

*Arroyo v. City of New York*,
 No. 14-CV-9953 (JPO), 2016 U.S. Dist. LEXIS 89274
 (S.D.N.Y. July 8, 2016) ......................................................................................24

*Babbitt v. Farm Workers*,
 442 U. S. 289 (1979)...........................................................................................13

*Boddie v. City of New York*,
 15 Civ. 4275 (GHW), 2016 U.S. Dist. LEXIS 50248
 (S.D.N.Y. Apr. 13, 2016)................................................................................7, 24

*Boggs v. Health Hosps. Corp.*,
 132 A.D.2d 340 (N.Y. App. Div. 1987) ...............................................................6

*Bryant v. Madigan*,
 84 F.3d 246 (7th Cir. 1996) ...............................................................................11

*Cacchillo v. Insmed, Inc.*,
 638 F.3d 401 (2d Cir. 2011)................................................................................16

*In re Carl C.*,
 126 A.D.2d 640, 511 N.Y.S.2d 144 (App. Div. 2nd Dept. 1987) ..........................6

*Carter v. HealthPort Techs., LLC*,
 822 F.3d 47 (2d Cir. 2016)..................................................................................13

*City of Canton v. Harris*,
 489 U.S. 378 (1989)..............................................................................................6

*City of Los Angeles v. Heller*,
 475 U.S. 796 (1986)..............................................................................................8

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013)..................................................................................13, 14, 18

**<u>Cases</u>**                                                                                            **<u>Pages</u>**

*Connick v. Thompson*,
    563 U.S. 51 (2011)..................................................................................24

*Cushing v. Moore*,
    970 F.2d 1103 (2d Cir. 1992)..................................................................11

*Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*,
    796 F.3d 293 (3d Cir. 2015)....................................................................11

*Doe v. Congregation of the Sacred Hearts of Jesus & Mary*,
    No. 21-CV-6865 (VSB), 2022 U.S. Dist. LEXIS 130614
    (S.D.N.Y. July 22, 2022) ........................................................................22

*Elbert v. N.Y. State Dep't of Corr. Servs.*,
    751 F. Supp. 2d 590 (S.D.N.Y. 2010)......................................................11

*Env't Working Grp. v. U.S. Food and Drug Admin.*,
    301 F. Supp. 3d 165 (D.D.C. 2018) .........................................................19

*Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*,
    954 F.3d 118 (2d Cir. 2020)....................................................................13

*Fifth Ave. Peace Parade Comm. v. Gray*,
    480 F.2d 326 (2d Cir. 1973)....................................................................18

*Green Haven Prison Preparative Meeting of the Religious Soc'y of Friends v.
    N.Y. State Dep't of Corr. & Cmty. Supervision*,
    16 F.4th 67 (2d Cir. 2021) ......................................................................16

*Guan v. City of New York*,
    37 F.4th 797 (2d Cir. 2022) ....................................................................12

*Handschu v. Special Servs. Div.*,
    475 F. Supp. 2d 331 (S.D.N.Y. 2007)......................................................18

*Hankard v. Town of Avon*,
    126 F.3d 418 (2d Cir. 1997)....................................................................18

*Hedges v. Obama*,
    724 F.3d 170 (2d Cir. 2013)....................................................................14

*Ingles v. City of New York*,
    01 CV 8279 (DC), 2004 U.S. Dist. LEXIS 21783
    (S.D.N.Y. Oct. 7, 2004) ..........................................................................23

**Cases**                                                   **Pages**

*Jacob v. Bon Secours Charity Health Sys.,*
  02 CV. 1398, 2011 U.S. Dist. LEXIS 15256
  (S.D.N.Y. Feb. 11, 2011) ...................................................................................10

*Laird v. Tatum,*
  408 U.S. 1 (1972)...............................................................................17, 18, 19

*Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. &*
  *Intergovernmental Affairs,*
  393 Fed. App'x 791 (2d Cir. 2010) ......................................................................8

*Los Angeles Cty. v. Humphries,*
  562 U.S. 29 (2010) ...............................................................................................8

*Los Angeles v. Lyons,*
  461 U.S. 95 (1983)................................................................................14, 15, 17

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)..................................................................................13, 14

*Marom v. City of New York,*
  15 Civ. 2017 (PKC), 2016 U.S. Dist. LEXIS 28466
  (S.D.N.Y. Mar. 7, 2016) .......................................................................................7

*McGugan v. Aldana-Bernier,*
  752 F.3d 224 (2d Cir. 2014)...............................................................................10

*MedImmune, Inc. v. Genentech, Inc.,*
  549 U. S. 118 (2007)...........................................................................................13

*Monell v. Dep't of Soc. Servs. of City of New York,*
  436 U.S. 658 (1978)...........................................................................5, 6, 7, 8, 9, 24

*N.Y. Bankers Ass'n v. City of New York,*
  13 Civ. 7212 (KPF), 2014 U.S. Dist. LEXIS 126000
  (S.D.N.Y. Sep. 9, 2014) ......................................................................................14

*Packard v. City of New York,*
  2020 U.S. Dist. LEXIS 54003 (S.D.N.Y. Mar. 25, 2020) .....................................12

*Patrolmen's Benevolent Ass'n of N.Y. v. City of New York,*
  97 Civ. 7895 (SAS), 98 Civ. 8202 (SAS), 2000 U.S. Dist. LEXIS 15179
  (S.D.N.Y. Oct. 13, 2000) ......................................................................................9

**Cases**                                                                    **Pages**

*Pluma v. City of New York*,
    13 Civ. 2017 (LAP), 2015 U.S. Dist. LEXIS 48134
    (S.D.N.Y. Mar. 31, 2015) ........................................................................................7

*Portland Police Ass'n v. City of Portland*,
    658 F.2d 1272 (9th Cir. 1981) ................................................................................9

*Rahman v. Chertoff*,
    530 F.3d 622 (7th Cir. 2008) ..................................................................................9

*Reynolds v. Giuliani*,
    506 F.3d 183 (2d Cir. 2007) ...................................................................................8

*Rizzo v. Goode*,
    423 U.S. 362 (1976) ...............................................................................................9

*Roberts v. Bassett*,
    Nos. 22-622-cv, 22-692-cv, 2022 U.S. App. LEXIS 31486
    (2d Cir. Nov. 15, 2022) .........................................................................................14

*Schoolcraft v. City of New York*,
    103 F. Supp. 3d 465 (S.D.N.Y. 2015) ...................................................................6

*Segal v. City of New York*,
    459 F.3d 207 (2d Cir. 2006) ..........................................................................8, 24

*Shain v. Ellison*,
    356 F.3d 211 (2d Cir. 2004) ........................................................................15, 17

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) .............................................................................................19

*Stinson v. City of New York*,
    304 F.R.D. 432 (S.D.N.Y. 2015) .....................................................................22–23

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) .............................................................................................13

*Taylor v. Bernanke*,
    No. 13-CV-1013, 2013 U.S. Dist. LEXIS 128533
    (E.D.N.Y. Sep. 9, 2013) ........................................................................................20

