

1/18/2023
The Bronx Defenders may file their amicus brief. SO ORDERED.

*Sent via ECF*

The Honorable Paul A. Crotty
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 1350
New York, NY 10007-1312

January 13, 2023

      Re:    <u>Baerga, et al. v. City of New York, et al.</u>, Case No. 21-CV-05762
              The Bronx Defenders' Request to Submit Amicus Brief in Support of Plaintiffs'
              Request for a Preliminary Injunction

Dear Judge Crotty:

For the reasons below, The Bronx Defenders[1] ("BxD") respectfully requests permission to file an amicus brief in support of Plaintiffs' Request for a Preliminary Injunction in the above-captioned matter.[2]

**I.  The Bronx Defenders Is Well-Positioned to Provide Vital Information and Unique Insight to the Court Regarding the Involuntary Removal Policy.**

---

[1] The Bronx Defenders ("BxD") is a public defender non-profit that is radically transforming how people in the Bronx are represented in the legal system. Our staff of over 400 includes interdisciplinary teams made up of criminal, civil, immigration, and family defense attorneys, as well as social workers, benefits specialists, legal advocates, parent advocates, investigators, and team administrators, who collaborate to provide holistic advocacy to address the causes and consequences of law system involvement. Through this integrated, team-based structure, we have pioneered a groundbreaking, nationally recognized model of representation we call holistic defense that achieves transformative outcomes for the people we represent and communities we work with. Each year, we defend Bronx residents in criminal, civil, family regulation, and immigration cases, and reach thousands more through our community intake, youth mentoring, and outreach programs. Through impact litigation, policy advocacy, and community organizing, we also push for systemic reform at the local, state, and national level. We take what we learn from the people and communities we work with and launch innovative initiatives to bring about real and lasting change.

[2] We understand that pursuant to Your Honor's December 14, 2022 order, Plaintiffs' supplemental briefing on the Motion for a Preliminary Injunction is due 7 days following the production of expedited discovery. In accordance with applicable rules governing amicus briefs in this Court, BxD would plan to file our amicus brief within 6 days following Plaintiffs' supplemental brief.

The Bronx Defenders     360 East 161st Street     t: 718.838.7878     www.bronxdefenders.org
                                Bronx, NY 10451        f: 718.665.0100

As a holistic public defender organization, BxD supports clients facing criminal, family, civil, and immigration legal systems, including many clients who face simultaneous, multi-system involvement from any of these same legal systems. BxD serves over 20,000 individuals in any given year. BxD is home to the Civil Action Practice ("CAP"), which provides holistic civil public defense in the form of anti-eviction work, supporting clients in the New York City ("NYC") shelter system, and regaining rights and freedoms lost following interaction with the above-mentioned legal systems, including employment, housing, and access to essential public benefits, personal property, among others. Many of our clients benefit from the support of CAP's social workers who connect clients to relevant health and social support resources that best suit their goals. CAP also supports clients who survive police misconduct and other violence by state actors by helping them file Notices of Claim to preserve their legal claims. CAP's direct services work stems from our commitment to housing, access to healthcare, and human dignity as human rights, and we advocate in local, state, and international fora about our work and its relevance to the human rights framework. Most of BxD's and CAP's clients are people who identify as Black, Indigenous and People of Color ("BIPOC"), with the overwhelming majority identifying as and/or perceived as Black or Latine.

CAP frequently serves clients who are street homeless and clients who are living with mental illness. For various reasons, including their poverty and assumptions/bias about them, many of our clients are perceived to have mental illness even where no diagnosis exists. Where our clients do have mental health diagnoses, we know from work with our clients that access to resources, including the shelter system and health care services, are only beneficial when clients themselves choose to access them and are informed of their potential impacts. On the contrary,

our clients have suffered harms when resources like these are forced upon them, and especially when they lack the pathways to connect to permanent housing and more stable outcomes. Like the individual plaintiffs in this matter, our clients have suffered violence during forced hospitalizations and shelter entry.

