**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------- X

STEVEN GREENE; GIOVANNA SANCHEZ-ESQUIVEL; SARAH ARVIO; LISA COLLINS; ORITSEWEYIMI OMOANUKHE AYU; and NEIL AMITABH, individually and on behalf of all others similarly situated, and COMMUNITY ACCESS, INC.; NATIONAL ALLIANCE ON MENTAL ILLNESS OF NEW YORK CITY, INC.; CORRECT CRISIS INTERVENTION TODAY – NYC; and VOICES OF COMMUNICTY ACTIVISTS AND LEADERS NEW YORK,

                                   Plaintiffs,

                    -against-

CITY OF NEW YORK; ERIC ADAMS; BILL DE BLASIO; EDWARD A. CABAN; KEECHANT L. SEWELL; DERMOT F. SHEA; NYPD POLICE OFFICER MARTIN HABER; NYPD POLICE SERGEANT CARRKU GBAIN, NYPD POLICE OFFICER VIKRAM PRASAD; NYPD POLICE OFFICER ANDRE DAWKINS; NYPD POLICE OFFICER TYRONE FISHER; NYPD POLICE OFFICER DEVIENDRA RAMAYYA; NYPD POLICE OFFICER JULIAN TORRES; NYPD OFFICER APRIL SANCHEZ; NYPD POLICE OFFICER GABRIELE MORRONE; NYPD OFFICER JOHN FERRARA; NYPD POLICE OFFICER MARYCATHERINE NASHLENAS; and NYPD OFFICERS JOHN and JANE DOES # 1-40,

                                   Defendants.
-------------------------------------------------------------------- X

No. 21-cv-05762 (LAP)

**THIRD AMENDED CLASS ACTION COMPLAINT**

     Plaintiffs STEVEN GREENE, GIOVANNA SANCHEZ-ESQUIVEL, SARAH ARVIO,

LISA COLLINS, ORITSEWEYIMI OMOANUKHE AYU, and NEIL AMITABH, individually

and on behalf of all others similarly situated, and COMMUNITY ACCESS, INC., NATIONAL

ALLIANCE ON MENTAL ILLNESS OF NEW YORK CITY, INC., CORRECT CRISIS

INTERVENTION TODAY – NYC; and VOICES OF COMMUNITY ACTIVISTS AND

LEADERS NEW YORK, as and for their complaint, by their attorneys, Beldock Levine &

i

Hoffman LLP, Marashi Legal, New York Lawyers for the Public Interest, Inc., and Allen Overy Shearman Sterling US LLP, challenging New York City's failure to provide responses to people experiencing mental health emergencies that are non-discriminatory and comparable to the responses provided to people experiencing physical health emergencies, and challenging New York City's use of unlawful entries, detentions, and excessive force when police respond to individuals experiencing such mental health emergencies, allege as follows:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

JURISDICTION ...................................................................................................... 6

VENUE .................................................................................................................... 6

PARTIES .................................................................................................................. 6

COMPLIANCE WITH NEW YORK'S GENERAL MUNICIPAL LAW ................ 11

STATEMENT OF FACTS ....................................................................................... 13

    I. The City's History of Criminalizing People with Mental Disabilities ....................... 13

    II.   The City's Police Response to Mental Health Emergencies Denies People with Mental Disabilities the Benefits of the City's Emergency Response Program ............. 15

    III.   The DOJ Has Concluded that Police Responses to Mental Health Calls Violate the ADA 25

    IV.   Non-Police Emergency Responses Are Recognized as Best Practices, Are Touted Praised by Health and Police Experts Alike, and Are Offered in Nearly 200 Cities Across the Country ....................................................................................................... 28

    V.   The City Has Repeatedly and Knowingly Failed to Redress its Discriminatory Treatment of People with Mental Disabilities ................................................................ 32

    VI.   The City's Police Response to Mental Health Emergencies Results in Involuntary Removals and Unconstitutional Arrests, Warrantless Entries and Use of Unnecessary Force ...................................................................................................................... 36

    VII. Plaintiffs' Experiences ....................................................................................... 41

        1. Steven Greene ................................................................................................ 41

        2. Giovanna Sanchez-Esquivel ......................................................................... 44

        3. Sarah Arvio ................................................................................................... 47

        4. Lisa Collins ................................................................................................... 51

        5. Oritseweyimi Omoanukhe Ayu ..................................................................... 54

        6. Neil Amitabh .................................................................................................. 58

7. Community Access: Independent, Integrated Living for all New Yorkers ...... 62

8. NAMI-NYC: Advocacy for Improved Mental-Health Services...................... 67

9. CCIT-NYC's Fight for Appropriate Mobile Crisis Response ........................ 71

10. Voice of Community Activists & Leaders New York.................................. 75

CLASS ACTION ALLEGATIONS ................................................................................ 77

CAUSES OF ACTION ................................................................................................... 81

First Cause of Action: The City's Discriminatory Police Response to Mental Health Emergencies Discrimination Based on Disability, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq* .................................................................. 81

Second Cause of Action: Discrimination Based on Disability or Perceived Disability, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. ..................................... 86

Third Cause of Action: Unlawful Seizure and Warrantless Entry, 42 U.S.C. § 1983, Fourth and Fourteenth Amendments to the United States Constitution ........................ 89

Fourth Cause of Action: Excessive Force, 42 U.S.C. § 1983, Fourth and Fourteenth Amendments to the United States Constitution ............................................................. 91

Fifth Cause of Action: Assault, Battery, False Imprisonment, Unreasonable Detention, and Warrantless Entry, New York State Constitution and New York State Common Law  93

Sixth Cause of Action: Discrimination Based on Disability, New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. ........................................................ 95

RELIEF REQUESTED..................................................................................................... 99

## PRELIMINARY STATEMENT

1.      This civil rights class action challenges New York City's discriminatory responses to people experiencing mental health emergencies as compared to the responses provided to individuals experiencing physical health emergencies, as well as New York City's use of unlawful entries, detentions, and excessive force when police respond to individuals experiencing mental health emergencies.

2.      In New York City, people who experience a *physical* health emergency and are brought to the attention of the City's all-encompassing emergency response program through a call to 911 or otherwise are sent health professionals, who are specifically trained to assess health issues, offer on-the-spot stabilization, provide basic health services and determine whether additional care is needed and whether the individual would be best served at a hospital or other specialized treatment facility.

3.      By contrast, people in New York City who experience or are perceived to be experiencing a *mental* health emergency, and are brought to the attention of the City's emergency response program by a call to 911 or otherwise, are sent police officers as first responders—not health professionals, who are specifically trained to assess mental health issues, offer on-the-spot stabilization, provide basic health services, and determine whether the individual would best be served at a hospital or other specialized treatment facility, such as a crisis stabilization center or other community-based mental health treatment center.

4.      As a result, people with mental disabilities[1] are, by reason of their disabilities, excluded from participation in the City's emergency response program, denied the benefits of the

---

[1] An individual with a "disability" under the Americans with Disabilities Act includes both individuals with actual or perceived disabilities, as well as those with a record of such disabilities. *See* 42 U.S.C. § 12102 ("The term 'disability' means, with respect to an individual

City's emergency response program, denied equal access to, or an equal opportunity to benefit from, the City's emergency response program, are subject to disparate treatment by the City, and denied a reasonable modification by which they can access the City's emergency response program.[2]

5.      Sending police officers as first responders to mental health emergencies is also counterproductive to resolving mental health emergencies. Police interventions are more likely to exacerbate than de-escalate a crisis and frequently trigger people with mental disabilities who otherwise pose no threat. These interventions are oftentimes dangerous for the person in crisis and result in a significant likelihood of the individual being arrested, involuntarily transported to a hospital for psychiatric evaluation, seriously injured, and, all-too-frequently, killed. The City's provision of police responses to individuals experiencing mental health emergencies also discourages people with mental disabilities and their loved ones from seeking help.

6.      The City's police-led emergency responses and arrests perpetuate and exacerbate the City's antiquated and inaccurate stereotypes of persons with mental disabilities, and a willful disregard of scientifically-based, contemporary standards of care.

7.      Further subjecting people with mental disabilities to unlawful treatment, the NYPD's Patrol Guide § 221-13 for "Mentally Ill or Emotionally Disturbed Persons" (hereinafter "Patrol Guide 221-13" and attached hereto as Exhibit 1) and the Mayor's November 2022

---

(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; . . . or (C) being regarded as having such an impairment . . . ."); U.S. Department of Justice, *Guide to Disability Rights Laws* ("An individual with a disability is defined by the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities . . . or a person who is perceived by others as having such an impairment."), https://www.ada.gov/resources/disability-rights-guide/.

[2] "Reasonable modification," the language used in Title II of the Americans with Disabilities Act, and "reasonable accommodation," used elsewhere in the ADA, are substantively interchangeable in the ADA context. *See, e.g.*, *McElwee v. County of Orange*, 700 F.3d 635, 646 n.2 (2d Cir. 2012).

Involuntary Removal Policy[3] (hereinafter "Involuntary Removal Policy") on their face and/or as applied, direct police to take persons with mental disabilities into custody—without probable cause and typically through the use of excessive force—even when it is clear to the responding officers that the person does not present a substantial risk of serious harm to themself or anyone else. This practice continues despite well-established law that mental illness alone cannot justify forcibly hospitalizing a person against their will.[4]

8.      The legal rights Plaintiffs seek to vindicate herein do not impinge upon New York State Mental Hygiene Law § 9.41 ("MHL § 9.41"), which *permits*—but does not mandate—the police to arrest, detain, and transport a person with mental disabilities when the person "is conducting himself or herself in a manner which is likely to result in serious harm to the person or others."[5]

9.      Plaintiffs are not challenging the NYPD's authority to take into custody persons who appear to be mentally ill *and* are conducting themselves in a manner that presents a substantial risk of serious harm to themselves or others under MHL § 9.41. Rather, Plaintiffs are challenging the City's policy, practice, and/or custom of using police as first responders to mental health emergencies. MHL § 9.41 does not require the City to send the police as the first responders to mental health emergencies. Plaintiffs' claims are therefore consistent with MHL § 9.41. Plaintiffs seek to have health personnel rather than the police as first responders to typical mental health emergencies where the person experiencing the mental health emergency (or perceived to be experiencing a mental health emergency) does not present a substantial risk of serious harm to

---

[3] *See Mental Health Involuntary Removals,*
*NYC.GOV,* https://www.nyc.gov/assets/home/downloads/pdf/press-releases/2022/Mental-Health-Involuntary-Removals.pdf.
[4] *See O'Connor v. Donaldson*, 422 U.S. 563, 575 (1975).
[5] "Likely to result in" as used in MHL § 9.41 means a "substantial risk of." MHL § 9.01.

themselves or others. The City's failure to provide health personnel under these circumstances is the discrimination about which Plaintiffs complain. MHL § 9.41 does not stand in the way of, and is not inconsistent with, such relief. MHL § 9.41 does not preclude Plaintiffs' allegation that the denial of a health response to people experiencing mental health emergencies—one that affords them the benefits of the City's emergency response program, and is comparable to the City's response to physical health emergencies—discriminates against Plaintiffs.

10.     All the Individual Plaintiffs received a police response to an actual or perceived mental health emergency. Yet, at no point during their encounters with the police were the Individual Plaintiffs a danger to themselves or anyone else. They were committing no crimes. In fact, three of them were in their own homes, sitting on their couches. One was at a luxury hotel about to go for a swim, and one was an unhoused New Yorker who was peacefully asleep on a subway station bench. Nonetheless, each Plaintiff was subjected to an unconstitutional seizure and detention. Each was forcibly arrested, all were injured physically and/or emotionally, most were handcuffed, and all were involuntarily transported to a hospital for a psychiatric assessment, where the majority were released within a short period of time.

11.     Plaintiffs live in fear of again experiencing such unconstitutional arrests, excessive force, and the other harms that result from a police response to mental health emergencies.

12.     Despite the well-documented harms caused by the City's emergency response for people with mental disabilities, Defendants City of New York, Mayor Eric Adams, former Mayor Bill de Blasio, New York City Police Department Commissioner Edward A. Caban, former Commissioner Keechant L. Sewell, and former Commissioner Dermot F. Shea have acted with deliberate indifference to the rights of people with mental disabilities. These Defendants have knowingly continued to deploy police officers as first responders to non-violent and non-

4

threatening mental health emergencies, while other communities across the country and around the world have adopted models that dispatch health professionals and do not require police involvement.

13. That the City could provide a health response to mental health emergencies, and thus avoid discrimination on the basis of disability and other harms is evidenced by a pilot program launched by the City in 2021 that promised to dispatch health professionals in place of police officers to certain mental health 911 calls that the City touted as its "commitment to treat mental health emergencies as public health problems—not public safety issues."[6] The program, however, has been underutilized, underfunded, is extremely limited in scope and accessibility, and has other flaws.

14. This action is brought by Individual Plaintiffs on their own behalf and on behalf of those similarly situated, as well as by organizational Plaintiffs that are committed to safeguarding the rights of individuals with mental disabilities—Community Access, Inc. ("Community Access"), the National Alliance on Mental Illness of New York City, Inc. ("NAMI-NYC"), Correct Crisis Intervention Today – NYC ("CCIT-NYC"), and Voices of Community Activists and Leaders New York ("VOCAL-NY")—against Defendants City of New York (the "City"), Mayor Eric Adams, former Mayor Bill de Blasio, New York Police Department (the "NYPD") Commissioner Edward A. Caban, former Police Commissioners Keechant L. Sewell and Dermot F. Shea, and numerous NYPD police officers, pursuant to the Americans with Disabilities Act (42 U.S.C. § 12101 *et seq*.) (the "ADA"), Section 504 of the Rehabilitation Act (29 U.S.C. § 794) ("Section 504"), the Civil Rights Act of 1871 (42 U.S.C. § 1983) ("Section 1983"), the Fourth and

---

[6] NYC Mayor's Office of Community Mental Health, *Re-imagining New York City's mental health emergency response*, https://mentalhealth.cityofnewyork.us/b-heard#:~:text=A%20new%20health%2Dcentered%20approach,problems%20%2D%20not%20public%20safety%20issues.

Fourteenth Amendments to the United States Constitution, the New York State Constitution, New York Common Law, and the New York City Human Rights Law (N.Y.C. Admin. Code § 8-101 *et seq.*).

15.    Plaintiffs seek declaratory relief and a) a permanent injunction prohibiting Defendants from continuing their discriminatory and unlawful policies, practices, and activities related to the City's emergency response program; b) a permanent injunction requiring the City to operate an emergency response program that provides a health response to mental health emergencies that affords Plaintiffs access to the City's emergency response program and is comparable to the health response the City provides to physical health emergencies; and c) damages for the Individual Plaintiffs, all members of the class, and the organizational Plaintiffs.

## JURISDICTION

16.    Jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (4). Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

17.    This Court also has supplemental jurisdiction to hear Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

## VENUE

18.    Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) and (2), as at least one of the Defendants resides in this district, and the acts alleged herein were committed within this district.

## PARTIES

19.    At all times relevant hereto, Plaintiff Steven Greene is an African-American resident of the State of New York, City of New York, and County of the Bronx. He has been

diagnosed with post-traumatic stress disorder ("PTSD") and attention deficit disorder ("ADD") and is a qualified individual with a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law.

20.    At all times relevant hereto, Plaintiff Giovanna Sanchez-Esquivel was a resident of the State of New York, City of New York, and County of Kings. She is a Latina woman who has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), depression, PTSD, autism, and bipolar disorder, and is a qualified individual with a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law.

21.    At all times relevant hereto, Plaintiff Sarah Arvio was a resident of the State of New York, City of New York, and County of the Bronx. She is a white woman whom certain defendant NYPD officers regarded as having a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law.

22.    At all times relevant hereto, Plaintiff Lisa Collins was a resident of the State of New York, City of New York, County of the Bronx. She is an African-American woman whom certain defendant NYPD officers regarded as having a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law.

23.    At all times relevant hereto, Plaintiff Oritseweyimi Omoanukhe Ayu was a resident of the State of New York, City of New York, and County of Bronx. He is a chronically unhoused Black man who currently resides in an apartment in the Bronx. He has been diagnosed with bipolar and schizoaffective disorder. He is a qualified individual with a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law.

24.    At all times relevant hereto, Plaintiff Neil Amitabh was a resident of the State of New York, City of New York, County of New York. He is a chronically unhoused man of West

Indian descent whom certain defendant NYPD officers perceived to have a disability within the meaning of the ADA, Section 504, and the City's Human Rights Law.

25.    Community Access is a nonprofit organization incorporated in the State of New York which conducts its operations in the State, City, and County of New York. Community Access was founded in 1974 to provide supportive housing to New Yorkers with mental disabilities.

26.    NAMI-NYC is a nonprofit organization incorporated in New York. NAMI-NYC conducts its operations in the State, City, and County of New York. NAMI-NYC helps families and individuals affected by mental disabilities build better lives through education, support, and advocacy.

27.    CCIT-NYC is a membership organization based in New York City. CCIT-NYC conducts its operations in the State, City, and County of New York. It is a coalition of more than 80 civil rights and human service organizations, peers (people with lived mental health experience), family members, and other advocates, who work together with a mission to transform the City's response to mental health emergencies.

28.    VOCAL-NY is a statewide grassroots membership organization with chapters throughout New York State. VOCAL-NY builds power among low-income people affected by mental disabilities, HIV/AIDS, the drug war, mass incarceration, and homelessness in order to create healthy and just communities.

29.    Defendant City of New York is a municipal entity authorized by New York State law to maintain a police department, and which maintains the NYPD, which in turn acts as the City of New York's agent in the area of law enforcement and other matters for which it is ultimately responsible. The Communications Division of the NYPD's Information Technology

Bureau oversees the City's 911 program. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

30.    Defendant Eric Adams was and is the Mayor of New York City from January 1, 2022 through the present. As Mayor, Defendant Adams is an elected officer and the chief executive officer of the City. Pursuant to Section 8 of the City Charter, he is responsible for the effectiveness and integrity of city government operations, is charged with establishing and maintaining such policies and procedures as are necessary and appropriate to accomplish this responsibility, and has the final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

31.    Defendant Bill de Blasio was the Mayor of New York City from January 1, 2014 to December 31, 2021. As Mayor, Defendant de Blasio was an elected officer and the chief executive officer of the City. Pursuant to Section 8 of the City Charter, he was responsible for the effectiveness and integrity of city government operations, was charged with establishing and maintaining such policies and procedures as are necessary and appropriate to accomplish this responsibility and had the final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

32.    Defendant Edward A. Caban was and is the Police Commissioner of the NYPD from July 17, 2023 to present. As Police Commissioner, Defendant Caban personally and/or through his authorized delegates, has final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures with respect to 911 and NYPD officers' performance of their duties. Defendant Caban is a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

9

33.     Defendant Keechant L. Sewell was the Police Commissioner of the NYPD from January 1, 2022 to July 17, 2023. As Police Commissioner, Defendant Sewell personally and/or through her authorized delegates, had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures with respect to 911 and NYPD officers' performance of their duties. Defendant Sewell was a City policymaker for whom the City is liable. She is sued individually and in her official capacity.

34.     Defendant Dermot F. Shea was the Police Commissioner of the NYPD from December 1, 2019 to January 1, 2022. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures with respect to 911 and NYPD officers' performance of their duties. Defendant Shea was a City policymaker for whom the City was liable. He is sued individually and in his official capacity.

35.     Defendants NYPD Police Officer Martin Haber, NYPD Police Sergeant Carrku Gbain, NYPD Police Officer Vikram Prasad, NYPD Police Officer Andre Dawkins, NYPD Police Officer Tyrone Fisher, NYPD Police Officer Deviendra Ramayya, and NYPD Police Officer Julian Torres are members of the NYPD who unlawfully detained and/or used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff Sanchez-Esquivel on the basis of her disability in violation of law. They are sued individually and in their official capacities.

36.     Defendant NYPD Police Officer Gabriele Morrone and NYPD Police Officer John Ferrara are members of the NYPD who unlawfully detained, failed to accommodate, and/or otherwise discriminated against Plaintiff Collins on the basis of her perceived disability in violation of the law. They are sued individually and in their official capacities.

