**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------------------- X

STEVEN GREENE; GIOVANNA SANCHEZ-
ESQUIVEL; SARAH ARVIO; LISA COLLINS;
ORITSEWEYIMI OMOANUKHE AYU; and NEIL
AMITABH, individually and on behalf of all others
similarly situated, and COMMUNITY ACCESS, INC.;
NATIONAL ALLIANCE ON MENTAL ILLNESS OF
NEW YORK CITY, INC.; CORRECT CRISIS
INTERVENTION TODAY – NYC; and VOICES OF
COMMUNITY ACTIVISTS AND LEADERS NEW
YORK,

Plaintiffs,

-against-

CITY OF NEW YORK; ERIC ADAMS; BILL DE
BLASIO; EDWARD A. CABAN; KEECHANT L.
SEWELL; DERMOT F. SHEA; NYPD POLICE
OFFICER MARTIN HABER; NYPD POLICE
SERGEANT CARRKU GBAIN, NYPD POLICE
OFFICER VIKRAM PRASAD; NYPD POLICE
OFFICER ANDRE DAWKINS; NYPD POLICE
OFFICER TYRONE FISHER; NYPD POLICE
OFFICER DEVIENDRA RAMAYYA; NYPD POLICE
OFFICER JULIAN TORRES; NYPD OFFICER APRIL
SANCHEZ; NYPD POLICE OFFICER GABRIELE
MORRONE; NYPD OFFICER JOHN FERRARA;
NYPD POLICE OFFICER MARYCATHERINE
NASHLENAS; and NYPD OFFICERS JOHN and JANE
DOES # 1-40,

Defendants.

--------------------------------------------------------------------- X

No. 21-cv-05762 (LAP)

**<u>ORAL ARGUMENT
REQUESTED</u>**

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' SECOND PARTIAL MOTION TO DISMISS AND MOTION TO
STRIKE PURSUANT TO RULE 12(f)**

# <u>TABLE OF CONTENTS</u>

**Page**

Table of Authorities ............................................................................................................. iii

Preliminary Statement...................................................................................................... 1

Statement of Facts ............................................................................................................ 3

Standard of Review ........................................................................................................... 6

Argument ........................................................................................................................... 6

I.    Plaintiffs Plausibly Allege that the City's Operation of its Emergency Response Program Violates the Rights of People with Mental Disabilities ...................................................... 6

    A.    All Plaintiffs, Including Those who are "Regarded as" having a Disability, are "Qualified Individuals with Disabilities" Pursuant to the ADA ............................ 7

    B.    Plaintiffs Plausibly Allege that the City's Emergency Response Program Discriminates Against Them Based on their Mental Disability ............................ 8

        1.    This Case Does *Not* Challenge MHL § 9.41 or Any Other Program Exclusively for People with Mental Disabilities ......................................... 9

        2.    The City's Emergency Response Program Discriminates Against People with Mental Disabilities .......................................................................... 12

II.   Defendants' Request for Reconsideration of the Court's Prior Ruling that Certain Plaintiffs Plausibly Alleged Denial of Reasonable Accommodations During the Course of their Interactions with the Police is Untimely and Meritless ............................................. 17

III.  The TAC Does Not Include an "Implied *Monell*" Claim .................................................. 18

IV.   The City Officials are Not Entitled to Dismissal or Immunity ......................................... 18

    A.    Plaintiffs Plausibly Allege the Personal Involvement of Individual City Officials, and Their Claims are Not Redundant.................................................... 18

    B.    Defendant City Officials are Not Entitled to Absolute Qualified Immunity ........ 21

V.    Defendants' Motion to Strike Plaintiffs' Class Allegations Is Untimely and Meritless ... 22

Conclusion ......................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Page**

**Cases**

*Alexander v. Choate,*
    469 U.S. 287 (1985)........................................................................................10

*Allah v. Goord,*
    405 F. Supp. 2d 265 (S.D.N.Y. 2005).......................................................15

*Allen v. Koeningsmann,*
    No. 19-cv-8173, 2023 U.S. Dist. LEXIS 57051 (S.D.N.Y. 2023) (Preska, J.).......................25

*Am. Council of the Blind v. Paulson,*
    525 F.3d 1256 (D.C. Cir. 2008)...............................................................16

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).......................................................................................6

*Attis v. Solow Realty Dev. Co.,*
    522 F. Supp. 2d 623 (S.D.N.Y. 2007)........................................................7

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007).......................................................................................6

*Bogan v. Scott-Harris,*
    523 U.S. 44 (1998).......................................................................................22

*Bread for the City v. Dist. Of Columbia,*
    No. 23-cv-1945-ACR (D.D.C. Sept. 10, 2024) ...................................... *passim*

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,*
    980 F.Supp.2d 588 .............................................................................. *passim*

*Canzoneri v. Inc. Vill. of Rockville Ctr.,*
    986 F. Supp. 2d 194 (E.D.N.Y. 2013) .....................................................20

*Casale v. Kelly,*
    257 F.R.D. 396 (S.D.N.Y. 2009) ..............................................................25

*Chenensky v. N.Y. Life Ins. Co.,*
    No. 07 CIV. 11504 WHP, 2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011).............................24

*Cincotta v. Hempstead Union Free Sch. Dist.,*
    313 F.Supp.3d 386 (E.D.N.Y 2018) ........................................................23

*Civic Ass'n of the Deaf of N.Y.C. v. City of N.Y.,*
    No. 95CV8591, 2011 ..................................................................10, 15, 16, 25

*Colon v. Coughlin*,
58 F.3d 865 (2d Cir. 1995)..................................................................20

*Davis v. Shah*,
821 F.3d 231 (2d Cir. 2016)................................................................15

*Disability Advocates, Inc. v. McMahon*,
124 Fed. Appx. 674 (2d Cir. 2005)......................................................19

*Disability Rts. Oregon v. Washington Cnty.*,
No. 24-cv-00235-SB (D. Oregon Aug. 30, 2024) (ECF No. 40).................... *passim*

*Disabled in Action v. Bd. of Elections*,
752 F.3d 189 (2d Cir. 2014)........................................................10, 13, 14, 17

*Doe v. Pfrommer*,
148 F.3d 73 (2d Cir. 1998)..................................................................15

*Duarte v. St. Barnabas Hosp.*,
265 F. Supp. 3d 325 (S.D.N.Y. 2017)...................................................7

*Est. of LeRoux v. Montgomery County*,
No. 22-0856, 2023 WL 2571518 (D. Md. Mar. 20, 2023) ....................17

*In re Fannie Mae 2008 Sec. Litig.*,
891 F. Supp. 2d 458 (S.D.N.Y. 2012)..................................................25

*Felix v. City of New York*,
344 F. Supp. 3d 644 (S.D.N.Y. 2018)..............................................19, 21

*Felix v. City of New York*,
No. 16cv5845, 2020 U.S. Dist. LEXIS 189223 (S.D.N.Y. Oct. 13, 2020) ...........18

*Floyd v. City of N.Y.*,
283 F.R.D. 153 (S.D.N.Y. 2012) .........................................................25

*g., Lorusso v. Borer*,
359 F. Supp. 2d 121 (D. Conn. 2005) ..................................................23

*Guan v. City of New York*,
37 F.4th 797 (2d Cir. 2022) ...............................................................19

*Hargrave v. Vermont*,
340 F.3d 27 (2d Cir. 2003)..............................................................12, 13

*Harhay v. Town of Ellington Bd. of Educ.*,
323 F.3d 206 (2d Cir. 2003)................................................................23

*Henrietta D. v. Bloomberg*,
331 F.3d 261 (2d Cir. 2003)................................................... *passim*

*Hilton v. Wright*,
    673 F.3d 120 (2d Cir. 2012) ..................................................................................8

