UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STEVEN GREENE; GIOVANNA SANCHEZ-
ESQUIVEL; SARAH ARVIO; LISA
COLLINS; ORITSEWEYIMI OMOANUKHE
AYU; and NEIL AMITABH,
individually and on behalf of
all others similarly situated,
and COMMUNITY ACCESS, INC.;
NATIONAL ALLIANCE ON MENTAL
ILLNESS OF NEW YORK CITY, INC.;
CORRECT CRISIS INTERVENTION
TODAY – NYC; and VOICES OF
COMMUNITY ACTIVISTS AND LEADERS
NEW YORK,

    Plaintiffs,


 - against –



CITY OF NEW YORK; ERIC ADAMS;
BILL DE BLASIO; EDWARD A. CABAN;
KEECHANT L. SEWELL; DERMOT F.
SHEA; NYPD POLICE OFFICER MARTIN
HABER; NYPD POLICE SERGEANT
CARRKU GBAIN, NYPD POLICE
OFFICER VIKRAM PRASAD; NYPD
POLICE OFFICER ANDRE DAWKINS;
NYPD POLICE OFFICER TYRONE
FISHER; NYPD POLICE OFFICER
DEVIENDRA RAMAYYA; NYPD POLICE
OFFICER JULIAN TORRES; NYPD
OFFICER APRIL SANCHEZ; NYPD
POLICE OFFICER GABRIELE MORRONE;
NYPD OFFICER JOHN FERRARA; NYPD
POLICE OFFICER MARYCATHERINE
NASHLENAS; and NYPD OFFICERS
JOHN and JANE DOES # 1-40,

    Defendants.

No. 21 Civ. 05762 (LAP)

OPINION & ORDER

1

LORETTA A. PRESKA, Senior United States District Judge:

Plaintiffs[1] bring this putative class action against defendants New York City ("the City") and numerous City employees[2] (collectively, "Defendants") pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101 et seq., Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, Section 1983 of the Civil Rights Act of 1871 ("Section 1983"), 42 U.S.C. § 1983, the Fourth and Fourteenth Amendments to the United States Constitution, the New York State Constitution, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq. (See Third Am. Compl. ("TAC") ¶ 14, dated June 10, 2024 [dkt. no. 212].)

---

[1] Plaintiffs comprise of two different groups: (1) Individual Plaintiffs-Steven Greene, Giovanna Sanchez-Esquivel, Sarah Arvio, Lisa Collins, Oritseweyimi Omoanukhe Ayu, and Neil Amitabh (collectively, "Individual Plaintiffs")—are individuals who have been involuntarily hospitalized by the New York City Police Department ("NYPD"); and (2) Organizational Plaintiffs—Community Access, Inc., National Alliance on Mental Illness of New York City, Inc. ("NAMI-NYC"), Correct Crisis Intervention Today-NYC ("CCIT-NYC"), and Voices of Community Activists and Leaders New York ("VOCAL-NY") (collectively, "Organizational Plaintiffs")—are non-profit organizations focused on mental health advocacy within New York City.

[2] Individual Defendants are Mayor Eric Adams, former Mayor Bill de Blasio, NYPD Police Commissioner Edward A. Caban, former NYPD Commissioners Keechant L. Sewell and Dermot F. Shea, NYPD Police Officers Martin Haber, Carrku Gbain, Vikram Prasad, Andre Dawkins, Tyrone Fisher, Deviendra Ramayya, Julian Torres, April Sanchez, Gabriele Morrone, John Ferrara, MaryCatherine Nashlenas and John and Jane Does #1-40.

Plaintiffs allege that the City's emergency response program discriminates against people who experience mental health emergencies. (TAC ¶¶ 1-4.) Plaintiffs additionally allege that Defendants use "unlawful entries, detentions, and excessive force" when responding to mental health emergencies. (Id. ¶ 1.) Plaintiffs seek, inter alia, a permanent injunction (1) "prohibiting Defendants from continuing their discriminatory and unlawful policies, practices, and activities related to the City's emergency response program," and (2) "requiring the City to operate an emergency response program that provides a health response to mental health emergencies that affords Plaintiffs access to the City's emergency response program and is comparable to the health response the City provides to physical health emergencies," as well as damages. (Id. ¶ 15.)

Before the Court is Defendants' partial motion to dismiss Plaintiffs' Third Amended Complaint ("TAC") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and Defendants' motion to strike the class action certification pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.[3] Plaintiffs oppose

---

[3] (See Def. Mot. to Dismiss & Strike, dated Aug. 19, 2024 [dkt. no. 228]; Def. Mem. of Law in Supp. of Mot. to Dismiss and Strike ("Def. Mem."), dated Aug. 19, 2024 [dkt. no. 229]; Def. Reply, dated Nov. 18, 2024 [dkt. no. 245]; Def. Sur-Sur-Reply, dated Dec. 12, 2024 [dkt. no. 251].)

the motions.[4]    The United States Department of Justice ("DOJ")
filed a Statement of Interest.[5]   For the reasons set forth below,
Defendants' motion to dismiss is GRANTED in part and DENIED in
part.   Defendants' motion to strike is DENIED.

## I.    **Background**

The following facts are from Plaintiffs' TAC and are taken as
true for purposes of resolving the instant motions.   See Faber v.
Metro. Life Ins. Co., 648 F.3d 98, 104 (2d Cir. 2011).

### A. The City's Emergency Response Program

The City operates an emergency response program, also known
as the 911 program, that allows people to call 911 when faced with
any emergency.   (TAC ¶ 67.)   The essential purpose of the City's
emergency response program is to provide "timely, safe[,] and
effective emergency response services."   (Id. ¶ 444.)

Each 911 call is answered by one of the New York Police
Department's ("NYPD") police communication technicians/police call
takers and routed according to the type of emergency.   (Id. ¶ 71.)
Emergencies typically involve a crime, fire, physical health, or
mental health.   (Id.)   The most common mental health emergencies
arise from depression, anxiety, and PTSD.   (Id. ¶ 78.)   Typical

---

[4] (See Pl. Mem. in Opp'n to Mot. to Dismiss and Strike ("Pl. Opp'n
Mem."), dated Sept. 30, 2024 [dkt. no. 235]; Decl. of Justin
Ormand in Supp. of Pl. Opp'n ("Ormand Decl."), dated Sept. 30, 2024
[dkt. no. 236]; Pl. Sur-Reply, dated Dec. 5, 2024 [dkt. no. 250];
Pl. Letter, dated Jan. 8, 2025 [dkt. no. 252].)
[5] (DOJ Statement of Interest, dated Oct. 2, 2024 [dkt. no. 238].)

mental health emergencies involve no allegations of criminal conduct, violence, use or position of a weapon, or threat of harm to others.  (Id.)

The City's deployed response is detailed on its website as follows:[6]



Notably, the website does not detail how a call is tagged as a mental health call or emotionally disturbed person ("EDP") call or how those calls are routed and subsequently responded to.