*United Public Workers* v. *Mitchell*,
    330 U.S. 75 (1947) ...............................................................................................18

**Cases**                                                                                           **Pages**

*United States v. Univ. Hosp.*,
    729 F.2d 144 (2d Cir. 1984)................................................................................11

*Velasquez v. City of New York Dep't of Bldgs.*,
    No. 19-cv-9687 (PKC), 2020 U.S. Dist. LEXIS 90361
    (S.D.N.Y. May 22, 2020)..............................................................................8

*Wagner v. City of New York*,
    14 Civ. 2521 (VEC), 2015 U.S. Dist. LEXIS 131204
    (S.D.N.Y. Sep. 28, 2015).............................................................................17

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990).....................................................................................14

*Young Advocs. for Fair Educ. v. Cuomo*,
    359 F. Supp. 3d 215 (E.D.N.Y. 2019) .......................................................19

**Statutes**

42 U.S.C. § 1983 .........................................................................................5, 8, 10

Fed. R. Civ. P. 5.1 ..............................................................................................5

Fed. R. Civ. P. 26 ............................................................................................22

Fed. R. Civ. P. 26(b)(1).................................................................................4, 22

Fed. R. Civ. P. 30(b)(6)..................................................................................22

N.Y. Mental Hyg. Law § 9.37 .......................................................................16

N.Y. Mental Hyg. Law § 9.39 .....................................................................3, 6

N.Y. Mental Hyg. Law § 9.41 ....................1, 2, 3, 4, 5, 6, 7, 10, 11, 12, 15, 17, 19, 21, 23, 24, 25

N.Y. Mental Hyg. Law § 9.55 .....................................................................3, 16

N.Y. Mental Hyg. Law § 9.57 .....................................................................3, 16

N.Y. Mental Hyg. Law § 9.58 ..................................................................1, 2, 4, 23

## PRELIMINARY STATEMENT

The plaintiffs' application for expedited discovery highlights their mistaken assumption that because they purport to have claims under the Fourth Amendment, the Court should allow them extraordinary oversight of duly elected and appointed City officials, and empower them, on an emergency basis, to inquire into City policies affecting the mentally ill and interrogate City officials about their policy decisions.  This presumed supervisory role over the City's office holders is underscored by plaintiffs' presumption that they were entitled to advance notice of developments in City policy,[1] such as the City's November 28, 2022 Initiative (the "Initiative"), announced in a statement titled "Mental Health Involuntary Removals," concerning the application of N.Y. Mental Hyg. Law §§ 9.41, 9.58  (the "Statement") (Docket Entry ("DE") No. 112-1).[2]  In fact, plaintiffs are entitled to no more than typical litigants pursuing a claim for alleged unlawful seizure against the City, and that does not include the expedited discovery now sought.

## STATEMENT OF FACTS

On November 28, 2022, the City announced the Initiative, in a written Statement reiterating guidance issued by the N.Y. State Office of Mental Health on February 18, 2022. (DE No. 113-1) ("OMH Memorandum").  As Mayor Eric Adams explained in a press conference announcing the Initiative, the effort clarified the law and called upon City officials to implement the relevant statutes in more of the circumstances where the law already permitted action.  The Mayor stated: "If severe mental illness is causing someone to be unsheltered and a danger to themselves, we have

---

[1] See Plaintiffs' Memorandum of Law in Support of Their Motion for Expedited Discovery ("P. Disc. Mem."), DE No. 122) at 1 ("Notably, despite its clear relevance to this litigation and the putative class, the City did not give Plaintiffs or the Court advanced notice that this new policy would be announced or implemented.").

[2] For brevity, the term the "Statement" refers to the document issued on November 28, 2022 submitted at DE No. 112-1, and the "Initiative" refers to the Statement and the plan of actions outlined therein.

a moral obligation to help them get the treatment and care they need."   (Transcript of Press

Conference November 29, 2022, DE No. 112-2 at 1)  The Mayor explained that a misapprehension

of the law was preventing it from being applied in circumstances where it was needed and lawfully

applicable:

> Job one is to make it universally understood by our outreach
> workers, hospital staff, and police officers that New York law
> already allows us to intervene when mental illness prevents a person
> from meeting their basic human needs, causing them to be a danger
> to themselves.  This policy has been confirmed in written guidance
> from our state office of mental health.   Yet, the common
> misunderstanding persists that we cannot provide involuntary
> assistance unless the person is violent, suicidal, or presenting a risk
> of imminent harm.  This myth must end. . . . In short, we are
> confirming that a person's inability to meet basic needs to the extent
> that it poses a risk of harm as part of the standard for mental health
> interventions . . . .

(DE No. 112-2 at 2)

The written Statement launching this effort correctly summarizes the provisions of state

law, under two separate statutes: § 9.41, governing police and peace officer removals for mental

health evaluation; and § 9.58, governing removals directed by psychiatrists or other designated

clinicians who are part of mobile crisis response team.  (Statement at 1)  The Statement correctly

sets forth the legal standard under both statutes, which allow a person to be transported to a hospital

for "psychiatric evaluation" when they "appear to be mentally ill and are conducting themselves

in a manner which is likely to result in serious harm to the person or others."  (*Id.* at 1); *see* N.Y.

Mental Hyg. Law §§ 9.41, 9.58).  Neither statute authorizes the person removed to be held in

custody, other than temporarily while awaiting emergency psychiatric evaluation at a hospital.

Other statutes govern when a person can be involuntarily held at a psychiatric facility for treatment.

*See* N.Y. Mental Hyg. Law §§ 9.39, 9.55, 9.57 (governing emergency admissions by physicians

of patients for involuntary psychiatric care).

The Statement correctly reiterates the guidance in the OMH Memorandum: the law "authorize[s] the removal of a person who appears to be mentally ill and displays an inability to meet basic living needs, even when no recent dangerous act has been observed." (*Id.* at 1) In this light, the Statement notes that: "If the circumstances support an objectively reasonable basis to conclude that the person appears to have a mental illness and cannot support their basic needs to an extent that causes them harm, they may be removed for an evaluation." *Id.* The Statement provides non-exclusive examples of "circumstances [that] could be reasonable indicia of an inability to support basic needs due to mental illness that poses harm to the individual: serious untreated injury, unawareness or delusional misapprehension of surroundings, or unawareness or delusional misapprehension of physical condition or health." *Id.* It then details certain tasks for various agencies and procedures to mental health removals to implement the Initiative. *Id.* at 1–5.