Thus, BxD has a particular and unique perspective, including working with clients with mental illness, clients who are street homeless, and clients interfacing with multiple legal systems, that is valuable to the Court's decision on Plaintiffs' Request for a Preliminary Injunction.

II. **The Involuntary Removal Plan Will Harm the People We Represent and the Communities We Serve; The Bronx Defenders Will Submit Information Regarding the Civil and Other Consequences of Involuntary Hospitalization, Likely Effects on BIPOC Individuals, and How the Involuntary Removal Policy Contravenes Human Rights Laws and Commitments.**

When New York City Mayor Eric Adams announced the Involuntary Removal Policy directive[3] enlisting the New York City Police Department and other designated city agencies to involuntarily detain and hospitalize homeless individuals exhibiting mental illness, public defender organizations like ours feared the effects that the policy would have on our clients. Many of our clients in the Bronx who suffer the effects of mental illness struggle to secure supportive housing due to discriminatory housing practices they encounter on the basis of race, disability, and other protected classifications. Many more remain street homeless or live in homeless shelters after experiencing an eviction, often waiting months or years until they can become eligible for housing vouchers and find an apartment. In addition, ongoing staff retention

---

[3] The New York City Mayoral Administration promulgated a directive entitled, "Mental Health Involuntary Removals Policy," which Mayor Adams announced in a press conference on November 29, 2022.

challenges across the city's human services sector (i.e., Department of Homeless Services, Department of Social Services, and the Human Resources Administration) have created unprecedented delays in subsidy eligibility screenings, public benefit recertification, and voucher processing, affecting pathways for homeless individuals and their families to secure permanent housing.[4]

In targeting these already vulnerable populations experiencing housing insecurity, the mayor's directive implicates additional concerns over the range of civil and other consequences that an individual with a perceived mental illness could face when in contact with law enforcement and/or involuntarily hospitalized against their will. Our clients commonly lose shelter placement or are asked to leave shelter following any absence from the shelter or police involvement. Our clients, especially those with mental health conditions, do not experience NYPD as supportive partners in their struggle to access appropriate healthcare, shelter, or other social services because NYPD frequently interferes with such access by arresting vulnerable individuals and often violently detaining them. NYPD involvement frequently leads to shelter eviction, litigation seeking eviction from stable housing, loss of employment, risk of prosecution and deportation, and many other consequences.

The Involuntary Removal Plan will disproportionately affect BIPOC individuals and is out of step with human rights law, including both local and international agreements that the United States is required to abide by or has pledged to support. In addition to sharing information

---

[4] *See* Annie McDonough, "New York City's municipal staffing problems are real," City & State New York (Sept. 16, 2022), (sharing findings from a new report from City Hall demonstrating municipal staffing shortages that affect affordable housing pipelines); *see also* Samar Khurshid, "Facing Depleted Agencies, New York City Government Plans to Add 25,000 More Employees by June 2023," Gotham Gazette (Nov. 17, 2022) (noting a 13.5% decrease of employees at social services agencies in NYC including the Department of Social Services and the Department of Homeless Services).

regarding civil and other consequences we believe would stem from the Involuntary Detention Policy, our brief would further detail how the Involuntary Removal Policy will adversely and disproportionately affect BIPOC-identifying individuals and why the policy is inconsistent with and in violation of human rights laws and commitments.

Supplementing our experiences as advocates, BxD may seek additional organizations to serve as signatories to our amicus brief.

Thank you for your consideration and review of this request.

Respectfully submitted,

/s/
_____
The Bronx Defenders
By: Adam Shoop, CAP Legal Director
Siya Hegde, CAP Housing Policy Counsel*
Gillian Stoddard Leatherberry, CAP Training Director*
360 East 161st Street
Bronx, New York 10451
Tel: (718) 838-7878
AdamS@bronxdefenders.org
SHegde@bronxdefenders.org
GillianS@bronxdefenders.org

* Application for admission to S.D.N.Y. forthcoming

cc: All Counsel (via ECF)