10

37.    Defendant NYPD Police Officer April Sanchez, NYPD Police Officer Marycatherine Nashlenas, and NYPD Officers John and Jane Does # 1-40 are members of the NYPD who unlawfully detained and/or used excessive force against, and/or otherwise discriminated against Plaintiff Arvio on the basis of her perceived disability in violation of the law. They are sued individually and in their official capacities.

38.    Defendant NYPD Officers John and Jane Does # 1-40 are members of the NYPD who unlawfully detained and/or used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff Amitabh on the basis of his perceived disability in violation of the law. They are sued individually and in their official capacities.

39.    Defendants NYPD Officers John and Jane Does # 1-40 are members of the NYPD who unlawfully detained and/or used excessive force against, failed to accommodate, and/or otherwise discriminated against Plaintiff Ayu on the basis of his disability in violation of the law. They are sued individually and in their official capacities.

40.    At all times relevant herein, Defendants Adams, de Blasio, Caban, Sewell, Shea, Haber, Gbain, Prasad, Dawkins, Fisher, Morrone, Ramayya, Torres, Ferrara, Nashlenas, and Sanchez have acted under color of law, and within their authority as employees, officers, and/or agents of the NYPD and/or the City of New York.

## COMPLIANCE WITH NEW YORK'S GENERAL MUNICIPAL LAW

41.    Plaintiffs Steven Greene timely served a Notice of Claim upon the City of New York.

42.    Plaintiff Greene attended a hearing pursuant to Section 50-h of New York's General Municipal Law on August 18, 2020.

43.     More than thirty days have elapsed since Plaintiff Greene served a Notice of Claim and the City has not offered adjustment or payment thereof.

44.     Plaintiff Giovanna Sanchez-Esquivel timely served a Notice of Claim upon the City of New York.

45.     Plaintiff Sanchez-Esquivel attended a hearing pursuant to Section 50-h of New York's General Municipal Law on June 9, 2021.

46.     More than thirty days have elapsed since Plaintiff Sanchez-Esquivel served a Notice of Claim and the City has not offered adjustment or payment thereof.

47.     Plaintiff Sarah Arvio timely served a Notice of Claim upon the City of New York.

48.     Plaintiff Arvio attended a hearing pursuant to Section 50-h of New York's General Municipal Law on December 4, 2020.

49.     More than thirty days have elapsed since Plaintiff Arvio served a Notice of Claim and the City has not offered adjustment or payment thereof.

50.     Plaintiff Lisa Collins timely served a Notice of Claim upon the City of New York.

51.     Plaintiff Collins attended a hearing pursuant to Section 50-h of New York's General Municipal Law on August 8, 2023.

52.     More than thirty days have elapsed since Plaintiff Collins served a Notice of Claim and the City has not offered adjustment or payment thereof.

53.     Plaintiff Neil Amitabh timely served a Notice of Claim upon the City of New York.

54.     Plaintiff Amitabh attended a hearing pursuant to Section 50-h of New York's General Municipal Law on December 6, 2023.

55.     More than thirty days have elapsed since Plaintiff Amitabh served a Notice of Claim and the City has not offered adjustment or payment thereof.

## STATEMENT OF FACTS

### I.    The City's History of Discrimination against People with Mental Disabilities

56.    New York City has a long history of discriminating against people with mental disabilities, and people with mental disabilities have been labeled as criminals and involuntarily removed from the community.

57.    People with mental disabilities have been seen as violent or dangerous, despite the fact that the overwhelming majority of people with mental disabilities are not violent, and people with mental disabilities are not any more likely to be violent than anyone else.[7] Only 3-5% of violent acts can be attributed to individuals with mental disabilities.[8]

58.    For decades, New York State frequently placed people with mental disabilities in state asylums.[9] A wave of deinstitutionalization, begun in the 1950s, sought, among other aims, to overcome the neglect and abuse in the state facilities. One of those state facilities—the Willowbrook State School on Staten Island—was referred to by Senator Robert F. Kennedy as a

---

[7] Substance Abuse and Mental Health Services Administration, *Mental Health Myths and Facts*, https://www.samhsa.gov/mental-health/myths-and-facts; Varshney M, Mahapatra A, Krishnan V, et al. *Violence and Mental Illness: What is the True Story?* J Epidemiology & Community Health 2016; 70:223-225, Mohit Varshney, et. al., *Violence and Mental Illness: what is the true story*, J. Epidemiology & Community Health Vol. 70 No.3 (Mar. 2016) (public perception of the association between mental illness and violence is not borne out by the research literature available on the subject), https://jech.bmj.com/content/jech/70/3/223.full.pdf.

[8] Substance Abuse and Mental Health Services Administration, *Myths and Facts about Mental Health* (2024), https://www.samhsa.gov/mental-health/myths-and-facts, (last visited May 29, 2024).

[9] *See* Catherine Ryan Gawron, *Funding Mental Healthcare in the Wake of Deinstitutionalization: How the United States and the United Kingdom Diverged in Mental Health Policy After Deinstitutionalization, and What We Can Learn From Their Differing Approaches to Funding Mental Healthcare*, 9 Notre Dame J. of Int'l & Compar. Law 85, 89 (2019).

"snake pit."[10] *See New York State Association for Retarded Children, Inc., v. Carey*, 551 F. Supp. 1165 (E.D.N.Y. 1982).

59.    Deinstitutionalization was not accompanied by the provision of necessary community-based mental health services in the City.

60.    The City failed to provide community-based services despite the United States Supreme Court's landmark decision in *Olmstead v. L.C.*, 527 U.S. 581 (1999), prohibiting the unnecessary institutionalization of people with disabilities and requiring public entities to provide people with disabilities with care in the most integrated settings appropriate to their needs.[11]

61.    As recently as 2023, the Mayor's Office of Community Mental Health specifically recognized that "the 911 pathway . . . almost exclusively routes someone experiencing a mental health crisis to the hospital"[12] instead of providing them with community-based services, including crisis services, peer support services, and assertive community treatment.[13]

62.    Community-based services to address mental health emergencies remain severely lacking in New York City.

---

[10] Benjamin Weiser, *Beatings, Burns and Betrayal: The Willowbrook Scandal's Legacy*, N.Y. Times, Feb. 21, 2020, https://www.nytimes.com/2020/02/21/nyregion/willowbrook-state-school-staten-island.html.

[11] *See New York State Home and Community-Based Services Settings Transition Plan* at 96, (2023), https://www.health.ny.gov/health_care/medicaid/redesign/hcbs/docs/2023_statewide_transition_plan.pdf (noting that the Office for Mental Health, the Department of Health, the Office for People with Developmental Disabilities, and other state agencies acknowledged New York's failures to provide community-based services to people with disabilities).

[12] The Mayor's Office of Community Mental Health 2023 Annual Report (2023) at 12, 2023-OCMH-Annual-Report.pdf, (last visited May 29, 2024).

[13] *See New York State Home and Community-Based Services Settings Transition* Plan at 96-97, (2023), 2023 statewide transition plan.pdf(ny.gov); Jumaane D. Williams, Office of the Public Advocate, *Improving New York City's Responses to Individuals in Mental Health Crisis: 2022 Update* (hereinafter "Public Advocate Mental Health Crisis Report"), at 5-7, https://advocate.nyc.gov/reports/improving-new-york-citys-responses-mental-health-crisis-2022/.

63.     The Office of the Public Advocate in 2019 and again in 2022 recommended increasing such community services by expanding the number of respite, drop-in, and urgent care centers and safe havens for people with mental health issues.[14]

64.     The lack of community-based services contributes to the rocketing number of mental health emergencies—a three-fold increase in the last two decades—and the increased number of calls to 911 for emergency responses to those crises—from 97,000 calls in 2009 to almost 180,000 in 2019 and rising every year and in every precinct.[15] In 2023, there were over 300,000 911 calls tagged as "EDP" ("Emotionally Disturbed Person") calls or mental health emergencies.[16]

65.     The increased numbers of calls for emergency responses to mental health crises, and the City's policies and practices governing its responses to people experiencing mental health emergencies, have led to an increased number of individuals with mental disabilities experiencing unlawful arrests, unnecessary injuries, and avoidable deaths.

II.     **The City's Police Response to Mental Health Emergencies Denies People with Mental Disabilities the Benefits of the City's Emergency Response Program**

66.     In New York City, the police are the *de facto* mental health mobile crisis system. Although physical health emergencies are immediately provided a health response, mental health emergencies are provided a non-health, police response.

---

[14] "Public Advocate Mental Health Crisis Report" at 3-9.

[15] Greg B. Smith, *The NYPD's Mental Illness Response Breakdown*, The City (Mar. 21, 2019) https://www.thecity.nyc/special-report/2019/3/21/21211184/the-nypd-s-mental-illness-response-breakdown; Urban Justice Center, Kramer Levin Naftalis & Frankel LLP, *Police Interactions with Individuals in Psychiatric Crisis* (Apr. 22, 2002), https://www.kramerlevin.com/images/content/2/1/v4/2161/Police-Interact-Fischman.pdf; James Panero, *A New Moral Treatment*, City Journal (Spring 2013), https://www.city-journal.org/html/new-moral-treatment-13549.html.

[16] NYC Open Data, https://data.cityofnewyork.us/Public-Safety/NYPD-Calls-for-Service-Historic-/d6zx-ckhd/data.

15

67.     The 911 system was designed to provide a universal, easy-to-remember number for people to call for police, fire, or emergency medical services from any phone in any location around the country.[17]

68.     The New York City Charter provides that the New York City Department of Health and Mental Hygiene is the City agency responsible for the health of the people of the City, and is supposed to "implement and administer an inclusive citywide planning process for the delivery of services for people with mental disabilities."[18] However, the Department of Health and Mental Hygiene has no role in the City's 911 program.

69.     All persons residing or present in the City of New York are eligible to utilize the City's 911 services.[19]

70.     The City's 911 program is overseen by, and a division of, the NYPD. Having police department employees handle the initial 911 calls *and* respond to 911 calls for mental health emergencies is an approach that national experts, after extensive research and analysis, have concluded is harmful for people experiencing mental health emergencies,[20] for reasons discussed below.

71.     The "Anatomy of a 911 Call," outlined by the City on its 911 reporting page, describes three routes of services provided in response to emergency calls. Each 911 call is answered by one of the NYPD's Police Communication Technicians (or "Police call-takers"). If

---

[17] *See* National 911 Program, www.911.gov.
[18] *See* N.Y. City Charter § 556(4).
[19] *See* NYC Text-to-911, https://www.nyc.gov/site/text911/index.page.
[20] *See* Transform911, *Transform911 Blueprint*, (2022) at 17-22 & Ch.6, https://bpb-us-w2.wpmucdn.com/voices.uchicago.edu/dist/e/2911/files/2022/08/Transform911-Blueprint-for-Change.pdf; *see also Public Advocate Advances Bill Creating Mental Health Emergency Phone Line*, New York City Public Advocate, https://advocate.nyc.gov/press/public-advocate-advances-bill-creating-mental-health-emergency-phone-line.

the caller is "reporting a crime, the Police call-taker will share the details of the call with the Police dispatcher. . . . If the caller is reporting a fire, the Police call-taker adds a Fire department call-taker to the call. . . . If the caller is reporting a medical emergency, the Police call-taker adds an EMS [(Emergency Medical Services)] call-taker to the call."[21] Absent from the NYC 911 page is information on how calls for mental health emergencies are handled.

72.     For 911 calls related to physical health emergencies, the City regards the call as a "medical emergency" and the EMS call-taker who is added to the call conducts "medical questioning" and then "shares the details with an EMS dispatcher that mobilizes the unit that will travel to the site."[22]

73.     For such physical health emergency calls, EMS, which is operated by the Fire Department of New York ("FDNY"), is the first or lead responder. Although police may also respond to such physical health emergency calls in certain instances, such as when police reports are required—for example in instances of motor vehicle accidents—their role is one of law enforcement.

74.     People who are the subject of 911 physical health emergency calls receive assistance that includes qualified health professionals who are specifically trained to assess a health emergency and provide on-the-spot stabilization and treatment. The EMS emergency medical technicians ("EMTs") and paramedics are considered the "leads" and "experts" on the scene; they receive extensive training and continuing medical education, and are certified, *inter alia*.

75.     The FDNY operates one of the largest fire department-based EMS systems in the country, and the resources available to it include staffed ambulances, mobile respiratory treatment

---

[21] NYC 911 Reporting, *Anatomy of a 911 Call*,
https://www.nyc.gov/site/911reporting/reports/reports.page.
[22] *See id.*

units, and emergency physicians with specialized prehospital skills.[23] EMS staff are not armed or authorized to make arrests, and they are not trained to adopt law enforcement strategies.

76.     EMS first responders are trained and well-qualified to assess, stabilize, and, when necessary, provide treatment right away to people experiencing physical health emergencies. They also are qualified to determine (and in fact do determine) whether the person needs to go to the hospital. Relatedly, EMTs and paramedics have the ability to communicate remotely with a supervisor or trained clinician to determine whether transport to a hospital is recommended or required. This health care provided to people experiencing physical health emergencies thus saves lives *and* prevents unnecessary hospitalization, along with affirming the dignity and rights of people who utilize the City's emergency response program.

77.     People experiencing mental health emergencies in New York City are not provided a comparable health response.

78.     The typical, or most common, mental health emergencies arise from depression, anxiety, and PTSD. The typical mental health emergency, including ones involving thoughts of suicide or self-harm, does not present a danger to others. Calls regarding typical mental health emergencies often involve no allegations of criminal conduct, violence, use or possession of a weapon, or threat of harm to others.[24]

---

[23] *See* Emergency Medical Services Political Action Committee, Municipal Sector, https://emspac.org/sectors/municipal/ (last visited May 30, 2024).

[24] *See, e.g.*, United States Department of Justice Civil Rights Division and United States Attorney's Office Western District of Kentucky Civil Division, Investigation of the Louisville Metro Police Department and the Louisville Metro Government 59 (March 8, 2023), https://www.justice.gov/opa/press-release/file/1573011/download.

79.    Suicidal ideation, suicide attempts, and mental health emergencies are not criminal activities; thus, it is not appropriate to have police as first-responders, without specific facts that delineate the need for law enforcement.[25]

80.    If a call is placed to 911 suggesting mental illness or a mental health concern, the Police call-takers and dispatchers, who lack the ability to de-escalate calls or re-route calls to the City's non-emergency services,[26]—code or categorize the call as an "Emotionally Disturbed Person" call or an "EDP" call. This prompts a police response that is similar to the response to 911 calls reporting a crime, with the police dispatched as the first and lead responder.

81.    The police officers who are dispatched to the mental health emergency calls are not qualified to make health determinations, de-escalate a mental health crisis, stabilize the person in crisis, or determine whether transport to a hospital for psychiatric evaluation is warranted.[27]

82.    Although EMS may also respond to some mental health emergency calls, their role is secondary to the police. As Plaintiffs' experiences demonstrate, the EMTs, who arrive after the police do, are not there to de-escalate or otherwise address mental health emergencies. In many cases, they further exacerbate the harms and injuries of individuals experiencing mental health emergencies.

83.    The City has acknowledged the lack of a health response to mental health emergencies and the routine routing of people experiencing mental health emergencies to

---

[25] April Shaw, Network for Public Health Law, *Rethinking and Reducing the Role of Law Enforcement in Suicide Prevention Efforts,* (May 18. 2021). https://www.networkforphl.org/news-insights/rethinking-and-reducing-the-role-of-law-enforcement-in-suicide-prevention-efforts/.

[26] *Supra* note 12, at 12.

[27] The limited exception to the City's delivery of its emergency responses program with its police-driven response to mental health emergencies, is a sparse and deficient pilot program launched in 2021 in limited police precincts, and operating for limited hours of the day, known as B-HEARD. discussed *infra*.

hospitals. For example, the Mayor's Office of Community Mental Health in 2023 in its Annual Report on Critical Gaps in the Mental Healthcare System in New York City, states: "For instance, the 911 pathway . . . dispatching police and EMS, almost exclusively routes someone experiencing a mental health crisis to the hospital when the individual may be better served by being connected to care in the community."[28] The Report also noted that the problems of the City's emergency response to mental health emergencies are compounded by "the inability to have [the NYPD] 911 dispatcher 'de-escalate' or re-route calls" to the City's non-emergency services, and the absence of a "mental health counselor or peer who would be the most effective and appropriate response for that situation."[29]

84.    Police not only fail to meet the health needs of people experiencing mental health emergencies, but experts have concluded, and experience in New York City and elsewhere has shown, that police are more likely to exacerbate than resolve mental health emergencies. *See, e.g., Amicus Brief on Behalf of Mental Health America*, *et al.*, Doc. #51 (expert analyses demonstrating harmfulness of police response to people experiencing mental health emergencies), filed in *Bread for the City v. District of Columbia*, 1:23-cv-01945--ACR, a case challenging the District of Columbia's reliance on police officers as the default responders to mental health emergencies as a violation of the ADA.

85.    Police officer training, which emphasizes command and control, law enforcement, and public safety protection, as well as the importance of police officers protecting themselves, renders police officers especially ill-suited to interact with someone experiencing a mental health emergency or perceived to be experiencing a mental health emergency. Their training and experience leads them to view crises through a law enforcement lens rather than a health lens, and

---

[28] *Supra* note 25, at 12.
[29] *Id.*

they often make people feel frightened, stressed, and anxious,[30] which is particularly true for individuals experiencing a mental health emergency.[31]

86.     Training designed for health professionals responding to mental health emergencies, by contrast, teaches de-escalation, non-threatening stances, active listening, patience, and capability to provide healthcare assistance and appropriate referrals.

87.     Moreover, an individual experiencing a mental health emergency may have difficulty complying with and/or understanding a police officer's commands, making those in crisis especially vulnerable to police escalation.[32] Police officers often perceive the behavior of a person experiencing a mental health emergency as dangerous or noncooperative, when it is actually a manifestation of the person's disability.[33]

88.     Additionally, the conditions of people with mental disabilities often worsen as a result of a police response (e.g., PTSD, depression, anxiety), as demonstrated by certain Plaintiffs' experiences.

---

[30] *See e.g.,* Substance Abuse and Mental Health Services Administration, *National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit*, at 33 (Feb. 2020) ("Unfortunately, well-intentioned law enforcement responders to a crisis call often escalate the situation solely based on the presence of police vehicles and armed officers that generate anxiety for far too many individuals in a crisis."), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf.

[31] *See, e.g.,* NYLPI, *Saving Lives, Reducing Trauma, Reducing Police From New York City's Mental Health Crisis Response*, at 10-16 (2021), https://www.nylpi.org/wp-content/uploads/2021/10/FINAL_Mental-Health-Crisis-Response-Report.pdf. *See also id.* at 10 (respondents to survey of NYPD response to individuals in mental health crisis described "harmful experiences, including inadequate care and treatment, re-traumatization, injuries, unnecessary and inappropriate involvement in the criminal legal system, forced hospitalizations, and elevated fear and mistrust towards law enforcement.").

[32] *See* Jamelia Morgan, *Disability's Fourth Amendment*, 122 COLUM. L. REV. 489, 558-59 (2022).

[33] *See id.*

89.     Dispatching the police in response to mental health calls also puts people with mental disabilities at serious risk of entanglement with the criminal legal system and of serious or deadly injury at the hands of the police.

90.     Police nationwide are nearly twelve times more likely to use force against people with mental disabilities than other individuals, and sixteen times more likely to kill people with mental disabilities than other individuals.[34] Roughly a quarter of people fatally shot by police in the United States each year are individuals experiencing mental health emergencies.[35]

91.     In New York City, police interactions with people with mental disabilities were the second most common situation in which police officers used force.[36]

92.     To illustrate how police responses to mental health emergencies often tragically escalate interactions with people with mental disabilities, some egregious cases from the past two decades are described below:

---

[34] Department of Justice and Department of Health & Human Services Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities, at 2 (2023), https://tinyurl.com/bdene967; Ayobami Laniyonu & Phillip Atiba Goff, *Measuring Disparities in Police Use of Force and Injury Among Persons with Serious Mental Illness*, (October 12, 2021), https://bmcpsychiatry.biomedcentral.com/articles/10.1186/s12888-021-03510-w; Randolph McLaughlin and Debra S. Cohen, *The NYPD and the Mentally Ill*, NEW YORK LAW JOURNAL (Feb. 17, 2017).