*Ironforge.com v. Paychex, Inc.*,
    747 F.Supp.2d 384 (W.D.N.Y. 2010) ..................................................................24

*Loeffler v. Staten Island Univ. Hosp.*,
    582 F.3d 268 (2d Cir. 2009)............................................................................7, 17

*McElwee v. Cnty. of Orange*,
    700 F.3d 635 (2d Cir. 2012)................................................................................13

*Mihalik v. Credit Agricole Cheuvreux N.A.*,
    715 F.3d 102 (2d. Cir. 2013)................................................................................7

*O'Brien v. City of Syracuse*,
    2023 U.S. Dist. LEXIS 164918 (N.D.N.Y. Sept. 18, 2023) ...................................18

*Olmstead v. L.C.*,
    527 U.S. 581 (1999)...........................................................................................12

*Pusepa v. Annucci*,
    No. 17-CV-1765 (RA), 2019 WL 690678 (S.D.N.Y. Feb. 19, 2019) .....................21

*Rodde v. Bonta*,
    357 F.3d 988 (9th Cir. 2004) .............................................................................12

*Staron v. McDonald's Corp.*,
    51 F.3d 353 (2d Cir.1995)...................................................................................17

*Tardif v. City of New York*,
    91 F.3d 394, 405 (2d Cir. 2021)....................................................................15, 16

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)..................................................................................6

*In re Tronox, Inc. Sec. Litig.*,
    No. 09 CIV. 6220 (SAS), 2010 WL 2835545 (S.D.N.Y. June 28, 2010)...............24

*Tugg v. Towey*,
    864 F. Supp. 1201 (S.D. Fla. 1994) .....................................................................17

*U.S. Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002).......................................................................................13, 14

*Van Velzor v. City of Burleson*,
    43 F. Supp. 3d 746 (N.D. Tex. 2014) ..............................................................15, 17

*Vista Food Exch., Inc. v. Lawson Foods, LLC*,
    No. 17cv07454, 2020 U.S. Dist. LEXIS 236037 (S.D.N.Y. Dec. 15, 2020)...........18

*Vogel v. City of N.Y.*,
    No. 14 CIV. 9171 (RMB), 2017 WL 4712791 (S.D.N.Y. Sept. 19, 2017) ............................25

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992)........................................................................................18

*Williams v. City of New York*,
    121 F. Supp. 3d 354 (S.D.N.Y. 2015)........................................................................18

*Winfield v. Citibank, N.A.*,
    842 F. Supp. 2d 560 (S.D.N.Y. 2012)........................................................................24

*Wright v. Guiliani*,
    230 F.3d 543 (2d Cir. 2000)........................................................................................10

*Wright v. McMann*,
    460 F.2d 126 (2d Cir. 1972)..................................................................................20, 22

*Wright v. N.Y. State Dep't of Corr.*,
    831 F.3d 64 (2d Cir. 2016)...........................................................................................7

**Rules and Statutes**

28 C.F.R. § 35.108(a)(1)(iii) .........................................................................................9

28 C.F.R. § 35.130(b) ............................................................................................13, 16

28 C.F.R. § 35.150(a)..............................................................................................10, 13

Americans With Disabilities Act, 42 U.S.C. §§ 12101-35. ................................... *passim*

29 U.S.C. § 794.....................................................................................................1,2,7

D.C. Code § 21-521 .....................................................................................................12

N.Y.C. Admin. Code § 8-101. ...................................................................................1, 7

N.Y.C. Admin. Code § 8-130 ......................................................................................7

N.Y. Mental Hyg. Law § 9.41 ............................................................................. *passim*

S.D.N.Y. Local Civ. R. 12(f) .................................................................................24, 25

S.D.N.Y. Local Civ. R. 6 ......................................................................................18, 24

## PRELIMINARY STATEMENT

New York City operates a unified emergency response program through 911 that responds to all types of emergencies. All health emergencies—except mental health emergencies—are dispatched health professionals as first responders who are specifically trained to provide health services, including assessment of the individual's health issues and healthcare needs, providing on-the-spot stabilizing care, determination of additional care needs, and connection to follow-up services. Mental health emergencies, on the other hand, are singled out from other health emergencies for a less effective response by law enforcement, who does not provide any of the same health services, and who are more likely to exacerbate than de-escalate a crisis, and more likely to inflict other adverse consequences. This constitutes disability discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* (the "ADA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* (the "NYCHRL").

This Court previously ruled that Plaintiffs' Second Amended Complaint failed to state a claim for disability discrimination as the claims focused on the inadequacy of the services provided to people with mental disabilities through New York State Mental Hygiene Law ("MHL") § 9.41 and the City's "Emotionally Disturbed Persons" ("EDP") Policies. *See* Opinion & Order, March 26, 2024 (ECF No. 193) ("Order"), at 30. The Third Amended Complaint ("TAC") filed by Plaintiffs—individuals who have mental disabilities or perceived disabilities on behalf of themselves and those similarly situated, as well as organizational plaintiffs that are committed to safeguarding the rights of individuals with disabilities—focuses on the City's operation of its unified emergency response program, a program that is available to the general population and which provides a healthcare response and services to all health emergencies, except mental health crises. As a result, the City's police response provided to 911 mental health calls denies people

with mental disabilities meaningful access to, and the equal opportunity to benefit from, the City's emergency response program, and otherwise discriminates against them on the basis of disability.

Federal courts in Oregon and D.C. have recently denied motions to dismiss ADA and Section 504 claims brought against similarly structured emergency response programs. *See* Ormand Decl, Ex. A., Findings and Recomm., *Disability Rts. Oregon v. Washington Cnty.*, No. 24-cv-00235-SB (D. Oregon Aug. 30, 2024) (ECF No. 40) (magistrate report recommending denial of defendants' motions to dismiss plaintiffs' claim that dispatching police as first responders to mental health emergencies violates the disability laws); Ormand Decl., Ex. B, Transcript of Status Conf. at 5-23, *Bread for the City v. D.C.*, No. 23-cv-1945-ACR (D.D.C. Sept. 10, 2024) (same, denying motion to dismiss). This Court should likewise deny Defendants' motion.

When police respond to mental health emergencies, they do so in ways that are not only harmful and counterproductive to resolving mental health emergencies but also violate people with mental disabilities' rights under the federal and state constitutions, as well as their right to reasonable accommodations during the course of the mental health arrests. This Court has ruled that the claims of certain Plaintiffs in this regard are entitled to move forward. Order at 20, 22, 23 & 33. Defendants' request for reconsideration of this Court's ruling on Plaintiffs' claims regarding reasonable accommodations should be rejected as untimely and meritless.

Using the vehicle of a motion to strike, Defendants also seek reconsideration of the Court's denial of their motion to dismiss Plaintiffs' class action allegations. Defendants' motion to strike the class allegations also fails as untimely and meritless. Finally, Plaintiffs do not bring a *Monell* claim against the City for damages for constitutional violations. Defendants' lengthy argument on this point is thus an irrelevant distraction.[1]

---

[1] Plaintiffs concur with Defendants' Points III and IV that certain false arrest and warrantless entry claims were dismissed by this Court. These claims are not being reasserted.

## STATEMENT OF FACTS

The City operates a unified emergency response program that responds to all types of health emergencies. TAC ¶¶ 2-4, 66-69, 71-72, 80. People who place 911 calls will speak to City employees, regardless of whether they are calling about a physical, mental health, or other medical emergency. *Id*. ¶¶ 70-71. Each 911 call is answered by one of the New York Police Department ("NYPD") Police Communication Technicians (hereinafter referred to as "911 call-takers"), who determines how to route the call and which type of first responder to dispatch. *Id*. ¶ 71.