---

[6] https://www.nyc.gov/site/911reporting/reports/reports.page ("Each 911 call is answered by a Police call-taker.  If the caller is reporting a crime, the Police call-taker will share the details of the call with the Police dispatcher, who mobilizes the unit.  The unit travels to the site specified on the call.  When the unit arrives, the process is complete.  If the caller is reporting a fire, the Police call-taker adds a Fire department call-taker to the call.  At the same time, a Fire department dispatcher mobilizes the unit who travels to the site.  When the unit arrives, the process is complete. If the caller is reporting a medical emergency, the Police call-taker adds an EMS call-taker to the call.  The EMS call-taker conducts medical questioning and then shares the details with an EMS dispatcher that mobilizes the unit that will travel to the site. When the unit arrives, the process is complete.").

Plaintiffs allege that the City's deployed response to physical health emergencies differs from the deployed response to mental health emergencies. (<u>Compare</u> ¶¶ 72-76 <u>with</u> ¶¶ 77-82.) For physical health emergencies, the police call-taker adds an emergency medical service ("EMS") call-taker to the call, who shares the details with an EMS dispatcher. (<u>Id.</u> ¶ 72.) The EMS dispatcher mobilizes the emergency medical technicians ("EMTs") and paramedics to travel to the site as the first or lead responders.[7] (<u>Id.</u> ¶¶ 72-74.) These individuals are qualified health professionals who are specifically trained to assess a health emergency and provide on-the-spot stabilization and treatment. (<u>Id.</u> ¶¶ 74, 76.) In contrast, for mental health emergencies, police call-takers categorize the call as an EPD, and police officers are dispatched as the first or lead responders.[8] (<u>Id.</u> ¶ 80.) Police officers are not qualified to make health determinations, de-escalate a mental health crisis, stabilize the person in crisis, or determine whether transport to a hospital for psychiatric evaluation is warranted.[9] (<u>Id.</u> ¶ 81.)

---

[7] "Although police officers may also respond, . . . their role is one of law enforcement." (TAC ¶ 73.)

[8] "Although EMS may also respond, their role is secondary to the police [officers']." (<u>Id.</u> ¶ 82.) Additionally, they "are not there to de-escalate or otherwise address mental health emergencies. In many cases, they further exacerbate the harms and injuries of individuals experiencing mental health emergencies." (<u>Id.</u>)

[9] The Court notes that Section 9.41 of the New York State Mental Hygiene Law <u>does</u> equip police officers with the ability (cont'd)

### B. On-Site Police Response to Mental Health Emergencies

The following law and policies apply once police officers are on-site at mental health emergencies.

Section 9.41 of the New York State Mental Hygiene Law ("MHL § 9.41") states that a police officer "may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others." N.Y. Mental Hyg. Law § 9.41(a). The police officer

> may direct the removal of such person or remove him or her to any hospital . . . or any comprehensive psychiatric emergency program . . . or pending his or her examination or admission to any such hospital or program, temporarily detain any such person in another safe and comfortable place . . . .

Id. Notably, MHL § 9.41 does not state that the police are required to respond to any or all mental health emergency calls. The law only governs the police's conduct once they are present.

There are two accompanying policies that provide the NYPD with guidance on MHL § 9.41: (1) the NYPD's Patrol Guide § 221-13 for "Mentally Ill or Emotionally Disturbed Persons" ("the Patrol Guide") and (2) the City's Involuntary Removal Policy, (collectively, the "Policies"). (TAC ¶¶ 7, 127-148.)

On September 10, 2020, the Patrol Guide was issued and became effective. (Dkt. no. 212-1 at 2.) The purpose of the Patrol Guide

---

(cont'd) to determine whether "transport to a hospital for psychiatric evaluation is warranted." (See infra Section I.B.)

is "to safeguard a mentally ill or emotionally disturbed person
who does not voluntarily seek medical assistance."  (<u>Id.</u>)  It
defines an EDP as "a person who appears to be mentally ill <u>or</u>
temporarily deranged <u>and</u> is conducting himself in a manner which
a police officer reasonably believes is likely to result in serious
injury to himself or others." (<u>Id.</u> (emphasis added).)  The Patrol
Guide outlines the procedures for "when a uniformed member of the
service reasonably believes that a person who is apparently
mentally ill or emotionally disturbed, must be taken into
protective custody because the person is conducting himself in a
manner likely to result in a serious injury to himself or others."
(<u>Id.</u> at 3-8.)

On November 28, 2022, the Involuntary Removal Policy took
effect "to clarify roles and responsibilities in involuntary
removals under MHY [Mental Hygiene Law] section 9.41 and 9.58."
(Dkt. no. 112-1 at 2.)  The policy correctly notes that Section
9.41 authorizes a police officer "to take into custody, for the
purpose of a psychiatric evaluation, an individual who appears to
be mentally ill and is conducting themselves in a manner likely to
result in serious harm to self or others."  (<u>Id.</u>)  The policy goes
further and states that "both sections 9.41 and 9.58 authorize the
removal of a person who appears to be mentally ill and displays an
inability to meet basic living needs, even when no recent dangerous
act has been observed."  (<u>Id.</u>)  It states, "the following

circumstances could be reasonable indicia of an inability to support basic needs due to mental illness that poses harm to the individual: serious untreated physical injury, unawareness or delusional misapprehension of surroundings, or unawareness or delusional misapprehension of physical condition or health." (Id.)  When announcing the Involuntary Removal Policy, Defendant Mayor Adams referred to "'the shadow boxer on the street corner in Midtown, mumbling to himself as he jabs at an invisible adversary,' as the type of individual who could be involuntarily hospitalized under the policy."  (TAC ¶ 144.)

### C. History of Actions Taken to Address Mental Health Issues in the City

In 2014, Defendant former Mayor de Blasio's "Task Force on Behavioral Health and Criminal Justice" issued an action plan to address the intersection of the criminal justice and health systems to "interrupt those needlessly cycling through the system."  (Id. ¶ 117.)  The action plan noted that, "while the overall jail population had decreased by 15% over the previous five years, the percentage of people in jail with 'mental health issues' rose from 29% to 38%, or from around 3,500 to over 4,000 people."  (Id.)

On June 22, 2018, Defendant former Mayor de Blasio created a second task force, the "NYC Crisis Prevention and Response Task Force," to address specific mental health issues connected to 911

calls and their aftermath.  (Id. ¶ 119.)  This task force "had little[,] if any[,] effect."  (Id. ¶ 121.)

Then, in 2021, Defendant former Mayor de Blasio launched the Behavioral Health Emergency Response Program ("B-Heard"), which was created to replace police officers with mental health professionals and EMTs to certain 911 mental health calls in Northern Manhattan.  (Id. ¶ 123.)  It is grounded in the City's "commitment to treat mental health crises as public health problems - not public safety issues."[10]  The City's website regarding B-Heard explains that "[i]n emergency situations involving a weapon or imminent risk of harm to self or others, a traditional emergency response is dispatched, which includes NYPD officers and an ambulance."[11]

B-Heard represents a "limited" exception to the police response for mental health emergencies as it is in "limited police precincts" and operates "for limited hours of the day."  (Id. ¶ 81 n. 27.)  "[L]ess than 5% of the overall number of mental health calls citywide in 2023 actually received a B-Heard response."  (Id. ¶ 101 (In 2023, B-Heard only responded to approximately 7,000 calls, whereas there was a total of 300,000 mental health calls citywide.).)  Moreover, "plans for expansion of B-Heard reportedly

---

[10] https://mentalhealth.cityofnewyork.us/b-heard.
[11] Id. at FAQ 1.

have been halted, with significant cuts to its budget having been proposed." (Id. ¶ 102.)