Shortly after the Statement was issued, the NYPD issued a "FINEST" message (a text message delivered to all members of the NYPD) advising police officers about the Initiative. (DE No. 123-1) The FINEST message correctly restates the standard under § 9.41 for taking a person into custody for psychiatric evaluation, and the guidance contained in the Statement. *Id.* The FINEST message states that, in addition to circumstances where a person is in danger of "imminent harm," § 9.41 authorizes a person to be removed for psychiatric evaluation where "the person appears mentally ill and incapable of meeting basic human needs to such an extent that the person is likely to suffer physical injury or serious harm without immediate attention." (*Id.*) The FINEST message then provides examples of circumstances that might meet these criteria: "An incoherent person may be unable to assess and safely navigate their surroundings (e.g., avoiding oncoming traffic or subway tracks), may suffer from a serious untreated injury, or unable to seek out food, shelter or other things needed for survival." (*Id.*)

Significantly, plaintiffs have not identified a single instance of a person being transported under § 9.41 (or § 9.58) without probable cause to believe that the requirements of the statute were met, whether because of the Initiative or for any other reason since the Initiative was announced.

## ARGUMENT

### POINT I

### THE DISCOVERY SOUGHT IS NOT RELEVANT TO PLAINTIFFS' PENDING CLAIMS SET FORTH IN THE AMENDED COMPLAINT

It is fundamental that discovery must be relevant to claim or defense at issue in the action and proportional to the needs of the case.[3]  But the discovery now sought is not relevant to any claim in the First Amended Complaint (DE No. 21) (the "AC"), or even any claim that could be added by amendment.  Accordingly, the plaintiffs' pending claims — which are the subject of defendants' pending motion to dismiss[4] — cannot support the discovery sought, let alone justify expediting that discovery.

Plaintiffs' recent applications assume that they are entitled to discovery regarding the Initiative because, they contend, they have plead claims for harm that occurred under prior practices.  (Plaintiffs' Memorandum of Law in Support of their Application for a Temporary

---

[3] "Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).

[4] *See* Memorandum of Law in Support of Defendants' Motion to Dismiss, DE No. 102 ("D. Mem."); Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss, DE No. 106 ("D. Reply"). Defendants did not move to dismiss plaintiff Arvio's excessive force claim.  (D. Mem. at p. 1 n.1)  However, even assuming *arguendo* that that claim is actionable, it is not relevant here, because the Initiative does not refer to or affect the use of force.  Defendants respectfully request that, to the extent that the Court deems the plaintiffs' pending claims at all relevant to plaintiffs' instant application, the Court rule on the pending motion to dismiss prior to allowing any discovery on the Initiative.

Restraining Order and Preliminary Injunction, DE No. 109 ("P. TRO Mem."), at p. 11)  Defendants

contend that no such claim for unlawful seizure has been adequately pled, but even if it had, the

new Initiative is irrelevant to that claim because it could not have — under the laws of temporal

causality — retroactively cause the events that plaintiffs allege in the AC.[5]

Plaintiffs' pending claim challenges the  pre-existing NYPD Patrol Guide ("PG") § 221-

13, not the Initiative.  (P. TRO Mem. at p. 11) (arguing "Plaintiffs have shown . . . that the City's

"EDP" Policy, on its face, discriminates against individuals because of their mental disabilities or

perceived mental disabilities.")  Plaintiffs contend that PG § 221-13 is unconstitutional and has

caused other constitutional violations.  (*See* P. TRO Mem. at p. 11)  Plaintiffs do not, however,

challenge the constitutionality of § 9.41 on which PG 221-13 is based.  (D. Mem. at Point VI.A)[6]

But even if PG § 221-13 were constitutionally defective — and it is not for reasons stated in

defendants' motion to dismiss — that contention cannot justify inquiry into the Initiative, which

arose well after the Patrol Guide section that is appended to the AC.

## A.     The Expedited Discovery is Not Relevant to Pending Claim Under Section 1983.

The expedited discovery is not relevant to plaintiffs' claim under *Monell v. Dep't of Soc.*

*Servs. of City of New York*, 436 U.S. 658, 694 (1978).  *Monell* is a doctrine of vicarious liability,

under which a municipality can be held liable for constitutional violations committed by its

employees.  *Id.*  The conduct forming the basis of the *Monell* theory must have been the proximate

cause — the "moving force" — giving rise to the constitutional injury to plaintiffs.  *City of Canton*

*v. Harris*, 489 U.S. 378, 389 (1989); (*see* D. Mem. at p. 20).  The Initiative can be no such thing,

---

[5] The Initiative was announced on November 29, 2022 — over 16 months *after* the original complaint was filed on July 5, 2021, and 11 months after the AC was filed on December 29, 2021.  (DE Nos. 1, 21)

[6] If plaintiffs were challenging N.Y. Mental Hyg. Law § 9.41, they would have had to serve a notice of a challenge to a state statute to the State of New York under Fed. R. Civ. P. 5.1, which they have not done.

as plaintiffs present no evidence or even allegation that it has caused a violation of the Fourth Amendment against them or anyone.

Moreover, the Initiative is lawful on its face, as is evident from the Statement and the FINEST message implementing it.  (*Supra* at p. 2)  The Initiative implements the N.Y. State OMH Memorandum and, as stated there, New York State courts have long held that § 9.41 lawfully permits the involuntary mental health treatment of persons whose actions create a danger of serious harm to themselves or others, even in the absence of immediate violence.  *See Boggs v. Health Hosps. Corp.*, 132 A.D.2d 340, 362 (N.Y. App. Div. 1987) (applying N.Y. Mental Hyg. Law § 9.39: "It is well established in this State that a person may be involuntarily confined for care and treatment, where his or her mental illness manifests itself in neglect or refusal to care for themselves to such an extent that there is presented 'serious harm' to their own well-being."); *In re Carl C.*, 126 A.D.2d 640, 640, 511 N.Y.S.2d 144, 145 (App. Div. 2nd Dept. 1987) (for involuntary commitment the "substantial threat of physical harm" can "result from a refusal or inability to meet his essential needs for food, clothing or shelter"); *see also Addington v. Texas*, 441 U.S. 418, 426 (1979) ("The state has a legitimate interest under its *parens patriae* powers in providing care to its citizens who are unable because of emotional disorders to care for themselves . . . ."); *Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 505 (S.D.N.Y. 2015) ("Likelihood of serious harm can be evidenced by overt acts, attempts or threats of harm, or by 'other conduct' such as neglect or refusal to care for oneself.") (quoting *Boggs*).

Neither New York law nor the Constitution requires that the danger of harm be "imminent" in order to justify the seizure under the Fourth Amendment.  The Initiative does no more than call upon police officers and mental health providers to follow existing law under § 9.41 in order to

provide the benefits of evaluation, and if needed, treatment, to more people who are eligible for removal for psychiatric evaluation because their conduct presents a danger of substantial harm.

Plaintiffs have proffered no authority that the Initiative misstates the law of New York or that § 9.41 is unconstitutional as interpreted by New York Courts. Accordingly, to prevail against the Initiative plaintiffs must show, *inter alia*, that the City's training and procedures to implement the Initiative are so deliberately indifferent to Fourth Amendment rights that it has caused a violation of rights. But that is impossible here, because *Monell* requires that a municipality be on notice through a pattern of prior constitutional violations that its training or procedures are insufficient. *See Boddie v. City of New York*, 15 Civ. 4275 (GHW), 2016 U.S. Dist. LEXIS 50248, at **11-13 (S.D.N.Y. Apr. 13, 2016) (report recommending training improvements does not support *Monell* claim).[7] Regardless of the content to the training or the testimony of witnesses that plaintiffs seek, the Initiative is far too new to have created a record of causing constitutional violations. Indeed, plaintiffs have cited no such examples. Thus, the Initiative cannot be the basis for a *Monell* claim for deliberately indifferent training, or anything else.