[35] Fola Akinnibi and Sarah Holder, 'All the Systems Failed:' Mental Health, Police and Deadly Risks, Bloomberg Law (Mar .9, 2021), https://www.bloomberglaw.com/product/blaw/bloomberglawnews/bloomberg-law-news/X3IFRNDS000000?bc=W1siU2VhcmNoICYgQnJvd3NlIiwiaHR0cHM6Ly93d3cuYmxvb21iZXJnbGF1LmNvbS9wcm9kdWN0L2JsYXcvc2VhcmNoL3Jlc3VsdHMvMzE3NjQyZGYwNDRjMzg1NmU2OWM3ZDM2ZWEwOWQxOGUiXV0--b25fc7c6fcc76b383d6e81aa471cff38c159946a&criteria_id=317642df044c3856e69c7d36ea09d18e&search32=gjPNYY5fG6XUrIg1Bcy8Mw%3D%3DTDZUNw4vpNmERYAG7HgUeb6TxqEltaRYYPErWiVpbG_3dmz2Y2j43gc4fBTMSxC9_BFxQBwKJe511akl6Ra3Y1wekloRfe3P8lPyuIcH8N0s5jZtJNZv-96v_ucRS42VhPch1-Z-x2rzPMIsfmrpqrMmVGMm4NYMult_Kw0ugoxfJMtgFio_fA8wU_l07L2IHl3EDzq77XFLOCZY5Gz-C4TncN1QXXyrOaE6JBMxPR0%3D (last accessed June 7, 2024).

[36] New York City Police Department, *Use of Force Report,* (2022), at 7, https://www.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2022.pdf (last visited May 30, 2024).

a. **2008 – <u>Iman Morales</u>**: Iman Morales, a 35-year-old Latino man with schizoaffective disorder who had barricaded himself in his apartment, fell to his death when police officers tasered him while he was standing on a ledge. The officers were responding to a 911 call for help placed at the request of his mother. *Negron v. City of N.Y.*, 976 F. Supp. 2d 360 (E.D.N.Y. 2013). The New York City Police Department admitted to violating departmental guidelines in its use of the taser which led to Morales' death.[37]

b. **2012 – <u>Shereese Francis</u>**: Shereese Francis, a 29-year-old Black woman, was killed in her home by NYPD officers summoned by her family to transport her to the hospital for psychiatric evaluation and care. The officers antagonized Ms. Francis, chased her, tackled her onto a bed, pressed their weight on her until she suffered cardiac arrest, and then prevented her from receiving appropriate, timely medical care. *Francis v. City of New York*, 13-cv-505 (E.D.N.Y. 2013)

c. **2012 – <u>Mohamed Bah</u>**: Mohamed Bah, a 28-year-old Black man, was killed by the NYPD after his mother called for an ambulance because he was experiencing mental health issues. Police officers arrived instead of an ambulance, and they insisted on confronting Mr. Bah, despite his refusal to interact with them and his mother's request to try to calm her son down herself. NYPD officers surrounded the apartment and forced open Mr. Bah's front door. The officers used a taser against Mr. Bah, fired bean bags at him, and ultimately shot and killed him. *Bah v. City of New York*, No. 13CV06690 (S.D.N.Y. 2013). NYPD was found liable for his killing.[38]

d. **2015 – <u>David Felix</u>**: With knowledge of the mental disability of David Felix, a 24-year-old Black man with paranoid schizophrenia, two NYPD detectives entered his apartment without a warrant, causing Mr. Felix to jump out of bed in fear and flee. The detectives pursued Mr. Felix, who was unarmed, and shot and killed him in the lobby of his apartment building. *Felix v. City of N.Y.*, 344 F. Supp. 3d 644 (S.D.N.Y. 2018); *Felix v. City of N.Y.*, 408 F. Supp. 3d 304 (S.D.N.Y. 2019); *Felix v. City of N.Y.*, No. 16-cv-5845 (AJN), 2020 U.S. Dist. LEXIS 189223 (S.D.N.Y. Oct. 13, 2020).

e. **2015 – <u>Anthony Paul</u>**: Anthony Paul, a 29-year-old Black man, was killed after officers responded to a 911 call about an alleged "EDP." When Mr. Paul purportedly refused to let officers into his apartment, NYPD officers used an electric saw to break down the door. Upon confronting an unarmed Mr. Paul,

---

[37] ABC News, *NYPD Admits Violating Guidelines in Tasering Man Who Fell to His Death*, (2008), https://abcnews.go.com/US/story?id=5884569&page=1 (last visited May 30, 2024).

[38] Adam Klasfield, *NYPD Still Liable for $2.2M Verdict for Immigrant's 2012 Killing,* Courthouse News Service, (2018) https://www.courthousenews.com/nypd-still-liable-for-2-2m-verdict-for-immigrants-2012-killing/.

NYPD officers tased him, causing him to suffer cardiac arrest and die.[39]

f.  **2016 – <u>Ariel Galarza</u>**: Ariel Galarza, a 49-year-old Latino man, was killed by the NYPD after a neighbor called 911, mistakenly believing he was holding a knife and acting erratically. When the officers arrived, Mr. Galarza was home and unarmed. He died after he was tased twice by NYPD officers, including after he fell to the ground.[40] *Galarza v. City of New York*, Index No. 28727/2017E (Bronx Supreme Court).

g.  **2017 – <u>Miguel Richards</u>**: Miguel Richards, a 31-year-old Black man, was killed in his home by police after the NYPD was sent in response to a request by his landlord for a "wellness check." The officers found Mr. Richards in his room, and believed he was holding a weapon. For approximately 15 minutes, officers screamed at him, ordering him to comply with their demands. Mr. Richards remained motionless and silent. One officer suggested that the officers close the door and allow the Emergency Service Unit officers, who were downstairs, to handle the situation. Instead, the officers fired 16 shots at Mr. Richards. While he lay on the ground bleeding, the officers stepped over his body, moved his body, and delayed calling for medical help. No weapon was recovered at the scene.[41]

h.  **2024 - <u>Win Rozario</u>**: On March 27, 2024, Win Rozario, a 19-year-old South Asian teenager, dialed 911 from his home in Queens. "He's having an episode," his younger brother told the two police officers who arrived. "He don't even know what he's doing, to be honest." The officers nevertheless entered the apartment. With his mother standing nearby, NYPD officers tased Mr. Rozario in response to his pulling a pair of scissors from a drawer. The police then shot and killed him. During a news conference, the mother stated, [the officers] "killed my son in minutes.… [B]efore they came, everything was calm. Then they came and created chaos and murdered him in front of me."[42] In response to the shooting Mayor Adams said, "We have to continue to look across the globe on how do we minimize the loss of life of the

---

[39] Emma Whitford, *Family Of Man Who Died After Being Tasered By NYPD Sues For $25 Million*, Gothamist (Mar. 16, 2016), https://gothamist.com/news/family-of-man-who-died-after-being-tasered-by-nypd-sues-for-25-million.

[40] Scott Heins, *Death Of Unarmed Bronx Man Tasered By NYPD Ruled A Homicide*, Gothamist (April 7, 2017), https://gothamist.com/news/death-of-unarmed-bronx-man-tasered-by-nypd-ruled-a-homicide.

[41] Ashley Southall & Joseph Goldstein, *Police Release Body Camera Footage of Shooting Death in Bronx*, N.Y. Times (Sept. 14, 2017), https://www.nytimes.com/2017/09/14/nyregion/police-body-camera-footage-new-york.html.

[42] Zoe Sottile, *A 19-year-old called 911 in a crisis and ended up dead. For advocates, it's a call for a better way of policing* (May 12, 2024), https://www.cnn.com/2024/05/12/us/win-rozario-nypd-killing/index.html.

person involved… I don't think we have it 100% right now."[43]

93.    With the most recent tragedy of Win Rozario, since 2015 alone, at least twenty people — seventeen of them Black or other people of color—have been killed by police in New York City while experiencing a mental health emergency.

### III.    The DOJ Has Concluded that Police Responses to Mental Health Calls Violate the ADA

94.    The increased risk of police use of force faced by people with mental disabilities who are sent police as first responders to their mental health emergencies is among the reasons that the Department of Justice found that two cities' emergency response systems with a police response to mental health emergencies discriminated against people with mental disabilities in violation of the ADA.

95.    In 2023, the Department of Justice ("DOJ"), the entity charged by Congress with implementing Title II of the ADA,[44] along with the U.S. Department of Health and Human Services (HHS), released a document entitled "Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities" ("DOJ-HHS Guidance"), which explains that the ADA applies to public emergency response and law enforcement systems and that the ADA's guarantee of equal opportunity for individuals with disabilities "requires that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response—for example, if call centers would dispatch an ambulance or medic rather than police officers to respond to a person experiencing a heart attack or a diabetic crisis, equal opportunity

---

[43] Shenal Tissera, *Mayor Says More Work is Needed on NYPD Mental Health Responses*, (May 15, 2024), https://www.bkreader.com/policy-government/mayor-says-more-work-is-needed-on-nypd-mental-health-responses-8747707#:~:text=%E2%80%9CThe%20unfortunate%20shooting%20is%20going,the%20best%20way%20we%20can.%E2%80%9D.

[44] *See* 42 U.S.C. §§ 12133-12134, 12206.

would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability."[45] Accordingly, the DOJ-HHS Guidance explains, emergency dispatchers are recommended to send a mobile crisis team or other responder rather than police officers when a call involves a person with a mental disability and there is no need for a police response.[46]

96.    In 2023, the DOJ issued reports of its investigations into the cities of Minneapolis and Louisville. The DOJ found that "a law enforcement-led response can cause real harm in the form of trauma, injury, and death to people experiencing behavioral health issues, as well as other impacts."[47] The DOJ concluded that those cities had engaged in a pattern-and-practice of disability-based discrimination by relying on police officers as the primary first responders to mental health emergencies, diverting only a small share of 911 mental health emergency calls to alternative first responder programs staffed by health professionals.

97.    More recently, the DOJ filed a Statement of Interest in *Bread for the City*, which explains, *inter alia*, how reliance on police responses for people experiencing mental health emergencies can deprive people with mental disabilities of an equal opportunity to benefit from a city's emergency response program in violation of the ADA.[48]

---

[45] *See* Department of Justice and Department of Health & Human Services, Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities 3-4 (2023) (citing 28 C.F.R. 35.130(b)(1(ii) & (iii)), https://tinyurl.com/bdene967.

[46] *Id. at* 4. Where a police response is called for, dispatching a team that includes a mental health specialist would constitute a reasonable modification. *Id.*

[47] United States Department of Justice Civil Rights Division and United States Attorney's Office District of Minnesota Civil Division, Investigation of the City of Minneapolis and the Minneapolis Police Department at 64 (June 16, 2023).

[48] *Bread for the City v. D.C.*, 1:23-cv-01945-ACR (Feb. 22, 2024), https://www.justice.gov/d9/2024-02/bread_v._dc_statement_of_interest_as_filed_in_court_on_feb._22_2024_0.pdf.

98.     The DOJ also explained the importance of considering the entire response system in assessing ADA claims. It cautioned that the relevant service, program, or activity must not be defined too expansively or too narrowly, such that it "effectively denies otherwise qualified individuals the meaningful access to which they are entitled,"[49] and described how a claim for discrimination can be stated even where people with disabilities are not entirely excluded from participation in a program if they must risk serious harm to access it.[50]

99.     Notably, the DOJ also discussed the affirmative obligation of public entities to make "reasonable modifications in policies, practices, or procedures" when necessary to avoid discrimination on the basis of disability, "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7). The DOJ concluded that the *Bread* plaintiffs' challenge to the District of Columbia's response to mental health emergencies did not involve a claim for a new service, program, or activity because the type of response it sought—the deployment of health professionals to mental health emergencies—already existed, albeit on a very limited basis.

100.     The same is true in New York City which also already has a limited program providing non-police responses to mental health emergencies, demonstrating that a health response to mental health emergencies is a realistic reasonable modification.

101.     The City's Behavioral Health Emergency Assistance Response Division ("B-HEARD") pilot program was launched in 2021 in limited police precincts for limited hours. To this day, the vast majority of 911 mental health calls citywide continue to receive a police response. Even in the very few precincts where the part-time B-HEARD pilot operates, approximately 80%

---

[49] *Id.* at 8 (citing, *inter alia*, *Alexander v. Choate*, 469 U.S. 287, 301 (1985)).
[50] *Id.*

of 911 mental health calls still result in a police response.[51] In 2023, B-HEARD only responded to approximately 7,000 calls.[52] As the total number of mental health calls citywide in 2023 was approximately 300,000, it appears that less than 5% of the overall number of mental health calls citywide in 2023 actually received a B-HEARD response.

102.    Moreover, plans for expansion of B-HEARD reportedly have been halted, with significant cuts to its budget having been proposed.[53]

103.    As a result, the City continues to treat the vast majority of mental health calls as criminal or public safety incidents, despite having acknowledged that deploying NYPD officers and FDNY EMTs "often is not the most appropriate form of help for those in a mental health emergency [as it] lacks a mental health professional in the response."[54]

IV.     **Non-Police Emergency Responses Are Recognized as Best Practices, Are Praised by Health and Police Experts Alike, and Are Offered in Nearly 200 Cities Across the Country**

104.    Experts from across the country agree that a health response to mental health emergencies is safer and more effective than a police response. Police officers cannot provide the needed healthcare response and the police can—and often do—cause extensive harm.

---

[51] NYC Mayor's Office of Community Mental Health, "B-HEARD: Transforming NYC's Response to Mental Health Emergencies" (January 1, 2023 – June 30, 2023), https://mentalhealth.cityofnewyork.us/wp-content/uploads/2024/01/BHEARD-Data-Brief-FY23-Q3-Q4_2024.pdf.

[52] NY1, *Mental Health in NYPD: What the Win Means for Rozario,* (May 23, 2024), https://ny1.com/nyc/all-boroughs/politics/2024/05/23/mental-health-nypd-win-rozario (last visited May 29, 2024).

[53] Jacqueline Neber, *City delays B-HEARD expansion despite signs of improvement in latest data* (Jan. 31, 2024), https://www.crainsnewyork.com/health-care/city-delays-b-heard-expansion-despite-improving-performance-latest-data.

[54] B-HEARD: 911 MENTAL HEALTH EMERGENCY ALTERNATE RESPONSE PILOT PROJECT: Frequently Asked Questions, https://www.nyc.gov/assets/nypd/downloads/pdf/public_information/b-heard-public-faqs-5-27-2021.pdf.

105.    In 2020, the United States Department of Health and Human Services Office of Substance Abuse and Mental Health Services Administration ("SAMHSA") issued a "National Guidelines for Behavioral Health Crisis Care: Best Practice Toolkit," to help communities implement effective mental health emergency response systems. SAMHSA noted that:

> In many communities, the absence of sufficient and well-integrated mental health crisis care has made local law enforcement the de facto mental health mobile crisis system. This is unacceptable and unsafe. . . . Unfortunately, well-intentioned law enforcement responders to a crisis call often escalate the situation solely based on the presence of police vehicles and armed officers that generate anxiety for far too many individuals in a crisis.[55]

106.    A 2019 national survey of law enforcement revealed that approximately 71% of police had observed an increase in the number of calls responding to mental health incidents over their career, with a significant percentage reporting an increased or substantially-increased amount of time being spent on these calls, and with over half reporting that the increase was due to the inability to connect individuals with mental health treatment.[56]

107.    Indeed, the Law Enforcement Action Partnership—a national organization of current and past individuals in law enforcement—advocates for a non-police response to mental health emergencies. The Partnership has concluded, based on research and the extensive experience of its members, "dispatching armed officers to calls where their presence is unnecessary is more than just an ineffective use of safety resources; it can also create substantially adverse outcomes for communities of color, individuals with behavioral health disorders and

---

[55] SAMHSA, National Guidelines for Behavioral Health Crisis Care Best Practice Toolkit at 33 (2020), https://www.samhsa.gov/sites/default/files/national-guidelines-for-behavioral-health-crisis-care-02242020.pdf. SAMHSA further recommends that communities have a continuum of mental health crisis services, including: a regional call center, 24/7 mobile mental health crisis services that the call center can deploy, and crisis stabilization services provided in residential settings that can include staffed crisis apartments and respite centers. *Id.* at 19-23.

[56] *Survey: Police needlessly overburdened by mentally ill abandoned by mental health system*, Mental Illness Policy Org (September 2011), https://mentalillnesspolicy.org/crimjust/homelandsecuritymentalillness.html.

disabilities, and other groups who have been disproportionately affected by the American criminal justice system." The Law Enforcement Action Partnership recommends that in order to "improve outcomes for the community and reduce the need for police response, . . . that cities establish a new branch of civilian first responders.'"[57]

108.    Similarly, Crisis Intervention Team International—a group consisting primarily of police, which developed crisis intervention team training for police over 35 years ago—now maintains that a health response is the only appropriate response for a mental health emergency, as police responses often escalate rather than deescalate mental health emergencies, *inter alia*.[58]

109.    Multiple municipalities across the country have established non-police emergency response programs. Oregon's Crisis Assistance Helping Out on the Streets ("CAHOOTS") has been providing non-coercive support services to community members with mental disabilities, including those experiencing mental health emergencies, for 35 years. CAHOOTS provides a non-police response to the vast majority of Eugene's mental health emergency calls.[59] In CAHOOTS' 35 years of service, handling as many as 24,000 calls a year, not a single person—neither

---

[57] *See* Amos Irwin and Betsy Pearl, *The Community Responder Model: How Cities Can Send the Right Responder to Every 911 Call*, Centre for American Progress (Oct. 28, 2020), https://www.americanprogress.org/article/community-responder-model/.

[58] *Crisis Intervention Team (CIT) Programs: A Best Practice Guide for Transforming Community Responses to Mental Health Crises,* CIT International (August 2019), https://citinternational.org/bestpracticeguide. *See also The Role and Impact of Law Enforcement in Transporting Individuals with Severe Mental Illness, A National Survey,* Treatment Advocacy Ctr., Road Runners(May 2019); Anna V. Smith, *There's Already An Alternative to Calling the Police*, High Country News (June 11, 2020), https://www.hcn.org/issues/52-7/public-health-theres-already-an-alternative-to-calling-the-police/ ("When police show up, situations can escalate, and the use of force can be disproportionate, especially towards Black people . . .").

[59] *What is CAHOOTS?*, White Bird Clinic (Oct. 29, 2020), https://whitebirdclinic.org/what-is-cahoots/.

community member nor staff—has ever been seriously injured.[60] CAHOOTS not only saves lives, it saves the city millions of dollars in public safety costs and ambulance trips.[61]

110.    Across the country, cities have instituted CAHOOTS-like programs to provide a non-police response to people with mental disabilities. These cities include Denver, Colorado;[62] Oakland, California;[63] Olympia, Washington;[64] New Haven, Connecticut;[65] Austin, Texas;[66]

---

[60] Ari Shapiro, *'CAHOOTS': How Social Workers and Police Share Responsibilities in Eugene, Oregon*, NPR (June 10, 2020), https://www.npr.org/2020/06/10/874339977/cahoots-how-social-workers-and-police-share-responsibilities-in-eugene-oregon.

[61] *See, e.g.*, Scottie Andrew, *This town of 170,000 replaced some cops with medics and mental health workers, It's worked for over 30 years*, CNN (July 5, 2020), https://www.cnn.com/2020/07/05/us/cahoots-replace-police-mental-health-trnd/index.html.

[62] *See, e.g.,* David Sachs, *In the First Six Months of Health Care Professionals Replacing Police Officers, No One They Encountered Was Arrested*, DENVERITE (Feb. 2, 2021), https://denverite.com/2021/02/02/in-the-first-six-months-of-health-care-professionals-replacing-police-officers-no-one-they-encountered-was-arrested/ (discussing the Denver Support Team Assisted Response (STAR) program's six-month progress report).