A health emergency is a health emergency whether it arises in the heart or the mind, or both, as is often the case. Mental health emergencies commonly arise in the mind from mental disabilities such as depression, anxiety, and PTSD. *Id*. ¶ 78. Typically, mental health emergencies, including ones involving suicidal ideation or self-harm, do not present a danger to others, and do not involve criminal conduct, violence, or use or possession of a weapon. *Id.*

According to the City's 911 website, if a call is reporting a medical emergency, the 911 call-taker adds an Emergency Medical Services ("EMS") call-taker to the call who conducts "medical questioning" and then shares the details with an EMS dispatch that mobilizes the unit that will travel to the site. TAC ¶¶ 71-72. People who access the City's emergency response program for all but one type of health emergency—a mental health emergency—are dispatched trained and certified EMTs and paramedics who provide extensive health services, including assessment of the individual's health care needs, on-the-spot stabilizing care, a determination of whether additional care is needed, and a connection of the individual to follow-up services. *Id*. ¶¶ 2-4, 9, 67, 74-77, 81, 83. While the police may also respond to physical health emergency calls in certain instances, their role is one of law enforcement. *Id*. ¶ 73.

Only people experiencing mental health crises, by contrast, are denied such a health response and services despite conclusive data that people with mental disabilities are no more

likely to be violent or dangerous than anyone else, *id.* ¶¶ 57, 87, based on antiquated and inaccurate stereotypes of people with mental disabilities, *id.* ¶¶ 56-58, 117, 144-45. *All* 911 calls suggesting a mental health concern (referred to as "EDP" calls) get dispatched a police response comparable to the response to calls reporting a crime. Police are sent as the first/primary responder.[2] *Id.* ¶ 80.

The police response for mental health emergencies not only denies people with mental disabilities urgent health care but is also likely to exacerbate the emergency and subject people with disabilities to an array of adverse outcomes, ranging from trauma to death. *Id.* ¶¶ 82, 84-85, 96. For example, Plaintiff Giovanna Sanchez-Esquivel was home when her boyfriend called 911 stating that she was not a risk to herself or others but was experiencing a "manic episode." *Id.* ¶ 178. Despite the arrival of eight NYPD officers at her home, Sanchez-Esquivel remained calm and did not do anything to suggest that she posed a danger to herself or others. Yet, she was handcuffed and forcibly placed into police custody, resulting in physical injuries, trauma, and exacerbation of the symptoms of her disabilities. *Id.* ¶¶ 185-90. She was also denied any health services. *Id.* ¶ 186.

Although EMS may accompany police to mental health emergencies, they do not provide health services or de-escalate the emergencies; their role is merely to provide transport to a hospital. *Id.* ¶¶ 249, 254. This is demonstrated in the case of Plaintiff Sarah Arvio, whose leg bled profusely as a result of the police response to her perceived mental health emergency. The EMT on the scene did not even examine her, let alone treat her. *Id.* ¶¶ 213-17; *see also, e.g.*, ¶¶ 238-49 (EMS transported Plaintiff Lisa Collins to the hospital even though they, and the police, acknowledged having no concerns about her mental health).

---

[2] The only exception to the police response to mental health emergencies is through the Behavioral Health Emergency Assistance Division ("B-HEARD") that dispatches mental health professionals and EMTs to mental health calls. TAC ¶ 123. The very existence of B-HEARD is an acknowledgement that a police response is neither necessary nor most effective for responding to mental health emergencies. However, the B-HEARD response has only been used for a small percentage of calls, with no further funding or expansion on the horizon. *Id.* ¶ 124.

Experts agree that people experiencing mental health emergencies must receive a health response and health services, just as all others who experience health emergencies do. A health response is far more effective and much safer than a police response. *Id.* ¶¶ 107-108; *see also, e.g.*, *id.* ¶¶ 65, 78-81, 94, 105 (describing the trauma and other injuries, including death, as well as violations of constitutional rights, resulting from police response, suffered by people with mental disabilities as a result of accessing the City's emergency program).

At least as early as 2002, the City was on notice of the discriminatory treatment of people with mental disabilities and the harm caused by its police response to mental health calls, based on a briefing presented to this effect to City officials by the Urban Justice Center. *Id.* ¶¶ 111-12. Nonetheless, the City failed to take any action to redress the discriminatory and harmful impact of denying people with disabilities the health response provided to all other emergencies. An advocacy campaign launched a decade later by Plaintiffs Community Access and CCIT-NYC again brought the problem to the City's attention though meetings with high-level officials, *inter alia*. *Id.* ¶¶ 114-16. Defendant Bill de Blasio announced a 2014 "Action Plan" to "ensure that we are reserving criminal justice resources for the appropriate cases and deploying *treatment* and other proven effective remedies" to mental health emergencies, but this brought no change in the City's police-led response to these calls. *Id.* ¶¶ 117-18 (emphasis added). A second task force also brought about little to no change. *Id.* ¶¶ 119-121. It was not until June of 2021 that a limited non-police response to some 911 mental health calls was provided through B-HEARD. *Id.* ¶¶ 13, 101, 123.

In 2023, the U.S Department of Justice ("DOJ"), charged with enforcing the ADA, along with the U.S. Department of Health and Human Services, issued guidance explaining that the ADA "requires that people with behavioral health disabilities receive a health response in circumstances where others would receive a health response—for example, if call centers would dispatch an ambulance or medic rather than police officers to respond to a person experiencing a heart attack

or a diabetic crisis, equal opportunity would entail dispatching a health response in similar circumstances involving a person with a behavioral health disability." *Id*. ¶ 95.

Multiple municipalities across the country have established emergency response programs that provide health responses to all health emergencies, including mental health emergencies, *id*. ¶ 109. Others have been found by the DOJ to have violated the ADA by operating an emergency response system, similar to the Defendant City's, that utilizes police as first responders to mental health emergencies. *See id*. ¶¶ 95-96.[3]

## STANDARD OF REVIEW

The issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Todd v. Exxon Corp*., 275 F.3d 191, 198 (2d Cir. 2001). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.

## ARGUMENT

I.    **Plaintiffs Plausibly Allege that the City's Operation of its Emergency Response Program Violates the Rights of People with Mental Disabilities**

Under Title II of the ADA, 42 U.S.C. § 12132, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." Stating a claim under Title II requires plausibly alleging that (1) Plaintiffs are

---

[3] *See also* United States Department of Justice Civil Rights Division, Investigation of the City of Phoenix and the Phoenix Police Department (June 13, 2024) ("DOJ Phoenix Report"), https://www.justice.gov/crt/media/1355866/dl?inline.

qualified individuals with disabilities, (2) Defendants are subject to the statute, and (3) Plaintiffs were denied the opportunity to participate in, or benefit from, Defendants' services, programs, or activities, or were otherwise discriminated against because of their disabilities. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).[4] The New York City Human Rights Law ("NYCHRL") imposes a different, higher standard on Defendants than the other disability laws. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009); N.Y.C. Admin. Code. § 8-130. Federal courts must consider separately whether challenged conduct is actionable under the NYCHRL. *Mihalik v. Credit Agricole Cheuvreux N.A.*, 715 F.3d 102, 109 (2d. Cir. 2013).[5]

Defendants do not dispute that the City is a covered entity within the meaning of the disability laws. Nor do they dispute that the City's provision of responses to physical and mental health emergencies through its emergency response program, is a "service, program, or activity"[6] within the meaning of Title II of the ADA. TAC ¶ 432. Instead, they dispute that (1) all Plaintiffs are qualified individuals with disabilities, because some Plaintiffs do not have actual disabilities; and (2) the City does not discriminate against people with disabilities because Defendants act pursuant to MHL § 9.41, a program exclusively for people with disabilities in responding to mental health calls. They are wrong on both counts.