In 2019 and 2022, the New York City Office of the Public Advocate recommended increasing community services for people with mental health issues. (Id. ¶ 63.) The 2022 update, which reported on police responses to mental health emergencies, stated that "to mitigate further harm and deaths, the City should strive for mental health professionals as the default response for mental health crises rather than law enforcement." (Id. ¶ 122.)

Additionally, the New York City Civilian Complaint Review Board ("CCRB") reported having received 2,687 allegations in a recent six-year period that the police had taken people involuntarily to the hospital. (Id. ¶ 138.) At least fifty lawsuits have been filed in New York alleging civil rights abuses during interactions between the police and EDPs. (Id. ¶ 139.) Police interactions involving EDPs are the second most common situations where police officers use force. (Id. ¶ 140.)

In 2023, the DOJ, released a document entitled "Guidance for Emergency Responses to People with Behavioral Health or Other Disabilities" ("DOJ Guidance"), which explains that the ADA applies to public emergency response and law enforcement systems and guarantees equal opportunity for individuals with disabilities. (Id. ¶ 95.) The DOJ found that the ADA "'requires that people with behavioral health disabilities receive a health

11

response in circumstances where others would receive a health response.'" (<u>Id.</u>)    The DOJ Guidance further explains that emergency dispatchers are recommended to send a crisis team, rather than police officers, "when a call involves a person with a mental disability and there is no need for a police response." (<u>Id.</u>)

Plaintiffs further rely on two reports issued by the DOJ in 2023 regarding the DOJ's investigations into the cities of Minneapolis and Louisville. (<u>Id.</u> ¶ 96.)    There, the DOJ concluded that the cities "had engaged in a practice of disability-based discrimination by relying on police officers as the primary first responders to mental health emergencies." (<u>Id.</u>)    Additionally, Plaintiffs informed the Court by letter of the DOJ's findings regarding the State of Oklahoma, Oklahoma City, and Oklahoma City Police Department's discrimination against people with mental disabilities, as well as its agreement with the City of Minneapolis and the Minneapolis Police Department to reform its unconstitutional and unlawful practices relating to people with mental disabilities. (Pl. Letter.)

### D. Individual Plaintiffs

Individual Plaintiffs in this action are individuals with actual or perceived mental disabilities.    The parties agree that Plaintiffs Greene, Sanchez-Esquivel, and Ayu have actual mental disabilities. (Pl Opp'n at 8.)    The parties disagree about whether Plaintiffs Amitabh, Arivo, and Collins have any mental

12

disabilities.   (See infra Sections III.A.i.1 & III.A.ii.)   The
Court assumes familiarity with the specific facts of each
Plaintiff's claims.   (See Mem. & Order ("Order") at 7-13, dated
Mar. 26, 2024 [dkt. no. 193]; see also TAC ¶¶ 149-331.)

Plaintiffs allege that the Individual Plaintiffs have been
"unlawfully seized and arrested without the requisite probable
cause."  (TAC ¶ 483.)  Plaintiffs claim that at the time of each
seizure the individuals "were committing no crimes" and presented
no risk to themselves or anyone else, yet each was "forcibly
arrested, all were injured physically and/or emotionally, most
were handcuffed, and all were involuntarily transported to a
hospital for a psychiatric assessment."  (Id. ¶ 10.)

### E. Procedural Background

On March 26, 2024, this Court issued an Opinion and Order
regarding Defendants' motion to dismiss the Second Amended
Complaint ("SAC").  (Order.)

The Court granted Defendants' motion to dismiss in part,
thereby dismissing, without prejudice, the following claims: (1)
false arrest claims regarding Plaintiff Ayu's April and May 2022
arrests under Section 1983 and corresponding state law claims; (2)
warrantless entry claims of Plaintiffs Collins, Ayu, and Amitabh
under Section 1983 and corresponding state law claims; (3) failure
to provide a reasonable accommodation claims under the ADA and
Rehabilitation Act of Plaintiffs Arvio, Collins, and Amitabh; (4)

all other claims under the ADA and Rehabilitation Act; (5) all claims under the NYCHRL; and (6) all claims under Section 1983 for municipal liability pursuant to Monell v. Dep't of Social Serv. of the City of New York, 436 U.S. 658 (1978).  The Court denied Defendants' motion to dismiss in part, thereby the following claims survived: (1) false arrest claims regarding Plaintiffs Arvio, Greene, Collins, Sanchez-Esquivel, Amitabh, and Ayu's March 2022 arrests; (2) warrantless entry claims of Plaintiffs Sanchez-Esquivel, Greene, and Arvio; (3) excessive force claims; (4) failure to provide a reasonable accommodation claims of Plaintiffs Greene, Sanchez-Esquivel, and Ayu under the ADA and Rehabilitation Act.  The Court held that Plaintiffs met their burden to overcome Defendants' qualified immunity defense.  (Order at 24.)  The Court also held that Plaintiffs sufficiently allege violations of the New York State Constitution under a theory of respondeat superior. (Id. at 25.)  Additionally, the Court held that Organizational Plaintiff Community Access has standing to bring this action.  (Id. at 25-27.)  The Court deferred consideration of the class certification.  (Id. at 40-41.)

On June 10, 2024, Plaintiffs filed a TAC repleading many of the dismissed claims.  (TAC.)  Subsequently, on August 19, 2024, Defendants filed a partial motion to dismiss certain claims in the TAC pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion to strike the class action certification pursuant to Federal

Rule of Civil Procedure 12(f).  (Def. Mot. to Dismiss & Strike.)
Specifically, Defendants move to dismiss "the following claims in
the TAC: (1) the [Section 1983] <u>Monell</u> claim;[12] (2) disabilit[y]
[discrimination] claims under state and federal law; (3)
[Plaintiff] Ayu's claim for false arrest arising from his alleged
April and May 2022 arrest under federal and state law; (4)
[Plaintiffs] Collins, Ayu, and Amitabh's warrantless entry claims
under federal and state law;"[13] and (5) Section 1983 claims against
a few Individual Defendants because Defendants "lack . . . personal
involvement," the claims are "duplicative," and the claims are
"barred by absolute and qualified immunity."  (Def. Mem. at 2,
13.)  On September 30, 2024, Plaintiffs filed a Memorandum in
Opposition to Defendants' motions.  (Pl. Opp'n Mem.)  Shortly
thereafter, on October 2, 2024, the DOJ filed a Statement of
Interest pursuant to 28 U.S.C. § 517, "to explain the legal
framework of the ADA as applied to emergency response services."
(DOJ Statement of Interest at 3.)  In response, on November 18,

---

[12] Defendants contend that Plaintiffs embed an "implied <u>Monell</u>
claim" within all of their claims.  (Def. Mem. at 5.)  However,
the TAC does not include a <u>Monell</u> claim against the City.  (Pl.
Opp'n Mem. at 18.)  Plaintiffs' claims under Section 1983 are
brought against the Government officials in their individual
capacities.  (<u>Id.</u>)  Therefore, the Court does not further address
Defendants' arguments regarding the <u>Monell</u> claim.
[13] Plaintiffs do not reassert these claims of false arrest and
warrantless entry.  (<u>See</u> Pl. Opp'n Mem. at 2, n. 1.)  Therefore,
the Court does not address Defendants' arguments regarding these
claims.