Nor is the sought discovery relevant to any plausible claim for injunctive relief. As noted below, plaintiffs' assertions of potential future harm are insufficient to give them standing for a claim to enjoin the Initiative. But even if there were such a claim — and there is not — it would not fall within the ambit of the AC. And even if plaintiffs amended the AC to attempt to bring a

---

[7] *Pluma v. City of New York*, 13 Civ. 2017 (LAP), 2015 U.S. Dist. LEXIS 48134, at **35–36 (S.D.N.Y. Mar. 31, 2015) (a "handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations"); *Marom v. City of New York*, 15 Civ. 2017 (PKC), 2016 U.S. Dist. LEXIS 28466, at *77 (S.D.N.Y. Mar. 7, 2016) (study suggesting further investigation of prior alleged incidents of force was insufficient to state a failure-to-train claim).

new claim,[8] such a claim would necessarily fail, because Section 1983 is not a vehicle for purely prospective relief against a policy that has not caused a constitutional violation against plaintiffs.

"*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation."  *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006); *see also City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) ("[I]f a defendant has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the use of constitutionally excessive force is quite beside the point."); *Velasquez v. City of New York Dep't of Bldgs.*, No. 19-cv-9687 (PKC), 2020 U.S. Dist. LEXIS 90361, at **14–15 (S.D.N.Y. May 22, 2020) (same); *Amato v. City of Saratoga Springs*, 170 F.3d 311, 320–21 (2d Cir. 1999) (same).

The *Monell* doctrine applies to suits for equitable relief as well as damages.  *See Los Angeles Cty. v. Humphries*, 562 U.S. 29, 39 (2010) ("*Monell*'s 'policy or custom' requirement applies in § 1983 cases irrespective of whether the relief sought is monetary or prospective."); *Reynolds v. Giuliani*, 506 F.3d 183, 191 (2d Cir. 2007) ("We join several of our sister circuits in adopting the view that *Monell*'s bar on *respondeat superior* liability under § 1983 applies regardless of the category of relief sought."); *Lawrence v. Town of Brookhaven Dep't of Hous., Cmty. Dev. & Intergovernmental Affairs*, 393 F. App'x 791, 794 (2d Cir. 2010) (summary order) (denying a preliminary injunction premised on a *Monell* claim, due to the lack of an underlying

---

[8] At the December 12, 2022 conference the Court properly questioned whether plaintiffs should amend their complaint if they wish to proceed with the instant action.  They have not done so.

constitutional violation).  Here, although plaintiffs alleged that their rights were violated, there is

no causal connection between the Initiative and those past harms that could satisfy *Monell*.

Moreover, the AC seeks not just a prohibitory injunction against constitutional violations,

but the creation of a new administrative agency and the ongoing supervision by judicial appointees,

to be paid by the City, of all mental health removals by the City.  (AC at p. 67 )  Plaintiffs could

never obtain such relief.  Although courts may enjoin the enforcement of unconstitutional statutes

or specific unconstitutional practices, injunctions dictating the details of local government

administration are strongly disfavored.  As the Supreme Court has counseled, "appropriate

consideration must be given to principles of federalism in determining the availability and scope

of equitable relief." *Rizzo v. Goode*, 423 U.S. 362, 379 (1976) (citation omitted).  Accordingly,

"when a plaintiff seeks to enjoin the activity of a government agency, even within a unitary court

system, his case must contend with the well-established rule that the Government has traditionally

been granted the widest latitude in the dispatch of its own internal affairs." *Id.* at 378-79 (internal

quotation marks and citations omitted); *see also Rahman v. Chertoff*, 530 F.3d 622, 626-27 (7th

Cir. 2008) ("Improper arrests are best handled by individual suits for damages (and potentially

through the exclusionary rule), not by a structural injunction designed to make every error by the

police an occasion for a petition to hold the officer (and perhaps the police department as a whole)

in contempt of court.").[9]  Accordingly, the Initiative is not relevant even to any relief that plaintiffs

could obtain, if they had standing, which they do not.  *See infra* at Point II.

---

[9] *See also Portland Police Ass'n v. City of Portland*, 658 F.2d 1272, 1274 n.3 (9th Cir. 1981) (equitable relief not available where it would require "federal courts to disturb the inner workings and structure of a local police department"); *Patrolmen's Benevolent Ass'n of N.Y. v. City of New York*, 97 Civ. 7895 (SAS), 98 Civ. 8202 (SAS), 2000 U.S. Dist. LEXIS 15179, at *9 (S.D.N.Y. Oct. 13, 2000) ("This Court declines to inject itself by injunctive decree into the internal operations of the NYPD." (citations and alterations omitted)).

Even if the Initiative were relevant to fashioning potential future relief under Section 1983 – and for the reasons stated above it is not – that relevance would be marginal at best, and would arise only at the end of these proceedings, not the beginning.   Accordingly, the motion for expedited discovery should be denied.

**B.      The Discovery is Not Relevant to a Claim Under the Disability Laws.**

As defendants set forth in their motion to dismiss, plaintiffs have no viable claim under the disability laws to enjoin police practices under § 9.41.  (*See* D. Mem. at Point III; D. Reply Mem. at Point II)  Plaintiffs' recent submissions do nothing to overcome this hurdle.

Plaintiffs challenge police implementation of § 9.41 as discriminating against persons with mental illness (*i.e.*, a disability), but § 9.41, on the face of the statute itself, concerns *only* people with mental illness.  Indeed, § 9.41 is a statute for the benefit of people with mental illness whose conduct presents a danger to themselves or others, but are unable to seek their own care.  Courts have found similar state conduct, including involuntary commitment, to be outside the bounds of the disability laws, in part because all people subject to those laws have a disability.

In considering a claim by a plaintiff for her involuntary commitment by hospital staff for mental health treatment, the Second Circuit held that there could be no such claim under the ADA or Rehabilitation Act because plaintiff could not contend that her mental health was an "improper consideration[], unrelated to determining whether she had a mental illness likely to result in serious harm to herself or others."  *McGugan v. Aldana-Bernier*, 752 F.3d 224, 233 (2d Cir. 2014).  The same is true here: the police *must* consider a person's mental illness — under the terms of § 9.41 — when deciding whether to remove them pursuant to that statute, and therefore it makes no sense to allege it is discriminatory for them to do so.  *See also Jacob v. Bon Secours Charity Health Sys.*, 02 CV 1398 (BSJ) (RLE), 2011 U.S. Dist. LEXIS 15256, at **7–8 (S.D.N.Y. Feb. 11, 2011) (plaintiff may not base disability claim on the contention that she was involuntarily committed

- 10 -

because she was mentally ill); *Cushing v. Moore*, 970 F.2d 1103, 1109 (2d Cir. 1992) (no claim

under disability laws for being denied outpatient methadone treatment while unemployed, because

"the rehabilitation act does not create a cause of action based on a handicap that is directly related

to providing the very services at issue"); *United States v. Univ. Hosp.*, 729 F.2d 144, 156 (2d Cir.