[63] *See, e.g.,* Julian Glover, *Oakland Launches Civilian Crisis Response Team to Handle Nonviolent Mental Health Calls*, ABC7 (Mar. 18, 2021), https://abc7news.com/macro-oakland-civilian-crisis-response-team-mental-health-police-dept/10430680/.

[64] *See, e.g.,* Abby Spegman, *Olympia's Crisis Response Team Had Nearly 700 Calls in its First Two Months*, THE OLYMPIAN (Jun. 4, 2019), https://www.theolympian.com/news/local/article230718039.html.

[65] *See, e.g.,* Mary E. O'Leary, *Officials: New Haven Crisis Response Team Could Take 10% of 911 Calls for Police*, NEW HAVEN REGISTER (May 11, 2021), https://www.nhregister.com/news/article/Officials-New-Haven-Crisis-Response-Team-could-16168634.php.

[66] *See, e.g.*, Jennifer Kendall, *Crisis Counselors Responding to More Mental Health Calls in Austin*, FOX7 Austin (Nov. 2, 2020), https://www.fox7austin.com/news/crisis-counselors-responding-to-more-mental-health-calls-in-austin; *Mental Health Option Added to 9-1-1*, City of Austin Reimagining Public Safety Blog (Feb. 12, 2021), https://www.austintexas.gov/blog/mental-health-option-added-9-1-1#:~:text=As%20of%20February%201%2C%202021,called%20the%20Austin%20CARES%20initiative.

Albuquerque, New Mexico;[67] Los Angeles County, California;[68] and San Francisco, California.[69]

## V.    The City Has Repeatedly and Knowingly Failed to Redress its Discriminatory Treatment of People with Mental Disabilities

111.    At least as early as 2002, the City was on notice of the discriminatory treatment of people with mental disabilities caused by its police response to mental health emergencies, when the Urban Justice Center presented a briefing to this effect to Michael A. Cardozo, then Corporation Counsel for the City of New York, and Raymond W. Kelly, then Commissioner of the NYPD.[70]

112.    The briefing identified multiple deficiencies, including the fact that there was "no systematic method for referring individuals in crisis to mental health providers."[71] It also warned that, "[i]n most cases, even when the person in crisis clearly needs or wants assistance, the only assistance the police can offer is 'non-assistance.' . . . Predictably, this pattern of non-assistance can lead to repeat incidents, often after the initial crisis has escalated."[72] Other findings included that "the NYPD has not complied with . . . ADA requirements," and that the City was at risk of violating Section 1983.[73] The report also noted the City's historical resistance to "develop[ing] a

---

[67] *See, e.g.,* City of Albuquerque, *Crisis Intervention,*
https://www.cabq.gov/police/programs/crisis-intervention (last visited May 29, 2024).
[68] *See, e.g.,* Los Angeles County Department of Mental Health, *Psychiatric Mobile Response Teams (PMRT),* https://dmh.lacounty.gov/our-services/countywide-services/eotd/pmrt/#:~:text=PMRT%20consists%20of%20LACDMH%20clinicians,clothing%2C%20or%20shelter%20for%20themselves (last visited May 29, 2024).
[69] *See, e.g.,* City and County of San Francisco Street Crisis Response Team, *Help for Behavioral Health Crises,* https://www.sf.gov/street-crisis-response-team (last visited May 29, 2024).
[70] Urban Justice Center, Kramer Levin Naftalis & Frankel LLP, *Police Interactions with Individuals in Psychiatric Crisis* (Apr. 22, 2002),
https://www.kramerlevin.com/images/content/2/1/v4/2161/Police-Interact-Fischman.pdf.
[71] *Id*. at 10.
[72] *Id*. at 12.
[73] *Id*. at 15.

more accurate picture of its interactions with consumers in crisis or disseminate publicly" the information it has in this area.[74]

113.    Despite the 2002 recommendations to Corporation Counsel Cardozo and Commissioner Kelly, the City failed to take any action to redress the discriminatory and harmful impact of providing police as first responders to mental health emergencies and the egregious consequences of NYPD's interactions with people with mental disabilities.

114.    Community organizations also continuously advocated against the City's discriminatory system of responding to emergency health emergencies.[75]

115.    In October 2012, Plaintiff Community Access launched an advocacy campaign called "Communities for Crisis Intervention Teams – NYC," (CCIT-NYC), the precursor to Plaintiff Correct Crisis Intervention Today – NYC (still known as CCIT-NYC). CCIT-NYC's goal was to educate about the need to improve the City's response to mental health emergencies.

116.    Plaintiffs Community Access and CCIT-NYC regularly met with high-level City officials and continued to advocate for a more appropriate City response to individuals experiencing mental health emergencies. Although the urgency was and remains clear, and the City has had notice of the harmful and discriminatory police response to mental health calls, the City and Defendants Adams and de Blasio have not made necessary changes.

117.    In 2014, Defendant de Blasio's Task Force on Behavioral Health and Criminal Justice (the "Mayoral Task Force") issued an Action Plan to purportedly address "how the criminal justice and health systems can work together better to ensure that we are reserving criminal justice resources for the appropriate cases and deploying treatment and other proven effective remedies

---

[74] *Id.* at 5.
[75] *See generally* Jeffrey Fagan & Alexis D. Campbell, *Race and Reasonableness in Police Killings*, 100 Boston Univ. L. Rev. 951 (2020).

to interrupt those needlessly cycling through the system."[76] The Action Plan noted that, while the overall jail population had decreased by 15% over the previous five years, the percentage of people in jail with "mental health issues" rose from 29% to 38%, or from around 3,500 to over 4,000 people.[77] The City recognized that its jails were becoming de facto psychiatric facilities.

118.    The Action Plan included a program that would allow individuals experiencing a mental health emergency to be brought to "diversion drop-off centers" instead of hospital emergency rooms or jails,[78] an acknowledgment that involuntary psychiatric evaluation, hospitalization, and incarceration should not be default responses to people experiencing mental health emergencies. Nonetheless, it wasn't until 2020 that the first diversion center opened with very limited capacity[79] and now there are only two diversion centers.

119.    On June 22, 2018, Mayor de Blasio convened a second task force—the NYC Crisis Prevention and Response Task Force ("Second Mayoral Task Force")—to address specific mental health issues connected to 911 calls and their aftermath.

120.    The Second Mayoral Task Force included over 80 individuals, the majority of them employees from City agencies, including the NYPD —,with virtually no people living with mental disabilities who would be recipients of the program's services, or civil rights advocates.

---

[76] Mayor's Task Force on Behavioral Health and the Criminal Justice System, *Action Plan*, at 6 (2014), http://criminaljustice.cityofnewyork.us/wp-content/uploads/2018/04/annual-report-complete.pdf.
[77] *Id*. at 5.
[78] Mayor's Task Force on Behavioral Health and the Criminal Justice System, *Action Plan*, at 9 (2014), http://criminaljustice.cityofnewyork.us/wp-content/uploads/2018/04/annual-report-complete.pdf.
[79] Greg B. Smith & Reuven Blau, *Failure to Thrive: NYC's $100 Million 'Diversion Centers' for Mentally Ill Sit Empty or Barely Used*, THE CITY (May 9, 2021), https://www.thecity.nyc/2021/5/9/22426250/thrive-nyc-nypd-diversion-centers-for-mentally-ill-sit-empty.

121.    The Second Mayoral Task Force, like the first Mayoral Task Force, had little if any effect. The City only issued a press release related to the second task force; no recommendations were ever publicly announced.[80]

122.    The New York City Office of the Public Advocate has also reported on the harms from providing a police response to mental health emergencies. It underscored in its 2022 Update to its recommendations to improve the City's response to people experiencing mental health emergencies: "[I]n order to mitigate further harm and deaths, the City should strive for mental health professionals as the default response for mental health crises rather than law enforcement."[81] The Public Advocate also called for the City to create an alternate non-police department number (i.e., an alternative number to 911), to call for those in mental health crisis to get urgent immediate treatment help.[82]

123.    As described *supra*, in 2021, the City itself acknowledged that health responses to mental health emergencies yield better outcomes, when former Mayor de Blasio launched the B-HEARD pilot program, promising to substitute police officers with "mental health professionals" and EMTs in response to certain mental health 911 calls in a small part of Northern Manhattan.[83]

124.    The B-Heard program was flawed from its conception, failing to consult with those most likely to benefit from non-police emergency response and their advocates. The promised "health-centered response" has been dispatched to only a very small percentage of mental health

---

[80] Press Release, NYC Office of the Mayor, *Mayor de Blasio, First Lady McCray and City Council Members Announce $37 Million Annual Investment in New Strategies to Address Serious Mental Illness*(Oct. 21, 2019), https://www1.nyc.gov/office-of-the-mayor/news/496-19/mayor-de-blasio-first-lady-mccray-city-council-members-37-million-annual-investment.

[81] Public Advocate *Mental Health Crisis* Report at 8.

[82] *See id.* at 9.

[83] Mayor's Office of Community Mental Health, *B-HEARD: 911 Mental Health Emergency Health-Centered Response Pilot Project* (May 27, 2021), https://mentalhealth.cityofnewyork.us/wp-content/uploads/2021/05/B-HEARD-One-Pager-FINAL-5.27.2021.pdf.

calls, with no further funding or program expansion on the horizon.[84] But it does demonstrate that the City can provide an effective health-driven response if it chooses to do so.

### VI.  The City's Police Response to Mental Health Emergencies Results in Involuntary Removals and Unconstitutional Arrests, Warrantless Entries, and Use of Unnecessary Force

125.    The City acknowledges that the "911 pathway. . . almost exclusively routes someone experiencing a mental health crisis to the hospital."[85]

126.    Psychiatric professionals have found that involuntarily being detained and transported to a hospital is frequently a clinically traumatizing experience.[86]

127.    Police officers routinely arrest and involuntarily transport to a hospital individuals in New York City who are experiencing or perceived to be experiencing mental health emergencies pursuant to NYPD's unlawful involuntary removal policies and practices -- Patrol Guide 221-13 and the Involuntary Removal Policy.

128.    Patrol Guide 221-13 and the Involuntary Removal Policy on their face and/or as applied expand the NYPD's authority to remove people with mental disabilities and involuntarily transport them for psychiatric evaluation even when probable cause for arrest is lacking.

Patrol Guide 221-13

129.    Patrol Guide 221-13 needlessly heightens the risk of harm to people experiencing a mental health crisis and results in unlawful detentions and transport to a hospital for psychiatric evaluation.

---

[84] Linda Sanabria, *NYC's Response to Mental Health Has Gotham Divided*, Accessibility (April 30, 2022), https://www.accessibility.com/blog/nycs-response-to-mental-health-has-gotham-divided (last accessed June 7, 2024).
[85] *Supra* note 12, at 12.
[86] Ingrid Sibitz, Alexandra Scheutz, and Richard Lakeman et al., *Impact of coercive measures on life stories: qualitative study,* 199 BR J PSYCHIATRY (3) 2011: 39–244.

130.    The stated purpose of Patrol Guide 221-13 is to provide "Tactical Operations" instruction to police officers. Other than direction to "[a]ttempt to slow the pace of the incident and establish dialogue with the EDP," it does not instruct police on *how* to respond to the healthcare needs of the subject of the 911 call. Noticeably absent from Patrol Guide 221-13 is any direction to police officers to render or seek appropriate resources, services, aid, or treatment for people experiencing mental health emergencies, other than a reference to "[r]equest and/or ensure the response of . . .[a]dditional personnel/equipment [or an] an ambulance."

131.    Patrol Guide 221-13, on its face and/or as applied, impinges upon the rights of people with mental disabilities who are the subject of the City's emergency response program.

132.    While MHL § 9.41 explicitly states that the police "may" "take into custody any person who appears to be mentally ill *and* is conducting himself or herself in a manner which is likely to result in serious harm to the person or others" (emphasis added), Patrol Guide 221-13 directs the police to take into custody anyone who is "mentally ill" *or* is an individual who "is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." The word "or" contained in 221-13 expands police authority far beyond the bounds of MHL § 9.41, directing officers to take an individual into custody, without probable cause and typically through the use of excessive force, merely based on a police officer's assumption that the individual is "mentally ill," without even a suspicion of the individual "conducting himself or herself in a manner which is likely to result in serious harm to the person or others."

133.    The impact of this Patrol Guide language and the NYPD's policy, practice and/or custom of taking people with mental disabilities into custody even when the individual is not "conducting himself or herself in a manner which is likely to result in serious harm to the person or others" is demonstrated by Plaintiffs' experiences.

134.    For example, when the Police arrived as a result of a 911 call, Plaintiffs Arvio, Collins, and Sanchez-Esquivel each denied any intention to harm themselves or others. Nothing suggested that these Plaintiffs presented a danger to themselves or others, or presented another basis to establish probable cause, yet they were arrested anyway. This is supported by the body-worn camera footage of the arrests of Plaintiffs.

135.    The large numbers of complaints made by people taken to the hospital against their will,[87] *see infra*, also confirm that NYPD officers routinely arrest—through the use of unnecessary force—and involuntarily transport to hospitals for psychiatric evaluation, people who do not present a "substantial risk" of "serious harm" to themselves or anyone else as required by MHL § 9.41.

136.    Because they are not health professionals and because they view mental health emergencies through a law enforcement lens, NYPD officers are not equipped to make determinations as to whether an individual is a risk of harm to themselves or others. Because the subjects of mental health calls appear "mentally ill" or are labelled and considered "EDPs," officers are compelled, or feel compelled, to take them to hospitals where health professionals can make such critical health care determinations, regardless of whether there is a factual basis to conduct a mental health arrest.

137.    Plaintiff Collins' arrest is illustrative of this point. Defendant Officer Ferrara informed Ms. Collins that officers had to take her to the hospital because he is "not a certified medical professional" and "can't make that determination of whether or not [Ms. Collins] is okay."

---

[87] *See, e.g.*, Corey Kilgannon, *Plan Tests Tense Relationship Between N.Y.P.D. and Mentally Ill People*, N.Y. Times (Dec. 5, 2022), https://www.nytimes.com/2022/12/05/nyregion/mental-health-plan-nypd.html.

138.    In a recent six-year period, the New York City Civilian Complaint Review Board ("CCRB") reported having received 2,687 allegations that the police had taken people to the hospital against their will—an average of one every 20 hours.[88] And these numbers only represent the allegations where people affirmatively filed a complaint with the CCRB.

139.    In the last decade alone, at least 50 lawsuits alleging civil rights abuses against in New York City against persons deemed "EDPs" during interactions with the police have been filed in New York's state and federal courts.

140.    Police interactions involving "EDPs" are the second most common type of situation in which police officers use force,[89] and this statistic does not account for incidents where mental health issues went unreported.[90]

141.    The NYPD's involuntary removal policies and practices, as well as their routine arrests and routine transporting to hospitals of Plaintiffs, violates the rights of people with mental disabilities perpetuates and exacerbates bias against, and stereotypes about, people with mental disabilities.

Mayor Adams' 2022 Involuntary Removal Policy

142.    The Mayor's November 2022 Involuntary Removal Policy further encourages the NYPD to improperly arrest people with mental disabilities and transport them to hospitals for involuntary psychiatric evaluation.

---

[88] *Id*.

[89] New York City Police Department, *Use of Force Report 2022*, at 47 (2022), https://www.nyc.gov/assets/nypd/downloads/pdf/use-of-force/use-of-force-2022.pdf.

[90] *See also* New York Civil Liberties Union, *Police are Not the Answer to Mental Health Crises,* (2023), https://www.nyclu.org/uploads/2023/11/2021-nyclu-onepager-danielslaw.pdf (up to half of all people who become victims of police violence have a disability—overwhelmingly, a mental disability).

143.    Under the Involuntary Removal Policy, people with mental disabilities may be forcefully transported to a hospital solely because an NYPD officer decides that the person appears unable to meet "basic living needs" or is exhibiting signs of "delusion"—without any indication that they present a danger to themselves or others. This allows the forcible removal, *inter alia*, of any unhoused person who appears to have a mental disability, as that individual has not met their basic need for shelter.

144.    During the announcement of the Involuntary Removal Policy, Mayor Adams referred to "the shadow boxer on the street corner in Midtown, mumbling to himself as he jabs at an invisible adversary," as the type of individual who could be involuntarily hospitalized under the policy. During a hearing of the City Council's Committee on Mental Health, Disabilities, and Addiction on February 6, 2023 regarding the Involuntary Removal Policy, Juanita Holmes, NYPD Chief of Training, spoke of an individual who was "reeking of urine" as someone who would be involuntarily detained.

145.    Arresting and removing people who appear to be "mentally ill," but who are not dangerous, is based on biased and inaccurate perceptions of people with mental disabilities and runs afoul of long-standing constitutional jurisprudence.

146.    Soon after the Mayor's announcement of the Involuntary Removal Policy, the Police Benevolent Association stated it will create "a strain on [the NYPD's] severely understaffed, overworked and underpaid ranks" and New York City hospitals will not be able to meet the dramatic rise in hospitalizations.[91]

---

[91] Corey Kilgannon, *Plan Tests Tense Relationship Between N.Y.P.D. and Mentally Ill People*, N.Y. Times, (Dec. 5, 2022), https://www.nytimes.com/2022/12/05/nyregion/mental-health-plan-nypd.html.

147.    Although over a thousand people a year are reportedly removed from the streets and subways for psychiatric evaluation, the City has yet to provide data on what has happened to the people who were removed, or other data on policy implementation and implications.[92]

148.    The Mayor's announcement of the Involuntary Removal Policy triggered traumatic memories for Plaintiffs who have been hospitalized against their will in New York City.[93]

## VII.    Plaintiffs' Experiences

### Steven Greene

149.    Steven Greene is a 29-year-old Black male diagnosed with PTSD, ADD, and an injured hip. He lives in Community Access housing and receives Social Security Disability benefits.

150.    On May 6, 2020, at approximately 12:30 a.m., armed NYPD officers including, Police MD Alam, Police Officer Jessaly Capo, Police Officer Tahreek Hines, Police Officer Juan Rivera, Police Officer Justin Rivera, Police Officer Jovanny Lopez, and EMS personnel arrived at Mr. Greene's apartment in response to an "EDP with gun" call to 911.

151.    One of the Defendant officers, whose name is not yet known, stated that Mr. Greene's social worker had called them, and that they were there to "check on him." Upon

---

[92] *See, e.g.*, Ethan Geringer-Sameth, *Police Have Removed Over 1,300 'Emotionally Disturbed People' From Transit in 2022*, The Good Men Project (Jan. 21, 2023), https://goodmenproject.com/featured-content/police-have-removed-over-1300-emotionally-disturbed-people-from-transit-in-2022/; NYCLU, *Testimony of Beth Haroules On Behalf of the New York Civil Liberties Union Before the New York City Council Committees on Public Safety, Mental Health, Disabilities and Addiction, Fire and Emergency Management and Hospitals Regarding Oversight -- Mental Health Involuntary Removals and Mayor Adams' Recently Announced Plan* (Feb. 6, 2023), https://www.nyclu.org/uploads/2023/02/230206-nycc9.41-oversighthearingtestimonyfinal_0.pdf.
[93] *See* Bahar Ostadan, *Patients familiar with NYC mental health system skeptical of new Adams policy*, Gothamist (Dec. 14, 2022), https://gothamist.com/news/patients-familiar-with-nyc-mental-health-system-skeptical-of-new-adams-policy.

information and belief, the 911 call was not made by a social worker, but rather was made by Mr. Greene's ex-girlfriend as a means to harass him. The Defendant Officer informed Mr. Greene that Mr. Greene would need to talk to the NYPD's Emergency Services Unit.

152.    Mr. Greene responded that he understood.

153.    The Emergency Services Unit personnel then asked him if he was suicidal.

154.    Mr. Greene stated he was not suicidal, did not tell anyone he was suicidal, and did not have medical problems. Mr. Greene did nothing to suggest that he was having a mental health crisis and did not conduct himself in a manner that could be considered likely to result in serious harm to himself or others. At no time was Mr. Greene in possession of a gun nor was there ever a gun present in his apartment.

155.    Nonetheless, the Emergency Services Unit personnel said that, because what they believed to be an unidentified social worker had reported that Mr. Greene was suicidal, they had to take him to the hospital.