### A.    All Plaintiffs, Including Those who are "Regarded as" having a Disability, are "Qualified Individuals with Disabilities" Pursuant to the ADA

Individuals with actual and perceived mental disabilities are the ones who experience

---

[4] Because the standards under both the ADA and Section 504 are to be construed "broadly" and are generally the same, courts treat claims under the two statutes identically. *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg* ("*BCID*"), 980 F.Supp.2d 588, 639 (quoting 42 U.S.C. §12101(b)(1)).

[5] *See, e.g.*, *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 346 (S.D.N.Y. 2017) (less demanding standard for demonstrating disparate treatment); *BCID*, 980 F. Supp.2d at 642 (broader notion of what constitutes reasonable modification); *Attis v. Solow Realty Dev. Co.*, 522 F. Supp. 2d 623, 631-32 (S.D.N.Y. 2007) (broader definition of disability).

[6] Courts have used these terms interchangeably and Plaintiffs do herein as well.

mental health crises and who are denied the health crisis response the City provides to all other health emergencies. The City does not dispute that Plaintiffs Greene, Sanchez-Esquivel, and Ayu are individuals with actual mental disabilities and are, therefore, qualified individuals with disabilities pursuant to the ADA. Defendants, however, argue for dismissal of the disability claims brought by Plaintiffs Amitabh, Arvio, and Collins because these plaintiffs do not allege that they have disabilities. Defendants' argument is wrong on the facts and the law.

An individual with a "disability" under the ADA includes individuals with actual disabilities, as well as those with perceived disabilities, and those with a record of such disabilities. *See* 42 U.S.C. § 12102(3); *see also* TAC ¶ 4 & n.1, 433-437; A plaintiff is "not required to present evidence of how or to what degree [defendant] believed the impairment affected him," just that the defendant "regarded him as having a mental or physical impairment." *Hilton v. Wright*, 673 F.3d 120, 129 (2d Cir. 2012).

Plaintiffs allege (and Defendants do not dispute) that the subjects of mental health calls either have or are perceived to have a disability. *See, e.g.*, TAC ¶¶ 3-4, 57-65, 78- 80, 435; Order at 30. Plaintiffs Arvio, Collins, and Amitabh further allege that they were designated "EDPs" and perceived by 911 call-takers, emergency dispatchers, and/or the individual police officers who responded as having mental disabilities. *See, e.g.*, *id*. ¶¶ 21, 22, 24, 198, 219, 242, 253-54, 314.[7] Thus, each Plaintiff plausibly alleges that they are a "qualified individual with a disability."

### B. Plaintiffs Plausibly Allege that the City's Emergency Response Program Discriminates Against Them Based on their Mental Disability

---

[7] The sole distinction between how a person with an actual disability and a person with a perceived disability is treated under Title II of the ADA is that a public entity is not required to provide a reasonable accommodation to an individual with a perceived disability. 28 C.F.R. § 35.108(a)(1)(iii). This distinction does not apply to the requirement that public entities "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." *Id.* § 35.130(b)(7)(i). Because the statutory definition of "disability" includes people with actual or perceived disabilities, whenever the term "disability" is used herein it refers to both.

The TAC challenges the City's emergency response program—a program that is available to all members of the public for all types of emergencies and that is designed to provide critical health care responses to medical emergencies, such as assessing the individual's medical needs, providing on-the-spot stabilizing services and treatment, determining whether additional care is needed, and connecting the subject of the call to follow-up services. *Id.* ¶¶ 67, 69, 71, 74-77. That the City does not do that in response to mental health emergencies, instead singling out mental health emergencies, and providing them with a police response, *id.* ¶¶ 80-92, 444-45, is the discriminatory conduct challenged by Plaintiffs.

Notably, courts evaluating nearly identical disability discrimination claims have found the plaintiffs' allegations regarding the relevant emergency response programs sufficient at the pleading stage. *See Disability Rts. Oregon*, at 40 (defining the relevant service as "the provision of consistent access to emergency medical service through the emergency communications system when an emergency call is made to 911"); *Bread* Tr. at 17, 21-22 (defining the relevant program as the emergency response program as a whole that benefits all people in D.C. by providing timely and effective assistance to health emergencies). The *Bread* court rejected the argument that the plaintiff's claim involved distinct services for different types of emergencies, finding that, like Plaintiffs in this case, the plaintiff pled that D.C.'s emergency response program *as a whole* discriminates against people with mental disabilities, and that at this point in the litigation, the court must accept these allegations as true and give plaintiff the benefit of all reasonable inferences. *See* Tr. at 19-22 (citing *Wright v. Guiliani*, 230 F.3d 543, 548-49 (2d Cir. 2000) (noting that factual development might be necessary to determine the scope of service) (emphasis added).

### 1.    This Case Does *Not* Challenge MHL § 9.41 or Any Other Program Exclusively for People with Mental Disabilities

Heeding the Supreme Court's instruction that the benefit of the relevant government program or service "cannot be defined in a way that effectively denies otherwise qualified . . .

individuals the meaningful access to [the program, service, or activity.]" *Alexander v. Choate*, 469 U.S. 287, 301 (1985), courts in this Circuit have similarly employed broad definitions of a program's scope in evaluating disability claims. *See, e.g.*, *Disabled in Action v. Bd. of Elections*, 752 F.3d 189, 199 (2d Cir. 2014) ("the relevant benefit is the opportunity to fully participate in BOE's voting program"); *Henrietta D.*, 331 F.3d at 264 (evaluating the service as benefits and services provided by a City agency); *BCID*, 980 F. Supp. 2d at 642 (evaluating the City's "emergency preparedness and planning" program and, citing 28 C.F.R. §35.150(a), noting that the program must be evaluated "in its entirety"); *Civic Ass'n of the Deaf of N.Y.C. v. City of N.Y.*, No. 95CV8591, 2011 LEXIS 90645 at *41 (S.D.N.Y. 2011) (evaluating the provision of "emergency services from the street" for people with disabilities).

Like the plaintiffs in those cases, Plaintiffs here are challenging a program, the emergency response program, as a whole. While Defendants would have this Court believe that Plaintiffs' disability claims are premised on "challenging law enforcement's role in enforcing New York State Mental Hygiene Law § 9.41," Memorandum of Law in Support of Defendants' Partial Motion ("MOL") (ECF No. 229), at 1, 20, this is not the case. Plaintiffs' claims center on the City's policy of dispatching police to mental health emergency calls while providing health services for all other health emergencies, in each case under the single emergency response program available to everyone. MHL § 9.41, by contrast, applies exclusively to people with mental disabilities whom law enforcement take into custody for transport to a hospital. It is thus wholly distinct from the general emergency response program which is *not* exclusively for people with mental disabilities and *not* exclusively tailored to mental health arrests.