2024, Defendants submitted a Reply that addressed Plaintiffs' opposition and the DOJ's filing. (Def. Reply.) On December 5, 2024, Plaintiffs filed a Sur-Reply. (Pl. Sur-Reply.) On December 12, 2024, Defendants filed a Sur-Sur-Reply. (Def. Sur-Sur-Reply.) Lastly, on January 8, 2025, Plaintiffs filed an additional letter. (Pl. Letter.)

## II.  **Legal Standards**

### A. Motion to Dismiss

To defeat a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must allege sufficient facts to state a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

While the Court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. (internal quotations and citations omitted). Thus, a pleading that offers only "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). At this stage, the task "is merely to assess the legal feasibility of the complaint, not to

16

assay the weight of the evidence which might be offered in support thereof." Lopez v. Jet Blue Airways, 662 F.3d 593, 596 (2d Cir. 2011) (internal quotations and citations omitted).

On a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010); Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002) (The Court may rely on material from sources heavily relied on by Plaintiffs.).

### B. Discrimination Under the ADA and Rehabilitation Act

"[A]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for state and local government services are generally the same as those required under section 504 of federally assisted programs and activities." Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003) (internal citation omitted). Because none of the subtle distinctions between the statutes are pertinent here, the Court considers the ADA and Rehabilitation Act claims in tandem. Id.; see also Davis v. Shah, 821 F.3d 231, 259 (2d Cir. 2016).

Plaintiffs must allege that (1) they are "qualified individuals" with a disability; (2) Defendants are subject to the statutes; (3) Plaintiffs were denied "meaningful access" to participate in or benefit from Defendants' "services, programs, or

17

activities," or were otherwise discriminated against by Defendants because of Plaintiffs' disabilities. <u>Henrietta D.</u>, 331 F.3d at 272. To ensure Plaintiffs have meaningful access to the benefit of the program, "reasonable accommodations . . . may have to be made." <u>Alexander v. Choate</u>, 469 U.S. 287, 301 (1985). However, Defendants need not employ "any and all means" to make services accessible but rather only "reasonable modifications that would not fundamentally alter the nature of the service provided or impose an undue financial or administrative burden." <u>Disabled in Action v. Bd. of Elections in City of New York</u>, 752 F.3d 189, 197 (2d Cir. 2014) (internal quotations and citations omitted). "Fundamental alteration" is an affirmative defense, which Defendants bear the burden of establishing. <u>Brooklyn Ctr. for Indep. of Disabled v. Bloomberg</u>, 980 F. Supp. 2d 588, 657 (S.D.N.Y. 2013); <u>see also</u> <u>Am. Council of Blind of New York, Inc. v. City of New York</u>, 495 F. Supp. 3d 211, 232–33 (S.D.N.Y. 2020).

### C. Discrimination Under the NYCHRL

The NYCHRL states

> It shall be unlawful discriminatory practice for any person[14] who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent, or employee of any place or provider of public accommodation[15] because of

---

[14] Section 8-102 states that "person" includes "governmental bodies or agencies." N.Y.C. Admin. Code § 8-102.
[15] Section 8-102 states that "place or provider of public accommodation" includes "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places, (cont'd)

any person's actual or perceived . . . disability . . .
directly or indirectly, to refuse, withhold from or deny to
such person the full and equal enjoyment, on equal terms and
conditions, of any of the accommodations, advantages,
services, facilities or privileges of the place or provider
of public accommodation . . . .

N.Y.C. Admin. Code § 8-107(4).  Bravo v. De Blasio, 167 N.Y.S.3d

708, 718 (N.Y. Sup. Ct. 2022) ("[NYCHRL] applies to the City of

New York as much as to any other perpetrator or facilitator of .

. . discrimination.").

The NYCHRL also requires that any person prohibited from

discriminating under Section 8-107 on the basis of disability

"provide a reasonable accommodation[16] to enable a person with a

disability to . . . enjoy the right or rights in question provided

that the disability is known or should have been known by the

covered entity."[17]   N.Y.C. Admin. Code § 8-107(15).

Claims brought under the NYCHRL must be evaluated "separately

and independently from any federal and state law claims." Mihalik

v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d

_____

(cont'd) whether licensed or unlicensed, where goods, services,
facilities, accommodations, advantages or privileges of any
kinds are extended, offered, sold, or otherwise made available."
N.Y.C. Admin. Code § 8-102.
[16] Section 8-102 states that "reasonable accommodation" is an
"accommodation that can be made that does not cause undue
hardship in the conduct of the covered entity's business."
N.Y.C. Admin. Code § 8-102.  It also states that the covered
entity has the burden of proving undue hardship.  Id.
[17] Section 8-102 defines "covered entity" as "a person required
to comply with any provision of section 8-107."  N.Y.C. Admin.
Code § 8-102.

Cir. 2013).  The provisions must be construed "broadly and in favor of the plaintiff."  <u>Lowell v. Lyft, Inc.</u>, 352 F. Supp. 3d 248, 262 (S.D.N.Y. 2018).

## III. <u>Discussion</u>

### A. Discrimination Regarding the Citywide Emergency Response Program[18]

The Court liberally reads the TAC as Plaintiffs' alleging that the City's emergency response program is discriminatory because different entities (NYPD versus EMS) are dispatched as the lead responders in response to mental health emergencies and physical health emergencies and, even if the same entity (EMS) was dispatched in both scenarios, mental health emergencies require a reasonable accommodation meaningfully to access the benefit of the City's emergency response program, which in Plaintiffs' view should be an expansion of the B-Heard program to ensure health professionals arrive on-site of mental health emergencies.

#### i. Discrimination Under the ADA and Rehabilitation Act

Defendants move to dismiss Plaintiffs' discrimination claim under the ADA and Rehabilitation Act arguing that: (1) Plaintiffs are challenging MHL § 9.41, and the Court previously decided this

---

[18] Plaintiffs state that they adequately allege a deliberate indifference claim.  (Pl Opp'n Mem. at 17 n. 15.)  However, Plaintiffs also state that they are no longer bringing a <u>Monell</u> claim.  (Pl. Opp'n Mem. at 18.)

issue in favor of Defendants, (Def. Reply at 19);[19] (2) all Individual Plaintiffs are not "qualified individuals," (Def. Mem. at 19); (3) Plaintiffs fail to reasonably define the "service, program, or activity," and even so, Plaintiffs "meaningfully access" its benefits, (Def. Reply at 1-12); (3) Plaintiffs seek a "fundamental alteration" of the City's program as opposed to a reasonable accommodation, (Def. Reply at 12-14, 15-18).  The Court will address each in turn.

### 1. "Qualified Individual"

#### a. Plaintiffs Greene, Sanchez-Esquivel, and Ayu

The parties agree that Plaintiffs Greene, Sanchez-Esquivel, and Ayu are individuals with mental disabilities and therefore are "qualified individuals" under the statutes.  (Pl Opp'n at 8.)