1984) ("[The Rehabilitation Act] prohibits discrimination against a handicapped individual only

where the individual's handicap is unrelated to, and thus improper to consideration of, the services

in question.  [But] where medical treatment is at issue, it is typically the handicap itself that gives

rise to, or at least contributes to, the need for services. . . . .").[10]

   In addition, the disability laws were intended to apply to routine programs of employment,

education and transportation, not case-by-case incidents where difficult fact-intensive judgments

are required, as is the case with removals under § 9.41.  *See Univ. Hosp.*, 729 F.2d at 156 (The

phrase "otherwise qualified" from the disability law was designed for "relatively static programs

or activities such as education, employment, and transportation systems" and therefore "the phrase

cannot be applied in the comparatively fluid context of medical treatment decisions without

distorting its plain meaning.").

---

[10] Nor can a plaintiff sue for inadequate services provided to treat or mitigate a disability (such as because police officers are allegedly unqualified for the task), because, among other reasons, the disability laws were not intended to create federal malpractice claims.  *See Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[Plaintiff] is complaining about incompetent treatment of his paraplegia.  [But t]he ADA does not create a remedy for medical malpractice."); *Disability Rights N.J., Inc. v. Comm'r, N.J. Dep't of Human Servs.*, 796 F.3d 293, 307 (3d Cir. 2015) (claim for procedural protections prior to forcible medication of involuntarily committed mental health patients was not authorized by disability laws because it did not concern a generally available service from which the disabled (*i.e.*, the civilly committed) are excluded); *Elbert v. N.Y. State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 596 (S.D.N.Y. 2010)) ("Plaintiff is claiming that Decedent was not properly treated for his transverse myelitis, not that he was mistreated because of his transverse myelitis. Accordingly, Plaintiff's ADA claim is dismissed.").

No discovery would help plaintiffs overcome these clear legal impediments to their theories of relief.  Therefore, the discovery sought is not relevant to a claim or defense properly at issue in this action and should be denied for that reason alone.

**C.      Plaintiffs' Pretension to a Class Action does Not Support Expedited Discovery.**

Plaintiffs purport to seek an injunction on behalf of absent class members, (P. TRO Mem. at pp. 7–9; P. Disc. Mem. at pp. 5–6), although no class has been certified in this case.  As an initial matter, plaintiffs and their counsel cannot 'represent' members of an uncertified, putative class. But neither could plaintiffs ever obtain class certification in this matter, because whether or not a person was seized without probable cause is a highly particularized inquiry for which class treatment is obviously inappropriate.  *Guan v. City of New York*, 37 F.4th 797, 805 (2d Cir. 2022) (Specifically, "for a mental health arrest, police officers must have reasonable grounds for believing that the person seized is dangerous to herself or others." (quotations omitted)).  "Such an intensive, individualized inquiry into the existence of probable cause for each Plaintiff means that the proposed certification fails to meaningfully further efficient issue resolution, as the Court would be unable to resolve the question of the City's liability without individualized inquiry." *Packard v. City of New York*, 2020 U.S. Dist. LEXIS 54003, at *8 (S.D.N.Y. Mar. 25, 2020). Unless plaintiffs can show that every detention under § 9.41 was *ipso facto* unconstitutional (which they do not even contend), there can be no class-wide determination of unconstitutional conduct.

### POINT II

### PLAINTIFFS LACK STANDING TO SEEK EXPEDITED DISCOVERY ON THE CITY'S INITIATIVE BECAUSE IT HAS NOT CAUSED THEM HARM OR IMMINENT HARM

Plaintiffs lack standing to seek expedited discovery on the City's Initiative.  "To establish 'the irreducible constitutional minimum' of Article III standing, a plaintiff must show: (1) 'an

injury in fact,' (2) 'a causal connection between the injury and the conduct complained of,' and (3) a likelihood that 'the injury will be redressed by a favorable decision.'" *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 126 (2d Cir. 2020) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The doctrine of standing requires courts to "evaluate 'whether the party invoking jurisdiction had the requisite stake in the outcome *when the suit was filed.*'" *Id.* (quoting *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56 (2d Cir. 2016)) (emphasis in original).

As set forth above, the Initiative lies outside the ambit of the AC, and for that reason "the party invoking jurisdiction" does not have "the requisite stake in the outcome when the suit was filed." *Carter*, 822 F.3d at 56.  The instant motion and its predecessor application are in substance new actions, and therefore plaintiffs must have standing to challenge the Initiative.  They do not.

## A.  The Individual Plaintiffs Cannot Demonstrate Injury in Fact.

"An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quoting *Lujan*, 504 U.S. at 560)) (some internal quotation marks omitted).  "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur.'" *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (some internal quotation marks omitted)).  "[W]here threatened action by government is concerned, [courts] do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat." *MedImmune, Inc. v. Genentech, Inc.*, 549 U. S. 118, 128–29 (2007).  Thus, a plaintiff can satisfy the injury-in-fact requirement where he alleges "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Babbitt v. Farm Workers*, 442 U. S. 289, 298 (1979).  But this standing for pre-enforcement review requires that — unlike plaintiffs' claim here — "a statute indisputably proscribed the conduct at issue," and

the law is a "traditional punitive statute" that the government may be presumed to enforce. *Hedges v. Obama*, 724 F.3d 170, 197, 201 (2d Cir. 2013). In contrast, "a highly attenuated chain of possibilities," such as plaintiffs proffer here, "does not satisfy the requirement that a threatened injury must be certainly impending." *Roberts v. Bassett*, Nos. 22-622-cv, 22-692-cv, 2022 U.S. App. LEXIS 31486, at *6 (2d Cir. Nov. 15, 2022) (alterations in original) (quoting *Clapper*, 568 U.S. at 410). Plaintiffs bear the burden of demonstrating that the harms they face are "certainly impending" or at "substantial risk" of occurring. *N.Y. Bankers Ass'n v. City of New York*, 13 Civ. 7212 (KPF), 2014 U.S. Dist. LEXIS 126000, at **28–29 (S.D.N.Y. Sep. 9, 2014).

In denying plaintiffs' application for an immediate temporary restraining order, this Court held that plaintiffs failed to establish that there is any "likely irreparable harm" prior to a preliminary injunction hearing. Order of Dec. 14, 2022 (DE No. 21) In other words, the Court found that plaintiffs had not demonstrated that they faced an imminent threat of harm from the Initiative. Plaintiffs add no facts to their application which could buttress any claim that they face imminent harm, and therefore they lack standing to challenge the Initiative.