156.    Mr. Greene had been on the phone with his fiancée when NYPD and EMS arrived, and he resumed talking with her.

157.    An NYPD officer took Mr. Greene's phone and began speaking with Mr. Greene's fiancée, who told the officer that Mr. Greene was not suicidal.

158.    Nonetheless, Mr. Greene was informed that he had no choice but to go to the hospital.

159.    Mr. Greene stated he did not want to go to the hospital and walked back inside his apartment.

160.    The Defendant NYPD officers then followed Mr. Greene into his apartment and began grabbing him. Mr. Greene asked them to stop touching him.

161.     Mr. Greene became increasingly anxious and told the officers he had PTSD, ADD, and an injured hip, and repeatedly asked the officers to stop touching him.

162.     The officers handcuffed Mr. Greene and dragged him against his will down the steps, forcing him out of his apartment.

163.     Rather than deescalate the interactions, the officers and the EMSs then forced Mr. Greene onto a gurney and strapped him down.

164.     EMSs and Defendant officers placed Mr. Greene inside an ambulance. At least one officer rode inside the ambulance with him to the hospital.

165.     Inside the ambulance, Mr. Greene repeatedly said that the stretcher straps and handcuffs were too tight and that his arms felt numb, but no one loosened the straps or cuffs.

166.     Mr. Greene explained to the EMS worker that it was impossible that his social worker had called 911 because the social worker did not work after 5 p.m. and could not have learned he was suicidal in the middle of the night.

167.     He also said that they should not barge into the apartment of someone who has PTSD because it is triggering.

168.     Mr. Greene was taken to North Central Bronx Hospital, where he remained for a few hours until he was released.

169.     Although Mr. Greene was not charged with any crime, he was detained and taken to the hospital against his will because he was designated an "EDP" and he was subjected to excessive and unnecessary force, as well as extensive emotional trauma.

170.     Mr. Greene suffered bruising and abrasions to his chest, arms, and head.

171.     Had he been provided with health services instead of a police response to the 911 call about him, Mr. Greene could have avoided needless interaction with the police, could have

avoided involuntarily being transported to a hospital for psychiatric evaluation, and could have created more stability for himself in the community.

172.    This is not the first time the City and NYPD officers have unlawfully forced Mr. Greene to be taken to a hospital against his will. Mr. Greene has been forced to suffer involuntary transfer to the hospital on at least three occasions. In none of these instances was he actually committed. These frequent occurrences have caused him to suffer and exacerbate his existing PTSD.

173.    Since he learned of the Involuntary Removal Policy, Mr. Greene lives in a constant state of fear that the City and the NYPD will forcibly hospitalize him against his will simply for being an individual with a mental disability who may appear to be unable to meet his basic needs.

174.    These fears are exacerbated by the fact that Mr. Greene lives in housing known by NYPD officers to house people with mental disabilities.

175.    Because of these past incidents, Mr. Greene's PTSD manifests as furtive gestures, causes him to speak loudly and sweat, and walk quickly to avoid police officers, which leads to officers becoming suspicious of Mr. Greene. This contributes to an increased likelihood of future detention.

176.    If a health response were to be provided in the future to Mr. Greene in response to a request for the City's emergency responses services for a mental health emergency (or perceived emergency), he could avoid further unnecessary involuntary psychiatric evaluations, among other harms.

### Giovanna Sanchez-Esquivel

177.    Plaintiff Giovanna Sanchez-Esquivel is a 30-year-old, Columbia University student who is diagnosed with PTSD, autism, depression, and bipolar disorder.

178.    On November 7, 2020, at approximately 9:00 p.m., Ms. Sanchez-Esquivel's boyfriend was trying to find mental healthcare for her due to a manic episode. He first called 311 and was told that there were no New York City services available for at least 24 to 48 hours and was instructed to call 911. He called 911 and stated that Ms. Sanchez-Esquivel had been having a "manic episode" for multiple days. He stated on the call that Ms. Sanchez-Esquivel was not violent and did not have any weapons. He also informed the 911 operator that she had a mental disability, including depression and likely bi-polar disorder.

179.    Days earlier, on November 2, 2020, Ms. Sanchez-Esquivel had been voluntarily admitted to Woodhull Hospital for psychiatric care and released the same day.

180.    NYPD officers, namely NYPD Police Officer Martin Haber, NYPD Police Sergeant Carrku Gbain, NYPD Police Officer Vikram Prasad, NYPD Police Officer Tyrone Fisher, NYPD Police Officer Devindra Ramayya, NYPD Police Officer Andre Dawkins, NYPD Police Officer Demetrice Perry, and NYPD Police Officer Julian Torres arrived at Ms. Sanchez-Esquivel's apartment shortly after her boyfriend's call and spoke with her for approximately 25 minutes. She did not threaten to harm herself or others and remained, for the majority of that time, seated on a couch. She did not do anything to suggest that her conduct would likely result in serious harm to herself or anyone else. Her boyfriend did not feel threatened by her.

181.    She repeatedly and clearly pleaded with the Defendant officers to leave her apartment, explaining that she knew her rights, that she recognized she had mental disabilities, but that she did not consent to them being present in her apartment.

182.    At approximately 9:10 p.m., the NYPD's Emergency Services Unit arrived.

183.    Ms. Sanchez-Esquivel explained that she had suffered trauma due to multiple rapes, that she was a neuroscientist with an understanding of her mental disabilities, and added, "I have zero cognitive empathy, I'm autistic, I have PTSD, I'm not crazy, I'm rooted in reality."

184.    After approximately 30 to 40 minutes, an officer stated that the police had to take Ms. Sanchez-Esquivel to the hospital because she was not willing to go on her own.

185.    NYPD officers handcuffed Ms. Sanchez-Esquivel as she cried and pleaded with them not to touch her, repeating that she had a history of trauma in that she had been repeatedly raped.

186.    The EMS personnel did not arrive until after the officers entered Ms. Sanchez-Esquivel's apartment. Upon arrival, they did not assess Ms. Sanchez-Esquivel and did not communicate with Ms. Sanchez-Esquivel in any way.

187.    The Defendant Officers forced Ms. Sanchez-Esquivel into the elevator against her will and picked her up and carried her when she refused to leave the building lobby.

188.    The NYPD's Emergency Services Unit used excessive force to detain Ms. Sanchez-Esquivel and to take her to Woodhull Hospital against her will because she was designated an "EDP."

189.    The NYPD did not charge Ms. Sanchez-Esquivel with a crime.

190.    The Defendant Officers injured Ms. Sanchez-Esquivel, resulting in physical injuries including severe bruises on her arms and hands, and back and shoulder pain caused by being handcuffed and dragged by NYPD officers. She also experienced PTSD and emotional distress.

191.    Had she been provided with health services instead of a police response to the 911 call her boyfriend placed, Ms. Sanchez-Esquivel could have avoided needless interaction with the

police, the trauma and injuries that resulted from that interaction and her unlawful detention, and she could have created more stability for herself in the community, *inter alia*.

**<u>Sarah Arvio</u>**

192.    Plaintiff Sarah Arvio is a slim 70-year-old white woman who has two rare, chronic illnesses, polycythemia vera (a form of leukemia) and Budd-Chiari syndrome (a related liver condition).

193.    On March 13, 2020, at approximately 11 a.m., Ms. Arvio was sitting at her desk, sipping tea, and talking on the phone with a staff member at the Mount Sinai Institute for Liver Medicine ("Mount Sinai").

194.    For about ten days prior to this phone call, Ms. Arvio had been repeatedly trying, without success, to have her hepatologist at Mount Sinai complete a form for her.

195.    During the call, the secretary told Ms. Arvio that the hepatologist would not complete the form.

196.    In nothing more than an expression of frustration, Ms. Arvio said to the secretary, "I'm so frustrated with you all that I feel like jumping off the bridge." The secretary simply hung up.

197.    Minutes later, in a total shock to Ms. Arvio, three NYPD officers, NYPD Police Officer April Sanchez, NYPD Police Officer Marycatherine Nashlenas, NYPD Sergeant Christopher J. O'Connor, and an EMT arrived at Ms. Arvio's home in the Bronx and knocked loudly on her door.

198.    Upon information and belief, the hospital secretary called 911 about Ms. Arvio and she was labeled by the police call-taker as an "EDP". Ms. Arvio opened the door for them. She was dressed only in a short coral-pink spa robe and was barefoot.

199.    NYPD Officers Sanchez and Nashlenas and Sergeant O'Connor entered Ms. Arvio's home and told her that they needed to take her to the hospital for psychiatric evaluation.

200.    Ms. Arvio spoke with the officers in a calm, rational, and cordial manner. She told them that she was fine, and that she had a busy day ahead, including a critical visit to her hepatologist at Mount Sinai.

201.    In the presence of the NYPD officers, Ms. Arvio did nothing to even remotely suggest that she presented a danger to herself or others.

202.    The officers responded that once they receive a call about suicide, they are mandated to take the person who was the subject of the call to a hospital. Ms. Arvio asked them if they would take her to Mount Sinai. They said no.

203.    Ms. Arvio asked for options, but the officers responded that she had no recourse but to go with them.

204.    A fourth armed officer then arrived at the door and entered.

205.    Seeing no alternative, Ms. Arvio agreed to go with the officers and began walking toward her bedroom to get dressed.

206.    However, Defendant NYPD Police Officer Sanchez blocked Ms. Arvio's way.

207.    Defendant Sanchez stated that she would get Ms. Arvio's clothes and began walking toward Ms. Arvio's bedroom. Ms. Arvio pleaded with the officer not to touch her things.

208.    Having been prevented from going to her own bedroom to get dressed, Ms. Arvio walked back toward her desk to sit down. She heard one of the officers say, "That's it!" At that moment, upon information and belief, Officer Nashlenas, Sergeant O'Connor and Defendant

48

Police Officer Sanchez, as well as one EMT, swarmed Ms. Arvio and crushed their bodies around hers, pressing her torso from all sides.[94]

209.    The officers twisted Ms. Arvio's arms behind her back and handcuffed her. The metal cuffs were too tight and squeezed her wrists.

210.    Two of the officers kicked the back of Ms. Arvio's legs with their knees while the third officer held Ms. Arvio's head and pressed his thumb into her neck, causing her to pass out.

211.    Ms. Arvio can only partially recollect being carried through her foyer and out the door, with her face downward and close to the floor. She regained full consciousness in the hallway, where the officers wrapped her tightly onto a gurney with a sheet, her handcuffed wrists squeezed underneath her.

212.    Ms. Arvio noticed that the lower part of the sheet was spattered with blood and that her leg was bleeding profusely.

213.    Even though Ms. Arvio cried out to the officers that she was bleeding, none of them asked the EMT on scene to even examine, let alone treat, the wound. The EMT also did not offer to examine or treat Ms. Arvio and did nothing to deescalate the matter.

214.    Ms. Arvio was then transported to Lincoln Medical Center accompanied by two officers and the EMT where she arrived around noon.

215.    In the waiting area, one of the officers observed that Ms. Arvio had been very calm and peaceful when she was in her apartment.

216.    At one point, Ms. Arvio heard medical staff yell, "COVID!" and three staff in protective gear slowly rolled a gurney right past her and took the gurney into a separate room.

---

[94] The body-worn camera footage of the police's interactions with Sarah Arvio was purportedly deleted on September 19, 2021, despite Ms. Arvio's 2020 filing of Notice of Claim and 50-h hearing in December of 2020.

Neither the patient on the gurney, nor Ms. Arvio, nor anyone else in the waiting room wore a mask or other protective gear.

217.    Ms. Arvio was then moved to the "psych ward." At approximately 12:30 p.m., she had two visits from psychiatrists who spoke with her briefly, and the second psychiatrist said, "Let's get you out of here."

218.    But she was not released until approximately 6 p.m. that day. In the meantime, the wound had swollen up, and the gash, two to three inches long, had turned black. Despite her entreaties, hospital personnel barely glanced at the gash during the hours that followed. She cleaned it herself with hand sanitizer, and an aide brought her plain distilled water to pour over it. At around 4 p.m., her shin was x-rayed. Ms. Arvio also reports that she cried for most of the day.

219.    The NYPD used excessive force against and detained Ms. Arvio, taking her to Lincoln Hospital against her will because she was perceived to have a mental disability and was therefore designated an "EDP."

220.    Dressed in hospital pants and someone else's unwashed sweater (provided by an aide), the then 66-year-old Ms. Arvio had to find her way home on public transportation, limping.

221.    When Ms. Arvio woke the next morning, she could not lift her head from the pillow. Her head pounded, her neck and upper arms were stiff and painful, there were sore spots all over her body, and her feet and ankles were bruised.

222.    Ms. Arvio's leg wound also became infected. She began to be feverish on March 16, and on March 19, at the advice of her hematologist, she visited the Weill-Cornell ER, where she was given extensive tests and prescribed a course of antibiotics for an infected "traumatic leg injury."

223.    Ms. Arvio, who lives alone, largely stayed in bed for over two months, suffering from recurrent fevers, chills, exhaustion, and shortness of breath. She was also in extreme emotional distress, which she describes as pain, despair, and a sense of having been violated. She relived the events over and over, trying to recall and understand every moment of what had happened to her.

224.    Even now, years later, Ms. Arvio feels severe emotional distress. She feels weakened and traumatized due to the defendant Officers' actions.

225.    Had she been provided with health-focused response to the 911 call about her, instead of the police, Ms. Arvio could have avoided the traumatization, extensive injuries, detention, and involuntary transport to a hospital for psychiatric evaluation caused by the police and instead taken care of her health needs as she had planned to do before this unwarranted police intervention.

**Lisa Collins**

226.    Plaintiff Lisa Collins is a 58-year-old African American woman who has never been diagnosed with a mental disability.

227.    On January 7, 2022, Ms. Collins checked in to the Four Seasons Hotel in lower Manhattan to enjoy a luxurious, regenerative weekend that had been gifted to her by her daughter.

228.    After checking in, Ms. Collins was escorted up to her room by a young woman who worked at the hotel.

229.    The young woman followed Ms. Collins into the room and engaged her in conversation.

230.    The young woman told Ms. Collins about various trials and tribulations that she had been through, including several cancer scares and miscarriages.

51

231.    While Ms. Collins was confused as to why the hotel employee had followed her to her room to divulge all this highly personal information, she nonetheless did her best to empathize with and comfort the young woman during their approximately half-hour long conversation.

232.    When the young woman left, Ms. Collins ordered a cocktail from the hotel bar to be sent to her room, made a dinner reservation for herself and her best friend in the hotel restaurant for later that night, and got ready to go for a swim in the hotel pool.

233.    While swimming in the hotel pool, she was approached by a hotel employee, who asked her to get out of the pool and come to the lobby, where someone was waiting to speak with her.

234.    Still in her bathing suit and wearing a robe supplied by the hotel, Ms. Collins walked to the lobby where two NYPD officers, Officer John Ferrara and Officer Gabriele Morrone, and EMS workers were waiting.

235.    A female EMS worker asked Ms. Collins if she was okay and if she had any thoughts of harming herself or heard voices in her head.

236.    Incredulous, Ms. Collins replied, "No, of course not. I'm swimming."

237.    She was then told by the officers that the hotel manager had called 911 to report a threat of suicide, based on information provided by the young female employee who had spoken to Ms. Collins in her room.

238.    Ms. Collins, still in shock, stated that she said nothing to anyone that day that suggested she had any intention of taking her own life, that she did not intend to take her own life, that she had made a reservation for dinner with a friend that night, and that she had booked a massage for the next day. She reiterated to the group of NYPD officers and EMS personnel that she was not in any type of distress.

239.    The EMS EMT looked at Officers Morrone and Ferrara and shrugged.

240.    One of the NYPD officers pulled the EMS workers and other NYPD officer to the side.

241.    Ms. Collins did not hear what they said during this private huddle, but the NYPD officers came back and informed Ms. Collins that she needed to go to the hospital for a psychiatric evaluation.

242.    When Ms. Collins refused, and again insisted that she was not suicidal, Officer Ferrara and Officer Morrone informed Ms. Collins that they are not mental health professionals and did not feel comfortable making a determination as to whether she was okay. As a result, they informed her that she had no choice, as once they received a report of an "EDP," they needed to bring that person to the hospital for a psychiatric evaluation.

243.    Ms. Collins stated again that moments ago she was swimming and relaxing, was looking forward to having dinner with her best friend later that evening and did not want to go to the hospital.

244.    The NYPD officers reiterated that she had no choice, and the two officers and EMS personnel escorted her through the hotel and up to her room in her robe. Ms. Collins was mortified.

245.    The female EMS personnel entered the room with Ms. Collins and watched her change out of her bathing suit and into her clothes.

246.    Ms. Collins was escorted back through the hotel, down to the lobby, and forced into an ambulance by the officers and EMS personnel, completely humiliated and frightened.

247.    During the ordeal, Ms. Collins was able to text her daughter, who lived nearby, and arrived at the hotel with a friend while Ms. Collins was in the ambulance.

248.    Ms. Collins was calm and composed.

249.    Ms. Collins' daughter's friend spoke with one of the EMS personnel who told her that they had no concerns about Ms. Collins' mental health, but that the NYPD officers insisted they take her to the hospital.

250.    Ms. Collins spent approximately ninety minutes at the hospital waiting to be seen by a healthcare professional.

251.    When she finally saw a psychiatrist, the psychiatrist questioned why she was brought there, stating, in sum and substance, that it was ridiculous and that she was angry on Ms. Collins' behalf.

252.    Ms. Collins was released soon thereafter.

253.    Ms. Collins was detained against her will by the NYPD officers and EMS personnel merely because she was labeled as an "EDP," despite doing nothing to suggest that she was a danger to herself or others during her interactions with the NYPD officers and EMS personnel.

254.    Even though EMS personnel did not believe that Ms. Collins was a threat to herself or anyone else, NYPD officers forced them to take Ms. Collins to the hospital because she had been labeled an "EDP."

255.    Had she been provided with a health response to the 911 call placed about her, Ms. Collins could have enjoyed the gift of an evening in a luxury hotel and avoided needless involuntary transport to a hospital for psychiatric evaluation, among other harms caused by the police response to her perceived mental health emergency.

**Oritseweyimi Omoanukhe Ayu**

256.    Plaintiff Oritseweyimi Omoanukhe Ayu is a 42-year-old Black man who has been diagnosed with bi-polar and schizoaffective disorder.

257.    Mr. Ayu has been involuntarily detained and taken to the hospital by NYPD officers on several occasions.

258.    In March 2022, Mr. Ayu was living at the Renaissance Shelter in Crown Heights, where he was also receiving mental health treatment.

259.    Mr. Ayu was waiting for a 10 a.m. appointment with a psychiatrist when he was told he could not be seen until 1 p.m. At 1 p.m., the receptionist told him he could not be seen until 3 p.m. When he asked if he could be seen sooner, since he had already been waiting for three hours, the receptionist told him to ask someone who was outside of the clinic.

260.    Once Mr. Ayu stepped outside, the receptionist locked the door behind him and told him no one else could assist him.

261.    Frustrated because he needed to see the psychiatrist to get his housing voucher, and because he felt the receptionist had tricked him into leaving, he began to bang on the door.

262.    Minutes later, presumably as a result of a call to 911, approximately seven NYPD officers showed up at the shelter.

263.    Mr. Ayu told the officers that he would leave the scene voluntarily, but the officers stated that Mr. Ayu had been deemed an "EDP" and that he needed to go with them.

264.    An officer wanted to put handcuffs on Mr. Ayu, but he resisted. An officer also threatened to arrest him.

265.    A separate officer tried to diffuse the situation and told Mr. Ayu that the officers would let him remain uncuffed if he went with them to the hospital.

266.    Scared of being arrested, Mr. Ayu relented and was taken to Kings County Hospital.

267.    Mr. Ayu was at the hospital for what felt like fifteen minutes, before a hospital employee told him, in sum and substance, "Get out of here and tell them not to bring you back."

268.    He received no treatment while he was at the hospital.

269.    On April 27, 2022, Mr. Ayu was on the subway at approximately 2 a.m. when he received a phone call informing him that his son had been shot and killed in Washington D.C.