Defendants argue that "it would be insufficient under MHL § 9.41 to fail to dispatch police," to mental health emergencies, falsely implying that MHL § 9.41 requires the police to respond. MOL at 8. However, MHL § 9.41 does not mandate a discrete emergency response

program for mental health calls. Nowhere in MHL § 9.41 does it state that the police are required to respond to any or all mental health calls. And, most importantly, through B-HEARD, the City acknowledges that police are not required to be sent to all mental health calls. B-HEARD provides non-police, health-centered responses to mental health calls, TAC ¶¶ 122-24, and it did so approximately 15,000 times in FY 2024 alone.[8]

In the cases where courts found plausible allegations that the emergency response program violates the ADA, people were being involuntarily removed pursuant to laws substantially similar to MHL § 9.41. For example, Oregon law authorizes the police to take into custody "a person who the officer has probable cause to believe is dangerous to self or to any other person and is in need of immediate care, custody or treatment for mental illness," Or. Rev. St. § 426.228(1), and the plaintiff in *Disability Rights Oregon* was taken into custody "because [he] expressed that he wanted to kill himself and because the officer stated he could see evidence of [plaintiff] cutting himself" in response to his call to 911 about suicidal ideation and acknowledgment that he had knives in his house. *Disability Rts. Oregon*, at 10-11 & n.5; *see also id.* at 12 (Jane Doe taken into custody in response to a 911 call about "a woman walking in traffic throwing unknown items near passing cars"). In D.C., police are authorized to arrest individuals reasonably believed to be mentally ill and likely to injure themselves or others if not immediately detained, D.C. Code § 21-521, and D.C. data shows that sending police as first responders resulted in involuntary removal 50% of the time. Ormand Decl., Ex. C, Complaint, *Bread for the City v. Dist. of Columbia*, 23-cv-1945 (D.D.C. Sept. 10, 2024) at ¶¶ 62 (ECF No. 1); *see also id.* ¶ 74 (recounting forcible removals of people experiencing mental health crises).

Plaintiffs' disability claims are therefore consistent with, and do not impinge upon, MHL

---

[8] *See* B-HEARD Data Overview (Sept. 20, 2024), https://mentalhealth.cityofnewyork.us/bheard-data.

§ 9.41. The cases cited by Defendants addressing claims about services provided only to people with disabilities, MOL at 20, are inapposite, and the City's emergency response program is not a program exclusively for people with mental disabilities.[9]

> ### 2. The City's Emergency Response Program Discriminates Against People with Mental Disabilities

The City has structured its emergency response program in a way that denies people with mental disabilities the equal opportunity to participate in, or benefit from, the health response and services that it provides to health emergencies experienced by the general population.[10] Singling out mental health emergencies for a non-health-driven and less effective law enforcement response is discriminatory. *See, e.g.*, *Hargrave*, 340 F.3d at 37 (singling out people with mental disabilities for more onerous government procedures is discrimination on the basis of disability). The discrimination alleged here is the *type* of response dispatched; the outcomes of the unequal treatment illustrate the denial of equal opportunity.[11]

---

[9] Even if the program were solely intended for people with disabilities, it could nonetheless be administered in a discriminatory manner. *See, e.g., Olmstead v. L.C.,* 527 U.S. 581, 598-99 (1999) (unjustified isolation in mental health institutions violates the ADA); *Rodde v. Bonta*, 357 F.3d 988 (9th Cir. 2004) (affirming injunction prohibiting closure of hospital that served patients with mental disabilities); *Hargrave v. Vermont*, 340 F.3d 27, 37, (2d Cir. 2003) ("A program may discriminate on the basis of mental illness if it treats a mentally ill individual in a particular set of circumstances differently than it treats non-mentally ill individuals in the same circumstances."); *Henrietta D.*, 331 F.3d at 284 (affirming injunction requiring accommodations to ensure people with HIV/AIDS had meaningful access to benefits provided by agency whose sole function was to assist persons with HIV-related diseases in obtaining benefits).

[10] This is the case whether framed as disparate treatment, denial of equal opportunity, a failure to provide reasonable accommodations/modifications, or denial of the opportunity to participate in, or benefit from, a program or service, or as otherwise discriminating by reason of disability. "Reasonable modifications," the language used in Title II of the ADA and its implementing regulations, and "reasonable accommodations," used elsewhere in the ADA, are substantively interchangeable. *See, e.g., McElwee v. Cnty. of Orange*, 700 F.3d 635, 646 n.2 (2d Cir. 2012).

[11] *See* TAC ¶¶ 84-93 (describing the trauma and other indignities, physical injuries, and violations of constitutional rights sustained by people with mental disabilities). Though EMS is dispatched on mental health calls, they fail to address the mental health issues, and ignore any physical health issues, highlighting the discriminatory treatment. *See, e.g.*, *id.* ¶ 82 (Plaintiff Arvio's leg bleeding is just one example of EMS not responding to physical injuries on mental health calls).

When providing any program, public entities must ensure that qualified individuals with disabilities have the opportunity to participate in, or benefit from, the program in a manner that is "equal to that afforded others" and "as effective in affording equal opportunity to . . . gain the same benefit." 28 C.F.R. §§ 35.130(b)(1)(i) & (ii); *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002); *Disabled in Action*, 752 F.3d at 200-01; *Henrietta D.*, 331 F.3d at 273-4.

A key issue in evaluating whether Plaintiffs have equal opportunity to benefit from the City's emergency response program is whether individuals with disabilities are provided "meaningful access" to the program. *Henrietta D.*, 331 F.3d at 261, 273. This assessment must be made by viewing the program "in its entirety." *BCID*, 980 F. Supp.2d at 641-42(quoting 28 C.F.R. § 35.150(a)). "Meaningful access" requires the government to do more than provide minimal access. *See Disabled in Action*, 752 F.3d at 198 (standard does not require proof of being "completely prevented from enjoying a service, program, or activity to establish discrimination"); *see also U.S. Airways, Inc.*, 535 U.S. at 397 (ADA's purpose is a "basic equal opportunity goal").

The City's emergency response program denies people with disabilities meaningful access to the benefits of the City's emergency response program. TAC ¶¶ 74-93. Police—who are not health professionals, who do not provide on-site assessment and stabilizing treatment, among other health benefits, and whose training emphasizes command and control and cultivates instincts in tension with appropriate health responses, *see, e.g.*, *id.* ¶¶ 81-88—are dispatched as first and primary responders to mental health emergencies, while the general population receives a health-led response and health-driven services in response to health emergencies. Although police can order removal to a hospital, this is not a comparable medical response to the health services the City's emergency response program provides to people without mental disabilities. As courts have noted, "[t]h[e]se allegations support a reasonable inference that people with mental health disabilities do not have meaningful access to the benefits of the [public entity's] emergency-

response system." *Bread* Tr. at 19; *see also Disability Rts. Oregon*, at 56, 64-65.[12]

Similar denials of the benefits of government programs or services have also been found by courts to constitute disability discrimination in analogous circumstances. *See, e.g.*, *Disabled in Action*, 752 F.3d at 199 (Board of Elections denied voters with disabilities the opportunity to fully participate in voting program by failing to ensure their access to polling sites); *BCID*, 980 F.Supp.2d at 643-652, 654 (emergency preparedness program violated ADA by failing to provide people with disabilities consistent access to program benefits in its evaluation, shelter, programmatic, and post-emergency plans; the fact that some services were usable was not enough to demonstrate meaningful access); *Civic Ass'n of the Deaf*, 2011 LEXIS 90645, at *45 (service reduction of the emergency reporting system violated the ADA because it did not ensure that people with disabilities would have meaningful access to emergency services).[13]

To the extent Defendants argue that Plaintiffs are challenging the adequacy of mental health services, MOL at 20, they mischaracterize the allegations in the TAC. This case is not about

---

[12] The D.C. and Oregon courts found Title II's "by reason of disability" requirement satisfied by the exclusion of mental health calls from the health response provided to others through the emergency response program. *See Bread* Tr. at 21-22; *Disability Rts. Oregon* at 64-65, n.26. "By reason of disability" can also be satisfied where plaintiffs have demonstrated that "they are facially entitled to public benefits which are also available to similarly situated persons without disabilities, and (ii) . . . their disabilities . . . necessitate a reasonable accommodation in order for them meaningfully to access the benefits (which accommodation they are not currently receiving)." *Henrietta D.*, 331 F.3d at 280.