#### b. Plaintiffs Amitabh, Arivo, and Collins

As to Plaintiffs Amitabh, Arivo, and Collins, Defendants argue that Plaintiffs "failed to allege that they had a disability."  (Def. Mem. at 19.)  Plaintiffs explain that they were "regarded as having such an impairment," as defined by 42 U.S.C. § 12102 (3), because they were designated as EDPs and perceived by the 911 call-takers, emergency dispatchers, and

---

[19] The Court does not address this argument further because Plaintiffs clearly state, in the TAC and their opposition papers, that they are not challenging MHL § 9.41, but rather they are challenging the City's emergency response program at the highest level.  (Pl. Opp'n Mem. at 10.)

responding police officers as having mental disabilities.  (Pl. Opp'n at 8.)

Under the ADA, the term "disability" includes individuals who are "being regarded as having such an impairment."[20]  42 U.S.C. § 12102(1)(C); 42 USC § 12102 (3).  Hilton v. Wright, 673 F.3d 120, 129 (2d Cir. 2012) (Plaintiff is "not required to present evidence of how or to what degree [Defendant] believed the impairment affected him," just that Defendant "regarded him as having a mental or physical impairment.").  Plaintiffs sufficiently allege that Plaintiffs had perceived mental disabilities given that the call-takers, dispatchers, and officers perceived Plaintiffs as having such.  Accordingly, Plaintiffs are all deemed to be "qualified individuals" under the statutes.

However, whether Plaintiffs are "qualified individuals" for the purpose of a reasonable accommodation claim requires further analysis.  This rationale was detailed in the Court's prior order and remains unchanged.  (Order at 33 n. 14.)

Discrimination under the ADA and Rehabilitation Act includes failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a

---

[20] Under Section 504 of the Rehabilitation Act, a "qualified individual with a disability" means "any person who has a disability as defined in section 12102 of Title 42," which is the ADA.  29 U.S.C. § 794(a); 29 U.S.C. § 705 (20)(B).  Thus, the standard is the same under both statutes.

disability . . . unless such covered entity can demonstrate that the accommodation would impose an undue hardship."[21]   42 U.S.C § 12112(b)(5)(A) (emphasis added).   The ADA states that a covered entity does not need to provide a reasonable accommodation to an individual who is a "qualified individual" solely because he/she was "being regarded as having such an impairment."   42 U.S.C. § 12201(h); 42 U.S.C. § 12102(1)(C).   Thus, Plaintiffs may only sustain their reasonable accommodation claim under the ADA and Rehabilitation Act where Defendants are on notice of an actual, not perceived, disability.   See Williams v. Geiger, 447 F. Supp. 3d 68, 79-80 (S.D.N.Y. 2020).   Therefore, Defendants' motion to dismiss as to Plaintiffs Amitabh, Arivo, and Collins is GRANTED. Accordingly, the following sub-sections of Section III.A.i address Plaintiffs Greene, Sanchez-Esquivel, and Ayu only.

### 2. "Meaningful Access" to the Benefits of the "Service, Program, or Activity"

Defendants argue that Plaintiffs fail to define reasonably the "service, program, or activity" that is the locus of the

---

[21] The Rehabilitation Act states, "The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under [T]itle I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. §§ 12201-12204 and 12210), as such sections relate to employment."   29 U.S.C. § 794(d).   Thus, the standard is the same under both statutes.

alleged discrimination. (Def. Reply at 1–12.) Defendants assert that the "city emergency program" is defined at an "amorphous level of generality," that has "no mooring in concrete services, statutes, or regulations." (Id. at 2.) Plaintiffs argue that the program at issue is the "emergency response program" and it falls within the meaning of "service, program, or activity." (Pl. Sur-Reply at 1–2.) For the purpose of this analysis, the Court assumes, without deciding, that the alleged emergency response program qualifies as a "service, program, or activity" under the statutes.

The relevant question is whether Plaintiffs were denied meaningful access to the benefits of the emergency response program. Am. Council of Blind of New York, Inc., 495 F. Supp. 3d at 232. Meaningful access does not mean equal access or equal results. Id.

Defendants argue that there is a difference between failing to provide Plaintiffs with any medical response and Plaintiffs' not receiving the response they want, in the exact way they want it. (Def. Mem. at 9.) Defendants note that challenging the adequacy or the substance of services that are being provided to mental health emergencies is not a valid claim. (Def. Reply at 3–4.) Defendants argue that Plaintiffs, in effect, demand that the City provide a different version of B-Heard – expanded citywide,

full-time and with improved services - to respond to all mental health emergencies.  (Def. Reply at 15-18.)

Plaintiffs allege that they were denied an equal opportunity to benefit from the emergency response program because their mental health emergencies receive a different, less effective response. (Pl. Opp'n Mem. at 12-17.)  They allege that they require a reasonable accommodation - expansion of B-Heard - to "meaningfully access" the benefits of the emergency response program.  (Id.)

The emergency response program was created to provide "timely, safe[,] and effective emergency response services."  (TAC ¶ 444.)  More specifically, Plaintiffs state that the programs' "benefits are timely and effective health responses to health emergencies, based on the Program's functions of providing assessment of health needs, on-the-spot stabilizing care, and determining need for further treatment."  (Pl. Sur-Reply at 3.) That is exactly what the program does for <u>all</u> participants - if there is a safety emergency, the police are dispatched, and if there is a health emergency, EMTs are dispatched.[22]  Plaintiffs allege that officers being dispatched as the first or lead responder to mental health emergencies is discriminatory.  The characterization of who is the "first or lead responder," however, is a red herring.  In fact, all Individual Plaintiffs had EMTs on-

---

[22] https://www.nyc.gov/site/911reporting/reports/reports.page.

site. <u>Contrast</u> <u>Disability Rts. Oregon v. Washington Cnty.</u> No. 24
Civ. 00235 (SB), 2024 WL 4046017, at *3-4 (D. Or. Aug. 30, 2024)
(Plaintiffs who experience mental health emergencies are not given
access to EMS unless police officers request the assistance.).
The website detailing the B-Heard program provides additional
evidence that the traditional emergency response is having both
officers and EMTs dispatched to mental health emergencies.[23]

Plaintiffs further allege that even if EMTs are present on-
site at mental health emergencies, EMTs do not handle mental health
emergencies the same way they do physical health emergencies.
Plaintiffs allege that when EMTs are dispatched to physical health
emergency they provide assessment and on-the-spot stabilizing care
and determine the need for further treatment; on the other hand,
at mental health emergencies, EMTs often exacerbate the harms.
(TAC ¶¶ 74, 76, 82.) Plaintiffs' allegations attack the adequacy
of the services provided as opposed to the denial of services
provided to non-disabled individuals. <u>See e.g.</u>, <u>Tardif v. City of
New York</u>, 991 F.3d 394, 404-05 (2d Cir. 2021) (holding that the
failure to provide custodial medical services does not, by itself,
"constitute[] a failure to make a reasonable accommodation 'by
reason of' an individual's disability under the ADA" because "the
fact that her disability was her motivation for seeking out such

---

[23] https://mentalhealth.cityofnewyork.us/b-heard.