Critically, "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes." *Lujan*, 504 U.S. at 564 n.2. Where, as here, "the plaintiff alleges only an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control," that injury is not imminent. *Id.* The Supreme Court has therefore "insisted that the injury proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all." *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 156–60 (1990); *Los Angeles v. Lyons*, 461 U.S. 95, 102–06 (1983)). "[A] plaintiff seeking injunctive relief must demonstrate *both* a likelihood of future harm *and* the

existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (emphasis in original) (citing *Lyons*, 461 U.S. at 105–06).

Here, plaintiffs have not even established past injury caused by the Initiative.  (*See* Point I, *supra*)  Nor can plaintiffs demonstrate that their future injuries are imminent, certainly impending, or at substantial risk of occurring, let alone that there is *more than a speculative possibility* they will be harmed by the Initiative announced November 29, 2022.  As set forth above, the Initiative implements § 9.41, which expressly authorizes police to take persons into custody if there is probable cause to believe that they are mentally ill and present a danger to themselves or others. (*See* D. Mem. at Points I, III.A, VI.A; D. Reply at Points II–III)  Even crediting plaintiffs' argument that the Initiative somehow departs from § 9.41 (for which plaintiffs cite no legal authority),[11] any future injuries remain wholly speculative.

Plaintiffs presuppose they will be seized in the future "for merely living with their [mental] illness while in a public place."  (P. TRO Mem. at p. 9)  They argue "it will be inevitable that class members will be illegally and unconstitutionally detained" as a result of the Initiative.  (*Id.*)  But these assertions are inconsistent with the provisions of the Statement and the FINEST message, and are precisely the same arguments rejected by the Supreme Court forty years ago.  *Lyons*, 461 U.S. at 105–06 ("In order to establish an actual controversy in this case, Lyons would have had . . . to allege that he would have another encounter with the police.").  As in *Lyons*, plaintiffs here similarly assume that their "inevitable" future seizures will be unconstitutional.  *Compare Lyons*, 461 U.S. at 106 (to establish standing, plaintiff need not only allege an imminent future encounter with police, "but also to make the incredible assertion either (1) that *all* police officers in Los Angeles *always* choke any citizen with whom they happen to have an encounter, whether for the

---

[11] *See* P. Disc. Mem. at p. 1 n.1.

purpose of arrest, issuing a citation, or for questioning, or (2) that the City ordered or authorized police officers to act in such manner") *with* (P. TRO Mem. at p. 9) ("it will be inevitable that class members will be illegally and unconstitutionally detained") *and* (P. Disc. Mem. at pp. 5–6) ("if the preliminary injunction is not granted, . . . the Involuntary Removal Policy will lead to a sizeable increase in illegal removals and detentions").

Plaintiffs further presuppose that they will suffer certain injuries while hospitalized as a result of those "inevitable" seizures.  (*See id.*) ("if the preliminary injunction is not granted, . . . the Involuntary Removal Policy will lead to . . . involuntary hospitalizations where many will be forcibly sedated or otherwise drugged").  Tellingly, this assertion assumes that plaintiffs will be involuntary committed following the finding by a psychiatrist at the hospital to which they are removed, because they are in need of involuntary treatment due to a mental illness likely to result in serious harm to themselves or others.  *See* N.Y. Mental Hyg. Law §§ 9.37, 9.55, 9.57.  In other words, the allegation assumes that the police were right to transport the plaintiffs for treatment; that what plaintiffs call a harm will actually be a benefit.

Moreover, allegations alone are insufficient to demonstrate standing when plaintiffs are seeking a preliminary injunction.  "At the preliminary injunction stage, 'a plaintiff's burden to demonstrate standing will normally be no less than that required on a motion for summary judgment.  Accordingly, to establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations . . . but must set forth by affidavit or other evidence specific facts' that establish the 'three familiar elements of standing: injury in fact, causation, and redressability.'" *Green Haven Prison Preparative Meeting of the Religious Soc'y of Friends v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 16 F.4th 67, 78–79 (2d Cir. 2021) (quoting *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011)).

The affidavit of Steven Greene adds nothing to plaintiffs' general speculations.  Mr. Greene states he was previously — approximately two years before the Initiative in 2020 — taken into custody by the police for mental health treatment.  (DE No. 110 at ¶ 27)  Mr. Greene, like his counsel, can only speculate that he will be transported pursuant to § 9.41; that he would be removed pursuant to the Initiative where he would not have been removed before; that such removal would be without probable cause; and he would be injured because he did not in fact require involuntary mental health treatment.  (*Id.* at ¶¶ 29–31)  As explained above, these claims are akin to the allegations of hypothetical future police encounters advanced by the plaintiff in *Lyons*, which the Supreme Court held were too speculative to confer standing.  Therefore, Mr. Greene has not established "a real or immediate threat" that he would be subjected to an unlawful seizure pursuant to the Initiative.  *See Lyons*, 461 U.S. at 105–06; *Shain*, 356 F.3d at 214–15 (victim of strip search had no standing to seek equitable relief against future strip searches); *Wagner v. City of New York*, 14 Civ. 2521 (VEC), 2015 U.S. Dist. LEXIS 131204, at **29–30 (S.D.N.Y. Sep. 28, 2015) (Plaintiffs' claims for injunctive relief under disability laws "predicated on the possibility that Plaintiffs might be re-arrested and deprived of their medically-necessary devices during the period of their arrest and detention, are simply 'too speculative and conjectural to supply a predicate for prospective injunctive relief.'"  (quoting *Shain*, 356 F.3d at 216)).

At the conference before the Court on December 12, 2022, plaintiffs relied heavily on Mr. Greene's subjective fear of another seizure by police, alleging that he is afraid to leave his home. (DE No. 110 at ¶ 30)  But subjective fear is insufficient to establish injury in fact.  In *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972), the Supreme Court considered whether plaintiffs who objected to the U.S. Army collecting data on civilians and felt a "chill" to their First Amendment activities out of fear further action the Army might take, had standing to challenge the Army's policy.  *Id.*

The Supreme Court held that "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; 'the federal courts established pursuant to Article III of the Constitution do not render advisory opinions.'" *Id.* (quoting *United Pub. Workers* v. *Mitchell*, 330 U.S. 75, 89 (1947)).

As the Supreme Court dictates, where, as here, a plaintiff's claim to standing is based on a "highly speculative fear" that a "highly attenuated chain of possibilities" will come to pass, that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper*, 568 U.S. at 410–11 (rejecting standing of plaintiffs speculating that they will be subjected to purportedly illegal surveillance); *see Handschu v. Special Servs. Div.*, 475 F. Supp. 2d 331, 354–55 (S.D.N.Y. 2007) (plaintiffs lack standing to enjoin police surveillance of demonstrations because "[t]here is no discernible way to distinguish the apprehensions and feelings of intimidation expressed by the plaintiffs in *Laird v. Tatum* and its progeny from the sentiments expressed by *Handschu* class members on the present motion.").[12]

In words directly applicable to the plaintiffs' claim here, the Court observed:

> Stripped to its essentials, what respondents appear to be seeking is a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court and the power of cross-examination, to probe into the Army's intelligence gathering activities, with the district court determining at the conclusion of that investigation the extent to which those activities may or may not be appropriate to the Army's mission.