270.    Distraught, Mr. Ayu went to Kings County Hospital to admit himself.

271.    When he arrived at the psychiatric department, Mr. Ayu was told to come back in the morning.

272.    Mr. Ayu walked to the hospital's emergency room to collect his thoughts and see if he could potentially be admitted to the hospital via the emergency room instead.

273.    Upon information and belief, while in the lobby of the emergency room, NYC Health and Hospitals Police Officer Williams and another NYPD officer approached Ayu and asked him to leave the building. Mr. Ayu refused, explaining the situation.

274.    When the officers continued to attempt to force Mr. Ayu out of the building, he started to film the officers with his phone.

275.    One of the officers attempted to knock the phone out of Mr. Ayu's hand, and during the struggle, the officer and Mr. Ayu landed on the ground.

276.    Mr. Ayu was restrained by multiple officers. He was then transported to the psychiatric ward for evaluation and was released the same night.

277.    Mr. Ayu was not charged with a crime.

278.    Just weeks later, in May 2022, Mr. Ayu was in the lobby of the mental health clinic at the Fortune Society in Queens speaking on the phone with someone from VOCAL-NY, of which he is a member.

279.    Mr. Ayu was speaking about how his son had recently been murdered and was emotional and loud. No one at Fortune Society asked him to get off the phone or go outside.

280.    Some minutes later four NYPD officers arrived and walked past Mr. Ayu.

281.    A moment later they returned and surrounded him. The officers told Mr. Ayu that someone had called 911 and said that he threatened someone over the phone.

282.    The NYPD officers informed Mr. Ayu that he had to go with them to the hospital.

283.    Mr. Ayu refused.

284.    The NYPD officers slammed Mr. Ayu to the ground and handcuffed him. His head was injured, and he suspected that he had a concussion.

285.    While he was waiting to be transported to the hospital, EMS EMTs arrived at the scene. Upon arriving, the EMTs did not de-escalate the situation or address Mr. Ayu's head injury.

286.    Mr. Ayu was taken to Woodhull Hospital in Brooklyn, New York where he was given a psychiatric evaluation and released.

287.    Mr. Ayu is chronically unhoused. He now lives in an apartment in the Bronx. At the time of the arrests described herein Mr. Ayu was living in shelters.

288.    Like many others who have been hospitalized against their will in New York City, the Mayor's announcement of the Involuntary Removal Policy triggered traumatic memories for Mr. Ayu.

289.    Being forcibly taken to the hospital by officers, only to be released without even receiving treatment for his head injury, made his precarious situation even worse by removing him from his support network and preventing him from being able to contact his children.

290.    With health responses to his mental health emergencies or perceived emergencies, Mr. Ayu could avoid the trauma, injuries and needless hospitalizations and institutionalization in the future that result from a police response to such emergencies and create more stability for himself in the community.

**Neil Amitabh**

291.    Plaintiff Neil Amitabh is a 39-year-old man of West Indian descent who has never been diagnosed with a mental disability.

292.    In February 2023, Mr. Amitabh was homeless and had fallen asleep in the Broadway-Lafayette subway station in Manhattan together with his girlfriend.

293.    At approximately 11 p.m., he woke up to NYPD officers kicking him to wake up and arguing with his girlfriend.

294.    Mr. Amitabh intervened in the argument to ask what was going on and the officers told him and his girlfriend that they needed to leave the station.

295.    Mr. Amitabh initially refused to leave the station as he had paid the fare to enter the subway station and was not disturbing anyone.

296.    Soon thereafter, Mr. Amitabh's girlfriend began to gather her things to leave the station. Mr. Amitabh decided to join her.

297.    While he was getting up to gather his belongings, an officer slammed Mr. Amitabh into the wall and then slammed him down to the ground, injuring his hip.

298.    He was then handcuffed by the officers and told he was going to be taken to the hospital.

299.    At some point during the commotion, more NYPD officers arrived at the scene.

300.    The officers forced him to stand in a corner of the station, handcuffed, facing the wall.

301.    Eventually an EMS EMT came down and escorted Mr. Amitabh out of the station and into an ambulance.

302.    The EMT did not attempt to de-escalate the situation, nor did they attempt to tend to Mr. Amitabh's physical injury on sight.

303.    When Mr. Amitabh asked the EMT why he was being taken to the hospital, he did not receive a response.

304.    He was taken to the psychiatric ward at Bellevue Hospital, where he spent the night.

305.    The officers never told Mr. Amitabh why he was being taken to a hospital.

306.    While at Bellevue, he spoke to a doctor on two occasions and was discharged at around 9:15 a.m. the following morning.

307.    He received no mental health treatment and no treatment for his injured hip at the hospital.

308.    When he returned to the Broadway-Lafayette station to get his belongings, he found they had already been removed, including his wallet containing his identification cards, his phone, clothing, and a pair of headphones.

309.    Mr. Amitabh was forcibly taken to the hospital for a psychiatric evaluation on two previous occasions by NYPD officers in 2020.

310.    In March 2020, Mr. Amitabh was living in a homeless encampment under an overpass near Fordham Road and 180th Street in the Bronx with about eight or nine other individuals.

311.    Mr. Amitabh went to a nearby building where he had formerly briefly resided. He and his girlfriend had laundered their clothes and hung them out to dry on the railing in front of the building because they didn't have money to dry them at the laundromat.

312.    The building manager became angry at Mr. Amitabh and, on information and belief, called 911, despite Mr. Amitabh remaining calm and nonthreatening during the encounter.

313.    The police and an ambulance arrived; however, the police led the response.

314.    The building manager reported that Mr. Amitabh was off his medications (he didn't take medications, nor had he been prescribed medications).

315.    Mr. Amitabh told the police officers that he did not want to go to the hospital and did not need medical care. The EMTs did not step in to deescalate the situation nor did they employ tactics to assess Mr. Amitabh's mental health or ensure his safety.

316.    Nonetheless, Mr. Amitabh was taken against his will to St. Barnabas Hospital in the Bronx. At the hospital, he was injected with a drug that caused him to pass out.

317.    He remained there for approximately two days and was discharged without any medications. He was not charged or cited by the police.

318.    A few months later, in the summer of 2020, Mr. Amitabh was taken to the hospital by the police against his will. This time he was at the encampment near Fordham Road.

319.    Officers arrived at the scene while Mr. Amitabh was smoking a cigarette before going to sleep. He was approached by NYPD officers who told him that he could no longer stay there and needed to move his belongings.

320.    Mr. Amitabh argued with the officers, pointing out that they were not in anyone's way and that the space was not being used for anything else.

321.    He was getting ready to pack up his things and move when an officer asked him to produce his identification.

322.    When Mr. Amitabh said he did not have any identification, the officers told him to put his hands behind his back and handcuffed him.

323.    He was again taken to St. Barnabas Hospital.

324.    He was at the hospital for about a day before being discharged without being charged, cited, or given a prescription.

325.    Mr. Amitabh still lives either in homeless shelters or on the streets in New York City.

326.    Mr. Amitabh fears being taken against his will by police for a psychiatric evaluation again. Because Mr. Amitabh does not have a home, he spends a lot of time in public spaces, including the transit system and on the street.

327.    Mr. Amitabh's fear is based not only to his prior experiences with the police, but also on the fact that he knows he is readily identifiable as homeless, and that people judge him and fear him because of the way he looks, including the fact that he is of West Indian descent.

328.    Mr. Amitabh spends time collecting recyclables to redeem deposits so that he may buy food and other necessities and he also panhandles for food and money.

329.    Mr. Amitabh has had negative and scary experiences in shelters, and it is out of fear that he at times sleeps in public spaces where he feels safer.

330.    Upon information and belief, Mr. Amitabh's homelessness was conflated by the defendant police officers, who are not health or social service professionals, as being indicia of having a mental disability and thus a danger and/or an inability to take care of himself warranting his detention and involuntary transport to a hospital for psychiatric evaluation.

331.    If he had been provided a health response to his perceived mental health emergencies, Mr. Amitabh could have avoided needless hospitalizations and institutionalization, among other harms, and created more stability for himself in the community.

**Community Access**

332.    Community Access is a nonprofit organization that provides assistance to New Yorkers living with mental disabilities. Its work includes developing and operating supportive housing units in New York City, providing supported education and job training, operating a peer-driven crisis respite program, operating mobile treatment teams for people who have been disconnected from traditional treatment, and leading advocacy efforts for people with mental disabilities.

333.    Community Access' mission is to expand opportunities for people living with mental disabilities to recover from trauma and discrimination through affordable housing, training, advocacy, and healing-focused services.

334.    Core to this mission is promoting "self-determination" for those with mental disabilities by enabling them to "create lives of their own choosing" free from involuntary treatment and institutionalization. Community Access prioritizes services and advocacy that support the ability of people with mental disabilities to live in integrated settings in their own communities.

335.    Defendants' wrongful and discriminatory conduct frustrates Community Access' ability to support integrated community living and forces it to divert organizational resources away from providing housing, counseling, and other services, into directly responding to and managing the after-effects of mental health emergencies of those they serve as a result of NYPD responses to mental health emergencies.

336.    Community Access' supportive housing program is a key part of its organizational mission to enable community living for people with mental disabilities. Community Access has developed 1,315 supportive housing units, where individuals with mental disabilities live side-by-

side with individuals who do not have disabilities. Community Access is currently developing additional supportive housing units, and these programs account for a substantial portion of Community Access' organizational budget.

337.    To make its housing model possible, Community Access hires and manages staff, including service coordinators and program directors, to provide day-to-day assistance to residents with mental disabilities. These staff are essential to Community Access' supportive housing model that promotes community integration and creates environments where residents can move forward with their lives.

338.    Some of the buildings' residents with mental disabilities experience mental health emergencies that require acute support.

339.    Community Access staff are hesitant to call 911 in these situations, for fear that members of the NYPD will escalate encounters or forcibly remove residents and transport them to hospitals for psychiatric evaluations, injure the residents, and otherwise traumatize the residents.

340.    As a direct result of the City's failure to provide individuals with mental health emergencies an equal opportunity to benefit from the City's emergency response program (by dispatching police to respond to mental health emergencies), Community Access must provide additional training to program managers, service coordinators, and other staff to enable them to respond to a significant portion of these emergencies themselves.

341.    This training includes instruction on how to identify and evaluate risky situations, when to call 911 and when to refrain from calling 911, and how to deescalate mental health emergencies. This training also involves instruction on how to interact with police and observe police encounters when they occur.

342.    Because Community Access cannot rely on the City to safely respond to any mental health emergencies its residents experience, Community Access must expend additional resources directly responding to and managing such emergencies and transporting residents to care facilities.

343.    When police respond to mental health emergencies at Community Access buildings, service coordinators and program directors frequently observe encounters and provide de-escalation support to minimize police harm. These tasks divert resources from the other necessary day-to-day tasks these staff need to perform for residents, and the tasks reduce Community Access' ability to provide services to residents not involved in these police encounters.

344.    Repeated instances of NYPD misconduct have occurred during these encounters, and Community Access has expended considerable resources and staff time to investigate these incidents, reach out to NYPD Community Liaisons to report issues, and act as an intermediary between officers and residents during such incidents to decrease harm.

345.    Residents with mental disabilities are often traumatized by these police encounters, and Community Access must expend even more resources to provide counseling services and crisis prevention plans to help residents recover from these encounters and to prevent future incidents. This too reduces Community Access' ability to provide its core services and supports to residents.

346.    Moreover, residents' trust in Community Access is undermined when traumatic police encounters result from staff having called the NYPD. These traumatic responses directly undermine Community Access' mission and have caused the organization to expend considerable time and resources to rebuild this trust.

347.    The police encounters are also traumatic for Community Access' staff and undermine the organization's ability to retain staff in a sector characterized by high turnover. They also require Community Access to provide extensive support to its traumatized staff.

348.    Supportive housing already encounters considerable stigma and opposition, and the City's inappropriate handling of people experiencing mental health emergencies only adds to this opposition. NYPD appearances at Community Access buildings have specifically been cited by opponents at public hearings as a justification for restricting further construction of new housing units. Construction of additional units is essential to Community Access' mission of providing supportive housing in communities across New York, many of which still lack these housing options.

349.    As a result of the Involuntary Removal Policy, Community Access has had to devote time and resources to providing an adequate response that advocates for New Yorkers facing mental health emergencies. For example, the rollout and potential impacts of the Involuntary Removal Policy were discussed at numerous Community Access meetings and were the subject of a plethora of emails both within the organization and with other stakeholders who were likewise concerned about the negative implications of this policy for those living with mental disabilities. Multiple rallies were held in opposition to the Involuntary Removal Policy, which required Community Access staff to dedicate time to attend and speak out against its implementation. This policy has also garnered considerable media attention, requiring Community Access staff to respond to various press inquiries. All of this was at the expense of Community Access' routine activities.

350.    Additionally, Community Access has been working with outside consultants to publish a position paper on the negative impacts of involuntary treatment on individuals living with mental disabilities. The time spent on the report, which was necessitated by the City's discriminatory emergency response program, has taken away from Community Access' ability to focus on the numerous other critical needs of the communities it serves.

351.    In an effort to counteract the effects of Defendants' discriminatory conduct, Community Access devotes significant resources to community organizing and policy advocacy aimed at ending police response to mental health emergencies and creating alternatives.

352.    For example, in response to Defendants' conduct, Community Access has organized numerous community events with lawmakers and citizens, addressing the City's failure to provide health responses to mental health emergencies, including a mayoral candidate forum and multiple panel discussions on appropriate, non-police, community-based health responses to mental health emergencies. Additionally, Community Access has diverted significant time to organizing and mobilizing community members to advocate for change through organizations of which it is a member, such as CCIT-NYC.

353.    All of these activities have burdened Community Access' limited resources and caused it to forego other activities in order to focus on improving the City's response to mental health emergencies.

354.    As a direct and proximate result of Defendants' discriminatory practices described above, Community Access has suffered and will continue to suffer a diversion of its resources and frustration of its mission to support community integration for people living with mental disabilities.

355.    Community Access seeks injunctive relief in this action in order to remedy the harms it has experienced by trying to address and counteract the effects of Defendants' discriminatory practices and to enable it to devote its resources to providing services to individuals with mental disabilities so that they can live independently in their communities.

**NAMI-NYC**

356.    National Alliance on Mental Illness of New York City is a nonprofit organization that helps families and individuals affected by mental disabilities build better lives in their communities.

357.    NAMI-NYC helps families and individuals affected by mental disabilities build better lives through education, support, and advocacy. The organization provides an information and referral helpline, offers evidence-based education classes, facilitates support groups for individuals and families affected by mental disabilities, conducts community education on state and local mental health policy, and provides mentorship and training to people affected by mental disabilities to advocate for improved mental health systems in their communities.

358.    In an effort to counteract the effects of Defendants' discriminatory conduct, NAMI-NYC has been forced to devote significant resources to community organizing and policy advocacy aimed at ending discriminatory police response to mental health emergencies and creating alternatives.

359.    For example, in response to Defendants' conduct, NAMI-NYC has organized numerous community events addressing the NYPD's discriminatory response to mental health emergencies, including a mayoral candidate forum and multiple panel discussions on decriminalizing mental disabilities by implementing health, non-police responses to mental health emergencies.

360.    NAMI-NYC has met with elected officials, testified at public hearings, submitted memoranda and letters of support to elected officials, conducted phone banking and email writing campaigns, and drafted public policy platforms to support policy reforms that would end

discriminatory police response to mental health emergencies and provide alternative responses in support of a health, non-police mental health crisis response program.[95]

361.    NAMI-NYC has also diverted significant time and resources to organizing and mobilizing community members to advocate for change. This includes organizing community rallies, participating in the work of CCIT-NYC, of which NAMI-NYC is a long-time member, and developing an advocacy ambassador program that empowers people affected by mental disabilities to advocate for the transformation of New York's mental health system, including mental health emergency response.

362.    Through its helpline, NAMI-NYC spends considerable time and resources providing individual consultation and assistance to people with mental disabilities who have been harmed by police encounters. Helpline staff provide direct support to help people work through the trauma of these encounters and help coordinate referrals to additional services.

363.    NAMI-NYC's helpline staff similarly provide support and referral services to people with mental disabilities and families working to avoid future police interaction during mental health emergencies. NAMI-NYC helps these clients connect with alternative mental health resources and proactively plan to mitigate potential police harm.

364.    These activities cause NAMI-NYC to forego other advocacy activities and devote fewer resources toward its other policy priorities. NAMI-NYC has and will continue to divert its attention away from its mentorship programs and support groups to focus on addressing the need to transform the City's mental health emergency response. It also diverts resources from its other community education efforts, such as its workplace mental health initiative, which aims to support

---

[95] *See, e.g.*, NAMI-NYC, *Advocacy Policy Priorities*,
https://www.naminycmetro.org/advocacy/nami-nyc-advocacy-policy-priorities/; NAMI-NYC,
*Education Events*, https://www.naminycmetro.org/events/public-education/.

employers in creating more accommodating, integrated workplaces for individuals with disabilities. In addition, it is forced to devote fewer resources toward its other policy priorities such as improving psychiatric emergency room services, increasing access to mental healthcare, and expanding the proper use of mental health courts.

365.    After Mayor Adams announced the Involuntary Removal Policy on November 29, 2022, NAMI-NYC rapidly convened a war room in their office to attempt to decipher what the announcement meant for their constituents and their organization, plan potential responses, and put together an action plan for helping the family members of individuals with mental disabilities who would be affected by the directive.

366.    NAMI-NYC organized and participated in multiple press conferences and rallies on the steps of City Hall regarding the Involuntary Removal Policy.

367.    Since the Mayor's announcement, some of NAMI-NYC's Advocacy Ambassadors, who participate in a program that provides families and individuals impacted by mental disabilities with the skills and training needed to meet with elected officials and create change in their communities, stepped back from their positions because they were fearful to be out in public more than necessary.

368.    One Advocacy Ambassador even informed NAMI-NYC that he did not feel comfortable continuing to be an Advocacy Ambassador while the Involuntary Removal Policy was in effect since as an individual with a mental disability that can involve hallucinations, he is frightened that he could be involuntarily hospitalized while carrying out his role or while traveling to NAMI-NYC's office.

369.     Calls to the public NAMI-NYC Helpline regarding the Involuntary Removal Policy ballooned the Helpline's call load in December 2022 following the Mayor's announcement, which forced staff to neglect other tasks and responsibilities in order to respond to those calls.

370.     In February 2023, NAMI-NYC staff noted a thirty percent (30%) increase in calls to the public NAMI-NYC Helpline, with a number of individuals asking for guidance regarding the Involuntary Removal Policy.

371.     All of this has led to NAMI-NYC diverting money and resources towards responding to the Involuntary Removal Policy from its robust policy agenda with regards to issues like maternal mental health and education and training for teachers in schools dealing with students with mental disabilities.

372.     NAMI-NYC has been forced to postpone or cancel meetings and events regarding these other programs because it has been forced to dedicate staff time and resources toward understanding the effects of the Involuntary Removal Policy on its constituents and responding to concerned calls of individuals with mental disabilities and their families. Other events have had lower turnout since NAMI-NYC staff have not been able to dedicate time and resources to planning and promotion.

373.     NAMI-NYC also relies heavily on philanthropy, as well as government grants, for its budget, and responding to the Involuntary Removal Policy has diverted time and energy from its fund-raising opportunities as well.

374.     As a direct and proximate result of Defendants' discriminatory practices described above, NAMI-NYC has suffered and will continue to suffer a diversion of its resources and frustration of its mission to support community members with mental disabilities and their families.

375.    NAMI-NYC seeks injunctive relief in this action in order to remedy the harms it has experienced by trying to eliminate Defendants' discriminatory practices and enable it to devote its resources to providing services to individuals with mental disabilities.

**CCIT-NYC**

376.    Correct Crisis Intervention Today – NYC is a membership organization whose members include nearly 80 New York nonprofit organizations, as well as individual members, including individuals with mental disabilities. CCIT-NYC's mission is to transform the City's response to mental health emergencies. It seeks to organize and enable its members to improve the mental health resources available to individuals in New York who experience mental health emergencies and to create change that will prevent or reduce mental health emergencies in the first place.