[13] Even if people with mental disabilities had access to some of the health services provided by the emergency response program, allegations showing the benefits received were not equal to those afforded to others are sufficient at this stage. *See, e.g., Van Velzor v. City of Burleson*, 43 F. Supp. 3d 746, 759-61 (N.D. Tex. 2014) (city's less rigorous enforcement of disability-related traffic laws may violate the ADA). Showing that people with disabilities risk incurring injury in accessing services, as is the case in New York City, *see, e.g.*, TAC ¶¶ 90-91, 139-40, is also sufficient to withstand a motion to dismiss. *See, e.g., Allah v. Goord*, 405 F. Supp. 2d 265, 280 (S.D.N.Y. 2005). Inferior access to services that puts people with mental disabilities at greater risk of institutionalization likewise demonstrates lack of meaningful access. *See, e.g., Davis v. Shah*, 821 F.3d 231, 261 (2d Cir. 2016). Here, the City acknowledges that mental health calls to 911 result in a significant risk of hospitalization. TAC ¶ 61 (City report found that the "911 pathway . . . almost exclusively routes someone experiencing a mental health crisis to the hospital"); *see also* ¶ 138 (voluminous complaints filed alleging NYPD had taken people to the hospital against their will).

the adequacy of treatment; it addresses the City's denying people with mental disabilities the benefits of a health-driven emergency response, which is a response that the City regularly provides to people experiencing all health emergencies, except mental health emergencies. Plaintiffs' claim falls squarely within the purpose of the disability laws "to ensure evenhanded treatment between the disabled and able-bodied." *Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998). This case is thus distinguishable from *Tardif v. City of New York*, also cited by Defendants, MOL at 20. The *Tardif* court noted that a claim of denial of medical services because of disability is a properly stated ADA claim, but found the claims before it focused on whether the plaintiff received adequate medical treatment. 91 F.3d 394, 405 (2d Cir. 2021).[14]

Plaintiffs are also not seeking a new "judicial regime," as Defendants claim. MOL at 1. Public entities are required to "provide different or separate aids, benefits, or services . . . [when] necessary to provide . . . benefits, or services that are as effective as those provided to others" and "to make reasonable modifications in policies, practices, or procedures . . . to avoid discrimination on the basis of disability." 28 C.F.R. §§ 35.130(b)(1)(iv) & (b)(7)(i); *see, e.g.*, *Civic Ass'n of the Deaf*, 2011 LEXIS 90645 at *25-26; *BCID*, 980 F. Supp. 2d at 657. The fact that Plaintiffs seek to bring the City's emergency response program into compliance with the law does not transform Plaintiffs' disabilities claims into ones about adequate health care or new services. Moreover, the City already provides non-police responses to mental health emergencies. TAC ¶¶ 89-90, 123. Although dispatched to a small percentage of calls, *id.* at ¶ 124, B-HEARD demonstrates that providing a health response rather than a police response to mental health emergencies is not a call

---

[14] Defendants' other cases, MOL at 20, n.18, are equally inapposite as Plaintiffs are not challenging the quality of services or any involuntary commitment laws. This also explains the failure of Defendants' argument comparing Plaintiffs' claim that individuals experiencing mental health crises must receive a healthcare emergency response, to the illogical claim that cardiac specialists be dispatched to 911 calls about possible heart attacks, MOL at 9, n. 11. Denying people experiencing mental health crises a health response is indistinguishable from refusing to provide a health response to people experiencing any variety of physical health crises.

for a new service. *See Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1268 (D.C. Cir. 2008) (characterizing significant changes in currency to accommodate needs of people with disabilities as the "remov[al] of an obstacle . . . not . . . a substantively different benefit").

Moreover, even if significant changes, including changes in personnel, are required to accommodate the needs of people with mental disabilities, that is an intensive fact-based affirmative defense not ripe for adjudication at this stage of the litigation. *See, e.g.*, *Disability Rts. Oregon*, at 56 (argument that "incorporating mental health clinicians into any remedy would require creation of a new service" was premature); *Van Velzor*, 43 F. Supp.3d at 760 (denying motion to dismiss plaintiff's claim that the disability laws entitled plaintiff to equally effective personnel to enforce disability-related traffic laws as the city provided for enforcement of other traffic laws ); *Tugg v. Towey*, 864 F. Supp. 1201, 1201-11 (S.D. Fla. 1994) (equal access required hiring new employees with different qualifications); *Henrietta D.*, 331 F.3d at 280-82 (affirming district court injunction imposing procedural mechanisms designed to effectuate the goal of delivering public benefits and services for people with disabilities); *Disabled in Action*, 752 F.3d at 202; *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d Cir.1995).

Courts are especially apt to find program modifications that expand existing services to be reasonable, where the modifications align with previous modifications or stated plans. *See, e.g.*, *BCID*, 980 F.Supp.2d at 658 (modifications to emergency plans made by City in response to Hurricane Sandy were indicative that modifications proposed by plaintiff in current litigation were reasonable); *Est. of LeRoux v. Montgomery County*, No. 22-0856, 2023 WL 2571518, at *11-12 (D. Md. Mar. 20, 2023) (denying motion to dismiss the plaintiffs' ADA claim where the plaintiffs, surviving family members of a man killed by police officers while suffering a mental health crisis, had "alleged that there were a number of reasonable accommodations that could have been implemented . . . such as dispatching the [existent] Mobile Crisis Team [or] the Crisis Intervention

Team"). Here, the program modifications are fully aligned with B-HEARD. TAC 447.[15]

## II. Defendants' Request for Reconsideration of the Court's Prior Ruling that Certain Plaintiffs Plausibly Alleged Denial of Reasonable Accommodations During the Course of their Interactions with the Police is Untimely and Meritless

This Court ruled that Plaintiffs Greene, Sanchez-Esquivel, and Ayu's allegations that Defendants failed to provide reasonable accommodations during their mental health arrests were sufficient to state a claim. *See* Order at 33. Defendants urge this Court to reverse this ruling, because Plaintiffs' custodial removals did not constitute "arrest[s]," but rather were "involuntary removal[s] for psychiatric evaluation called for by MHL 9.41." MOL at 22. Defendants' request to alter the law of the case, *months* after the 14-day timeframe for motions for reconsideration, S.D.N.Y. Local Rule 6.3, is untimely. *See, e.g.*, *Vista Food Exch., Inc. v. Lawson Foods, LLC*, No. 17cv07454, 2020 U.S. Dist. LEXIS 236037, at *4 n.2 (S.D.N.Y. Dec. 15, 2020) (rejecting defendant's objections, which were "tantamount to a request for reconsideration," because the

---

[15] Lastly, although not necessary for injunctive relief, Plaintiffs also adequately allege deliberate indifference which "may be inferred when a policymaker acted with at least deliberate indifference to the strong likelihood that a violation of federally protected rights will result from the implementation of the challenged policy or custom." *Loeffler*, 582 F.3d at 275. The City had knowledge of how the police response and training violates the rights of people with mental disabilities. *See, e.g.*, TAC ¶¶ 92, 105, 111-120 (federal agencies issued guidance on mental health emergency responses as early as 2002, City was briefed on its discriminatory treatment, NYC community organizations have advocated against the discriminatory emergency health response for years, and the City has acknowledged issues such as "de-facto psychiatric facilities" through its ineffective task forces); *Felix v. City of New York*, No. 16cv5845, 2020 U.S. Dist. LEXIS 189223, *6 (S.D.N.Y. Oct. 13, 2020) (denying motion for summary judgment, finding the City on notice of training deficiencies leading to police officers' mishandling encounters with people with mental disabilities in violation of the ADA). That Defendants could have instituted corrective measures, but failed to do so, proves deliberate indifference. *See O'Brien v. City of Syracuse*, 2023 U.S. Dist. LEXIS 164918, at *35-37 (N.D.N.Y. Sept. 18, 2023) (finding Plaintiff's showing the City's awareness that police encounters with mentally ill persons often ended tragically and its failure to institute corrective measures through procedures and trainings sufficient to demonstrate deliberate indifference). In addition, to show deliberate indifference, plaintiffs need only allege a singular instance of a policy maker knowing of a risk, and disregarding it, *Williams v. City of New York*, 121 F. Supp. 3d 354, 374 (S.D.N.Y. 2015) (citing *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)). Here, Plaintiffs have cited to numerous City policies that numerous policy makers were aware of yet failed to remedy. S*ee* TAC at ¶¶ 127-133; 142-148.

timeframe for requesting reconsideration had long since passed, and "the law of the case doctrine 'foreclose[d] re-litigation of issue expressly or impliedly decided by the . . . court'").