services does not suddenly transform her allegations regarding the inadequate medical treatment into a 'failure to accommodate' claim."); Maccharulo v. New York State Dep't of Corr. Servs., No. 08 Civ. 301 (LTS), 2010 WL 2899751, at *4 (S.D.N.Y. July 21, 2010) ("A challenge to the adequacy of services provided, as opposed to a challenge alleging denial of services provided to non-disabled persons, is not a valid claim under the ADA or the Rehabilitation Act."); Atkins v. Cnty. of Orange, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (finding there to be no claim under the ADA or Rehabilitation Act where Plaintiff is "in essence challenging the adequacy of the mental health services provided . . . not illegal disability discrimination"); see also Harrell v. New York State Dep't of Corr. & Cmty. Supervision, No. 15 Civ. 7065 (RA), 2019 WL 3821229, at *16 (S.D.N.Y. Aug. 14, 2019) (no ADA or Rehabilitation Act violation where Plaintiff "merely asserts that his disability was not adequately treated, not that he was treated inadequately because of his disability"). This claim is not cognizable under the ADA or Rehabilitation Act. Doe v. Pfrommer, 148 F.3d 73, 84 (2d Cir. 1998) (There is no violation of the statutes where Plaintiff challenges "the substance of the services provided" rather than "illegal discrimination against the disabled."). As the Court noted in its prior Order,

> If Plaintiffs claimed that they had a medical emergency, like a heart attack, but were denied an ambulance because of their mental disability, their claim would come closer to stating

> actionable discrimination under the ADA.  But this is not
> their claim, which concerns only the adequacy of the services
> provided exclusively for the mentally disabled.

(Order at 32.)

Evaluating the emergency response program and considering the relevant case law, Plaintiffs do not sufficiently allege that the City's emergency response program is discriminatory.  Accordingly, Defendants' motion to dismiss this claim is GRANTED.[24]

### ii. Discrimination Under the NYCHRL

Defendants argue that Plaintiffs' discrimination claims under the NYCHRL should be dismissed consistent with the reasons articulated for the discrimination claims under the ADA and Rehabilitation Act, see supra Section III.A.i.  The elements of a claim under the NYCHRL mirror those of the ADA and Rehabilitation Act with one exception – the NYCHRL requires that reasonable accommodations be provided "to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity."  N.Y.C. Admin. Code § 8-107(15).  This means that all Individual Plaintiffs may bring reasonable accommodation claims under the NYCHRL.  However, the analysis is otherwise the same as detailed above, see supra Section III.A.i.  Accordingly, even under

---

[24] Given this holding, the Court need not address the parties' arguments regarding whether B-Heard is a reasonable accommodation or a fundamental alteration of the emergency response program.

the more liberal standard of the NYCHRL, Defendants motion to dismiss this claim as to all Individual Plaintiffs is GRANTED.

## B. Discrimination Regarding the On-Site Response to the Mental Health Emergency

Plaintiffs allege that they should have received reasonable accommodations during their "arrests" that occurred on-site of their mental health emergencies under the ADA, Rehabilitation Act and NYCHRL.  (TAC ¶¶ 448, 470, 530.)

### i. Discrimination Under the ADA and Rehabilitation Act

#### 1. Claims as to Plaintiffs Greene, Sanchez-Esquivel, and Ayu's Known Disabilities

The Court previously held that the reasonable accommodations claims as to Plaintiffs Greene, Sanchez-Esquivel, and Ayu were sufficiently alleged under the ADA and Rehabilitation Act.  (Order at 33.)  Defendants request "reconsideration" of this holding because "the Court did not consider whether plaintiffs' incidents were alleged to be 'arrests' in the relevant sense."  (Def. Mem. at 21.)  Defendants argue that "MHL [§] 9.41 applies <u>if and only if</u> the person is being taken into custody involuntarily for psychiatric evaluation" and to characterize that as an "arrest" such that it is a "program or service" that requires Plaintiffs to be reasonably accommodated "is inconsistent with the governing law on which the Court has relied."  (<u>Id.</u>)  Defendants add that

> 'the mental health arrest' referred to by the TAC, and the Court, is none other than the involuntary removal for psychiatric evaluation called for by MHL [§] 9.41, which, as

the Court held, is a program intended solely for persons having a mental disability, not the general public. Therefore, all of plaintiffs' disability claims should be dismissed.

(Id. at 22; see also Def. Reply at 14-15.)

Plaintiffs argue that Defendants' request for reconsideration on this issue is both untimely and meritless. (Pl. Opp'n Mem. at 17-18.) Plaintiffs state that police officers must make reasonable accommodations for people with disabilities during an arrest (even if the "arrest" is made pursuant to MHL § 9.41) and whether the "arrest" is an arrest by definition, or a mental health arrest, or a detainment, or a removal. (Id. at 18.)

Under S.D.N.Y Local Civil Rule 6.3, "a notice of motion for reconsideration must be served within 14 days after the entry of the court's order being challenged." S.D.N.Y. L.R. 6.3. The Court's Order on this issue was entered on March 26, 2024. (Order.) Defendants requested reconsideration in its partial motion to dismiss the TAC on August 19, 2024. (Def. Mem. at 21.) Thus, having filed nearly five months later, the Defendants' request for reconsideration is untimely. McGraw-Hill Glob. Educ. Holdings, LLC v. Mathrani, 293 F. Supp. 3d 394, 397 (S.D.N.Y. 2018) ("[T]he untimeliness of a motion for reconsideration is reason enough to deny the motion.").

Even if the Court needed to reach the merits of the motion to reconsider, Defendants' arguments fail. "The major grounds

justifying reconsideration are an intervening change of
controlling law, the availability of new evidence, or the need to
correct a clear error or prevent manifest injustice." <u>Virgin Atl.</u>
<u>Airways, Ltd. v. Nat'l Mediation Bd.</u>, 956 F.2d 1245, 1255 (2d Cir.
1992) (quotations and citations omitted).  Motions to reconsider
are generally denied "unless the moving party can point to
controlling decisions or data that the court overlooked -- matters,
in other words, that might reasonably be expected to alter the
conclusion reached by the court." <u>Nakshin v. Holder</u>, 360 F. App'x
192, 193 (2d Cir. 2010) (internal citation omitted); <u>see also</u>
<u>Shrader v. CSX Transp., Inc.</u>, 70 F.3d 255, 257 (2d Cir. 1995).
Defendants argue that the Court mischaracterized the detainment
that the officers conducted pursuant to MHL § 9.41 as an arrest
but do not point to any controlling law.  (Def. Mem. at 21-22.)
<u>Whiddon v. Buzzfeed, Inc.</u>, No. 22 Civ. 4696 (CM), 2022 WL 17632593,
at *3 (S.D.N.Y. Dec. 13, 2022) ("A motion to reconsider should not
be granted when the moving party seeks solely to relitigate an
issue already decided." (internal citation omitted)).
Additionally, Defendants must make reasonable accommodations for
people with disabilities during an "arrest" whether the "arrest"
is an arrest by definition, or a mental health arrest, or a
detainment, or a removal.  <u>Morales v. City of New York</u>, No. 13
Civ. 7667 (RJS), 2016 WL 4718189, at *7 (S.D.N.Y. Sept. 7, 2016);
<u>Anthony v. City of New York</u>, No. 00 Civ. 4688 (DLC), 2001 WL

741743, at *11 (S.D.N.Y. July 2, 2001) (concluding that "police officers' response to the 911 call and seizure of [plaintiff] for psychiatric evaluation are police activities or services and are, thus, covered by the ADA"), aff'd on other grounds, 339 F.3d 129 (2d Cir. 2003); see also Guan v. City of New York, 37 F.4th 797, 807 (2d Cir. 2022) (stating the standard to make a mental health arrest, which is the same standard as that under MHL § 4.91.).