---

[12] *See also Hankard v. Town of Avon*, 126 F.3d 418, 423 (2d Cir. 1997) ("plaintiffs must make specific allegations that indicate a deprivation of constitutional rights; general, indirect and conclusory allegations are not sufficient"); *Am. Library Ass'n v. Barr*, 294 U.S. App. D.C. 57, 956 F.2d 1178, 1193 (1992) (standing depends on "how likely it is that the government will attempt to use these provisions against them - that is, on the threat of enforcement - and not on how much the prospect of enforcement worries them"); *Fifth Ave. Peace Parade Comm. v. Gray*, 480 F.2d 326, 332 (2d Cir. 1973) (finding no standing because "[t]he shivering here was self-induced.").

*Laird*, 408 U.S. at 14.  Like the plaintiffs in *Laird*, plaintiffs here should not be permitted to conduct their "broad-scale investigation" solely on the grounds of the firmness with which they "disagree with the judgments made by the Executive Branch." *Id.*

**B.    The Institutional Plaintiffs Also Lack Standing**

The three institutional plaintiffs lack standing not only to challenge the Initiative but also on all claims pled in the AC.  (*See* D. Mem. at Point V; D. Reply at Point IV)  For instance, plaintiff CCIT-NYC — the only institution to submit evidence in support of standing — is an advocacy group composed of other advocacy groups, which (like its fellow organizational plaintiffs) is devoted in this case, and its lobbying efforts, to the same goal of curtailing law enforcement responses under § 9.41 and creating new City-funded mental health services.  (*See* AC at ¶¶ 238–252)  Its affidavit largely reiterates the relevant allegations in the AC, (DE No. 111 at ¶¶ 7–16), and complains that it "has already diverted resources to deal with the Mayor's announcement, by holding internal meetings, contacting its membership organizations and coordinating potential responses, and organizing a rally to take place at City Hall on December 8, 2022." (*Id.* at ¶ 18)

While CCIT-NYC is free to pursue its mental health policy goals through elections and free expression, purported "injuries to an organization's government lobbying and issue advocacy programs cannot be used to manufacture standing, because that would allow lobbyists on either side of virtually any issue to take the Government to court." *Env't Working Grp. v. U.S. Food and Drug Admin.*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018); *see also Sierra Club v. Morton*, 405 U.S. 727, 739–40 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' . . . . "); *Young Advocs. for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 234–36 (E.D.N.Y. 2019) ("[A]n organization whose primary endeavor is to change or enforce the law, whether by communicating directly with government

officials, community leaders, or the public, occupies no position different from that of a concerned citizen."); *Taylor v. Bernanke*, No. 13-CV-1013, 2013 U.S. Dist. LEXIS 128533, at **38–41 (E.D.N.Y. Sep. 9, 2013) (denying standing because although plaintiffs may be forced to "engage in . . . advocacy different from what they otherwise would, there is no indication that" the advocacy directly conflicts with OSEC's mission to "advocate[] for regulatory reforms in the banking and financial system").

CCIT-NYC proclaims on its website that it is "Fighting to Transform Responses to Mental Health Crises" (https://www.ccitnyc.org/), and is devoted to achieving the same result that it seeks in this lawsuit:

> **CCIT-NYC** is a coalition of more than 80 mental health advocacy and other community organizations,[13] consisting of hundreds of community stakeholders, *working to transform how New York City responds to mental health crises*. CCIT-NYC has *proposed a mental health crisis response system that replaces police with teams of trained peer specialists and independent emergency medical technicians* . . . .

(https://www.nylpi.org/resource/correct-crisis-intervention-today-ccit-nyc/)   (emphasis   added); (see also https://www.ccitnyc.org/in-the-news) CCIT-NYC's website identifies no activities other than those aimed at changing City policy with respect to mental health.

CIIT-NYC has posted a "Proposal" — including references to a "draft budget" — for a City government program to spend "roughly $3.5 million to $4.0 million annually" for only two

---

[13] The Declaration of Felix Guzman claims that CCIT-NYC's 80 members include advocacy and civil rights organizations, as well as "peers," defined as "people with lived mental health experience," and their family members.  (DE No. 111 at ¶ 4)  But CCIT-NYC's website reveals no evidence that it is anything other than a coalition of advocacy groups.  There is no means offered to become a member of CCIT-NYC and all the identified members are organizations.  CCIT-NYC's "Join Us" section merely solicits people to sign up for its  mailing  list.  (https://www.ccitnyc.org/)   CCIT-NYC's  list  of  its  Steering  Committee  includes  only lawyers and advocacy groups, including two of the attorneys appearing working for plaintiffs on this case: Jenny  Marashi,  and  Ruth  Lowenkron  of  the  New  York  Lawyers  for  the  Public  Interest. (https://www.ccitnyc.org/steering-committee)

police precincts, to replace police with civilian City contractors to respond to mental health removal calls under § 9.41.   (https://www.nylpi.org/wp-content/uploads/2021/08/CCITNYC-Proposal.pdf)   The relief that CCIT-NYC demands in this lawsuit closely tracks its "Proposal," including the demand for "Mental health crisis first responder teams to be deployed by a nongovernmental agency or agencies *which shall receive funding from the City*," the staffing its new program, and the establishment of an oversight board.  (AC at ¶ 67) (emphasis added)  Thus, CCIT-NYC invokes the civil rights laws in an attempt to force onto City officials and taxpayers a spending program that the group has failed to persuade elected officials to adopt through democratic means.  Failed lobbying efforts do not confer standing.[14]

Accordingly, the Court should deny plaintiffs' motion for lack of jurisdiction.[15]

## POINT III

**THE DISCOVERY REQUESTS WOULD IMPOSE BURDENS THAT ARE DISPROPORTIONATE TO THE NEEDS OF THE CASE AND THERE IS NO NEED TO EXPEDITE THE DISCOVERY, IF IT IS TO BE HAD AT ALL**

Defendants do not itemize here all of their objections to the proposed discovery, as plaintiffs do not yet have leave to serve the discovery, so objections are not yet due (and none are waived).  However, the Court should consider whether the requests are reasonable in light of the burden that they would impose, when compared to the discovery's lack of relevance to any viable

---

[14] Whatever else the organizational plaintiffs may allege in the AC that they do, with respect to the Initiative they can only have conducted advocacy and litigation activities — in other words bringing this application — since there is no evidence that any violation of rights has occurred pursuant to the Initiative.

[15] In the event the Court does not deny the application, in the alternative defendants respectfully request an evidentiary hearing to determine whether the organizational plaintiffs have standing to prosecute this matter.

claim.  *See, e.g.*, *Doe v. Congregation of the Sacred Hearts of Jesus & Mary*, No. 21-CV-6865 (VSB), 2022 U.S. Dist. LEXIS 130614, at **3–4 (S.D.N.Y. July 22, 2022) (considering proportionality in evaluating and denying requests for expedited discovery).  Under the factors set forth in Fed. R. Civ. P. 26(b)(1), the sweeping discovery sought is disproportionate to any slight benefit to the case, and there is certainly no need to take such discovery on an expedited basis.