377.    CCIT-NYC is governed by a steering committee composed of representatives of these member organizations. The Steering Committee makes strategic decisions for CCIT-NYC and determines how and when CCIT-NYC will expend its resources.

378.    As a Plaintiff in this action, CCIT-NYC represents its members who have been harmed by Defendants' discriminatory conduct. Many of CCIT-NYC's member organizations, including Community Access, NAMI-NYC, the Police Reform Organizing Project, and Concern for Independent Living have standing to bring this lawsuit, as do several of its individual members.

379.    As set forth above, Community Access and NAMI-NYC are members of CCIT-NYC and have diverted significant resources to counteract Defendants' discriminatory conduct by, *inter alia*, documenting and publicizing the discriminatory conduct, training their staff to respond to the discriminatory conduct, and engaging in extensive policy advocacy to eliminate future discriminatory conduct.

380.    Many of CCIT-NYC's member organizations experience similar harms and have similarly diverted resources from their core services and advocacy to counteract Defendants' discriminatory conduct by documenting and publicizing the discriminatory conduct, training their staff to respond to the discriminatory conduct, and engaging in extensive policy advocacy to eliminate future discriminatory conduct, including delivering testimony at public hearings and meeting with elected officials and their staff to brief them on viable alternatives. Member organizations have also conducted focus groups, as well as an extensive community survey regarding community attitudes toward the City's current police response to mental health emergencies, which was the basis of a report entitled *Saving Lives, Reducing Trauma: Removing Police from New York City's Mental Health Crisis Response*.[96] Members have also been involved in extensive advocacy to obtain body-worn camera footage of police shootings of individuals experiencing mental health emergencies.

381.    CCIT-NYC seeks to improve the mental health resources available to New Yorkers, both to avoid mental health emergencies and to help deal with the effects of crises after they have been deescalated. CCIT-NYC also seeks to relieve its organizational members of the resource drain caused by expending resources on crisis de-escalation.

382.    Some of CCIT-NYC's individual members have also been detained by the police and forcibly brought to psychiatric hospitals, despite not presenting a risk of serious harm to themselves or others.

383.    CCIT-NYC also has suffered in its own right.

384.    In an effort to counteract the effects of Defendants' discriminatory conduct, CCIT-NYC, through the decisions of its steering committee, diverts significant resources to community

---

[96] https://www.nylpi.org/wp-content/uploads/2021/10/FINAL_Mental-Health-Crisis-Response-Report.pdf.

organizing and policy advocacy aimed at transforming the City's response to mental health crises and reducing the incidence of violence and trauma caused by police serving as first responders.

385.    In response to Defendants' conduct, CCIT-NYC developed a public proposal to remove the NYPD from mental health emergency response, and CCIT-NYC has organized public rallies, panel discussions, and other events to promote reform.

386.    CCIT-NYC has also met with elected officials and testified at public hearings to draw attention to police misconduct and advocate for reforms addressing these inappropriate responses to mental health emergencies.

387.    All of these activities have burdened CCIT-NYC's limited resources and caused it to forego other activities in order to focus on police response to mental health emergencies.

388.    For example, CCIT-NYC has had to divert its attention away from its other core policy goals—namely, expanding access to both acute and long-term services for those experiencing mental health emergencies and to avoid mental health emergencies in the first place, and advocating for peer involvement in all aspects of mental health service delivery.

389.    Defendants' conduct has also caused CCIT-NYC to divert a larger portion of its resources to reforming City policy, at the expense of the coalition's broader efforts on the state level, including advocacy for a suicide and mental health crisis hotline, expansion of crisis stabilization centers, and funding of regional mobile crisis teams.

390.    As a direct and proximate result of Defendants' discriminatory practices described above, CCIT-NYC has suffered and will continue to suffer a diversion of its resources and its member organization resources, as well as a frustration of its mission to support community members with mental disabilities.

391.    After the Involuntary Removal Policy was announced on November 29, 2022, CCIT-NYC was compelled to expend resources to educate its members and the public about the Policy's details and to advise them about how to avoid finding themselves in harm's way. CCIT-NYC organized a rally opposing the Involuntary Removal Policy and its members have attended several others.

392.    CCIT-NYC's members with mental disabilities will also be in danger of being forcibly detained under the Involuntary Removal Policy merely for appearing to police officers to have mental disabilities and appearing to be unable to care for themselves.

393.    The City's policies and practices regarding involuntary removals have diverted resources away from CCIT-NYC's advocacy in support of Daniel's Law, under which New York State would only fund emergency response plans where the role of police is limited to situations where there is a public safety risk. CCIT-NYC has also had to divert resources away from opposition to the expansion and extension of Kendra's Law, which denies people the fundamental right to determine the course of their medical treatment by forcing them to participate in treatment even if they do not meet the medical criteria for involuntary hospitalization. CCIT-NYC has also diverted resources away from focusing on increasing the number of voluntary mental health services to reduce the number of mental health emergencies.

394.    CCIT-NYC seeks injunctive relief in this action in order to remedy the harms that both CCIT-NYC and its member organizations have experienced in trying to eliminate Defendants' discriminatory practices, thus permitting it to engage in broader mental health advocacy.

## **VOCAL-NY**

395.    Voices of Community Activists & Leaders New York (VOCAL-NY) is a grassroots membership organization with its headquarters in Brooklyn and chapters throughout the State of New York.

396.    VOCAL-NY is made up of low-income people affected by mental disabilities, the war on drugs, HIV/AIDS, mass incarceration, and homelessness, and seeks to create thriving communities.

397.    This goal is accomplished through community organizing, advocacy, direct services, participatory research, direct action, and leadership development.

398.    VOCAL-NY has members based in New York City who have been or currently are unhoused, many of whom have been diagnosed with mental disabilities.

399.    In 2016, VOCAL-NY launched its Homeless Union, comprised of homeless and formerly homeless people, and dedicated to fighting for affordable housing for unhoused New Yorkers.

400.    VOCAL-NY also has members who have been diagnosed with mental disabilities who are low-income New Yorkers who have never been unhoused.

401.    Members of VOCAL-NY have been detained and taken to hospitals against their will by NYPD officers for appearing to have a mental disability.

402.    VOCAL-NY is a member of CCIT-NYC. VOCAL-NY and its members oppose the use of police officers as first responders for mental health emergencies.

403.    VOCAL-NY has diverted resources for years in response to the City's reliance on the NYPD for the handling of mental health emergencies, such as referring people to housing providers if they lose housing following an arrest, individual advocacy to City officials to reduce

penalties, participatory defense groups, Know Your Rights trainings for members' interactions with police, documenting NYPD abuse, helping members and participants restore belongings lost after an arrest, rallies, legislative advocacy, and programs for referring members and participants to civil attorneys.

404.    Time and resources spent on these activities would have otherwise been dedicated to pursuing and winning campaigns led by its members to address their needs in the context of ending the war on drugs, ending homelessness, ending HIV/AIDS, and ending mass incarceration. For example, resources VOCAL-NY has put towards advocating against the use of the NYPD in handling mental health emergencies directly lessened resources put towards campaigns to expand access to City FHEPS vouchers to reduce homelessness throughout New York City.

405.    Since Mayor Adams announced the Involuntary Removal Policy on November 29, 2022, VOCAL-NY has expended additional resources into protecting its members from involuntarily hospitalizations by educating them on the state of the law and informing them of their rights.

406.    Since it has homeless members and members in precarious housing, many members of VOCAL-NY, such as Individual Plaintiff Mr. Ayu, have shared their concerns that they face an increased chance of being forced to the hospital without justification based on the Involuntary Removal Policy.

407.    VOCAL-NY has also diverted resources from its other programming to focus on the acute challenges facing its unhoused members as a result of the Involuntary Removal Policy, as those members are particularly vulnerable to unconstitutional seizures by NYPD officers and have aired these concerns at VOCAL-NY events.

408.    The Involuntary Removal Policy has also affected VOCAL-NY directly, as the instability the Policy generated in the community VOCAL-NY serves makes it harder for them to advance their structural campaigns and legislative agenda. It also makes it more difficult for their unhoused members to come to meetings and engage in VOCAL-NY's campaigns.

409.    The Involuntary Removal Policy's targeting of the street homeless undermines VOCAL-NY's provision of direct services to this community, such as Hepatitis C testing and overdose prevention education, as the people served by these programs are most vulnerable to being detained under the Policy and their fragile lives are easily disrupted by the fear of involuntary detention, as well as the detentions themselves.

410.    VOCAL-NY seeks injunctive relief in this action in order to remedy the harms that it has experienced in trying to protect its members from Defendants' discriminatory practices, which has also prevented VOCAL-NY from pursuing its other core issues.

## CLASS ACTION ALLEGATIONS

411.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, the Individual Plaintiffs seek to represent a certified Plaintiff class consisting of individuals with mental disabilities a) to whom NYPD police officers have been or will be the first responders to actual or perceived mental health emergencies and/or b) who have been or will be unconstitutionally seized, and/or subjected to force in their interactions with NYPD police officers who responded or will respond to their actual or perceived mental health emergencies.

412.    The members of the class are so numerous as to render joinder impracticable.

413.    Based on information and belief, the City receives between 150,000 and 400,000 mental health calls a year. The NYPD responds to the vast majority of them.

414.    This large number of calls does not account for the individuals whom NYPD officers encounter on patrols or sweeps and who are involuntarily detained and transported to a hospital for psychiatric evaluation.

415.    Thousands of people deemed "EDPs" have suffered civil rights abuses at a result of the City's police response to mental health emergencies, including unlawful detentions, seizures, and warrantless entries and excessive force, as evidenced by complaints filed against the NYPD, *inter alia*.

416.    The Class Members share questions of law and fact in common, including without limitation:

a.    Whether the City's police response to mental health emergencies provides a response to the mental health emergencies experienced by people with mental disabilities comparable to the responses provided to physical health emergencies, in violation of the ADA, Section 504, and the New York City Human Rights law.

b.    Whether people with mental disabilities are denied equal opportunity to benefit from the City's emergency response program and denied access to the City's emergency response program or otherwise discriminated against on the basis of disability, in violation of the ADA, Section 504, and the New York City Human Rights law.

c.    Whether the City's failure to provide a health response to mental health emergencies constitutes a failure to provide a system-wide reasonable modification to the City's policies and practices necessary to avoid discrimination based on disability and therefore constitutes a violation of the ADA, Section 504, and the New York City Human Rights law.

d.    Whether NYPD officers responding to mental health emergencies engage in false mental health arrests without sufficient probable cause, warrantless entries, and/or excessive force in violation of the Fourth Amendment of the U.S. Constitution and New York State Constitution.

417.    Plaintiffs' claims are typical of those of the class. Like the other members of the class, Plaintiffs have been harmed as a result of the City's operation of its emergency response program and/or are victims of the NYPD's discriminatory practices of unlawful seizures of individuals with mental disabilities. Because of their mental disabilities, Plaintiffs have been

deprived of the benefits of the City's emergency response program and otherwise discriminated against on the basis of disability and subjected to unlawful treatment, among other harmful consequences.

418.    The legal theories under which Plaintiffs seek declaratory and injunctive relief are the same or similar to those on which all members of the class will rely, and the harms suffered by Plaintiffs are typical of the harms suffered by the Class Members.

419.    Plaintiffs have a strong personal interest in the outcome of this action, have no conflicts of interest with members of the class, and will fairly and adequately protect the interests of the class.

420.    Plaintiffs are represented by competent counsel: Jonathan C. Moore, Luna Droubi, and Jody Yetzer of the law firm Beldock, Levine & Hoffman LLP ("BLH"); P. Jenny Marashi of Marashi Legal Group; Marinda van Dalen and Ruth Lowenkron of New York Lawyers for the Public Interest ("NYLPI"); and Richard Schwed and Zhaohua Huang of Allen Overy Shearman Sterling US LLP ("A&O Shearman").

421.    BLH attorneys have litigated multiple class action lawsuits including: *El Sayed v. City of New York*, No. 18-cv-10566 (S.D.N.Y.) (injunctive claims, including a revised Patrol Guide policy, resolved on June 11, 2021); *Sughrim v. State of New York*, No. 19-cv-7977 (RA) (SDA) (Obtained class certification, summary judgement, and injunctive relief); *Syed v. City of New York*, No. 16-cv-04789 (S.D.N.Y. 2016) (class certified on February 15, 2019); *McLennon v. City of New York*, No. 14-cv-6320 (E.D.N.Y. 2014) (injunctive claims resolved on March 3, 2020); *Floyd v. City of New York*, No. 08-cv-1034 (S.D.N.Y.) (currently in the remedial stages); *Daniels v. City of N.Y.*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001) ("Aided by the capable hands of Jonathan C. Moore

. . . class counsel is undoubtedly qualified and experienced to conduct this litigation."); *see also MacNamara v. City of N.Y.*, 275 F.R.D. 125, 154 (S.D.N.Y. 2011).

422.    P. Jenny Marashi has litigated dozens of cases in federal court, including cases with multiple plaintiffs seeking policy change, such as *Meister and Greater Los Angeles Agency on Deafness*, CV14-1096 MWF (C.D.C.A. 2014); *The Estate of Reyes v. City of New York*, 16-cv-4880 (S.D.N.Y. 2016); *Urbina v. City of New York*, 16-349-CV (2d Cir.); *Li v. City of New York*, 15-cv-1599 (E.D.N.Y. 2015), and *Flores v. City of New York*, 15-cv-5845 (S.D.N.Y. 2015) (involving mental health emergencies and policing).

423.    NYLPI attorneys have litigated numerous class action lawsuits, the majority of which were litigated on behalf of people with disabilities and under the same laws at issue in this case, including *Jimenez v. N.Y.C. Dep't of Educ.*, No. 155825/2018 (N.Y. App. Div.) (currently in the monitoring and enforcement stage); *N.Y. Ass'n for Retarded Children v. Paterson*, No. 72 -cv-356 (E.D.N.Y) (currently in the monitoring and enforcement stage); *O'Toole v. Cuomo*, 1:12-cv-04166 (E.D.N.Y.) (currently in the monitoring stage); *Brad. H. v. City of New York*, No. 117882/99 (N.Y. App. Div.) (currently in the monitoring stage); *Ligon v. City of New York*, 12-cv-02274 (S.D.N.Y.) (currently in the remedial stages); *Casale v. Kelly*, 257 F.R.D. 396 (S.D.N.Y. 2009).

424.    A&O Shearman has represented countless individuals and organizations in civil rights matters including *HIAS, Inc. v. Trump*, No. 19-cv-03346 (D. Md. 2021) (obtained preliminary injunction, executive order later revoked); *The Humane Society of the United States v. USDA*, No. 20-cv-03258 (C.D. Cal. 2022) (jointly dismissed on June 3, 2022)); and *Kim v. Kum Gang, Inc.*, No. 12-cv-06344 (S.D.N.Y. 2015) (obtained $2.67 million in back wages and damages for restaurant workers).

425.    Plaintiffs' counsel have the resources, expertise, and experience to prosecute this action, and know of no conflicts among members of the class or between the attorneys and members of the class.

426.    The Plaintiff class should be certified pursuant to Rule 23(b)(2) and Rule 23(b)(3) of the Federal Rules of Civil Procedure because Defendants have acted on grounds generally applicable to the class, thereby making class-wide declaratory and injunctive relief appropriate.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**The City's Discriminatory Police Response to Mental Health Emergencies**
**Discrimination Based on Disability**
**Title II of the Americans with Disabilities Act,**
**42 U.S.C. § 12131,** *et seq.*
**(On Behalf of All Plaintiffs and Class Members against the City of New York)**

427.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

428.    In enacting the ADA, Congress recognized that "discrimination against individuals with disabilities continue[s] to be a serious and pervasive social problem" in "such critical areas as . . . health services . . . and access to public services. . . ." 42 U.S.C. § 12101(a)(2)&(3).

429.    Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, states that, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

430.    A "public entity" includes state and local governments, their agencies, and their instrumentalities. 42 U.S.C. § 12131(1).

431.    Defendants are public entities, or employees of public entities, within the meaning of 42 U.S.C. § 12131.

432.    The City's provision of responses to physical and mental health emergencies through its emergency response program, including 911 and other services that receive information about potential emergency situations and that dispatch or facilitate the dispatch of personnel to respond to those situations, is a service, program, or activity within the meaning of Title II.

433.    The term "disability" includes a "mental impairment that substantially limits one or more major life activities," or major bodily functions, 42 U.S.C. § 12102(1)(A), as well as "a record of such impairment" or "being regarded as having such an impairment," 42 U.S.C. § 12102(1)(B) & (C). *See also* U.S. Department of Justice, Guide to Disability Rights Laws (using "perceived by" interchangeably with "regarded as").[97] Impairments that are episodic are also covered by the ADA under 42 U.S.C. § 12102(4)(D), and the determination of whether an impairment substantially limits a major life activity is made "without regard to the ameliorative effects of mitigating measures such as medication . . . ." 42 U.S.C. § 12102(4)(E)(i)(I). The question of whether an individual's impairment is a disability under the ADA "should not demand extensive analysis." 42 U.S.C. § 12101 note(b)(5).

434.    Whether an individual has a disability "shall be construed in favor of broad coverage . . . to the maximum extent permitted . . . ." 42 U.S.C. § 12102(4)(A).

435.    Plaintiffs and Class Members have mental impairments that substantially limit one or more of their major life activities or major bodily functions such as thinking, communicating, cognitive function, neurological function, working, and interacting, or have a record of, or are "regarded as" or "perceived of," having such impairments.

436.    A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of

---

[97] Disability Rights Section, U.S. Department of Justice, *A Guide to Disability Rights Laws,* (last updated Feb. 28, 2020) https://www.ada.gov/resources/disability-rights-guide/.

architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).

437.    Plaintiffs and Class Members are qualified individuals with disabilities protected by the ADA, 42 U.S.C. § 12101, 12131(2), because they meet the essential eligibility requirements for the receipt of services through the City's emergency response program by having resided in and/or been present in the City of New York, and they are therefore eligible for the City's emergency response program.

438.    The ADA mandates that "[n]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity," 42 U.S.C. § 12132.

439.    The ADA prohibits public entities from "provid[ing] any aid, benefit, or service" to qualified individuals in such a way that is "not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii), "not as effective in affording equal opportunity to obtain the same result [or] to gain the same benefit . . . as that provided to others," *id.* § 35.130(b)(1)(iii), or that relies on "methods of administration that . . . . have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" . . . or that "defeat[] or substantially impair[] accomplishment" of the program's objectives, or that "perpetuate the discrimination of another public entity," *id.* § 35.130(b)(3). The ADA also provides that public entities are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).

440.    When the City receives a request for an emergency response for a physical health emergency, the City sends a health professional who is capable of providing a health response which includes on-site health assessments and stabilization, as well as making critical determinations regarding the need for further treatment.

441.    By contrast, for the vast majority of requests for an emergency response for a mental health emergency, the City sends the NYPD as the first responders.

442.    Police are not qualified health professionals capable of providing on-site health assessments and stabilization, or critical determinations regarding the need for further treatment.

443.    Moreover, the City's police response to mental health emergencies deprives people with mental disabilities of the immediate care they need, *exacerbates* the crises (as well as some underlying disabilities), causes trauma, and unnecessarily exposes people with mental disabilities to the risk of police use of force and excessive force, unlawful detention and involuntary psychiatric evaluation and hospitalization, and entanglement with the criminal legal system, among other adverse outcomes.

444.    The City therefore discriminates against the Individual Plaintiffs and the Class Members by depriving them of an emergency response that is comparable to the response provided to people experiencing physical health emergencies. The City's failure to provide a health response denies Plaintiffs and Class Members the equal opportunity to benefit from the City's emergency response program, and otherwise discriminates against them, subjects them to disparate treatment on the basis of their disability, defeats or substantially impairs the essential purpose of the City's emergency response program of providing timely, safe and effective emergency response services with respect to individuals with mental disabilities, and denies them a system-wide reasonable

modification by which they can access the City's emergency response program in order to avoid discrimination on the basis of disability.

445. By denying Plaintiffs and the Class Members a health response to mental health emergencies, Defendants have been deliberately indifferent to the needs and rights of people with mental disabilities.