Defendants' argument is also meritless. This Court has already ruled that police must make reasonable accommodations for people with disabilities during an arrest. Order at 33. This is the law whether Plaintiffs' arrests are characterized as criminal arrests, custodial removals, mental health arrests, or mental health seizures. *See e.g.*, *Disability Advocates, Inc. v. McMahon*, 124 Fed. Appx. 674, 677 (2d Cir. 2005) (NYMHL § 9.41 grants NYPD legal authority to arrest); *Guan v. City of New York*, 37 F.4th 797, 807 (2d Cir. 2022) (explaining contours of probable cause for a "mental health arrest"); *see also Felix v. City of New York*, 344 F. Supp. 3d 644, 664 (S.D.N.Y. 2018) (police officers acting in custodial capacity are subject to the ADA).

## III.    The TAC Does Not Include an "Implied *Monell*" Claim

Contrary to Defendants' argument, MOL at 5, Plaintiffs do not bring a *Monell* claim against the City of New York for damages related to federal constitutional violations. Defendants' argument on this point seeks to distract from the TAC's central focus of the emergency response program as a whole being discriminatory.[16]

## IV.    The City Officials are Not Entitled to Dismissal or Immunity

### A.    Plaintiffs Plausibly Allege the Personal Involvement of Individual City Officials, and Their Claims are Not Redundant

Because the TAC does not include a *Monell* claim, see Point III, *supra*, their claims against the defendant City officials under Section 1983 are brought against the officials in their individual capacities. These claims should proceed because these defendants were aware of, and failed to

---

[16] Plaintiffs' claims for damages against the City officials (outlined below), pertain to the violation of rights that occur at the time police respond to mental health emergencies. Similarly, Plaintiffs' factual allegations regarding the City's policies and practices, which may have led to Defendants' confusion, relate to, and provide context for, Plaintiffs' disability claims, as well as their state constitutional claims under *respondeat superior*, and claims for injunctive relief under the federal constitution. The City is a proper defendant on these claims.

remedy, the civil rights violations that occur when police are dispatched to mental health emergencies.[17] *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (personal involvement of a supervisory official can be established by showing failure to remedy, creating or allowing a policy or custom under which the violation occurred to continue, gross negligence, and/or deliberate indifference); *see also, e.g.*, *Wright v. McMann*, 460 F.2d 126, 135 (2d Cir. 1972) (warden responsible for condition of disciplinary units at prison because he "must have known" of conditions and was "charged with having such knowledge" based on his role and responsibilities).

Plaintiffs allege facts sufficient to show that Defendant Bill de Blasio was both aware of the violations occurring under his supervision and that he failed to remedy them. In 2014, de Blasio's Task Force on Behavioral Health and Criminal Justice issued an "Action Plan" to address how criminal justice resources can be reserved for "appropriate cases . . . to interrupt those *needlessly cycling through the system*." TAC ¶ 117 (emphasis added), demonstrating his awareness of the fact that police responding to mental health emergencies results in people needlessly being taken into custody, which Plaintiffs allege was the result of Patrol Guide 221-13 and the City's policy and practice of taking all "EDPs" into custody. Plaintiffs' experiences confirm that police officers understand the City's policies to require them to remove all persons tagged as "EDPs," whether or not probable cause exists. *See, e.g.*, *id.* ¶¶ 136-37, 155, 169, 202, 219 (police officers informed several individual Plaintiffs that they are required to take people reported as suicidal to the hospital); ¶ 263 (police officers informed Plaintiff Ayu he needed to go with them to the hospital because he had been deemed an "EDP"); ¶ 61 (City report acknowledging that police routinely route people experiencing mental health calls to the hospital). Yet, de Blasio's Task

---

[17] The standard to find supervisory liability, while at some points overlapping with the standard for municipal liability, is both different and less onerous. *See, e.g.*, *Canzoneri v. Inc. Vill. of Rockville Ctr.*, 986 F. Supp. 2d 194, 198 (E.D.N.Y. 2013) (finding supervisory liability while rejecting municipal liability).

Force brought about little, if any, change. *Id.* ¶¶ 117-18.

Additionally, according to the City's own data, police interactions involving "EDPs" are the second most common type of situation in which police officers use force, *id.* ¶ 140, which Plaintiffs allege is a consequence of police officers' law enforcement focused training and lens, *id.* ¶¶ 85-87, 89-91; *see also* DOJ Phoenix Report at 35-36 (police officer training contributes to their use of force). The large number of complaints filed with the Civilian Complaint Review Board about involuntary removals and lawsuits brought in the last decade by people designated "EDPs" raising civil rights abuses against the City, *id.* TAC ¶¶ 138-39; *see also id.* ¶ 61, also put de Blasio, as well as Defendant Eric Adams, on notice of constitutional violations resulting from NYPD's response to mental health emergencies. These allegations are enough to withstand a motion to dismiss on a claim of supervisory liability. *See, e.g., Pusepa v. Annucci*, No. 17-CV-1765 (RA), 2019 WL 690678, at *5 (S.D.N.Y. Feb. 19, 2019) (supervisory liability sufficiently alleged based on officials' authority to create or allow the continuation of policies that violated civil rights).

The City Officials also have been on notice since at least 2018 of how deficiencies in police training can result in the violation of the rights of people with mental disabilities. *See, e.g.*, TAC ¶¶ 81-87, 92, 105, 111-120; *Felix*, 344 F. Supp 3d at 665 (plaintiffs "adequately alleged that the City of New York was deliberately indifferent to a risk of discrimination against persons with mental disabilities in policing, in violation of the ADA").[18]

Plaintiffs also allege additional facts sufficient to show that Mayor Adams was aware of the civil rights violations that occur when police respond to mental health emergencies, but failed to remedy them. In 2022, the Office of the Public Advocate released a report calling on the City

---

[18] In fact, the frequency of the NYPD's Crisis Intervention Team (CIT) training has dropped dramatically since 2018, from 127,680 hours in 2018, 0 hours in 2021, to 40,960 hours in 2023. 2024 Preliminary Mayor's Management Report, at 49, https://www.nyc.gov/assets/operations/downloads/pdf/pmmr2024/nypd.pdf.

to use "mental health professionals as the default response for mental health crises rather than law enforcement" in order to "mitigate further harms" and "avoidable deaths." TAC ¶ 122.[19] That same month, Mayor Adams publicly referred to the "shadow boxer on the street corner in Midtown, mumbling to himself as he jabs at an invisible adversary" and the person "reeking of urine" as the type of people who should be involuntarily hospitalized under his new Involuntary Removal Policy, *id.* TAC ¶ 144, which Plaintiffs allege functionally encouraged officers to make more mental health arrests, *id.* ¶¶ 142-147, exacerbating the violations of the rights of people with mental disabilities occurring during police dispatches to mental health emergencies

NYPD Commissioners have final authority to promulgate and implement administrative and managerial policies and procedures with respect to the 911 dispatch system and NYPD officers' performance of their duties. TAC ¶¶ 32-34. Defendant Commissioners Edward Caban, Keechant Sewell, and Dermot Shea thus knew or should have known of a) the operation of the 911 system, b) police officers' understanding that Patrol Guide 221-13 requires involuntary removal of all "EDPs," and c) the consequences of police officer training (or lack thereof) for handling mental health emergencies. *Wright,* 460 F.2d at 134-35. Thus, these Defendants must have known about the violations of rights stemming from the police response to mental health emergencies yet failed to promulgate or implement appropriate policies or otherwise remedy the police violations.