Lastly, outside of the context of a formal motion for reconsideration, Defendants argue that they are allowed to make this argument now because the claims were replead in the TAC, however that is not the law.  Dikambi v. City Univ. of New York, No. 19 Civ. 9937 (RA), 2022 WL 2292873, at *3 (S.D.N.Y. June 24, 2022) (finding Defendant's motion to dismiss was "a disguised reconsideration motion, as he . . . attempts to relitigate the Court's prior findings [from the previously denied motion to dismiss]").

Accordingly, Defendants' motion to dismiss on this issue as to Plaintiffs Greene, Sanchez-Esquivel, and Ayu is DENIED.

### 2. Claims as to Plaintiffs Amitabh, Arivo, and Collins' Perceived Disabilities

Plaintiffs do not reallege this claim as to Plaintiffs Amitabh, Arivo, and Collins.  Thus, the Court need not address it.

### ii. Discrimination Under the NYCHRL

#### 1. Claims as to Plaintiffs Greene, Sanchez-Esquivel, and Ayu's Known Disabilities

As noted, the Court previously held that the ADA and Rehabilitation Act apply to "arrests." (Order at 33.) The NYCHRL similarly applies to "arrests." See, e.g., D.H. v. City of New York, 309 F. Supp. 3d 52, 80-81 (S.D.N.Y. 2018). Additionally, as detailed above, the Court finds that the ADA and Rehabilitation Act apply to "arrests," whether classified an arrest by definition, or a mental health arrest, or a detainment, or a removal, see supra Section III.B.i. The analysis under the more liberal standard of the NYCHRL is no different. Williams v. City of New York, 121 F. Supp. 3d 354, 364 n. 10 (S.D.N.Y. 2015) (In the context of whether the ADA, NYSHRL, and NYCHRL apply to police interactions at the scene of an arrest, the Court states, "[i]f Plaintiff can satisfy her burden under the ADA, she will also satisfy her burden under Section 504, the NYSHRL, and NYCHRL."). Notably, even though MHL § 9.41 permits the "arrest" it does not mean that it precludes reasonable accommodations from being made during such "arrest."

Accordingly, Defendants' motion to dismiss this claim under the NYCHRL is DENIED.

#### 2. Claims as to Plaintiffs Amitabh, Arivo, and Collins' Perceived Disabilities

Plaintiffs do not reallege this claim as to these Plaintiffs. Thus, the Court need not consider it.

## C. Section 1983 Claims Against the Executive Defendants

Plaintiffs allege that Defendants Mayor Adams, former Mayor de Blasio, NYPD Commissioner Caban, former NYPD Commissioner Sewell, and former NYPD Commissioner Shea (collectively, "Executive Defendants") were personally involved in the law and policies that "instructed" police officers to unlawfully enter Plaintiffs' homes and seize Plaintiffs without probable cause and use excessive force in the process, all of which constitute constitutional violations.[25]  (Pl. Opp'n Mem. at 18-22.)  This claim is essentially a restatement of Plaintiffs' <u>Monell</u> liability claim, but instead of against the City it is being brought against the officials in their individual capacities.  (<u>Id.</u> at 18.)

Plaintiffs argue that Executive Defendants were "aware of, and failed to remedy, the civil violations that occur when police are dispatched to mental health emergencies."  (<u>Id.</u> at 18-19.) Defendants move to dismiss these Section 1983 claims against Executive Defendants because Executive Defendants lack "personal involvement," the claims are "duplicative," and the claims are

---

[25] The Court has previously held that "Plaintiffs have sufficiently pled that Defendants, [the individual officers], violated these rights by unlawfully entering Plaintiffs' homes and seizing Plaintiffs without probable cause and by using excessive force in the process."  (Order at 24.)

"barred by absolute legislative immunity and qualified immunity."[26]
(Def. Mem. at 13-18.)

        For the reasons set out below, Defendants' motion to dismiss
the Section 1983 claims against Executive Defendants is GRANTED
due to a lack of personal involvement.  As such, the Court need
not address the parties' arguments regarding absolute legislative
immunity or qualified immunity.

### i. Lack of Personal Involvement

        To state a claim under Section 1983 against Executive
Defendants, Plaintiffs must allege specific facts to demonstrate
that each Executive Defendant was personally involved in the
alleged constitutional violations.  Wright v. Smith, 21 F.3d 496,
501 (2d Cir. 1994).  Prior to Tangreti v. Bachmann, 983 F.3d 609
(2d Cir. 2020), the Court of Appeals held that the following
factors could establish Defendants' personal involvement:

> (1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after being
> informed of the violation through a report or appeal, failed
> to remedy the wrong, (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or

---

[26] Defendants argue that the claims against the Executive
Defendants should be dismissed as duplicative or redundant because
a "suit against the mayor and police chief in their official
capacities is essentially a suit against the City . . . , because
in a suit against a public entity, naming officials of the public
entity in their official capacities adds nothing to the suit."
(Def. Mem. at 15 (internal citation omitted).)    However,
Defendants' argument is meritless because the TAC does not include
a Monell claim against the City but rather sues Executive
Defendants in their individual capacities.  (Pl. Opp'n Mem. at
18.)

> allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995); see also Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986).  But, in Tangreti, the Court of Appeals rejected "a special test for supervisory liability."  983 F.3d at 620.  And since Tangreti, whatever the alleged constitutional violation may be, "[t]he violation must be established against the supervisory official directly."  Id. at 618; see also Smart v. Annucci, No. 19 Civ. 7908 (CS), 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021).

> Although the Second Circuit generally rejected Colon, Tangreti does not suggest that Colon's third factor—whereby a defendant can be said to be personally involved in a constitutional violation if he 'created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom,'—could never form the basis of an official's liability.

Stone #1 v. Annucci, No. 20 Civ. 1326 (RA), 2021 WL 4463033, at *8 (S.D.N.Y. Sept. 28, 2021).  "[M]ere notice of an unconstitutional practice may be inadequate.  After all, the mens rea required of a supervisor to be held liable can be no less than the mens rea required of anyone else."  Id. at *9 (internal quotations and citations omitted).  "The distinction between actual subjective knowledge and mere notice, however, may not be especially significant at the pleadings stage."  Id. at *10.

Plaintiffs allege, in a conclusory manner, that Executives Defendants were aware of the City's history of mental health policies and deficiencies in the police response to mental health emergencies since 2014 through statistical reports, complaints, and lawsuits against the City, and therefore had the requisite knowledge. See infra Section I.C. Additionally, regarding the Commissioners, Plaintiffs allege that they "knew or should have known of a) the operation of the 911 system, b) police officers' understanding that the Patrol Guide requires involuntary removal of all 'EDPs,' and c) the consequences of police officer training (or lack thereof) for handling mental health emergencies." (Pl. Opp'n Mem. at 21.)