Plaintiffs would foist four burdensome discovery obligations onto the City — twelve document demands, eight interrogatories, and a deposition pursuant to Fed. R. Civ. P. 30(b)(6) of City officials on *thirteen topics*.  (DE Nos. 123-2, 123-3)  As an initial matter, plaintiffs' demands purport to impose 20 "Instructions" on the City, which would impose burdens greater than those called for by Fed. R. Civ. P. 26.  Then, plaintiffs demand that the City conduct an investigation to respond to its interrogatories, to identify, among other things, (1) City "decision makers" who "agreed" to the standard set forth in the Initiative; (2) create new summaries of the applicable legal standards; (3) identify all persons who attended training regarding the Initiative; (4) identify all trainings regarding the Initiative; (5) identify "all other aspects" of the Initiative which have commenced; (6) identify the budgetary sources for the Initiative; (7) identify all persons who "worked on" the Initiative, and (8) "set forth the number of mental health arrests" made per day during specific time periods, disaggregated by ZIP code, and labeled by race, sex, and type of location (all factors irrelevant to their claims).

Plaintiffs' twelve document requests cover the same territory and more.  Among other things, plaintiffs seek all internal City communications regarding the Initiative, regardless of agency.  (Document Request No. 11)  This sweeping demand would require electronic discovery imposing significant expense and burdens, and most of the result would be protected by the governmental deliberations privilege.  *See, e.g.*, *Stinson v. City of New York*, 304 F.R.D. 432, 436

(S.D.N.Y. 2015) (applying deliberative process privilege);  *Ingles v. City of New York*, 01 CV 8279

(DC), 2004 U.S. Dist. LEXIS 21783, at **4–7 (S.D.N.Y. Oct. 7, 2004) (sustaining assertion of

deliberative process privilege).  Thus, the City would be required to collect, review, and log as

privileged reams of emails gathered electronically, only some of which would turn out to concern

the Initiative and even fewer would be non-privileged.  That project alone — to satisfy a single

request — would likely entail hundreds of hours of work, and would produce no documents

relevant to plaintiffs' underlying claims or the legality of any actual seizure.

Moreover, none of the document requests distinguish between removals conducted by the

NYPD pursuant to § 9.41, from other removals directed by "a physician or qualified mental health

professional who is a member of an approved mobile crisis outreach team."  N.Y. Mental Hyg.

Law § 9.58.  Such crisis team removals are also a subject of the Initiative, but lie entirely outside

the scope of plaintiffs' claims, which challenge only NYPD decisions to remove persons under §

9.41.  Nevertheless, plaintiffs' demands encompass actions, training and communications among

*all* City agencies, regardless of whether the concern NYPD officers or mental health providers.

In addition, plaintiffs desire to interrogate City officials regarding on no less than eleven

topics, including, *inter alia*, training plans and attendance rosters; mental health arrests made

"pursuant to the Initiative" (including their number and circumstances); the legal standard of "basic

needs" referenced by the Initiative; the "rollout and phasing in" of the Initiative; policies regarding

the "collection of data"; the identify of all persons responsible for any aspect of the Initiative; and

more.

Plaintiffs make little attempt to explain why this sweeping investigation — including

demands that the City compile statistical data with irrelevant information — is relevant to the trial

of any claim or defense in this matter, let alone why it should be expedited.  Plaintiffs assert

generally that information about "the City's goals, rationales, interpretations, plans and intended consequences" and "who and how many individuals have already been removed, detained and transported" is needed for their motion for a preliminary injunction. (DE No. 122 at 5)  It is not.

The validity of the Initiative depends on whether its guidelines call upon officers to comply with the law, which they do. *See supra* at pp. 1–3.  Plaintiffs' discovery is premised on the notion that the Initiative can be enjoined because plaintiffs find fault with the reasoning behind the Initiative; the people involved in its formulation;[16] the details of training; the identity and number of officers trained;[17] or the number and identity of persons removed for mental health evaluation. But that is not the law.  Probable cause is an objective standard, and therefore the legality of any removal under § 9.41 stands or falls on the facts of each case,[18] not on the number of such removals, the race of gender of the persons removed, or the subjective thought processes and plans of City officials.  Moreover, plaintiffs and their counsel do not represent every mentally ill person who is taken into custody pursuant to § 9.41, and there is no warrant for their burdensome

---

[16] Plaintiffs' demands for lists of potential witnesses and all persons involved are also irrelevant to their instant application.  The identity of persons involved cannot make the Initiative illegal.  Moreover, the identification of potential witnesses for later discovery is not an emergency, if they are intended to be witnesses relevant to plaintiffs underlying claims in the AC (which they are not).

[17] "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it extends liability to a municipal organization where that organization's failure to train . . . led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (emphasis in original).  "'[S]howing merely that additional training would have been helpful in making difficult decisions does not establish municipal liability.'"  *Boddie v. City of New York,* 2016 U.S. Dist. LEXIS 50248, at *13 (quoting *Connick v. Thompson*, 563 U.S. 51, 68 (2011)).

[18] "In assessing whether an officer had probable cause to arrest a person under this statute, courts apply the same objective reasonableness standard that governs Fourth Amendment claims. . . . Thus, in cases involving arrests under MHL § 9.41, probable cause exists where "the facts and circumstances known to the officers at the time of the arrest were sufficient to warrant a person of reasonable caution to believe that the plaintiff might be mentally ill and was conducting [herself] in a manner likely to result in serious harm to herself or others." *Arroyo v. City of New York*, No. 14-CV-9953 (JPO), 2016 U.S. Dist. LEXIS 89274, at *9 (S.D.N.Y. July 8, 2016) (quotations, citations, and alterations omitted).

inquisition into the circumstances of all such removals, even for a limited period.  (Interrogatory No. 8)

In sum, plaintiffs' sweeping demands highlight their presumption that because they have brought a civil rights claim, the Court should empower them as inquisitors over the elected and appointed officials who make public health and safety policy for the people of New York, solely because the plaintiffs disagree with their decisions.  The Court should decline the invitation.

## **CONCLUSION**

For the foregoing reasons, defendants respectfully request that the Court deny plaintiffs' motion for expedited discovery, together with such other and further relief as the Court deems just and proper.

Dated:        New York, New York
              January 11, 2023

HON. SYLVIA O. HINDS-RADIX
Corporation Counsel of the City of New York
*Attorney for Defendants City, de Blasio,*
  *Shea, Wnorowski, Sheron, Mole, Haber,*
  *Gbain, Dawkins, Fisher, Ramayya, Torres,*
  *Prasad, McDowell and Sanchez*
100 Church Street, Rm. 377
New York, New York 10007
(212) 356-2344

By:      *Alan H. Scheiner* /s/
         Alan H. Scheiner
         *Senior Counsel*

cc:      All Counsel (via ECF)

- 25 -