446. The provision of a health response to mental health emergencies would not require a fundamental alteration of the City's emergency response program.

447. The City's B-HEARD pilot is but one way of demonstrating that providing a health response to mental health emergencies that is comparable to the health response provided to people experiencing physical health emergencies, and that affords people with mental disabilities an equal opportunity to benefit from the City's emergency response program, would not require a fundamental alteration of the nature of the City's services, programs, or activities.

448. Defendants further discriminated against Plaintiffs Greene, Sanchez-Esquivel, Ayu, and certain Class Members in the course of their arrests by not making individualized reasonable modifications to the known physical or mental limitations of an otherwise qualified individual, and instead (a) escalating the interactions; (b) seizing them without probable cause or basis; (c) using excessive and extreme force; (d) wrongly determining that they required psychiatric evaluation; and/or (e) inappropriately deploying the heavily-armed Emergency Services Units that lead to further escalation.

449. Defendants' conduct as described herein, unless enjoined, will continue to inflict injuries for which Plaintiffs and Class Members have no adequate remedy at law.

450. As a result of Defendants' discriminatory acts, Plaintiffs and Class Members have been harmed and will continue to suffer harm in violation of their rights under the ADA, 42 U.S.C.

§ 12131.

451.    Plaintiffs and Class Members are entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs pursuant to Title II of the ADA, 42 U.S.C § 12205.

452.    Plaintiffs and Class Members are also entitled to damages, including damages to compensate for bodily injury, medical expenses, emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

**SECOND CAUSE OF ACTION**
**Discrimination Based on Disability**
**Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**
**(On Behalf of All Plaintiffs and Class Members against the City of New York)**

453.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

454.    Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). A program or activity includes "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1).

455.    The City's emergency response program, which responds to physical and mental health emergencies, including its 911 emergency response program, is such a program or activity within the meaning of 29 U.S.C. § 794(b)(1)(A)-(B).

456.    The City receives "federal financial assistance" within the meaning of 29 U.S.C. § 794(a).

457.    An "individual with a disability" is defined under the statute, in pertinent part, as an "individual who has a physical or mental impairment that substantially limits one or more major

86

life activities of such individual," has a "record of" or is "perceived" as having such an impairment. 29 U.S.C. § 705 (referencing 42 U.S.C. § 12102).

458.    A "qualified" individual with a disability means a person who meets the essential eligibility requirements for participation in, or receipt of benefits from, a program or activity receiving Federal financial assistance. 28 C.F.R. § 39.103.

459.    For the reasons set forth above, Plaintiffs and Class Members are qualified persons with actual or perceived disabilities with the meaning of Section 504.

460.    Section 504 prohibits covered entities from providing aids, benefits, or services in such a way that qualified individuals are denied opportunities to participate or benefit, are not afforded equal opportunity to obtain the same result as that provided to others, or are otherwise limited in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service. Section 504 also prohibits methods of administration that defeat or substantially impair accomplishment of the program's objectives.

461.    When the City receives a request for an emergency response for a physical health emergency, the City sends a health professional who is capable of providing a health response which includes on-site health assessments and stabilization, as well as making critical determinations regarding the need for further treatment.

462.    By contrast, for the vast majority of requests for an emergency response for a mental health emergency, the City sends the NYPD as the first responders.

463.    Police are not qualified health professionals capable of providing on-site health assessments and stabilization, or critical determinations regarding the need for further treatment.

464.    Moreover, the City's police response to mental health emergencies deprives people with mental disabilities of the immediate care they need, *exacerbates* the crises (as well as some

underlying disabilities), causes trauma, and unnecessarily exposes people with mental disabilities to the risk of police use of force and excessive force, unlawful detention, involuntary psychiatric evaluation and hospitalization, and entanglement with the criminal legal system, among other adverse outcomes.

465.    The City therefore discriminates against the Individual Plaintiffs and the Class Members by depriving them of an emergency response that is comparable to the response provided to people experiencing physical health emergencies. The City's failure to provide a health response denies Plaintiffs and Class Members the equal opportunity to benefit from the City's emergency response program, and otherwise discriminates against them, subjects them to disparate treatment on the basis of their disability, defeats or substantially impairs the essential purpose of the City's emergency response program of providing timely, safe and effective emergency response services with respect to individuals with mental disabilities, and denies them a system-wide reasonable modification by which they can access the City's emergency response program in order to avoid discrimination on the basis of disability in violation of Section 504 and have resulted in injury to Plaintiffs and Class Members.

466.    By denying Plaintiffs and the Class Members a health response to mental health emergencies, Defendants have been deliberately indifferent to the needs and rights of people with mental disabilities.

467.    The provision of a health response to mental health emergencies would not require a fundamental alteration of the City's emergency response program.

468.    The City's B-HEARD pilot is but one way of demonstrating that providing a health response to mental health emergencies that is comparable to the health response provided to people experiencing physical health emergencies and that affords people with mental disabilities an equal

opportunity to benefit from the City's emergency response program would not require a fundamental alteration of the nature of the City's services, programs, or activities.

469.    Defendants' conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs and Class Members have no adequate remedy at law.

470.    Defendants further discriminated against Plaintiffs Greene, Sanchez-Esquivel, Ayu, and certain Class Members in the course of their arrests by not making individualized reasonable modifications to the known physical or mental limitations of an otherwise qualified individual, and instead (a) escalating the interactions; (b) seizing them without probable cause or basis; (c) using excessive and extreme force; (d) wrongly determining that they required psychiatric evaluation; and/or (e) inappropriately deploying the heavily-armed Emergency Services Units that lead to further escalation.

471.    As a result of Defendants' discriminatory acts, Plaintiffs and Class Members have been harmed and are entitled to damages, including damages to compensate for emotional distress, bodily injury, medical expenses, pain and suffering, punitive damages, and pre-judgment interest.

472.    Plaintiffs and Class Members are also entitled to injunctive relief and reasonable attorneys' fees, expenses, and costs, pursuant to 29 U.S.C. § 794(a).

473.    Plaintiffs and Class Members are also entitled to damages, including damages to compensate for bodily injury, medical expenses, emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

**THIRD CAUSE OF ACTION**
**Unlawful Seizure and Warrantless Entry**
**Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights**
**Under the Fourth and Fourteenth Amendments to the United States Constitution**
**(On Behalf of Individual Plaintiffs and Class Members against Defendants)**

474.   Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

475.   Defendants' seizure of Plaintiffs herein was done without any judicial warrant, was unreasonable, and was done without lawful justification.

476.   Plaintiffs did not consent to, and were conscious of, their confinements by Defendants.

477.   Defendants did not have probable cause to seize, detain, or involuntarily transport Plaintiffs for psychiatric evaluation, as Plaintiffs did not pose a risk of harm to themselves or others.

478.   Defendants' seizure of Plaintiffs was unjustified and objectively unreasonable, taking into consideration the information available to Defendants at the time they seized Plaintiffs.

479.   Defendants entered the homes of the Plaintiffs without probable cause or exigent circumstances.

480.   In addition, the City designed and/or implemented policies and practices, pursuant to which the individual officer Defendants and other members of the NYPD ordered, effected, and otherwise participated in unlawfully seizing and unlawfully entering the homes of Plaintiffs and other individuals with mental disabilities.

481.   NYPD Patrol Guide 221-13, on its face and/or as applied, directs NYPD officers to enter the home, and to take people who appear mentally ill and/or who are designated an "EDP" into custody, even without probable cause and typically through the use of excessive force, even when it is clear to the responding officers that the person does not present a substantial risk of serious harm to themselves or anyone else.

482.     Similarly, the City and NYPD use the grounds of "inability to meet basic living needs," without other indicia that the individual is in fact a danger to themself or others, to engage in a mental health arrest.

483.     As a result of these policies and practices, Plaintiffs and Class Members have been and will continue to be unlawfully seized and arrested without the requisite probable cause, even when the Plaintiffs and Class Members do not present a substantial risk of serious harm to themselves or others.

484.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs and Class Members of their federal, state, city, and/or other legal rights; caused Plaintiffs and Class Members bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; and caused Plaintiffs and Class Members to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs and Class Members.

485.     The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them, as well as damages to compensate for emotional distress, bodily injury, medical expenses, pain and suffering, and pre-judgment interest.

486.     Plaintiffs and Class Members are also entitled to reasonable attorneys' fees, expenses, and costs, pursuant to 42 U.S.C. § 1988(b).

**FOURTH CAUSE OF ACTION**
**Excessive Force**
**Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiffs' Rights Under the Fourth and Fourteenth Amendments to the United States Constitution**
**(On Behalf of Individual Plaintiffs and Class Members, except Lisa Collins against Defendants)**

487.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

488.    The means by which the NYPD engages in false mental health arrests leads to unnecessary escalation and excessive force.

489.    Defendants used force against Plaintiffs that was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

490.    The types and levels of force Defendants used against Plaintiffs were unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

491.    Defendants Haber, Gbain, Prasad, Dawkins, Fisher, Ramayya, Torres, Escobar Pereira, Sanchez, and NYPD Officer John Does ## 1-40 used excessive force against Plaintiffs, without making appropriate determinations about whether those uses of force were necessary, justified, or reasonable.

492.    Defendants used excessive force, even where Plaintiffs and/or Class Members agreed to leave with Defendants to go to a nearby hospital.

493.    Defendants used excessive force even where Plaintiffs and/or Class Members were observably frail, did not resist, or did not otherwise pose a threat to the safety of the officers or others.

494.    Where Defendants caused injury to Plaintiffs and/or Class Members through the use of excessive force, they did nothing to address those injuries.

495.    The types and levels of force Defendants used against Plaintiffs were harmful and resulted in serious physical and emotional injury to Plaintiffs.

496.    Pursuant to Defendant City's policies and practices, including Patrol Guide 221-13 and the Involuntary Removal Policy, individual officer Defendants and other members of the

NYPD ordered, effected, and otherwise participated in using excessive force against the Individual Plaintiffs, as well as against the Class.

497.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiffs of their federal, state, city, and/or other legal rights; caused Plaintiffs bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiffs to expend costs and expenses; and/or otherwise damaged and injured Plaintiffs.

498.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them as well as damages to compensate for emotional distress, bodily injury, medical expenses, pain and suffering, and pre-judgment interest.

499.    Plaintiffs and Class Members are also entitled to reasonable attorney's fees, expenses, and costs, pursuant to 42 U.S.C. § 1988(b).

## FIFTH CAUSE OF ACTION

### Violations of the New York State Constitution and New York State Common Law
### (On Behalf of Individual Plaintiffs Greene, Arvio, Ayu and Sanchez-Esquivel, and Class Members against Defendants)

500.    Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

501.    The conduct of the Defendant police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, invoking state power and/or authority, and as a result, Defendant City is liable to Plaintiffs pursuant to the state common law doctrine of *respondeat superior*.

**Violations of the New York State Constitution**

502.    Defendants, acting under color of law, violated Plaintiffs' rights pursuant to Article I, §§ 11 and 12 of the New York State Constitution, which prohibit discrimination in a person's civil rights, as well as warrantless entries and searches and unreasonable searches and seizures.

503.    Damages are necessary to effectuate the purposes of Article I, §§ 11 and 12 of the New York State Constitution, and appropriate to ensure full realization of Plaintiffs' rights under those sections.

504.    As a result of the foregoing, Plaintiffs and Class Members were deprived of liberty, suffered specific and serious bodily injury and emotional distress, and were otherwise damaged and injured.

505.    The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

**Assault and Battery**

506.    Defendants committed assault against Plaintiffs within the meaning of New York's common law by intentionally placing Plaintiffs in fear of imminent harmful or offensive contact.

507.    Defendants committed battery against Plaintiffs within the meaning of New York's common law by intentionally physically contacting Plaintiffs without Plaintiffs' consent.

**False Imprisonment and Unreasonable Detention**

508.    By the actions described above, the named police officials falsely arrested and/or imprisoned Plaintiffs within the meaning of New York's common law, without reasonable suspicion or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiffs were conscious of the confinement, and it was without their consent.

94

509.     As a result of Defendants' acts and omissions as outlined above, Plaintiffs and Class Members have suffered severe harm, including physical injury, psychological and/or emotional injury, and/or humiliation, and caused Plaintiffs and Class Members to expend costs and expenses, and/or otherwise damaged and injured Plaintiffs and Class Members.

510.     The unlawful conduct of Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them as well.

**SIXTH CAUSE OF ACTION**
**Discrimination Based on Disability**
**New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*.**
**(On Behalf of All Plaintiffs and Class Members against Defendants)**

511.     Plaintiffs reallege and incorporate by reference the allegations set forth in the foregoing paragraphs as if fully set forth herein.

512.     The New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a) provides, "[i]t shall be an unlawful discriminatory practice for any person who is the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of any person's actual or perceived . . . disability . . . directly or indirectly, to refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation . . . ."

513.     The term "person" in the NYCHRL includes "governmental bodies or agencies." N.Y.C. Admin. Code § 8-102(a).

514.     The NYCHRL defines the term "place or provider of public accommodation" to include "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods,

services, facilities, accommodations, advantages or privileges of any kinds are extended, offered, sold or otherwise made available." N.Y.C. Admin. Code § 8-102(9).

515.    The City, including through its agency the NYPD, is a person, place, or provider of public accommodation because it provides services, facilities, accommodations, advantages, and privileges by acting in response to calls regarding individuals experiencing mental health emergencies.

516.    The City's provision of responses to physical and mental health emergencies, including its 911 emergency response program is a program, service, and activity of the NYPD and the City.

517.    Through the actions and for the reasons described above, the City has denied individuals with mental disabilities the full and equal enjoyment of their lives, on equal terms and conditions as those without mental disabilities. This includes the freedom to live without discrimination based on actual or perceived disability, as well as the freedom to live without unlawful seizures and excessive force by police officers.

518.    The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "provide reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Administrative Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of Section 8-107, which includes Defendants under the N.Y.C. Admin. Code § 8-102(1).

519.    When the City receives a request for an emergency response for a physical health emergency, the City sends a health professional who is capable of providing a health response

which includes on-site health assessments and stabilization, as well as making critical determinations regarding the need for further treatment.

520.    By contrast, for the vast majority of requests for an emergency response for a mental health emergency, the City sends the NYPD as the first responders.

521.    Police are not qualified health professionals capable of providing on-site health assessments and stabilization, or critical determinations regarding the need for further treatment.

522.    Moreover, the City's police response to mental health emergencies deprives people with mental disabilities of the immediate care they need, *exacerbates* the crises (as well as some underlying disabilities), causes trauma, and unnecessarily exposes people with mental disabilities to the risk of police use of force and excessive force, unlawful detention, involuntary psychiatric evaluation and hospitalization, and entanglement with the criminal legal system, among other adverse outcomes.

523.    The City therefore discriminates against the Individual Plaintiffs and the Class Members by depriving them of an emergency response that is comparable to the response provided to people experiencing physical health emergencies. The City's failure to provide a health response denies Plaintiffs and Class Members the equal opportunity to benefit from the City's emergency response program, and otherwise discriminates against them, subjects them to disparate treatment on the basis of their disability, defeats or substantially impairs the essential purpose of the City's emergency response program of providing timely, safe and effective emergency response services with respect to individuals with mental disabilities, and denies them a system-wide reasonable accommodation by which they can access the City's emergency response program in order to avoid discrimination on the basis of disability.

524.    By denying Plaintiffs and the Class Members a health response to mental health emergencies, Defendants have been deliberately indifferent to the needs and rights of people with mental disabilities.

525.    Defendants have been aware of the need for a health response to mental health emergencies in New York City for years, but have failed to remedy the policies and practices, causing continuing and repeated harm to Plaintiffs and Class Members.

526.    The provision of a system-wide health response to mental health constitutes a reasonable accommodation under the NYCHRL.

527.    The City's B-HEARD pilot is but one way of demonstrating that providing a health response to mental health emergencies that is comparable to the health response provided to people experiencing physical health emergencies and that affords people with mental disabilities an equal opportunity to benefit from the City's emergency response program would not require a fundamental alteration of the nature of the City's services, programs, or activities.

528.    Defendants' conduct also violates N.Y.C. Administrative Code § 8-107(17), which states that "an unlawful discriminatory practice . . . is established . . . [when plaintiff] demonstrates that a policy or practice of a covered entity or a group of policies or practices of a covered entity results in a disparate impact to the detriment of any group protected by the provisions of this chapter."

529.    Defendants' policy or practice of dispatching police officers in response to mental health emergencies and to make discretionary decisions about an individual's mental disability has a disparate negative impact on individuals with mental disabilities.

530.    Defendants further discriminated against Plaintiffs Greene, Sanchez-Esquivel, Ayu, and certain Class Members in the course of their arrests by not making individualized

reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual, and instead (a) escalating the interactions; (b) seizing them without probable cause or basis; (c) using excessive and extreme force; (d) wrongly determining that they required psychiatric evaluation; and/or (e) inappropriately deploying the heavily-armed Emergency Services Units that lead to further escalation.

531.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs and Class Members have been injured as set forth herein.

532.    As a result of Defendants' discriminatory acts, Plaintiffs and Class Members have been harmed and are entitled to damages, including damages to compensate for emotional distress, pain and suffering, punitive damages, and pre-judgment interest.

533.    This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs and Class Members have no adequate remedy at law.

534.    Consequently, Plaintiffs and Class Members are also entitled to injunctive relief, as well as attorneys' fees and costs pursuant to N.Y.C. Admin. Code § 8-502(g).

## **RELIEF REQUESTED**

**WHEREFORE**, the Individual Plaintiffs, on behalf of themselves and other members of the class they seek to represent, as well as Plaintiffs Community Access, NAMI-NYC, CCIT-NYC, and VOCAL-NY, respectfully request that this Court:

      a.     Enter an order certifying this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, for the class described herein, with the Individual Plaintiffs as class representatives;

      b.     Issue a class-wide declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that the City's emergency response program violates the ADA, Section 504, and the New York City Human Rights Law;

      c.     Issue a class-wide declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure Rule 57, declaring that Patrol Guide 221-13 and

the Involuntary Removal Policy, either expressly and/or as applied, violate the Fourth and Fourteenth Amendments of the United States Constitution, Section 1983, the New York State Constitution, and New York State's Common Law principles of Assault, Battery, False Imprisonment, Warrantless Entry, and Unreasonable Detention;

      d.    Issue Plaintiffs a permanent injunction requiring that the City implement and operate its emergency response program so as to provide equal opportunity for people with mental disabilities to benefit from the emergency response program, and ensure that health professionals, rather than police, are first responders for mental health emergencies;

      e.    Issue a permanent injunction enjoining the City from continuing to apply Patrol Guide 221-13 and the Involuntary Removal Policy;

      f.    Award Plaintiffs, and the members of the class they seek to represent, compensatory damages in an amount that is fair and reasonable, to be determined at trial;

      g.    Award Plaintiffs punitive damages in an amount to be determined at trial;

      h.    Award Plaintiffs, and the members of the class they seek to represent, reasonable attorneys' fees, the costs and disbursements of this action, and pre-and post-judgment interest;

      i.    Retain jurisdiction of this case until the unlawful practices, policies, acts, and omissions complained of herein no longer exist and this Court is satisfied that they will not recur; and

      j.    Grant such other and further relief as this Court may deem appropriate and equitable as may be required in the interests of justice, including such orders as may be necessary to effectuate and implement the foregoing.

Dated: New York, New York

    June 7, 2024

      BELDOCK LEVINE & HOFFMAN LLP    MARASHI LEGAL
      99 Park Avenue, PH/26th Floor         930 Grand Concourse #1E
      New York, New York 10016            Bronx, NY 10451
      (212) 490-0400                    (917) 703-1742

By: _____    By: _____
      Jonathan C. Moore               P. Jenny Marashi
      Luna Droubi
      Jody Yetzer

NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.
151 West 30th Street, 11th Floor
New York, New York 10001-4017
(212) 244-4664

ALLEN OVERY SHEARMAN
STERLING US LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000


By: _____
    Marinda van Dalen (*pro hac vice*)
    Ruth Lowenkron

By: */s/ Richard F. Schwed*
    Richard F. Schwed
    Zhaohua Huang