## B.    Defendant City Officials are Not Entitled to Absolute Qualified Immunity

The City Officials are not entitled to legislative immunity because they were not engaged in "purely legislative activity." *See, e.g., Bogan v. Scott-Harris,* 523 U.S. 44, 53 (1998). Courts distinguish between legislative activities, for which absolute immunity may be granted, and administrative or executive actions, which are not granted absolute immunity. *Harhay v. Town of*

---

[19] Office of the Public Advocate, Improving New York City's Responses to Individuals in Mental Health Crisis: 2022 Update, https://advocate.nyc.gov/reports/improving-new-york-citys-responses-mental-health-crisis-2022.

*Ellington Bd. of Educ.*, 323 F.3d 206, 210-11 (2d Cir. 2003).

While Mayor Adams' policy promulgation may be entitled to absolute immunity, Plaintiffs challenge his conduct after his announcement of the policy, TAC ¶ 144, including functionally encouraging police to arrest people with mental disabilities based on false stereotypes of their being prone to violence, *id.* ¶¶ 144, 146, 147, 288-89, 330-31. Similarly, Plaintiffs challenge Mayor de Blasio's failure to remedy the constitutional violations occurring under his supervision. *See* TAC ¶¶ 117-20, 124-25. This conduct does not bear the "hallmarks of traditional legislation," *Cincotta v. Hempstead Union Free Sch. Dist.*, 313 F.Supp.3d 386, 401 (E.D.N.Y 2018), nor count as policymaking, *see, e.g.*, *Lorusso v. Borer*, 359 F. Supp. 2d 121, 124 (D. Conn. 2005) (mayor was entitled to legislative immunity for conduct related to his proposal of a budget, but not for conduct occurring *after* the passage of the budget). Rather, the failure to remedy the constitutional violations demonstrates deliberate indifference to the rights of people with mental disabilities, and additionally demonstrates these Defendants' negligent execution of existing policies and initiatives, which is more than enough to satisfy the pleading standard.

Lastly, for reasons similar to this Court's prior ruling that Plaintiffs met their burden to overcome the police officer Defendants' qualified immunity defense, *see* Order at 24; *see also id.* at 33 (mental health arrests), this argument should again be rejected. The TAC alleges that the City officials were aware of, and failed to remedy, these violations of rights. ¶¶ 116, 525. Thus, there is no basis to grant the City officials qualified immunity or otherwise dismiss them.

## V.    Defendants' Motion to Strike Plaintiffs' Class Allegations Is Untimely and Meritless

Defendants' untimely motion to strike Plaintiffs' class allegations must be denied, as it attempts an end run around this Court's prior Order and otherwise lacks merit. Moreover, "[m]otions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so." *In re Tronox, Inc. Sec. Litig.*, No. 09 CIV. 6220 (SAS), 2010 WL 2835545,

at *4 (S.D.N.Y. June 28, 2010). Defendants have not demonstrated any reason, let alone a strong one, to strike Plaintiffs' class action allegations at this early stage of the litigation.

The Court has already rejected Defendants' pleadings-stage attacks on Plaintiffs' class allegations and has told Defendants that it is "defer[ring] the consideration of the issue until the class certification stage." Order at 41. Defendants should not be permitted to use Rule 12(f) to window dress what is actually an untimely motion for reconsideration of the Court's Order that should have been filed long ago. *See* S.D.N.Y. Local Civ. R. 6. The Court can and should deny Defendants' motion to strike on this basis alone.

Plaintiffs' motion to strike also lacks merit for several reasons. *First*, motions to strike class action allegations are "even more disfavored" than other Rule 12(f) motions because they ask a court to "preemptively terminate" a class "before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Ironforge.com v. Paychex, Inc.*, 747 F.Supp.2d 384, 404 (W.D.N.Y. 2010). Determination of whether Rule 23(b)'s requirements have been met likewise must await record development and argument at the class certification stage. *See Winfield v. Citibank, N.A.*, 842 F. Supp. 2d 560, 574 (S.D.N.Y. 2012) (denying motion to strike). Put succinctly, it is "simply too soon to tell" whether a class will be certified. *Chenensky v. N.Y. Life Ins. Co.*, No. 07 CIV. 11504 WHP, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011) (denying motion to strike).

*Second*, Rule 12(f) motions are meant for "redundant, immaterial, impertinent, or scandalous matter," not properly pleaded class allegations. Fed. R. Civ. P. 12(f). A movant must show that: "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012). Defendants do not, and cannot, make such a showing here.

*Third*, Defendants' regurgitation of their failed Rule 12(b)(6) arguments against class certification is not a substitute for the showing required by Rule 12(f), and those arguments remain as meritless today as they were when Defendants first made them. Plaintiffs' disability law and constitutional claims are appropriate for class certification. *See* TAC ¶¶ 411-426. Factual variations in the circumstances of the violations of rights, including false arrests and other claims, do not defeat Plaintiffs' commonality allegations at the pleading stage, especially where, as here, plaintiffs' injuries "derive from unitary course[s] of conduct" and defendants "acted or refused to act on grounds that apply generally to the class." *See, e.g.*, *Allen v. Koeningsmann*, No. 19-cv-8173, 2023 U.S. Dist. LEXIS 57051, *15 (S.D.N.Y. 2023) (Preska, J.) (certifying class); *Floyd v. City of N.Y.*, 283 F.R.D. 153 (S.D.N.Y. 2012) (same); *Casale v. Kelly*, 257 F.R.D. 396, 411 (S.D.N.Y. 2009) (same). The same is true with respect to typicality. *See Vogel v. City of N.Y.*, No. 14 CIV. 9171 (RMB), 2017 WL 4712791, at *4 (S.D.N.Y. Sept. 19, 2017). That other courts have denied class certification of cases bringing claims under Title III of the ADA is apropos of nothing. Courts regularly certify cases bringing Title II claims, *see, e.g.*, *Henrietta D.*, 331 F.3d at 265; *BCID*, 290 F.R.D. at 412; *Civic Ass'n of Deaf*, 915 F. Supp. at 625-26. Plaintiffs will demonstrate the suitability of their proposed classes for certification at the appropriate juncture.

## CONCLUSION

For the reasons articulated above, this Court should deny Defendants' Partial Motion to Dismiss and Motion to Strike in its entirety.

Dated:    New York, New York

24

September 30, 2024


BELDOCK LEVINE & HOFFMAN LLP
99 Park Avenue, PH/26th Floor
New York, New York 10016
(212) 490-0400


By: _____
    Jonathan C. Moore
    Luna Droubi
    Jody Yetzer


MARASHI LEGAL
930 Grand Concourse #1E
Bronx, NY 10451
(917) 703-1742


By: /s/ P. Jenny Marashi _____
    P. Jenny Marashi


NEW YORK LAWYERS FOR THE
PUBLIC INTEREST, INC.
151 West 30th Street, 11th Floor
New York, New York 10001-4017
(212) 244-4664


By: _____
    Marinda van Dalen (*pro hac vice*)
    Ruth Lowenkron


A&O SHEARMAN LLP
599 Lexington Avenue
New York, NY 10022-6069
(212) 848-4000


By: /s/ Justin Ormand _____
    Justin Ormand
    Corrine McCrum