In addition, Plaintiffs allege specific facts as to each Executive Defendant's relevant individual actions. Regarding Defendant Former Mayor de Blasio, Plaintiffs allege that he created two task forces and participated in the launch of B-Heard. (TAC ¶¶ 117, 119, 123.) Regarding Defendant Mayor Adams, Plaintiffs allege that he made a statement after the announcement of the Involuntary Removal Policy, see supra Section I.C, which "functionally encourage[ed] police to arrest people with mental disabilities based on false stereotypes of their being prone to

37

violence."[27]  (Pl. Opp'n Mem. at 21.)   However, his statement did

not address how people should be treated when arrested, which is

what the underlying constitutional violation alleged here relates

to.  And, regarding the NYPD Commissioners, Plaintiffs allege that

they had/have "final authority to promulgate and implement

administrative and managerial policies and procedures, including

policies and procedures with respect to 911 and NYPD officers'

performance of their duties."  (TAC ¶¶ 32-34; Pl. Opp'n Mem. at

21.)

    None of these actions, taken together with the purported

knowledge that Executive Defendants had, is sufficient to

establish that Executive Defendants were personally involved in

the alleged constitutional violations.  In re New York City

Policing During Summer 2020 Demonstrations, 548 F. Supp. 3d 383,

410-11 (S.D.N.Y. 2021) (holding that the Commissioner did not have

personal involvement in the alleged constitutional violations

where he made several statements to the press indicating that he

had seen protest footage, was aware of the confrontations and

praised the NYPD's handling of the protests, and he received

regular reports); Contrast Stone #1, 2021 WL 4463033, at *10

(holding that Commissioners of the Department of Corrections were

---

[27] Plaintiffs do not dispute that Defendant Mayor Adams has
absolute legislative immunity for the promulgation of the
Involuntary Removal Policy.  (Pl. Opp'n Mem. at 22.)

personally involved where they had knowledge of statistical reports, were aware of steps taken by other states and local institutions, were named defendants in other suits, and were aware of numerous prosecutions and convictions.).    Instead, the allegations are an unsuccessful attempt to hold Executive Defendants liable merely because they held an influential and supervisory position.  See Dove v. Fordham Univ., 56 F. Supp. 2d 330, 336-37 (S.D.N.Y. 1999), aff'd sub nom. Dove v. O'Hare, 210 F.3d 354 (2d Cir. 2000); Gill v. Mooney, 824 F.2d 192, 196 (2d Cir. 1987) (dismissing a Section 1983 claim against the superintendent of a correctional facility that is responsible for the operations, management, and conduct of all staff because absent some personal involvement in the allegedly unlawful conduct of his subordinates, cannot be held liable under Section 1983).

Accordingly, Defendants' motion to dismiss claims against Executive Defendants for lack of personal involvement is GRANTED.

## IV.  **Class Certification**

Plaintiffs request class certification pursuant to Federal Rules of Civil Procedure 23(b)(2) and (3).   (TAC ¶ 426.) Defendants move to strike Plaintiffs' demand for class certification pursuant to Federal Rule of Civil Procedure 12(f) arguing that Plaintiffs' claims cannot meet the requirements of Federal Rule of Civil Procedure 23(a).  (Def Mem. at 22-25; Def. Reply at 19-20.)

The Court has already rejected Defendants' pleadings-stage attacks on Plaintiffs' class allegations.  (Order at 40-41.) Defendants cannot use Federal Rule of Civil Procedure 12(f) to window dress what is an untimely motion for reconsideration. However, even looking to the merits of the claim, Defendants fail to show that the allegations should be stricken.

Federal Rule of Civil Procedure 12(f) provides that the "court may strike . . . any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Motions to strike class action allegations are typically "viewed with disfavor and infrequently granted."  Haley v. Tchrs. Ins. & Annuity Assoc. of Am., 377 F. Supp. 3d 250, 272 (S.D.N.Y. 2019) (internal quotations and citation omitted).  This is because such motions require the Court to "preemptively terminate the class aspects of litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification."  Blagman v. Apple Inc., No. 12 Civ. 5453 (ALC) (JCF), 2013 WL 2181709, at *2 (S.D.N.Y May 20, 2013).  There are exceptions to the rule – (1) if the motion to strike addresses issues that are "separate and apart from the issues that will be decided on a class certification motion," then the motion is not procedurally premature, Chen-Oster v. Goldman, Sachs & Co., 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012), and/or (2) "where it is clear

that the putative class action claim will not proceed," Bank v. CreditGuard of Am., No. 18 Civ. 1311 (PKC) (RLM), 2019 WL 1316966, at *4 (E.D.N.Y. Mar. 22, 2019).

The exceptions are not applicable here.  Defendants raise the same arguments that would ordinarily be raised at the class certification stage.  And, the TAC does not demonstrate that "the requirements for maintaining a class action cannot be met." Borgese v. Baby Brezza Enterprises LLC, No. 20 Civ. 1180 (VM), 2021 WL 634722, at *2 (S.D.N.Y. Feb. 18, 2021); see also Camacho v. City of New York, No. 19 Civ. 11096 (DLC), 2020 WL 4014902, at *3-4 (S.D.N.Y. July 16, 2020).  Thus, it is "simply too soon to tell" whether the class will be certified.  Chenensky v. NY Life Ins. Co., No. 07 Civ. 11504 (WHP), 2011 WL 1795305, at *4 (S.D.N.Y. Apr. 27, 2011).  Therefore, the Court defers the Rule 23 determination until the class certification stage.  Haley v. Tchrs. Ins. & Annuity Assoc. of Am., 377 F. Supp. 3d 250, 272-73 (S.D.N.Y. 2019); Rojas v. Triborough Bridge & Tunnel Auth., No. 18 Civ. 1433 (PKC), 2020 WL 1910471, at *3 (S.D.N.Y. Apr. 17, 2020) ("A proposed class definition is not properly adjudicated at the Rule 12(b)(6) stage, and should be raised in connection with any Rule 23 motion for class certification.").  Accordingly, Defendants' motion to strike is DENIED.

V.    <u>**Conclusion**</u>

For the foregoing reasons, Defendants' motion to dismiss the disability claims regarding the emergency response program pursuant to Title II of the ADA, Section 504 of the Rehabilitation Act, and the NYCHRL is GRANTED as to all Individual Plaintiffs. Defendants' motion to dismiss the disability claims regarding the on-site response pursuant to Title II of the ADA, Section 504 of the Rehabilitation Act, and the NYCHRL is DENIED. Additionally, Defendants' motion to dismiss claims under Section 1983 against Executive Defendants is GRANTED. Lastly, Defendants' motion to strike Plaintiffs' demand for class certification is DENIED.

The Court finds this matter suitable for determination on the papers and without oral argument pursuant to Federal Rule of Civil Procedure 78(b).

The Clerk of the Court is respectfully directed to close the open motion at dkt. no. 228.

The parties shall confer and inform the Court, by letter, how the parties wish to proceed, including on the outstanding discovery issues, by April 15, 2025.

**SO ORDERED.**

Dated:    March 28, 2025
          New York, New York

_____
LORETTA A. PRESKA
Senior United States District Judge